Daniel W. Levy
dlevy@mckoolsmith.com
Eliza Beeney
ebeeney@mckoolsmith.com
McKool Smith P.C.
One Manhattan West
395 Ninth Avenue, 50th Floor
New York, New York 10001-8603
Telephone: (212) 402-9400

*Attorneys for Plaintiff Marc Restellini*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARC RESTELLINI,<br><br>                              Plaintiff,<br><br>             v.<br><br>THE WILDENSTEIN PLATTNER INSTITUTE, INC.,<br><br>                              Defendant. | 20 Civ. _____ (_____)<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>

Plaintiff Marc Restellini, by and through his undersigned attorneys, for his Complaint against Defendant The Wildenstein Plattner Institute, Inc., hereby alleges, on knowledge as to himself and on information and belief with respect to facts that are peculiarly within the possession and control of the Defendant and where the belief is based on factual information that makes the inference of liability plausible, as follows:

### <u>NATURE OF THE ACTION</u>

1.      For more than thirty years, Plaintiff Marc Restellini has been studying and researching the life and work of the Italian artist Amedeo Modigliani. Initially, Restellini's research was a scholarly endeavor and, because of the quality of his scholarship and his

reputation, Restellini came to organize exhibitions of Modigliani's work, including at some of the most prominent museums in the world.  After his research commenced, Restellini began to create a work of scholarship identifying and describing all the known works by the hand of the Italian artist Amedeo Modigliani.  Such works are known as *catalogues raisonnés.*  As part of his authorship of the *catalogues raisonné*, Restellini: (a) created substantial original material; and (b) assembled substantial research material, both of which Restellini owns.  In addition, Restellini obtained copies of unique archival material that was, and remains, unavailable to anyone else and that Restellini uses by specific permission.

2.    In or about 1997, The Wildenstein Institute, a Paris-based non-profit organization, offered logistical assistance to Restellini in his creation of the *catalogue raisonné*, primarily in the form of access to its library of materials, storage facilities, secretarial support, and workspace, including for the examination paintings purportedly by the hand of Modigliani and submitted for study, examination, and scientific analysis by Restellini in relation to the Modigliani *Catalogue Raisonné*.

3.    Restellini's arrangement with The Wildenstein Institute was, among other things, that Restellini would remain the sole author of the *catalogue raisonné*.

4.    For about the next seventeen years, Restellini continued to author the *catalogue raisonné* under the auspices of The Wildenstein Institute, a non-profit organization that provided philanthropic aid to researchers, authors, and art historians.

5.    During that time, Restellini: (a) continued to create substantial original material; (b) updated original material that Restellini had created previously; (c) continued to assemble substantial research material; and (d) obtained copies of additional unique archival material that was otherwise unavailable to others.  All of this material is owned by Restellini or, in the case of archival material, used with specific permission by Restellini.

2

6.      During that time, Restellini also developed trade secrets that he uses in determining whether a particular work was by the hand of Modigliani, including: (a) a scientific protocol to test particular aspects of works to determine their authenticity; (b) a scientific reference database; and (c) reports reflecting scientific analyses of numerous Modigliani works that employed the scientific protocol and the reference database.  All of this information is owned by Restellini.

7.      The Wildenstein Institute has largely wound down its affairs and has purported to transfer by gift all the material owned by Restellini to Defendant The Wildenstein Plattner Institute.  The Wildenstein Institute neither sought, nor obtained, Restellini's permission to transfer the material owned by Restellini.  The Wildenstein Institute never acquired any rights in any material associated with Restellini's work.

8.      Defendant The Wildenstein Plattner Institute, Inc., currently possesses or exercises custody or control over Restellini's material without Restellini's permission and in violation of Restellini's rights and has refused to return, and to recognize Restellini's ownership interest in, the material.  Under the guise of its non-profit status, Defendant is trying to pass off Restellini's life work as its own without any compensation or attribution.  And Defendant has held Restellini's work, to which it has no valid claim, hostage.

9.      Beyond the unlawful possession, custody, or control, Defendant has made unauthorized copies of all of Restellini's material, used Restellini's material publically, and has refused to respect Restellini's rights to, among other things, possess and control dissemination of that material.  Still worse, Defendant has already disseminated copies of some of Restellini's material in violation of Restellini's rights.  Finally, Defendant has announced that it intends to disseminate publicly material that Restellini owns, created, and generated without Restellini's permission and in violation of Restellini's rights.

10.     By this action, Restellini seeks relief under federal law, New York law, and French law for claims arising out of Defendant's unauthorized use, possession, detention, reproduction, and dissemination of the material that Restellini owns, created, and/or generated and for Defendant's unfair competition.

## PARTIES

11.     Plaintiff Marc Restellini ("Restellini") is a citizen of France and a lawful resident of the United Arab Emirates.  Restellini has never been lawfully admitted for permanent residence in the United States.

12.     Defendant The Wildenstein Plattner Institute, Inc. ("WPI") is a not-for-profit corporation formed under the law of the State of Delaware.  WPI was formed on or about March 11, 2016.  WPI maintains its principal place of business at 30 East 20th Street, Suite 2FW, New York, New York 10003.  WPI obtained authority to do business in the State of New York on or about September 12, 2016.

## JURISDICTION AND VENUE

13.     The Court has personal jurisdiction over WPI because it transacts business within the State of New York, has committed a tortious act within the State of New York, and maintains its principal place of business in the State of New York.

14.     The Court has subject matter jurisdiction with respect to Counts I, IV, and VIII under 28 U.S.C. § 1331 because Counts I, IV, and VIII arise under 17 U.S.C. § 1 *et seq.*, 18 U.S.C. § 1836 *et seq.*, and 15 U.S.C. § 1125(a), respectively.

15.     The Court may exercise supplemental jurisdiction with respect to Counts II, III, V, VI, VII, and IX under 28 U.S.C. § 1367(a) because Counts II, III, V, VI, VII, and IX are so related to Counts I, IV, and VIII that they form part of the same case or controversy under Article III of the United States Constitution.

4

16.     The Court may also exercise subject matter jurisdiction with respect to Counts II, III, V, VI, VII, and IX under 28 U.S.C. § 1332 because the matter in controversy as to each of Counts II, III, V, VI, VII, and IX and as to Counts II, III, V, VI, VII, and IX in the aggregate, exceeds the sum or value of $75,000, exclusive of interests and costs, and is between WPI, a citizen of a State, and Restellini, a citizen or subject of a foreign state.

17.     Venue in this District is proper under 28 U.S.C. § 1391 because WPI resides in this District and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**Modigliani and Modigliani Scholarship**

18.     Amedeo Modigliani ("Modigliani") was an Italian painter and sculptor. Modigliani was active as a painter from approximately 1898 through 1919.  Modigliani died in January 1920.  Modigliani is widely believed to have created a few hundred paintings, a few dozen sculptures, and many drawings.

19.     The interest in Modigliani and his art has increased substantially in recent years. This interest has resulted in substantial increases in the prices at which Modigliani works are offered for sale and purchased at sale.  For example, in 2010, a Modigliani sculpture sold at auction for more than €43 million.  In 2014, another Modigliani sculpture sold at auction for more than $70 million and, in 2019, another Modigliani sculpture sold at auction for more than $34 million.  In 2015, a collector purchased at auction a Modigliani painting for more than $170 million.  In 2018, another Modigliani painting sold at auction for more than $157 million.

20.     At the same time that prices for works by Modigliani have increased substantially, there have come to be more and more fake Modigliani works exhibited and sold throughout the world.  For example, over just the past ten years, there have been numerous government seizures

of works falsely attributed to Modigliani.

### *Catalogues Raisonnés*

21.     A *catalogue raisonné* is a work of scholarship intended to list all the known works by the hand of a particular artist.  A *catalogue raisonné* typically describes each work and places it in the overall context of the artist's life and creative process.  *Catalogues raisonnés* frequently reproduce an image of the work, provide detailed notes about the work, and list references to the work in other publications and instances in which the work was sold or exhibited.  The creation of a *catalogue raisonné* is a painstaking process of research and verification that a known work is by the hand of a particular artist.

22.     Inclusion of a particular work in an existing *catalogue raisonné* is widely viewed by participants in the art market to be verification that a known work is authentic.  As a result, published *catalogues raisonnés* are frequently used by collectors, auction houses, museums, art dealers, and other art market participants to determine, for example, whether they will buy or sell a particular work and at what price.

23.     Written confirmation that a particular work will be included in a forthcoming *catalogue raisonné* or a forthcoming edition of a previously published *catalogue raisonné* is also widely viewed by participants in the art market to be verification that a known work is authentic. As a result, participants in the art market frequently seek the views of the person or entity creating a forthcoming *catalogue raisonné* or editing a previously published *catalogue raisonné* as to whether a particular work will be included in a forthcoming *catalogue raisonné* or a future and updated edition of a previously published *catalogue raisonné*.

24.     Beginning less than ten years after the death of Modigliani, scholars and others began to attempt to create *catalogues raisonnés* of the works of Modigliani.  These efforts have proven inadequate for a number of reasons, including because, on the one hand, they have not

included all of the known works entirely by the hand of Modigliani and because, on the other hand, they have included works that are not entirely by the hand of Modigliani.

25.     For example, the effort of Arthur Pfannstiel, whose original work was published in 1929, is widely believed to be substantially underinclusive and to exclude many works known to be by the hand of Modigliani.  The effort of Joseph Lanthemann, whose work was published in 1970, is widely believed to be substantially overinclusive and to include works known not to be by the hand of Modigliani.  Christian Parisot published a multi-volume work between 1998 and 2012, but was subsequently criminally charged in France and Spain for his role in false attributions of works to Modigliani that were included in his *catalogue raisonné*, seriously damaging its credibility.

26.     Ambrogio Ceroni, an Italian banker, published a Modigliani *catalogue raisonné* in 1958 with revised editions published in 1965 and 1970.  Ceroni's *catalogue raisonné* is, and is widely believed to be, underinclusive and to exclude many works known to be by the hand of Modigliani.  Ceroni's *catalogue raisonné* is also overinclusive and includes works that are not by the hand of Modigliani.  Despite these well-known inadequacies, Ceroni's *catalogue raisonné* has come to be the most widely relied upon *catalogue raisonné* of Modigliani's work.  The reason for the reliance on Ceroni's *catalogue raisonné* is because no more comprehensive, accurate, and reliable *catalogue raisonné* of Modigliani's work has been has been published since 1970.

27.     The reliance on Ceroni's flawed *catalogue raisonné* has caused substantial problems in the market for Modigliani works.  For example, in or about November 1997, a major New York auction house (the "Auction House") sold at auction a particular work that was presented by the Auction House to be entirely by the hand of Modigliani.  The work sold at auction for $2,642,500.  In accepting the work for sale, the Auction House relied substantially on

7

the fact that this work was included in the Ceroni *catalogue raisonné*. The Auction House represented the work sold at auction to be authentic despite, among other derogatory information about the work, indications in Modigliani literature and other *catalogues raisonnés*, which the Auction House had consulted, that the work had been modified after Modigliani completed the work in or about 1915 and provided it to one of his Paris dealers.

28. Following the 1997 auction, Restellini informed the Auction House, in substance and in part, that this particular work sold by the Auction House was not in the same form and appearance in which it was when Modigliani provided it to his dealer upon completion in or about 1915. Restellini also provided the Auction House with a photograph of the work obtained from the archives of one of Modigliani's Paris first dealers. The archival photograph clearly evidenced the differences between: (a) the painting as it was when Modigliani completed it in or about 1915 and provided it to his dealer; and (b) the painting sold by the Auction House in November 1997.

29. In or about November 2019, the Auction House again sold the same work and again presented it as entirely by the hand of Modigliani. In accepting the work for sale, the Auction House again relied substantially on the fact that this work was included and depicted in the Ceroni *catalogue raisonné*. The work sold at auction for $4,815,000.

30. The known inadequacies of Ceroni's *catalogue raisonné* underscore the importance of Restellini's work on a definitive, comprehensive, scientifically supported, and yet to be published *catalogue raisonné* to scholars of art history, collectors, auction houses, museums, art dealers, and other art market participants.

**<u>Marc Restellini</u>**

31. Restellini holds an undergraduate degree in art history and a post-graduate degree in art history from the University of Paris 1 Pantheon-Sorbonne, where he was also one of its

youngest lecturers of art history.

32.     Restellini is one of the world's foremost scholars of the art of Modigliani.

33.     Restellini has organized over 125 exhibitions of more than 600 artists all over the world, including major exhibitions of Modigliani's work in Japan, Switzerland, France, South Korea, Russia, and Italy.

34.     Restellini began curating and arranging exhibitions of Modigliani's work in or about 1989.  For example, in or about 1992, Restellini curated the first significant exhibition of Modigliani's work in Japan at the inaugural exhibition of the Tobu Art Museum in Tokyo.  In 1994, Restellini curated an exhibition of works by Modigliani and other artists at a major museum in Lausanne, Switzerland.

35.     In curating and arranging these and other exhibitions of Modigliani's work and in researching Modigliani's life and work, Restellini created significant original material regarding more than approximately 75 works of Modigliani (the "Preexisting Original Modigliani Material").  The Preexisting Original Modigliani Material consists of: (a) descriptions of the provenance of many Modigliani works, that is, a detailed description of the sequence of ownership of a particular work, including the names of the owners of the work and the corresponding dates of ownership; (b) lists of instances in which the works were exhibited; and (c) references to the work in literature.  Creation of the Preexisting Original Modigliani Material required finding, collecting, and evaluating pre-existing data and independently selecting, coordinating, and arranging that data.  The Preexisting Original Modigliani Material includes original expressions of Restellini's activities, observations, opinions, and conclusions with respect to particular works.

36.     Curating and arranging exhibitions require an immense amount of research.  In the course of curating and arranging exhibitions of Modigliani's work, Restellini spent several

9

years creating a complete bibliography of Modigliani's work and a list of instances in which Modigliani's work had been exhibited or sold at auction or otherwise (collectively, the "Bibliography"). In creating the Bibliography, Restellini exercised his independent judgment, creativity, and expertise in collecting, selecting, evaluating, coordinating, and arranging the material ultimately contained in the Bibliography.

37.    The Preexisting Original Modigliani Material and the Bibliography reflect the imprint of Restellini's personality, reveal a personal and intellectual contribution, and were products of Restellini's mind. The Preexisting Original Modigliani Material and the Bibliography consist of original works of authorship fixed in a tangible medium of expression from which they can be perceived and reproduced.

38.    Restellini also obtained copies of extraordinary and unique privately held archives that were previously unavailable to Modigliani scholars (the "Archival Material") and have not been made available to any scholars other than Restellini. The Archival Material consists of: (a) documents Restellini obtained from the family of Jonas Netter, one of the earliest collectors and patrons of Modigliani's work, with whom Restellini and his family have a longstanding relationship; (b) documents Restellini obtained from the owner of the archive of Paul Guillaume, one of the first dealers of Modigliani's work; (c) documents Restellini obtained from the family of Roger Dutilleul and Jean Masurel, two of the earliest collectors and patrons of Modigliani's work; (d) documents Restellini obtained from Galerie Schmit, one of the most important galleries in France and that exhibited Modigliani's work; (e) documents Restellini obtained from Luc Prunet, a member of the family of Jeanne Hébuterne, a painter, model, and the last lover of Modigliani, who was the subject of multiple works of Modigliani and the mother of his daughter; and (f) archives of the Alex Reid & Lefevre Gallery, one of the earliest galleries to exhibit Modigliani's work. Restellini was able to obtain the Archival Material solely for the purpose of

creating his *catalogue raisonné*.  In relation to organizing and researching the Archival Material, among other things, Restellini obtained unique information about the owners and locations of hundreds of works of Modigliani, including those in private collections, which he used in conjunction with the Archival Material as part of the research on his *catalogue raisonné*.

39.    In the course of arranging and curating exhibitions of works of Modigliani and researching the works of Modigliani over many years, Restellini obtained hundreds of high-quality photographs and transparencies of the works (the "Ektachromes").  Restellini owns the Ektachromes.

40.    As a scholar of Modigliani and organizer of Modigliani exhibitions, Restellini has a great interest in ensuring the integrity of the market for Modigliani's art and ensuring that fake Modigliani works are neither sold nor exhibited.  Restellini has assisted various authorities in seizing works falsely attributed to Modigliani.

## Restellini Begins Work on The Modigliani *Catalogue Raisonné*

41.    For well more than twenty-five years, Restellini has been creating a *catalogue raisonné* of the work of Modigliani (the "Modigliani *Catalogue Raisonné*").

42.    From approximately 1997 to approximately 2014, Restellini's work on the Modigliani *Catalogue Raisonné* was facilitated by The Wildenstein Institute, a Paris-based non-profit organization originally founded as the *Fondation Wildenstein* in 1970 by Daniel Wildenstein and controlled by him.  The Wildenstein Institute functioned as a research center for art history and housed a large repository of art-related material that began to be assembled in the late 19th century by Daniel Wildenstein's grandfather.  The Wildenstein Institute held books, *catalogues raisonnés*, catalogues of private collections, sale catalogues, periodicals, photographs, and other materials.  The Wildenstein Institute's philanthropic activities included the provision of aid to researchers, authors, and art historians.

43.     The Wildenstein Institute itself published various *catalogues raisonnés* authored by others.  The Wildenstein Institute typically published these *catalogues raisonnés* in partnership with other publishers of art-related books.  Among these *catalogues raisonnés* are a four-volume *catalogue raisonné* of the work of Claude Monet and a two-volume *catalogue raisonné* of the paintings of Paul Gauguin, both projects authored by Daniel Wildenstein himself.

44.     Restellini and Daniel Wildenstein were introduced in the 1990s.  By that point, Restellini had already been working on the Modigliani *Catalogue Raisonné* for some years.  After they were introduced, Daniel Wildenstein expressed to Restellini that it was important that Restellini complete a Modigliani *catalogue raisonné* that was superior to the one that had been prepared by Ambrogio Ceroni.  Daniel Wildenstein knew that Restellini's use of scientific techniques as part of the Modigliani *Catalogue Raisonné* would make it unique.

45.     Restellini and Daniel Wildenstein agreed that Restellini would remain the sole author of the Modigliani *Catalogue Raisonné*.  Restellini and Daniel Wildenstein also expected that The Wildenstein Institute would co-publish the Modigliani *Catalogue Raisonné* together with another publisher.

46.     The determination of whether a particular work will be included in a *catalogue raisonné* is frequently made by a committee of experts.  However, because Daniel Wildenstein so trusted Restellini and his expertise in Modigliani's work, Daniel Wildenstein agreed to facilitate Restellini's continued authorship on the Modigliani *Catalogue Raisonné* and that Restellini would be the sole individual responsible for determining whether a particular work would be included in the Modigliani *Catalogue Raisonné*.  Daniel Wildenstein considered Restellini to be the most eminent scholar of Modigliani.

47.     In the course of Restellini's continued work on the Modigliani *Catalogue Raisonné* and before Daniel Wildenstein's death in 2001, Restellini came to have a very close

12

personal relationship with Daniel Wildenstein.

48.    The Wildenstein Institute did not specially order or commission the Modigliani *Catalogue Raisonné* and did not compensate, agree to compensate, or offer to compensate Restellini for work done on, or in connection with, the Modigliani *Catalogue Raisonné*.

49.    Restellini was never an employee of The Wildenstein Institute.

50.    Restellini has never received any compensation for his work on the Modigliani *Catalogue Raisonné* from The Wildenstein Institute or otherwise.

51.    During his continued work on the Modigliani *Catalogue Raisonné*, Restellini incurred significant costs.  For example, Restellini incurred costs to travel to examine works purportedly by the hand of Modigliani and to assess whether he would include such works in the Modigliani *Catalogue Raisonné*.  These expenses were not reimbursed by The Wildenstein Institute or otherwise.  Rather, these expenses were borne entirely by Restellini.

52.    After he began his relationship with The Wildenstein Institute, Restellini brought the Preexisting Original Modigliani Material, the Bibliography in its then-current form, the Archival Material, the Ektachromes, and the Modigliani Research Material, as defined below, that had been obtained by then to continue his work on the Modigliani *Catalogue Raisonné*.

53.    Restellini and Daniel Wildenstein agreed that all of Restellini's work underlying the Modigliani *Catalogue Raisonné* would remain confidential.

54.    At all times relevant to this Complaint, The Wildenstein Institute had a policy and practice of strictly maintaining the secrecy and confidentiality of research and the work of researchers, authors, and art historians to whom The Wildenstein Institute provided assistance.

55.    In or about October 1997, The Wildenstein Institute announced, in French, the "*préparation du catalogue raisonné définitif de l'œuvre peint et dessiné de [Modigliani] par Marc Restellini*," that is, the preparation of a definitive *catalogue raisonné* of paintings and

13

drawings of Modigliani by Marc Restellini.  As part of the announcement of the *catalogue raisonné*, the announcement invited the submission by public and private collectors of photographs and documents relevant to Modigliani's life and work.  The public announcement was made in, among other places, the Drouot Gazette, a magazine well known in the art world that typically publishes information about public auctions of art.  The public announcement included a photograph of Modigliani derived from the Archival Material that Restellini permitted to be used.

56.    After the death of Daniel Wildenstein in 2001, his son, Guy Wildenstein, acting on behalf of The Wildenstein Institute, affirmed what his father had already agreed to, specifically, that all of Restellini's work underlying the Modigliani *Catalogue Raisonné* would remain confidential.

**Restellini's Pioneering Scientific Analysis of Art**

57.    Restellini is a pioneer in the use of scientific techniques to analyze works of art.  Among other things, Restellini was one of the first people to use magnetic resonance and infrared photography to analyze works of art to determine whether they should be included in a *catalogue raisonné*.

58.    In the course of Restellini's work on the Modigliani *Catalogue Raisonné*, Restellini developed a scientific protocol to assist in determining whether a particular work was, or was not, by the hand of Modigliani, including the specific elements of the Modigliani work to be scientifically tested (collectively, the "Scientific Protocol").  The Scientific Protocol involved, among other things, the selection of specific elements of each work for testing and the identification of particular paints used by Modigliani in the selected elements.

59.    In the course of Restellini's work on the Modigliani *Catalogue Raisonné*, Restellini developed an understanding, based on his knowledge and experience, of Modigliani

works known to be authentic.  Restellini requested that the owners of unquestionably authentic works submit them for scientific analysis.  Because of Restellini's reputation as a Modigliani scholar and his relationships with various participants in the art market, the owners of the various Modigliani works known to be authentic complied with Restellini's request and submitted their Modigliani works for scientific examination.

60.     Under the instruction and supervision of Restellini and based on the Scientific Protocol, scientific analysis was performed on certain specific elements of these authentic Modigliani works.  The precise elements of each work to be tested were determined solely by Restellini based on the Scientific Protocol.  Restellini used the combined results of these scientific analyses to generate an understanding of various characteristics of authentic Modigliani work (the "Reference Database").  The Reference Database reflects and reveals the Scientific Protocol.

61.     Because it had become widely known that Restellini was working on the Modigliani *Catalogue Raisonné*, collectors, auction houses, art dealers, and other art market participants submitted works that they believed were, or could be, by the hand of Modigliani for scientific and other analysis and study by Restellini.  These works were analyzed pursuant to the Scientific Protocol and using the Reference Database and resulted in approximately 120 written reports of the scientific analysis (the "Reports of Scientific Analysis").  The Reports of Scientific Analysis reflect and reveal the Scientific Protocol and the Reference Database.

62.     Restellini spent significant amounts of time and money developing, improving, and protecting the secrecy of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material.  Restellini is the person in whom rightful legal and equitable title to, and license in, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material is reposed.

4829-2677-7012

63.     The Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material are not generally known or easily accessible to persons familiar with the practice of authenticating or analyzing works of art or with Modigliani's work.

64.     The Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material derive independent commercial and economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material.  For example, the Scientific Protocol and the Reference Database provide a reliable method for determining whether a particular work is by the hand of Modigliani and, thereby, the reliability and value of the Modigliani *Catalogue Raisonné*.  As another example, access to the Archival Material renders the determinations in the Modigliani *Catalogue Raisonné* more reliable and commercially valuable.

65.     At all times relevant to this Complaint, Restellini took reasonable measures to keep the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material secret.  He did so for various reasons, including to frustrate those who would create fake Modigliani works and to otherwise prevent them from doing so.  Restellini also took reasonable measures to keep the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material secret because the commercial value of the Modigliani *Catalogue Raisonné* would be diminished if the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material became known to others.

**Restellini's Opinions about Particular Works Are Relied Upon in the Market**

66.     As part of his work on the Modigliani *Catalogue Raisonné*, Restellini issued, upon request, various notices that a work submitted for analysis by Restellini either would, or

16

would not, be included in the forthcoming Modigliani *Catalogue Raisonné*.  Notices that a work

would, or would not, be included in the forthcoming Modigliani *Catalogue Raisonné*

(collectively, "*avis d'inclusion*") have been routinely relied upon by participants in the art

market, including dealers, auction houses, and collectors.

67.     In the course of Restellini's work on the Modigliani *Catalogue Raisonné*, he

conducted research on Modigliani's life and work to, among other things, determine whether

works purportedly by the hand of Modigliani would be included in the Modigliani *Catalogue

Raisonné*.

68.     The Wildenstein Institute charged back to the owners of works purportedly by the

hand of Modigliani the fees paid to have their works studied by Restellini and tested pursuant to

the Scientific Protocol and for the creation of one of the Reports of Scientific Analysis, which

was used solely by Restellini to determine whether to include, or not include, a work in the

Modigliani *Catalogue Raisonné*.  The Reports of Scientific Analysis were not provided to those

who had their works submitted for scientific analysis.  Because works were submitted for

examination solely to determine whether they would be included by Restellini in the Modigliani

*Catalogue Raisonné*, owners of works typically agreed that the only information to be provided

to them by Restellini would be notice of whether the relevant work would be, or would not be,

included in the Modigliani *Catalogue Raisonné*.

**The Original Modigliani Material and the Modigliani Research Material**

69.     After Restellini began to work on the Modigliani *Catalogue Raisonné* under the

auspices of The Wildenstein Institute, Restellini created and otherwise generated significant

original material.

70.     Specifically, Restellini created in Paris various original works that reflect the

imprint of Restellini's personality, reveal a personal and intellectual contribution, and were

products of Restellini's mind.  These works (collectively, the "Original Modigliani Material")
consist of original works of authorship fixed in a tangible medium of expression from which they
can be perceived and reproduced.  The Original Modigliani Material is largely organized into
thousands of dossiers that each correspond to a particular work of art.

71.    The Original Modigliani Material consists of:

(a)    Original photographs taken by Restellini:  These photographs were taken
by Restellini and include infrared photographs of specific elements of works purportedly by the
hand of Modigliani taken by Restellini under specific conditions determined by Restellini.  The
original photographs taken by Restellini reflect, among other things, his personal choices, and his
personal choices alone, of subject, staging, composition, framing, shooting angles, lighting
sources, and contrasts.  The original photographs were not, and not intended to be, reproductions
of the entirety of the Modigliani works, either exact or otherwise.  There are more than 500
original photographs.

i.    For example, one photograph taken by Restellini depicts the left
eye of a woman painted in a particular Modigliani work, under certain lighting selected by
Restellini and at a certain angle selected by Restellini, revealing certain characteristics of the
work.

ii.    Another photograph taken by Restellini depicts the lips of a
woman drawn in a particular Modigliani work, under certain lighting selected by Restellini and
at a certain angle selected by Restellini, revealing certain characteristics of the work.

(b)    Correspondence written by or on behalf of Restellini:  These materials,
including the *avis d'inclusion*, contain original expressions of Restellini's activities,
observations, opinions, and conclusions during his research for the Modigliani *Catalogue
Raisonné*, were created by Restellini or typed at Restellini's specific direction, and include

18

correspondence from Restellini to certain owners of works purportedly by the hand of Modigliani.

   i. For example, by letter dated June 23, 1997, Restellini informed the owner of a work purportedly by the hand of Modigliani of Restellini's opinion about the whether the particular work could be by the hand of Modigliani and Restellini's intention regarding whether the work would be included in the Modigliani *Catalogue Raisonné*.

   ii. As another example, by letter dated March 31, 2005, Restellini informed the owner of a work purportedly by the hand of Modigliani of Restellini's opinion about whether the particular work could be by the hand of Modigliani and Restellini's intention regarding whether the work would be included in the Modigliani *Catalogue Raisonné*.

   (c) Notes and summaries created by Restellini:  These materials contain original expressions of Restellini's activities, observations, opinions, and conclusions during his research for the Modigliani *Catalogue Raisonné* and were created by Restellini and either written by Restellini or dictated by Restellini.  The notes and summaries were typically made and kept with respect to specific works that were under consideration for inclusion in the Modigliani *Catalogue Raisonné* and were organized into the dossiers associated with specific works.  There are thousands of documents in the form of notes and summaries.

   i. For example, one note and summary reflects Restellini's comments and observations about a particular Modigliani work, including about the work's exhibition, provenance, and bibliography.

   ii. As another example, one note and summary includes Restellini's comments and observations about a particular Modigliani work, including about the work's exhibition, bibliography, provenance, and location.

   72. After his relationship with The Wildenstein Institute began, Restellini continued

his creation and improvement of the Bibliography and, in doing so, Restellini exercised his judgment, creativity, and expertise in collecting, selecting, coordinating, and arranging the material added to the Bibliography.

73.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material are protected both under the Copyright Act and the Intellectual Property Code of France.

74.    Under the Copyright Act, among other rights, Restellini has the exclusive rights to reproduce the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, prepare derivative works based on the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, distribute copies of the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, and publicly display the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material.

75.    Under the Intellectual Property Code of France, among other exclusive rights that Restellini, as the author of the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, holds with respect to the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material are: (1) the right to divulge his work; (2) the right to determine the method of disclosure of his work; (3) the right to determine the conditions for reproduction of his work; (4) the right to respect to his name, his authorship, and his work; (5) the right of exploitation of his work; and (6) the right to derive monetary profit from his work.

76.    Having personally authored *catalogues raisonnés* and having supported the creation of others through The Wildenstein Institute, Daniel Wildenstein was well aware of the immense amount of research and scholarly work necessary to create the Modigliani *Catalogue*

*Raisonné* and, as a result, the immense amount of research material that would be generated by Restellini and the immense amount of research material that was, in fact, generated by Restellini. In addition, Daniel Wildenstein was well aware of the extensive original and research material that Restellini brought to the premises of The Wildenstein Institute to continue his creation of the Modigliani *Catalogue Raisonné*.  Daniel Wildenstein was also well aware that Restellini had taken numerous original photographs of Modigliani works, including primarily infrared photographs.

77.     Neither Daniel Wildenstein nor The Wildenstein Institute had the right to, or did in fact, in any way direct or supervise Restellini's creation of the Preexisting Original Modigliani Material, the Bibliography, or the Original Modigliani Material.  Neither Daniel Wildenstein nor The Wildenstein Institute directed or supervised Restellini's authorship and creation of the Modigliani *Catalogue Raisonné*.  The Wildenstein Institute and Daniel Wildenstein recognized Restellini's complete independence as the author of the Modigliani *Catalogue Raisonné.*

78.     The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not consist of any work of collaboration under the Intellectual Property Code of France, that is, a work in the creation of which more than one natural person has participated.

79.     The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not consist of a collective work under the Copyright Act, that is, a work in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective work.

80.     The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not consist of any collective work under the Intellectual Property Code of France, that is, a work created at the initiative of a natural or legal person who edits it, publishes

it, and discloses it under his direction and name and in which the personal contributions of the various authors who participated in its production are merged in the overall work for which they were conceived, without it being possible to attribute to each author a separate right in the work as created.

81.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not consist of a joint work under the Copyright Act, that is, a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

82.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not consist of a composite work under the Intellectual Property Code of France, that is, a new work in which a preexisting work is incorporated without the collaboration of the author of the latter work.

83.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not reflect the imprint of the personality of any person other than Restellini, reveal the personal and intellectual contribution of no one other than Restellini, and were a product of the mind of no one other than Restellini.

84.    In connection with curating and arranging various exhibitions of Modigliani works and in connection with authoring the Modigliani *Catalogue Raisonné*, Restellini compiled and generated extensive research material that he used in authoring the Modigliani *Catalogue Raisonné* (the "Modigliani Research Material").  The Modigliani Research Material was gathered before and during Restellini's relationship with The Wildenstein Institute.  Restellini gathered this material from many sources, including libraries, galleries, dealers, publications, sale catalogs, exhibition catalogs, and The Wildenstein Institute's archives, largely by using the Bibliography that Restellini had researched and created over years.  The Modigliani Research

Material includes correspondence that was written, dictated, sent to, and received by, and on behalf of, Restellini.

**Restellini Continues Working on the Modigliani**
***Catalogue Raisonné* Outside of the Wildenstein Institute**

85.    In or about the middle of 2014, The Wildenstein Institute ceased its provision of support for Restellini's authorship of the Modigliani *Catalogue Raisonné*.  At or about the same time, Guy Wildenstein, the son of Daniel Wildenstein, acting on behalf of The Wildenstein Institute, indicated to Restellini, in substance and in part, that The Wildenstein Institute no longer intended to publish the Modigliani *Catalogue Raisonné* and that Restellini should continue work creating the Modigliani *Catalogue Raisonné* on his own.

86.    As a result, Restellini continued creating the Modigliani *Catalogue Raisonné* outside of, and not in relationship with, The Wildenstein Institute.

87.    Restellini never transferred, or assigned, any rights to any of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material, either by written or oral contract or by operation of law, to any other person or entity.

88.    Restellini never consented, expressly or impliedly, to the transfer of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material, to any person or entity.

89.    Restellini is the exclusive owner of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.  The Wildenstein Institute never obtained rights to ownership or

23

use of any of this material.

**The Wildenstein Plattner Institute**

90.    WPI was formed in or about 2016.  WPI describes itself as:

a non-profit foundation dedicated to the study of art history and to fostering the accessibility, cataloguing, and digitization of archival materials that support critical research in the field.

91.    WPI has described itself as devoted to the research and production of an online database of *catalogues raisonnés*.  WPI has disclosed that it is developing a database of digitized archival material and online *catalogues raisonnés* of significant artists of the 19th and 20th centuries.

92.    WPI derives income from "research requests in which WPI can verify whether a work of art was previously recorded in its archives, which include dossiers on individual works of art related to past and ongoing *catalogue raisonné* projects."  WPI charges consumers a $500 fee for doing this research.

93.    WPI also derives income from requests for inclusion in *catalogues raisonnés* that it is preparing on its own.  WPI permits "a person in possession of a work of art they wish to include in the digital catalogue [to] submit an application to WPI based on which WPI will begin its research and create a dossier on the work.  Once the dossier is complete, a committee of scholars will examine the work in person and will send a decision letter along with any additional information that will be published on the work of art."  From on or about July 1, 2017, through on or about June 30, 2018, WPI received more than $820,000 of income by engaging in this activity.

94.    On July 20, 2017, WPI publicly announced that it had been "promised the gift of the art historical archives and scholarly data held by the Wildenstein Institute," including the "rights to the Wildenstein Institute's affiliated catalogue critiques, catalogue *raisonnés*, [and]

records from past publications and research projects." WPI further announced that "[i]ncluded among these archives are research dossiers on individual works of art, scholars' research notes from past publications, dealers' and galleries' stock books, artists' and collectors' estate inventories, artists' correspondence, and a vast collection of annotated sales catalogues." At the same time, WPI announced that, "[i]n an effort to facilitate access to this resource, [WPI would] create a comprehensive inventory of the archives available on its website" and that it would "digitize critical elements of the archives to preserve this unique material for future scholarly research."

95.     In or about 2019, WPI publicly asserted that "[WPI] administer[ed] the art historical archives and scholarly resources gifted by the Wildenstein Institute" and that "[t]his generous gift includes rights to the Wildenstein Institute's affiliated catalogues critiques, *catalogues raisonnés*, records from past publications and research projects on artists such as . . . Amedeo Modigliani." In truth and in fact, The Wildenstein Institute had no rights in any materials associated with the Modigliani *Catalogue Raisonné*, or the research and other work therefor, and could not have transferred them to WPI, by gift or otherwise.

96.     On or about March 5, 2020, WPI's Director of Technology publicly stated, in substance and in part, that WPI had completed digitization of all of the material it had received from The Wildenstein Institute.

97.     The archives that The Wildenstein Institute purported to transfer by gift to WPI include the entirety of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material. As a result of this transfer, WPI possesses, and otherwise exercises dominion, custody, and control over, the entirety of the Preexisting Original Modigliani Material, the Bibliography, the

Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.

98.     WPI controls from its headquarters in New York, including through a data server in New York, the digitization process and the resulting digitized version of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.  WPI maintains possession, custody, dominion, and/or control of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.

**Restellini Announces Completion and Expected**
**Publication of the Modigliani *Catalogue Raisonné***

99.     In or about April 2018 and after more than twenty-five years of work, Restellini announced that he had largely completed the Modigliani *Catalogue Raisonné* and that it would be published by virtue of an agreement in interstate and foreign commerce.

100.     The current expected date of publication of the first several volumes of the Modigliani *Catalogue Raisonné* is Winter 2020-2021.

101.     The Modigliani *Catalogue Raisonné* will be sold in interstate and foreign commerce.

102.     Substantially all of the authorship of the Modigliani *Catalogue Raisonné*, and creation, assembly, gathering, generation, compilation, and development of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material, before and during Restellini's relationship with The Wildenstein Institute, took place in France.

26

**WPI Announces That It Has Copied, and Intends**
**to Make Publicly Available, Restellini's Material**

103.    On or about November 22, 2019, the Executive Director of WPI announced in public at a conference of the International *Catalogue Raisonné* Association in London, in substance and in part, that WPI had digitized, that is, made a digital copy of, all of the material that it possessed concerning Modigliani, including the entirety of the material created, assembled, and owned by Restellini.  The Executive Director of WPI further announced that some of this material would be made publicly available from New York in or about January 2020.

104.    WPI did not select certain documents from the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material for copying and digitization.  Rather, WPI has copied and digitized the entirety of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.

105.    At the conference, an employee of Restellini's (the "Restellini Employee") requested, in substance and in part and on behalf of Restellini, that WPI permit Restellini access to the material created, assembled, and owned by Restellini.

106.    In response, the Executive Director of WPI refused these demands and stated, in substance and in part, that:

   (a)    WPI would not permit Restellini access to any material; and

   (b)    Restellini would not be able to view any material until it was published by WPI.

107.    Beginning on or about February 12, 2020, Restellini demanded, in substance and

in part, that WPI promptly make arrangements to return to Restellini all of the material created, assembled, and owned by Restellini.

108.     WPI did not make such arrangements and has otherwise refused to return any of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.

109.     Restellini also demanded that WPI make no further use or disclosure of various trade secrets associated with Restellini's work on the Modigliani *Catalogue Raisonné*.

110.     Restellini does not have possession of, or access to, the entirety of the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material as they are possessed by WPI, among other materials associated with his work on the Modigliani *Catalogue Raisonné*.

111.     WPI misappropriated the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material.  For example, when WPI acquired the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, WPI knew, or had reason to know, that it had acquired the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material as a result of a breach by The Wildenstein Institute of a duty to maintain secrecy.

112.     On or about March 5, 2020, the Executive Director of WPI publicly stated in New York, in substance and in part, that "scanning an entire archive and putting it online" was a "no-brainer" and suggested that everyone should "oppose overly restrictive applications of copyright and intellectual property."

113.     WPI has interfered with, and acted inconsistently with, Restellini's use, control, possession, and ownership of the Preexisting Original Modigliani Material, the Bibliography, the

Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material.

114.    WPI intends to make publicly available, including to consumers within the State of New York at least, a database of exhibitions, sales, and literature references to Modigliani works. The basis of WPI's effort is the work of Restellini, to wit, the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material. To do so, WPI digitized, and made a copy of this material.

115.    WPI intends to pawn off its data-mining of Restellini's material as its own and to do so without credit or compensation to, or the permission of, Restellini. WPI has, in bad faith, misappropriated the labors and expenditures of Restellini for its own advantage.

116.    WPI is a competitor of Restellini's including because WPI intends to publish some of the same or similar information that Restellini will publish in the Modigliani *Catalogue Raisonné* and obtained such information by exploiting, copying, and otherwise misappropriating the labors and expenditures of Restellini.

117.    At all times relevant to this Complaint, the value of each of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material has exceeded, and continues to exceed, $75,000.

118.    WPI's conduct has caused, and threatens to cause, Restellini damage. For example, WPI has disclosed some or all of the material owned by Restellini and possessed by WPI with respect to specific Modigliani works to at least one competitor of Restellini. The

material disclosed includes correspondence written by Restellini.

119.     If WPI further digitizes and makes publicly available online any part of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material, or works based on those materials, Restellini will be irreparably harmed because WPI will have, among other things, deprived Restellini of, among other things, the right to control the first publication of these materials and the right to control usage of his trade secrets, diminished the commercial value of the Modigliani *Catalogue Raisonné* and the revenue to be earned by Restellini from the Modigliani *Catalogue Raisonné*, which would be difficult to calculate, harmed Restellini's goodwill, reputation, and business and other relationships, caused consumer confusion to Restellini's detriment, and interfered with Restellini's ability to exploit publication of the Modigliani *Catalogue Raisonné*.

120.     Restellini never authorized, expressly or impliedly, the digitization, copying, or dissemination of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, or the Modigliani Research Material.

121.     The Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material are physically stored in approximately 89 boxes, several binders, and various other receptacles.

30

## COUNT I
**(Copyright Infringement under the
Copyright Act, 17 U.S.C. § 101 *et seq.*)**

122.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

123.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material each consist of original works of authorship fixed in a tangible medium of expression, from which they can be directly perceived and reproduced.

124.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material each consist of unpublished works.  The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material do not consist of any United States works, that is, works the authors of which are nationals, domiciliaries, or habitual residents of the United States.

125.    Restellini is the author and copyright owner of the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material.

126.    As the owner of the copyright of the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Restellini has the exclusive rights to reproduce the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, prepare derivative works based on the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, distribute copies of the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, and publicly display the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material.

127.    WPI has violated Restellini's rights with respect to the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material.

31

128.    By copying and digitizing the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has infringed, and will continue to infringe, Restellini's exclusive rights under the Copyright Act.

129.    By depriving Restellini of the return of, and access to, the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has violated, and will continue to violate, Restellini's rights under the Copyright Act.

130.    By threatening to make publicly available or otherwise disseminate the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has violated, and will continue to violate, Restellini's rights under the Copyright Act.

131.    By making publicly available and otherwise disseminating the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has violated, and will continue to violate, Restellini's rights under the Copyright Act.

132.    By copying and digitizing the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused damage, and will continue to cause damage, to Restellini.

133.    By depriving Restellini of the return of, and access to, the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused damage, and will continue to cause damage, to Restellini.

134.    By threatening to make publicly available or otherwise disseminating the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused, and threatens to cause, damage to Restellini.

135.    By making publicly available and otherwise disseminating the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant

32

has caused damage, and will continue to cause damage, to Restellini.

136.    WPI's actions, and threatened actions, have caused, and will continue to cause, irreparable harm to Restellini.

**COUNT II**
**(Copyright Infringement and Violation of Moral**
**Rights Under the Intellectual Property Code of France)**

137.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

138.    At all times relevant to this Complaint, there was in full force and effect the Intellectual Property Code of France, which provides in part:

> (a)    Article L111-1.  The author of a work of the mind shall enjoy in that work, by the mere fact of its creation, an exclusive incorporeal property right which shall be enforceable against all persons.
>
> This right shall include attributes of an intellectual and moral nature as well as attributes of an economic nature, as determined by Books I and III of this Code.
>
> The existence or conclusion of a contract for hire or of service by the author of a work of the mind shall in no way derogate from the enjoyment of the right afforded by the first paragraph above.
>
> (b)    Article 111-2.  A work shall be deemed to have been created, irrespective of any public disclosure, by the mere fact of realization of the author's concept, even if incomplete.
>
> (c)    Article 111-3.  The incorporeal property right set out in Article L111-1 shall be independent of any property right in the physical object.
>
> Acquisition of such object shall not vest in the acquirer of the object any of the rights afforded by this Code, except in those cases referred to in the provisions of the second and third paragraphs of Article L123-4 [relating to posthumous works].  These rights shall subsist in the person of the author or of his successors in title who, nevertheless, may not require the proprietor of the physical object to make such object available to them for the exercise of those rights.
>
> (d)    Article L112-1.  The provisions of this Code shall protect the rights of authors in all works of the mind, whatever their kind, form of expression, merit or purpose.

33

The following, in particular, shall be considered works of the mind within the meaning of this Code:

> 1°. books, pamphlets and other literary, artistic and scientific writings;
>
> 2°. lectures, addresses, sermons, pleadings and other works of such nature;
>
> . . .
>
> 7°. works of drawing, painting, architecture, sculpture, engraving and lithography;
>
> 8°. graphical and typographical works;
>
> 9°. photographic works and works produced by techniques analogous to photography;
>
> 10°. works of applied art;
>
> 11°. illustrations, geographical maps;
>
> 12°. plans, sketches and three-dimensional works relative to geography, topography, architecture and science;
>
> . . .

(e)    Article L113-1.  Authorship shall belong, unless proved otherwise, to the person or persons under whose name the work has been disclosed.

(f)    Article 113-2.  "Work of collaboration" shall mean a work in the creation of which more than one natural person has participated.

"Composite work" shall mean a new work in which a preexisting work is incorporated without the collaboration of the author of the latter work.

"Collective work" shall mean a work created at the initiative of a natural or legal person who edits it, publishes it and discloses it under his direction and name and in which the personal contributions of the various authors who participated in its production are merged in the overall work for which they were conceived, without it being possible to attribute to each author a separate right in the work as created.

(g)    Article L121-1. An author shall enjoy the right to respect for his name, his authorship and his work.  This right shall attach to his person. It shall be perpetual, inalienable and imprescriptible.

34

(h)     Article L121-2. The author alone shall have the right to divulge his work. He shall determine the method of disclosure and shall fix the conditions thereof . . .

(i)     Article L122-1.  The right of exploitation belonging to the author shall comprise the right of performance and the right of reproduction.

(j)     Article L122-2.  Performance shall consist in the communication of the work to the public by any process whatsoever, particularly:

1°. public recitation, lyrical performance, dramatic performance, public presentation, public production and transmission in a public place of a telediffused work;

2°.  telediffusion.

Telediffusion shall mean distribution by any telecommunication process of sounds, images, documents, data and messages of any kind.

(k)     Article 122-3.  Reproduction shall consist in the physical fixation of a work by any process permitting it to be communicated to the public in an indirect way.

It may be carried out, in particular, by printing, drawing, engraving, photography, casting and all processes of the graphical and plastic arts, mechanical, cinematographic or magnetic recording.

(l)     Article L122-4.  Any complete or partial performance or reproduction made without the consent of the author or of his successors in title or assigns shall be unlawful.

(m)    Article L123-1. The author shall enjoy, during his lifetime, the exclusive right to exploit his work in any form whatsoever and to derive monetary profit therefrom.

(n)     Article L131-2.  The performance, publishing and audiovisual production contracts defined in this Title shall be in writing.

(o)     Article L131-3.  Transfer of authors' rights shall be subject to each of the assigned rights being separately mentioned in the instrument of assignment and the field of exploitation of the assigned rights being defined as to its scope and purpose, as to place and as to duration.

(p)     Article 132-1.  A publishing contract is a contract by which the author of a work of the mind or his successors in title assign under specified conditions to a person referred to as the publisher the right to manufacture or have manufactured a number of copies of the work, it being for the latter to ensure publication and dissemination thereof.

(q)    Article 335-3.  Any reproduction, performance or dissemination of a work of the mind, by any means whatsoever, in violation of the author's rights as defined and regulated by law shall also constitute an infringement.

139.    Restellini requests that the Court take notice of the Intellectual Property Code of France.  A copy of the Intellectual Property Code of France in French and English is attached as Exhibit A.

140.    The French version is available online at <<https://beta.legifrance.gouv.fr/codes/texte_lc/LEGITEXT000006069414/2006-03-02>>.

141.    The English version was prepared for reference purposes by the French government entity responsible for publishing legal texts online.  The English version is available online at <<https://www.legifrance.gouv.fr/content/ location/1742>>.

142.    The Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material are copyrightable subject matter under, and protected by, the Intellectual Property Code of France.

143.    Restellini is the owner of the copyright in the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material under the Intellectual Property Code of France.

144.    WPI has violated Restellini's rights under the Intellectual Property Code of France with respect to the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material.

145.    By possessing, copying, and digitizing the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has violated, and will continue to violate, Restellini's rights under the Intellectual Property Code of France.

146.    By depriving Restellini of the return of, and access to, the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has

36

violated, and will continue to violate, Restellini's rights under the Intellectual Property Code of France.

147. By threatening to make publicly available or otherwise disseminate the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has violated, and will continue to violate, Restellini's rights under the Intellectual Property Code of France.

148. By making publicly available and otherwise disseminating the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has violated, and will continue to violate, Restellini's rights under the Intellectual Property Code of France.

149. By possessing, copying, and digitizing the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused damage, and will continue to cause damage, to Restellini.

150. By depriving Restellini of the return of, and access to, the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused damage, and will continue to cause damage, to Restellini.

151. By threatening to make publicly available or otherwise disseminating the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused, and threatens to cause, damage to Restellini.

152. By making publicly available and otherwise disseminating the Preexisting Original Modigliani Material, the Bibliography, and the Original Modigliani Material, Defendant has caused damage, and will continue to cause damage, to Restellini.

153. WPI's actions, and threatened actions, have caused, and will continue to cause, irreparable harm to Restellini.

4829-2677-7012

## COUNT III
### (Violation of Trade Secret Laws of France, Law No. 2018-670, and Decree No. 2018-1126)

154.     Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

155.     On or about July 30, 2018, Law No. 2018-670, dated July 30, 2018 and decree No. 2018-1126, dated December 11, 2018 (the "Trade Secret Laws of France") went into effect after adoption by the French Parliament and review by the Constitutional Council.  The Trade Secret Laws of France provide in relevant part:

(a)     Article L151-1.  Any information corresponding to the following criteria is protected as a business secret:

1°. It is not in itself or in the configuration or exact assembly of its elements, generally known or easily accessible to persons familiar with this kind of information by reason of their field of activity;

2°. It has commercial value, effective or potential, resulting from its secret nature;

3°. It is subject by its legitimate owner of reasonable protection measures, taking into account the circumstances, to maintain its secret nature.

(b)     Article L151-2.  The legitimate holder of a business secret is the one who is legally controlling it.

(c)     Article L151-3.  A business secret can be legally obtained as follows:

1°. An independent creation or find;

2°. The observation, the study, the disassembly or the test of a product or of an object which has been made available to the public or which is legally possessed by the person who obtains the information, subject to contractual stipulation limiting or prohibiting the obtaining of the secret.

(d)     Article 151-4.  Obtaining a business secret is illegal when it is obtained without the consent of the legitimate holder and its results:

1°. From an unauthorized access to any document, object, material, substance or numerical file which contains the secrets from which it can be deducted, or from an unauthorized appropriation or copy of those elements;

2°. From any other behavior, which under the circumstances, is disloyal and contrary to commercial practices.

(e)    Article L151-5.  The use or dissemination of a business secret is illegal when it is done without the consent of its legitimate holder by a person who obtained the secrets under other circumstances mentioned in art. L151-4 or who acts in breach of an obligation not to disseminate the secret or to limit its use.

The production, offer or marketing, as well as the import, the export or the warehousing for those purposes of any product resulting significantly from a breach of a business secrets are equally an illegal use when the person who performs those activities knew, or should have known, given the circumstances, that these secrets were illegally used under the meaning of the first paragraph of this article.

(f)    Article L151-6.  Obtaining, using or disseminating a business secret is also illegal when, at the time of obtaining, using or disseminating the secret, a person knew, or should have known under the circumstances, that these secrets had been obtained, directly or indirectly, by another person who used or disseminated it illegally under the meaning of the first paragraph of art. L151-5.

(g)    Article L152-1.  Any infringement to the business secret as provided by article L151-4 to L151-6 commits the civil liability of the perpetrator.

(h)    Article L152-2.  Legal actions related to a breach of a business secret are limited by a period of five years from the facts causing such breach.

(i)    Article L152-3.  When asked for an injunction to prevent or stop a breach of the secret, the Court can, without prejudice to damages and interest, order, including with a fine, any proportionate measure able to prevent or stop such a breach. The Court can notably:

1°. Prohibit the use or dissemination of a business secret;

2°. Prohibit production, offer, marketing or use of products resulting from a significant breach of business secrets, or the import, export or warehousing of such products for such purposes;

3°. Order the total or partial destruction of any document, object, material, substance or numerical data containing those business secrets or from which it can be deducted or, as the case may be, order their remittance, totally or partially, to the plaintiff.

(j)    II.  The Court can also order that the products resulting from a significant breach of business secrets be called back from the commercial circuits, removed permanently from those circuits, modified in order to eliminate

39

the breach to the business secrets, destroyed or as the case may be, confiscated to the benefit of the injured party.

(k)    III.  When the Court limits the duration of the measures mentioned in n° 1 and 2 of I., the duration must be sufficient to eliminate any economic or commercial advantage which the perpetrator of the business secret's breach could have gained from the illegal obtaining, use or dissemination of the business secret.

(l)    IV.  Except special circumstances and without prejudice to damages and interests which could be claimed, the measures mentioned in I. to III. are ordered at the costs of the perpetrator of the breach. Those measures can be terminated upon request of the perpetrator when the information at stake cannot be qualified as business secrets in the meaning of article L151-1 anymore, for reasons not pertaining, directly or indirectly, to him.

(m)    Article L152-4.  To prevent an imminent breach or to stop the ongoing breach of a business secret, the Court can, upon request, in a summary proceeding, order interim and conservatory measures, which procedures are determined by a decree of the *Conseil d'État*.

(n)    Article L152-5.  Without prejudice to art. L152-6, the Court can order, upon request of the perpetrator of the breach, the payment of an indemnification to the injured party instead of the measures mentioned in I to III of art. L152-3 when the following conditions are met:

When the business secret was used or disseminated, the perpetrator of the breach didn't know, or could not know under the circumstances, that the business secret had been obtained from another person who used it or disseminated it illegally.  The implementation of the measures mentioned in I to III of art. L152-3 would cause to this perpetrator a disproportionate damage.

The payment of a monetary indemnification to the breach party seems reasonable satisfactory.

When the payment of such monetary identification is ordered instead of the measures provided for by 1 and 2 of I of the same art. L152-3, this indemnification cannot be set to an amount higher than the amount which had been due if the perpetrator of the breach had sought the permission to use those business secrets for the period of time during which the use of the business secret could have been prohibited.

(o)    Article L152-6.  To determine the damages and interests due as compensation for the harm effectively suffered, the Court will consider separately:

The negative economic impact of the business secret's breach, of which the loss of earnings and the loss suffered by the injured party, including the loss of opportunity;

The moral damage caused to the injured party;

The profits made by the perpetrator of the business secret's breach, including the savings in intellectual, material and marketing investments which resulted from the breach.

The Court can alternatively and upon request of the injured party allocate as damage and interests a flat sum which takes notably into account the amounts which should have been due if the perpetrator of the breach had sought the permission to use the business secrets at stake.

This amount is not exclusive of the moral damage caused to the injured party.

(p)     Article L152-7.  The Court can order any publicity action of the decision relating to the illegal obtaining, use or dissemination of a business secret, notably its billboard display or integral publication or by extracts in papers or online communication services to the public which the Court designates, according to the procedure the Court will define.

When the Court orders such an action, the Court will protect the business secrets in the conditions provided for by art. L153-1.The actions are ordered at the expense of the perpetrator of the breach.

(r)     Article L152-8.  Any physical person or legal entity which proceeds abusively or as a delaying tactic on the basis of this chapter can be ordered to pay a civil penalty, which cannot be higher than 20% of the amount of the damages and interest claim. In the absence of a damages and interests claim, the amount of the civil penalty cannot exceed EUR 60'000.-.

The civil penalty can be ordered without prejudice to also ordering damages and interests to the party suffering of the abusive or delaying proceeding.

156.     Restellini requests that the Court take notice of the Trade Secret Laws of France.

A copy of the Trade Secret Laws of France in French is attached as Exhibit B.

157.     The French version is available online at <<https://www.legifrance.gouv.fr/affichTexte.do?cidTexte=JORFTEXT000037262111&categorieLien=id>>.

158.     As of the date of the filing of this Complaint, the French government entity

41

responsible for publishing legal texts online had not published an English translation of the Trade Secret Laws of France. An unofficial translation of the Trade Secret Laws of France is set forth above.

159.     The Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material each constitute a trade secret under the Trade Secret Laws of France. The Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material are each not generally known or easily accessible to persons familiar with the practice of authenticating or analyzing works of art or with Modigliani's work, have commercial value, effective or potential, resulting from its secret nature, and were subject to reasonable protection measures to maintain their secret nature.

160.     WPI obtained each of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material without Restellini's consent and as a result of unauthorized access to, unauthorized appropriation of, and unauthorized copying of, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material and as a result of behavior which, under the circumstances, is disloyal and contrary to commercial practices.

161.     WPI's use and/or dissemination of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material has been, and will be, without Restellini's consent.

162.     By using and/or disseminating the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, WPI has caused, and will continue to cause, damage to Restellini.

163.     By using and/or disseminating the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, WPI has caused, and will continue

42

to cause, irreparable harm to Restellini.

164.    By using and/or disseminating the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, WPI has been, and will continue to be, unjustly enriched.

### COUNT IV
### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)

165.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

166.    Restellini is the person in whom rightful legal and equitable title to, and license in, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material is reposed.

167.    The Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material are each related to a product or service used in, or intended for use in, interstate and/or foreign commerce.

168.    Restellini has taken reasonable measures to keep the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material secret.

169.    The Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material.

170.    Defendant misappropriated the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material.

171.    Defendant's misappropriation of the Scientific Protocol, the Reference Database,

the Reports of Scientific Analysis, and the Archival Material is willful and malicious.

172.    As a direct result of Defendant's misappropriation of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, Restellini has been, and continues to be, materially, immediately, and irreparably injured.

173.    As a direct result of Defendant's misappropriation of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, Restellini has suffered damages.

174.    As a direct result of Defendant's misappropriation of the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material, Restellini has been irreparably harmed.

175.    If Defendant's conduct is not remedied and enjoined, Defendant will continue to misappropriate the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, and the Archival Material to Restellini's detriment and will continue to be unjustly enriched.

## COUNT V
**(Conversion Under New York Law)**

176.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

177.    By refusing to return and surrender the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material to Restellini upon request, Defendant exercised unauthorized dominion and control over Restellini's property to the exclusion of Restellini, its true owner.

178.    Defendant, through its unauthorized dominion and control over the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the

44

Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original

Modigliani Material, and the Modigliani Research Material interfered with and converted

Restellini's interest in his property.

179.    Defendant's conversion of the Preexisting Original Modigliani Material, the

Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference

Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the

Modigliani Research Material has caused damage to Restellini.

### COUNT VI
**(Replevin Under New York Law)**

180.    Restellini repeats and realleges the allegations contained in paragraphs 1 through

121 as if fully set forth herein.

181.    At all times relevant herein, Restellini was and is the owner of the Preexisting

Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the

Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original

Modigliani Material, and the Modigliani Research Material and is entitled to immediate and

exclusive possession of these materials.

182.    Defendant is in possession, custody, or control of the Preexisting Original

Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific

Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani

Material, and the Modigliani Research Material.

183.    Defendant has exercised, and continues to exercise, dominion over the Preexisting

Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the

Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original

Modigliani Material, and the Modigliani Research Material, in derogation of the rights of

Plaintiff with respect to this property.

4829-2677-7012

184.    Defendant's detention of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material is wrongful because, among other things, these materials rightfully belong to Restellini and Restellini is the owner of these materials.

185.    Before commencing this action, Restellini or his agent made a demand for all of the material owned by Restellini.   WPI refused the demand.

**Count VII**
**(Violation of Secrecy of Correspondence**
**Under Civil Code of France, Article 9)**

186.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

187.    At all times relevant to this Complaint, there was in full force and effect the Civil Code of France, which provides in Article 9 that "[e]veryone has the right to respect for his private life."  This right has been interpreted to include the right of, for example, both a sender and recipient to maintain correspondence of a personal, private, or business nature, as confidential and prevent the dissemination and publication of such correspondence.

188.    Restellini requests that the Court take notice of the Civil Code of France and the manner in which it has been interpreted.  A copy of the relevant provisions of the Civil Code of France in French and English is attached as Exhibit C.

189.    The French version is available online at << https://beta.legifrance.gouv.fr/codes/texte_lc/LEGITEXT000006070721?etatTexte=VIGUEUR&etatTexte=VIGUEUR_DIFF>>.

190.    The English version was prepared for reference purposes by the French government entity responsible for publishing legal texts online.  The English version is available online at <<https://www.legifrance.gouv.fr/Media/Traductions/English-

4829-2677-7012

en/code_civil_20130701_EN>>.

191.    Among the Original Modigliani Material and the Modigliani Research Material is correspondence written, dictated, sent to, and received by, and on behalf of, Restellini and to which Restellini's rights under Article 9 of the Civil Code of France apply.

192.    By disclosing, and threatening to disclose, correspondence written, dictated, sent to, and received by, and on behalf of, Restellini, WPI has violated, and will continue to violate, Restellini's rights under Article 9 of the Civil Code of France.

193.    By disclosing, and threatening to disclose, correspondence written, dictated, sent to, and received by, and on behalf of, Restellini, WPI has caused damage, and threatens to cause damage, to Restellini.

194.    By disclosing, and threatening to disclose, correspondence written, dictated, sent to, and received by, and on behalf of, Restellini, WPI has caused damage, and threatens to cause irreparable harm to Restellini.

### Count VIII
### (Unfair Competition, 15 U.S.C. § 1125(a))

195.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

196.    Defendant's actions constitute a direct and/or contributory violation of 15 U.S.C. §1125(a), as such actions are likely to: (a) cause confusion; (b) cause mistake; or (c) deceive as to the affiliation, connection, or association of Defendant with Plaintiff and/or to the origin, sponsorship, and/or approval of services to be offered by Defendant.

197.    Defendant's actions have caused and threaten to cause, damage to Restellini.

198.    Defendant's actions have caused, and threaten to cause, irreparable harm to Restellini.

## Count IX
### (Unfair Competition Under New York Law)

199.    Restellini repeats and realleges the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

200.    In bad faith, Defendant has misappropriated the labors and expenditures of Restellini and its conduct is likely to cause confusion or to deceive consumers.

201.    Defendant's actions have caused, and threaten to cause, damage to Restellini.

202.    Defendant's actions have caused, and threaten to cause, irreparable harm to Restellini.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marc Restellini respectfully requests judgment against Defendant as follows:

i.    Finding that Defendant has infringed Restellini's rights to the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material;

ii.    Finding a substantial likelihood that Defendant will continue to infringe Restellini's rights unless enjoined from doing so;

iii.    Finding that Restellini will suffer irreparable harm if Defendant is not enjoined from publicizing, making publicly available, copying, making available to any person, retaining, or using the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material;

iv.    Preliminarily and permanently enjoining Defendant and its officers, agents, servants, employees, attorneys, successors and assigns, and all persons, firms, corporations, and

4829-2677-7012

associates acting on its behalf from publicizing, making publicly available, copying, making

available to any person, retaining, or using the Preexisting Original Modigliani Material, the

Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference

Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the

Modigliani Research Material;

        v.      Ordering Defendant to inventory the Preexisting Original Modigliani Material, the

Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference

Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the

Modigliani Research Material in its possession or under its dominion or control;

        vi.      Ordering Defendant to account for all gains, profits, and advantages derived from

its acts of infringement, possession, dominion, control, use, and/or dissemination of the

Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the

Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis,

the Original Modigliani Material, and the Modigliani Research Material and ordering that all

gains, profits, and advantages derived by Defendant from its acts of infringement, possession,

dominion, control, use, and/or dissemination are deemed to be held in constructive trust for the

benefit of Restellini;

        vii.      Ordering Defendant to return, or cause to return, the Preexisting Original

Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific

Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani

Material, and the Modigliani Research Material;

        viii.      Ordering Defendant to disclose, or cause to disclose, the names of any persons or

entities who had, or were given, access to all or part of the Preexisting Original Modigliani

Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the

Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material;

ix.    Ordering Defendant to destroy, or cause to destroy, any copies, whether physical or digital, in its possession, dominion, or control, after returning, the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material;

x.    Awarding Restellini damages in an amount to be determined for the deprivation, use, and disclosure of the Preexisting Original Modigliani Material, the Bibliography, the Archival Material, the Ektachromes, the Scientific Protocol, the Reference Database, the Reports of Scientific Analysis, the Original Modigliani Material, and the Modigliani Research Material;

xi.    Awarding Restellini exemplary damages, as allowed by law;

xii.    Awarding Restellini costs incurred in bringing this claim, including attorney's fees and costs, as permitted by law;

xiii.    Awarding Restellini pre-judgment and post-judgment interest; and

xiv.    Granting such other, further, and different relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Restellini demands a trial by jury on all issues so triable in this action.

Dated: New York, New York
      June 9, 2020

                    McKool Smith P.C.

                         /s/ *Daniel W. Levy*
By: _____
                    Daniel W. Levy
                    dlevy@mckoolsmith.com
                    Eliza Beeney
                    ebeeney@mckoolsmith.com
                    One Manhattan West
                    395 Ninth Avenue, 50th Floor
                    New York, New York  10001-8603
                    Telephone: (212) 402-9400

                    *Attorneys for Plaintiff Marc Restellini*