MARC RESTELLINI,
Plaintiff,

v.

THE WILDENSTEIN PLATTNER
INSTITUTE, INC.,
Defendant.

Complaint

# Exhibit A

| **INTELLECTUAL PROPERTY CODE** |
|---|
| **Legislative Part** |

**PART I**
**Literary and Artistic Property** — Articles L111-1 to L343-4

   **BOOK I**
   **Copyright** — Articles L111-1 to L133-4

      TITLE I
      Subject of Copyright — Articles L111-1 to L113-9

         CHAPTER I
         Nature of Copyright — Articles L111-1 to L111-5

**Article L111-1**

   The author of a work of the mind shall enjoy in that work, by the mere fact of its creation, an exclusive incorporeal property right which shall be enforceable against all persons.

   This right shall include attributes of an intellectual and moral nature as well as attributes of an economic nature, as determined by Books I and III of this Code.

   The existence or conclusion of a contract for hire or of service by the author of a work of the mind shall in no way derogate from the enjoyment of the right afforded by the first paragraph above.

**Article L111-2**

   A work shall be deemed to have been created, irrespective of any public disclosure, by the mere fact of realization of the author's concept, even if incomplete.

**Article L111-3**

   The incorporeal property right set out in Article L111-1 shall be independent of any property right in the physical object.

   Acquisition of such object shall not vest in the acquirer of the object any of the rights afforded by this Code, except in those cases referred to in the provisions of the second and third paragraphs of Article L123-4. These rights shall subsist in the person of the author or of his successors in title who, nevertheless, may not require the proprietor of the physical object to make such object available to them for the exercise of those rights. However, in the event of manifest abuse by the proprietor preventing exercise of the right of disclosure, the first instance court may take any appropriate measure, in accordance with the provisions of Article L121-3.

**Article L111-4**

   Subject to the international conventions to which France is party, in the event that it is ascertained, after consultation with the Minister for Foreign Affairs, that a State does not afford to works disclosed for the first time in France, in any form whatsoever, protection that is adequate and effective, works disclosed for the first time on the territory of such State shall not enjoy the copyright protection afforded by French legislation.

   However, neither the integrity nor the authorship of such works may be impaired.

   In the cases referred to in the first paragraph above, the royalties shall be paid to general interest bodies designated by decree.

**Article L111-5**

   Subject to the international conventions, foreigners shall enjoy in France the rights afforded to authors of software by this Code on condition that the law of the State of which they are nationals or on the territory of which they have their place of residence, their registered offices or an effective establishment affords its protection to software created by French nationals and by persons having in France their place of residence or an effective establishment.

         CHAPTER II
         Protected Work — Articles L112-1 to L112-4

**Article L112-1**

   The provisions of this Code shall protect the rights of authors in all works of the mind, whatever their kind, form of expression, merit or purpose.

**Article L112-2**

INTELLECTUAL PROPERTY CODE
*(Act No. 94-361 of 10 May 1994 art. 2 Official Journal of 11 May 1994)*
The following, in particular, shall be considered works of the mind within the meaning of this Code:
1°.books, pamphlets and other literary, artistic and scientific writings;
2°.lectures, addresses, sermons, pleadings and other works of such nature;
3°.dramatic or dramatico-musical works;
4°.choreographic works, circus acts and feats and dumb-show works, the acting form of which is set down in writing or in other manner;
5°.musical compositions with or without words;
6°.cinematographic works and other works consisting of sequences of moving images, with or without sound, together referred to as audiovisual works;
7°.works of drawing, painting, architecture, sculpture, engraving and lithography;
8°.graphical and typographical works;
9°.photographic works and works produced by techniques analogous to photography;
10°.works of applied art;
11°.illustrations, geographical maps;
12°.plans, sketches and three-dimensional works relative to geography, topography, architecture and science;
13°.software, including the preparatory design material;
14°.creations of the seasonal industries of dress and articles of fashion. Industries which, by reason of the demands of fashion, frequently renew the form of their products, particularly the making of dresses, furs, underwear, embroidery, fashion, shoes, gloves, leather goods, the manufacture of fabrics of striking novelty or of special use in high fashion dressmaking, the products of manufacturers of articles of fashion and of footwear and the manufacture of fabrics for upholstery shall be deemed to be seasonal industries.

## Article L112-3
*(Act No. 96-1106 of 18 December 1996 Art. 1 Official Journal of 19 December 1996)*
*(Act No. 98-536 of 1 July 1998 art. 1 Official Journal of 2 July 1998)*
The authors of translations, adaptations, transformations or arrangements of works of the mind shall enjoy the protection afforded by this Code, without prejudice to the rights of the author of the original work. The same shall apply to the authors of anthologies or collections of miscellaneous works or data, such as databases, which, by reason of the selection or the arrangement of their contents, constitute intellectual creations.
Database means a collection of independent works, data or other materials, arranged in a systematic or methodical way, and capable of being individually assessed by electronic or any other means.

## Article L112-4
The title of a work of the mind shall be protected in the same way as the work itself where it is original in character.
Such title may not be used, even if the work is no longer protected under Articles L123-1 to L123-3, to distinguish a work of the same kind if such use is liable to create confusion.

CHAPTER III
Owners of Copyright                                    Articles L113-1 to
                                                        L113-9

## Article L113-1
Authorship shall belong, unless proved otherwise, to the person or persons under whose name the work has been disclosed.

## Article L113-2
"Work of collaboration" shall mean a work in the creation of which more than one natural person has participated.
"Composite work" shall mean a new work in which a preexisting work is incorporated without the collaboration of the author of the latter work.
"Collective work" shall mean a work created at the initiative of a natural or legal person who edits it, publishes it and discloses it under his direction and name and in which the personal contributions of the various authors who participated in its production are merged in the overall work for which they were conceived, without it being possible to attribute to each author a separate right in the work as created.

## Article L113-3
A work of collaboration shall be the joint property of its authors.
The joint authors shall exercise their rights by common accord.
In the event of failure to agree, the civil courts shall decide.
Where the contribution of each of the joint authors is of a different kind, each may, unless otherwise agreed, separately exploit his own personal contribution without, however, prejudicing the exploitation of the common work.

## Article L113-4
A composite work shall be the property of the author who has produced it, subject to the rights of the author of the preexisting work.

## Article L113-5
A collective work shall be the property, unless proved otherwise, of the natural or legal person under whose name it

INTELLECTUAL PROPERTY CODE

has been disclosed.

The author's rights shall vest in such person.

**Article L113-6**

The authors of pseudonymous and anonymous works shall enjoy in such works the rights afforded by Article L111-1.

They shall be represented in the exercise of those rights by the original editor or publisher, until such time as they reveal their true identity and prove their authorship.

The declaration referred to in the preceding paragraph may be made by will; however, any rights previously acquired by other persons shall be maintained.

The provisions in the second and third paragraphs above shall not apply if the pseudonym adopted by the author leaves no doubt as to his true identity.

**Article L113-7**

Authorship of an audiovisual work shall belong to the natural person or persons who have carried out the intellectual creation of the work.

Unless proved otherwise, the following are presumed to be the joint authors of an audiovisual work made in collaboration:

1°.the author of the script;

2°.the author of the adaptation;

3°.the author of the dialogue;

4°.the author of the musical compositions, with or without words, specially composed for the work;

5°.the director.

If an audiovisual work is adapted from a preexisting work or script which is still protected, the authors of the original work shall be assimilated to the authors of the new work.

**Article L113-8**

Authorship of a radio work shall belong to the natural person or persons who carried out the intellectual creation of the work.

The provisions of the final paragraph of Article L113-7 and those of Article L121-6 shall apply to radio works.

**Article L113-9**

*(Act No. 94-361 of 10 May 1994 art. 2 Official Journal of 11 May 1994)*

Unless otherwise provided by statutory provision or stipulation, the economic rights in the software and its documentation created by one or more employees in the execution of their duties or following the instructions given by their employer shall be the property of the employer and he exclusively shall be entitled to exercise them.

Any dispute concerning the application of this Article shall be submitted to the first instance court of the registered place of business of the employer.

The first paragraph of this Article shall also apply to servants of the State, of local authorities and of public establishments of an administrative nature.

| | |
|---|---|
| TITLE II | |
| Authors' Rights | Articles L121-1 to L123-12 |
| CHAPTER I | |
| Moral Right | Articles L121-1 to L121-9 |

**Article L121-1**

An author shall enjoy the right to respect for his name, his authorship and his work.

This right shall attach to his person.

It shall be perpetual, inalienable and imprescriptible. It may be transmitted mortis causa to the heirs of the author.

Exercise may be conferred on another person under the provisions of a will.

**Article L121-2**

The author alone shall have the right to divulge his work. He shall determine the method of disclosure and shall fix the conditions thereof, subject to Article L132-24.

After his death, the right to disclose his posthumous works shall be exercised during their lifetime by the executor or executors designated by the author. If there are none, or after their death, and unless the author has willed otherwise, this right shall be exercised in the following order: by the descendants, by the spouse against whom there exists no final judgment of separation and who has not remarried, by the heirs other than descendants, who inherit all or part of the estate and by the universal legatees or donees of the totality of the future assets.

This right may be exercised even after expiry of the exclusive right of exploitation set out in Article L123-1.

**Article L121-3**

In the event of manifest abuse in the exercise or non-exercise of the right of disclosure by the deceased author's representatives referred to in Article L121-2, the first instance court may order any appropriate measure. The same shall

INTELLECTUAL PROPERTY CODE

apply in the event of a dispute between such representatives, if there is no known successor in title, no heir or no spouse entitled to inherit.

Such matters may be referred to the courts by the Minister responsible for culture.

### Article L121-4

Notwithstanding assignment of his right of exploitation, the author shall enjoy a right to reconsider or of withdrawal, even after publication of his work, with respect to the assignee. However, he may only exercise that right on the condition that he indemnify the assignee beforehand for any prejudice the reconsideration or withdrawal may cause him. If the author decides to have his work published after having exercised his right to reconsider or of withdrawal, he shall be required to offer his rights of exploitation in the first instance to the assignee he originally chose and under the conditions originally determined.

### Article L121-5

An audiovisual work shall be deemed completed when the final version has been established by common accord between the director or, possibly, the joint authors, on the one hand, and the producer, on the other.

Destruction of the master copy of such version shall be prohibited.

Any change made to that version by adding, deleting or modifying any element thereof shall require the agreement of the persons referred to in the first paragraph above.

Any transfer of an audiovisual work to another kind of medium with a view to a different mode of exploitation shall require prior consultation with the director.

The authors' own rights, as defined in Article L121-1, may be exercised by those authors only in respect of the completed audiovisual work.

### Article L121-6

If one of the authors refuses to complete his contribution to an audiovisual work or is unable to complete such contribution due to circumstances beyond his control, he shall not be entitled to oppose use of that part of his contribution already in existence for the purpose of completing the work. He shall be deemed the author of such contribution and shall enjoy the rights deriving therefrom.

### Article L121-7

*(Act No. 94-361 of 10 May 1994 art. 2 Official Journal of 11 May 1994)*

Except for any stipulation more favorable to the author, such author may not:

1°.oppose modification of the software by the assignee of the rights referred to in item 2 of Article L122-6 where such modification does not prejudice either his honor or his reputation;

2°.exercise his right to reconsider or of withdrawal.

### Article L121-8

The author alone shall have the right to make a collection of his articles and speeches and to publish them or to authorize their publication in such form.

With regard to all works published in such way in a newspaper or periodical, the author shall maintain his right, unless otherwise stipulated, to have them reproduced or to exploit them in any form whatsoever, on condition that such reproduction or exploitation is not such as to compete with the newspaper or periodical concerned.

### Article L121-9

Whatever the marriage arrangements and on pain of nullity of any clause to the contrary contained in a marriage contract, the right to disclose a work, to lay down the conditions for exploiting it and for defending its integrity shall remain vested in the spouse who is the author or in the spouse to whom such rights have been transmitted. This right may not be brought in dowry nor acquired as community property nor subsequently acquired as community property.

The monetary proceeds resulting from the exploitation of a work of the mind or from the total or partial assignment of the right of exploitation shall be subject to the general rules of law applicable to marriage arrangements only if acquired during the marriage; the same shall apply to savings made on such account.

The provisions laid down in the preceding paragraph shall not apply if the marriage was contracted prior to March 12, 1958.

The legislative provisions relating to the contributions of the spouses to the cost of the household shall apply to the monetary proceeds referred to in the second paragraph of this Article.

CHAPTER II

Patrimonial Rights                                                                                    Articles L122-1 to

L122-12

### Article L122-1

The right of exploitation belonging to the author shall comprise the right of performance and the right of reproduction.

### Article L122-2

Performance shall consist in the communication of the work to the public by any process whatsoever, particularly:

1°.public recitation, lyrical performance, dramatic performance, public presentation, public projection and transmission in a public place of a telediffused work;

2°.telediffusion.

INTELLECTUAL PROPERTY CODE

Telediffusion shall mean distribution by any telecommunication process of sounds, images, documents, data and messages of any kind.

Transmission of a work towards a satellite shall be assimilated to a performance.

### Article L122-2-1
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 1 Official Journal of 28 Mars 1997)*

The right of performance of a work broadcast by satellite shall be governed by the provisions of this Code where the work is transmitted to the satellite from the national territory.

### Article L122-2-2
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 1 Official Journal of 28 Mars 1997)*

The right of performance of a work broadcast by satellite which is transmitted from the territory of a non-Member State of the European Community that does not afford a level of copyright protected equivalent to that guaranteed by this Code shall also be governed by the provisions of this Code:

1°.where the uplink to the satellite is provided by a station situated on the national territory, in which case the rights provided for in this Code shall be exercisable against the person operating the uplink station;

2°.where the uplink to the satellite is not provided by a station situated in a Member State of the European Community, and where the transmission takes place at the request, on behalf or under the control of an audiovisual communication enterprise having its principal establishment on the national territory, in which case the rights provided for in this Code shall be exercisable against the said audiovisual communication enterprise.

### Article L122-3

Reproduction shall consist in the physical fixation of a work by any process permitting it to be communicated to the public in an indirect way.

It may be carried out, in particular, by printing, drawing, engraving, photography, casting and all processes of the graphical and plastic arts, mechanical, cinematographic or magnetic recording.

In the case of works of architecture, reproduction shall also consist in the repeated execution of a plan or of a standard project.

### Article L122-4

Any complete or partial performance or reproduction made without the consent of the author or of his successors in title or assigns shall be unlawful. The same shall apply to translation, adaptation or transformation, arrangement or reproduction by any technique or process whatsoever.

### Article L122-5
*(Act No. 94-361 of 10 May 1994 art. 5 II Official Journal of 11 May 1994)*
*(Act No. 97-283 of 27 Mars 1997 art. 17 Official Journal of 28 Mars 1997)*
*(Act No. 98-536 of 1 July 1998 art. 2 and art. 3 Official Journal of 2 July 1998)*
*(Act No. 2000-642 of 11 July 2000 art. 47 Official Journal of 11 July 2000)*

Once a work has been disclosed, the author may not prohibit:

1°. private and gratuitous performances carried out exclusively within the family circle;

2°. copies or reproductions reserved strictly for the private use of the copier and not intended for collective use, with the exception of copies of works of art to be used for purposes identical with those for which the original work was created and copies of software other than backup copies made in accordance with paragraph II of Article L. 122-6-1, as well as copies or reproductions of an electronic database;

3°. on condition that the name of the author and the source are clearly stated:

a) analyses and short quotations justified by the critical, polemic, educational, scientific or informatory nature of the work in which they are incorporated;

b) press reviews;

c) dissemination, even in their entirety, through the press or by broadcasting, as current news, of speeches intended for the public made in political, administrative, judicial or academic gatherings, as well as in public meetings of a political nature and at official ceremonies;

d) complete or partial reproductions of works of graphic or three-dimensional art intended to appear in the catalogue of a judicial sale held in France, in the form of the copies of the said catalogue made available to the public prior to the sale for the sole purpose of describing the works of art offered for sale.

A decree by the Conseil d'Etat shall determine the characteristics of the documents and the conditions governing their distribution.

4°. parody, pastiche and caricature, observing the rules of the genre.

5°. acts necessary to access the contents of an electronic database for the purposes of and within the limits of the use provided by contract.

### Article L122-6
*(Act No. 94-361 of 10 May 1994 art. 5I Official Journal of 11 May 1994)*

Subject to the provisions of Article L122-6-1, the exploitation right belonging to the author of the software shall include the right to do or to authorize:

1°.the permanent or temporary reproduction of software by any means and in any form, in part or in whole. Insofar as loading, displaying, running, transmission or storage of the software necessitate such reproduction, such acts shall be possible only with the authorization of the author;

INTELLECTUAL PROPERTY CODE

2°.the translation, adaptation, arrangement or any other alteration of software and the reproduction of the results thereof;

3°.the placing on the market for consideration or gratuitously, including rental, of the software or of copies thereof by any process. However, the first sale of a copy of software on the territory of a Member State of the European Community or of a State party to the agreement on the European Economic Area by the author or with his consent shall exhaust the right of placing on the market of that copy in all Member States, with the exception of the right to authorize further rental of a copy.

### Article L122-6-1

*(Act No. 94-361 of 10 May 1994 art. 5I Official Journal of 11 May 1994)*

I.The acts referred to in items 1 and 2 of Article L122-6 shall not require authorization by the author where they are necessary for the use of the software by the person entitled to use it in accordance with its intended purpose, including for error correction.

However, an author may by contract reserve the right to correct errors and stipulate any special conditions to which shall be subject the acts referred to in items 1 and 2 of Article L122-6, necessary to enable the entitled person to use the software in accordance with its intended purpose.

II. A person having the right to use the software may make a backup copy where such is necessary to ensure use of the software.

III. A person having the right to use the software shall be entitled, without the authorization of the author, to observe, study or test the functioning of the software in order to determine the ideas and principles which underlie any element of the software if he does so while performing any of the acts of loading, displaying, running, transmitting or storing the software which he is entitled to do.

IV. Reproduction of the code of the software or translation of the form of that code shall not require the authorization of the author where reproduction or translation within the meaning of item 1 or 2 of Article L. 122-6 is indispensable for obtaining the information necessary to achieve the interoperability of independently created software with other software, providing that the following conditions are met:

1°.these acts are performed by a person entitled to use a copy of the software or on his behalf by a person authorized to do so;

2°.the information necessary to achieve interoperability has not previously been readily available to the persons referred to in item 1, above;

3°.and these acts are confined to the parts of the original software which are necessary to achieve interoperability.

The information thus obtained may not:

1°.be used for goals other than to achieve the interoperability of the independently created software;

2°.be given to others, except where necessary for the interoperability of the independently created software;

3°.or be used for the development, production or marketing of software substantially similar in its expression, or for any other act which infringes copyright.

V. This Article may not be interpreted in such a way as to prejudice the normal exploitation of the software or to cause unreasonable prejudice to the author's legitimate interests.

Any stipulation contrary to the provisions of paragraphs II, III and IV of this Article shall be null and void.

### Article L122-6-2

*(Act No. 94-361 of 10 May 1994 art. 5I Official Journal of 11 May 1994)*

Any publication or user's handbook concerning means of removing or circumventing any technical device protecting software shall state that the unlawful use of such means is liable to the penalties laid down for cases of infringement.

A Conseil d'Etat decree shall lay down the implementing rules for this Article.

### Article L122-7

The right of performance and the right of reproduction may be transferred, for or without payment.

Transfer of the right of performance shall not imply transfer of the right of reproduction.

Transfer of the right of reproduction shall not imply transfer of the right of performance.

Where a contract contains the complete transfer of either of the rights referred to in this Article, its effect shall be limited to the exploitation modes specified in the contract.

### Article L122-8

Authors of graphic and three-dimensional works shall have an inalienable right, regardless of any transfer of the original work, to participate in the proceeds of any sale of such work by public auction or through a dealer.

The royalty levied shall be a uniform 3% applicable only on a selling price above an amount to be laid down by regulation.

The royalty shall be levied on the selling price of each work and on the full price with no deduction from the basis. A Conseil d'Etat decree shall lay down the conditions under which authors may assert the rights afforded them by this Article with respect to the sales referred to in the first paragraph above.

### Article L122-9

In the event of manifest abuse in the exercise or non-exercise of the rights of exploitation by the deceased author's representatives referred to in Article L121-2, the first instance court may order any appropriate measure. The same shall apply in the event of a dispute between such representatives, if there is no known successor in title, no heir or no spouse entitled to inherit.

INTELLECTUAL PROPERTY CODE

Such matters may be referred to the courts, inter alia, by the Minister responsible for culture.

### Article L122-10
*(inserted by Act No. 95-4 of 3 January 1995 art. 1 Official Journal of 4 January 1995)*

The publication of a work shall imply assignment of the right of reprographic reproduction to a society governed by Title II of Book III and approved to such end by the Minister responsible for culture. Only approved societies may conclude an agreement with users for the purpose of administering the right thus assigned, subject, for the stipulations authorizing copies for the purposes of sale, rental, publicity or promotion, to the agreement of the author or his successors in title. Failing such designation by the author or his successor in title on the date of publication of the work, one of the approved societies shall be deemed the assignee of the right.

Reprography shall mean reproduction in the form of a copy on paper or an assimilated medium by means of a photographic process or one having equivalent effect permitting direct reading.

The provisions of the first paragraph shall not affect the right of the author or his successors in title to make copies for the purposes of sale, rental, publicity or promotion.

Notwithstanding any stipulation to the contrary, the provisions of this Article shall apply to all protected works whatever the date of their publication.

### Article L122-11
*(inserted by Act No. 95-4 of 3 January 1995 art. 1 Official Journal of 4 January 1995)*

The agreements referred to in Article L122-10 may provide for lump sum remuneration in the cases defined in items 1 to 3 of Article L131-4.

### Article L122-12
*(inserted by Act No. 95-4 of 3 January 1995 art. 1 Official Journal of 4 January 1995)*

Approval of the societies referred to in the first paragraph of Article L122-10 shall be given on consideration of:
— the diversity of the partners;
— the professional qualifications of the officers;
— the human and material means they propose to use to administer the reprographicre production right;
— the equitable nature of the conditions foreseen for distributing the amounts collected.

A Conseil d'Etat decree shall lay down the conditions for granting and withdrawing such approval and also the choice of the assignee societies in application of the final sentence of the first paragraph of Article L122-10.

CHAPTER III

Term of Protection

Articles L123-1 to L123-12

### Article L123-1
*(Act No. 97-283 of 27 Mars 1997 art. 5 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

The author shall enjoy, during his lifetime, the exclusive right to exploit his work in any form whatsoever and to derive monetary profit therefrom.

On the death of the author, that right shall subsist for his successors in title during the current calendar year and the 70 years thereafter.

### Article L123-2
*(Act No. 97-283 of 27 Mars 1997 art. 6 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

In the case of works of collaboration, the calendar year taken into account shall be that of the death of the last surviving joint author.

In the case of audiovisual works, the calendar year taken into account shall be that of the death of the last survivor of the following joint authors: the author of the scenario, the author of the dialogue, the author of the musical compositions, with or without words, specially composed for the work and the main director.

### Article L123-3
*(Act No. 97-283 of 27 Mars 1997 art. 7 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

In the case of pseudonymous, anonymous or collective works, the term of the exclusive right shall be 70 years from January 1 of the calendar year following that in which the work was published. The publication date shall be determined by any form of proof recognized by the general rules of law, particularly by statutory deposit.

Where a pseudonymous, anonymous or collective work is published in installments, the term shall run as from January 1 of the calendar year following the date on which each installment was published.

Where the author or authors of anonymous or pseudonymous works reveal their identity, the term of the exclusive right shall be that provided for in Article L123-1 or Article L123-2.

The provisions of the first and second paragraphs shall apply only to pseudonymous, anonymous or collective works published during the 70 years following the year of their creation.

Nevertheless, where a pseudonymous, anonymous or collective work is disclosed on the expiry of the term mentioned in the foregoing paragraph, its owner by succession or on another ground who publishes it or causes it to be published shall enjoy exclusive rights for 25 years from January 1 of the calendar year following that of publication.

### Article L123-4
*(Act No. 97-283 of 27 Mars 1997 art. 1 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

INTELLECTUAL PROPERTY CODE

In the case of posthumous works, the term of the exclusive right shall be that provided for in Article L123-1. In the case of posthumous works disclosed after the expiry of that term, the term of exclusive rights shall be 25 years from January 1 of the calendar year following that of publication.

The right of exploitation in posthumous works shall belong to the author's successors in title if the work is disclosed during the term referred to in Article L123-1.

If disclosure is made on expiry of that term, the right shall belong to the owners of the work, whether by succession or for other reason, who publish or have the work published.

Posthumous works shall be published separately, except where they constitute only a fragment of a work previously published. They may only be joined with previously published works of the same author if the author's successors in title still enjoy the exploitation rights therein.

## Article L123-6

*(Act No. 2001-1135 of 3 December 2001 art. 15 IV Official Journal of 4 December 2001 in force on 1 July 2002)*

During the term laid down in Article L. 123-1, the surviving spouse, against whom there is no final decision of separation, shall enjoy the usufruct of any right of exploitation that the author has not assigned, irrespective of the type of marriage arrangements and of the rights of usufruct deriving from Articles 756 to 757-3 and 764 to 766 of the Civil Code with respect to other assets of the estate. However, if the author has left forced heirs, the usufruct shall be reduced to the benefit of the heirs, according to the proportions and distinctions laid down by Articles 913 and 914 of the Civil Code.

Such right shall lapse should the spouse contract a new marriage.

## Article L123-7

*(Act No. 97-283 of 27 Mars 1997 art. 9 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

After the death of the author, the resale royalty right referred to in Article L122-8 shall subsist to the benefit of the heirs and, with respect to usufruct laid down in Article L123-6, of the spouse, to the exclusion of all legatees and successors in title, for the current calendar year and 70 years thereafter.

## Article L123-8

The rights afforded by the Act of July 14, 1866, on the Rights of Heirs and Successors in Title of Authors to the heirs and other successors in title of authors, composers or artists shall be extended for a period equal to that which elapsed between August 2, 1914, and the end of the year following the day of signature of the peace treaty for all works published prior to that latter date and which had not fallen into the public domain on February 3, 1919.

## Article L123-9

The rights afforded by the above mentioned Act of July 14, 1866, and by Article L123-8 to the heirs and successors in title of the authors, composers and artists shall be extended for a period equal to that which elapsed between September 3, 1939, and January 1, 1948, for all works published before that date and which did not fall into the public domain on August 13, 1941.

## Article L123-10

The rights referred to in the preceding Article shall be further extended for a term of 30 years if the author, the composer or the artist has died for France, as recorded in the death certificate.

Where the death certificate has neither to be drawn up nor registered in France, the Minister responsible for culture may extend by order to the heirs or other successors in title of the deceased person the benefit of the additional extension of 30 years; such order, issued after obtaining the opinion of the authorities referred to in Article 1 of Ordinance No. 45-2717 of November 2, 1945, may only be issued in those cases where the entry "died for France" would have appeared on the death certificate if such certificate had been drawn up in France.

## Article L123-11

Where the rights extended under Article L123-10 have been assigned for consideration, the assignors or their successors in title may apply, within a period of three years as from September 25, 1951, to the assignee or his successors in title for a review of the conditions of the assignment as compensation for the advantages resulting from the extension.

## Article L123-12

*(inserted by Act No. 97-283 of 27 Mars 1997 art. 10 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

Where the country of origin of the work, within the meaning of the Paris Act of the Berne Convention, is a country outside the European Community and the author is not a national of a Member State of the Community, the term of protection shall be that granted in the country of origin of the work, but may not exceed that provided for in Article L123-1.

TITLE III
Exploitation of Rights                                   Articles L131-1 to
                                                         L133-4

    CHAPTER I
    General Provisions                                   Articles L131-1 to
                                                         L131-8

INTELLECTUAL PROPERTY CODE

**Article L131-1**

Total transfer of future works shall be null and void.

**Article L131-2**

The performance, publishing and audiovisual production contracts defined in this Title shall be in writing. The same shall apply to free performance authorizations.

In all other cases, the provisions of Articles 1341 to 1348 of the Civil Code shall apply.

**Article L131-3**

Transfer of authors' rights shall be subject to each of the assigned rights being separately mentioned in the instrument of assignment and the field of exploitation of the assigned rights being defined as to its scope and purpose, as to place and as to duration.

Where special circumstances demand, the contract may be validly concluded by an exchange of telegrams, on condition that the field of exploitation of the assigned rights be defined in compliance with the first paragraph of this Article.

Assignment of audiovisual adaptation rights must be effected by written contract in an instrument separate from the contract relating to publication itself of the printed work.

The assignee shall undertake by such contract to endeavor to exploit the assigned right in accordance with trade practice and to pay to the author, in the event of adaptation, a remuneration that is proportional to the revenue obtained.

**Article L131-4**

*(Act No. 94-361 of 10 May 1994 art. 6 Official Journal of 11 May 1994)*

Assignment by the author of the rights in his work may be total or partial. Assignment shall comprise a proportional participation by the author in the revenue from sale or exploitation of the work.

However, the author's remuneration may be calculated as a lump sum in the following cases:

1°. the basis for calculating the proportional participation cannot be practically determined;

2°. the means of supervising the participation are lacking;

3°. the cost of the calculation and supervising operations would be out of proportion with the expected results;

4°. the nature or conditions of exploitation make application of the rule of proportional remuneration impossible, either because the author's contribution does not constitute one of the essential elements of the intellectual creation of the work or because the use of the work is only of an accessory nature in relation to the subject matter exploited;

5°. assignment of rights in software;

6°. in the other cases laid down in this Code.

Conversion, at the author's request, between the parties of the rights under existing contracts to lump sum annuities for periods to be determined between the parties shall also be lawful.

**Article L131-5**

If the exploitation right has been assigned and the author suffers a prejudice of more than seven-twelfths as a result of a burdensome contract or of insufficient advance estimate of the proceeds from the work, he may demand review of the price conditions under the contract.

Such demand may only be formulated where the work has been assigned against lump sum remuneration.

The burdensome contract shall be assessed taking into account the overall exploitation by the assignee of the works of the author who claims to have suffered a prejudice.

**Article L131-6**

Any assignment clause affording the right to exploit a work in a form that is unforeseeable and not foreseen on the date of the contract shall be explicit and shall stipulate participation correlated to the profits from exploitation.

**Article L131-7**

In the event of partial assignment, the assignee shall replace the author in the exercise of the assigned rights subject to the conditions and limitations and for the duration laid down in the contract, and with the obligation to render accounts.

**Article L131-8**

With regard to payment of the royalties and remuneration due to them for the last three years for the assignment, exploitation or use of their works, as defined in Article L112-2 of this Code, the authors, composers and artists shall enjoy the privilege set out in item 4 of Article 2101 and in Article 2104 of the Civil Code.

CHAPTER II
Special Provisions for Certain Contracts                    Articles L132-1 to
                                                            L132-34

SECTION I
Publishing Contracts                                         Articles L132-1 to
                                                            L132-17

**Article L132-1**

A publishing contract is a contract by which the author of a work of the mind or his successors in title assign under specified conditions to a person referred to as the publisher the right to manufacture or have manufactured a number of

INTELLECTUAL PROPERTY CODE

copies of the work, it being for the latter to ensure publication and dissemination thereof.

### Article L132-2

A contract at the author's expense shall not constitute a publishing contract within the meaning of Article L132-1.

Under such contract, the author or his successors in title pay to the publisher an agreed remuneration against which the latter manufactures a number of copies of the work in the form and according to the modes of expression specified in the contract and ensures their publication and dissemination.

Such contract constitutes a contract for hire governed by convention, usage and the provisions of Articles 1787 et seq. of the Civil Code.

### Article L132-3

A contract at joint expense shall not constitute a publishing contract within the meaning of Article L132-1.

Under such contract, the author or his successors in title commission a publisher to manufacture at his expense a number of copies of the work in the form and according to the modes of expression specified in the contract and to ensure their publication and dissemination in accordance with the agreement reciprocally contracted to share profits and losses of exploitation in the agreed proportion.

Such contract shall constitute a joint undertaking. It shall be governed, subject to the provisions of Articles 1871 et seq. of the Civil Code, by convention and usage.

### Article L132-4

A clause by which the author undertakes to afford a right of preference to a publisher for the publication of his future works of clearly specified kinds shall be lawful.

Such right shall be limited, for each kind of work, to five new works as from the day of signature of the publishing contract concluded for the first work or to works produced by the author within a period of five years from that same date.

The publisher shall exercise the right afforded him by notifying the author in writing of his decision within three months of the date on which the author has delivered to him each final manuscript.

If the publisher enjoying the right of preference successively refuses two new works submitted by the author of the kind laid down in the contract, the author may immediately and automatically recover his liberty with respect to any future works he produces of that kind. However, if he has received advances from the first publisher against his future works, he must first refund such advances.

### Article L132-5

The contract may lay down either remuneration proportional to the proceeds of exploitation or, in the cases referred to in Articles L. 131-4 and L132-6, a lump sum remuneration.

### Article L132-6

In the case of trade editions, the author's remuneration for the first edition may also be in the form of a lump sum, subject to the formally expressed agreement of the author, in the following cases:

1°.scientific and technical works;
2°.anthologies and encyclopedias;
3°.prefaces, annotations, introductions, forewords;
4°.illustrations for a work;
5°.limited deluxe editions;
6°.prayer books;
7°.at the request of the translator, in the case of translations;
8°.inexpensive popular editions;
9°.inexpensive picture books for children.

Lump sum remuneration may also be paid for the assignment of rights by or to a person or enterprise established abroad.

In the case of works of the mind published in newspapers and periodicals of any kind and by press agencies, the remuneration of an author bound to the information enterprise by a contract for hire or of service may also be laid down as a lump sum.

### Article L132-7

The personal consent of the author given in writing shall be obligatory.

Notwithstanding the provisions that govern contracts made by minors and adults under guardianship, consent shall be required even in the case of a legally incompetent author, unless he is physically unable to give his consent.

The provisions of the preceding paragraph shall not apply if the publishing contract is signed by the author's successors in title.

### Article L132-8

The author shall guarantee the publisher the undisturbed and, unless otherwise agreed, exclusive exercise of the right assigned.

He shall be required to ensure respect for the right and to defend it against any possible violation.

### Article L132-9

The author shall put the publisher in a position to manufacture and disseminate copies of the work.

He shall deliver to the publisher, within the period of time stipulated in the contract, the subject matter of publication

INTELLECTUAL PROPERTY CODE

in a form permitting normal manufacture.

The subject matter of publication furnished by the author shall remain the property of the author unless otherwise agreed or technically impossible. The publisher shall remain responsible for the subject matter of publication for a period of one year after completion of manufacture.

### Article L132-10

The publishing contract must state the minimum number of copies that constitute the first printing. However, this obligation shall not apply to contracts laid down at minimum royalties guaranteed by the publisher.

### Article L132-11

The publisher shall be required to manufacture the work or have it manufactured under the conditions, in the form and according to the modes of expression laid down in the contract.

He may not make any modification to the work without the written authorization of the author.

Unless otherwise agreed, he shall place on each of the copies the name, pseudonym or symbol of the author.

Unless there is a special agreement, the publisher shall complete the publication within the term customary in the trade.

In the case of a contract of fixed duration, the rights of the assignee shall lapse automatically on expiry of that term without need of any formal notice.

However, for three years after expiry of that term, the publisher may continue to market at the normal price the copies remaining in stock, unless the author prefers to buy the copies at a price which, in the absence of an amicable agreement, shall be fixed according to expert opinion, whereby this faculty afforded the first publisher shall not prevent the author from proceeding with a new edition within a period of 30 months.

### Article L132-12

The publisher shall be required to ensure continuous and sustained exploitation and commercial dissemination of the work in accordance with the practices of the trade.

### Article L132-13

The publisher shall be required to render accounts.

In the absence of special conditions stipulated in the contract, the author may require the publisher to produce, at least once a year, a statement of the number of copies manufactured during the period in question and specifying the date and size of the printings and the number of copies in stock.

In the absence of contrary usage or agreement, the statement shall also contain the number of copies sold by the publisher, the number of copies that cannot be used or have been destroyed by accident or due to unavoidable circumstances and the amount of royalties due or paid to the author.

### Article L132-14

The publisher shall be required to furnish the author with all evidence required to establish the accuracy of his accounts.

If the publisher fails to provide the necessary evidence, he shall be obliged to do so by the court.

### Article L132-15

Judicial rehabilitation of the publisher shall not terminate the contract. Where activities are continued in application of Articles 31 et seq. of Act No. 85-98 of January 25, 1985, on the Judicial Rehabilitation and Liquidation of Enterprises, all of the publisher's obligations with regard to the author shall be respected.

Where the publishing enterprise is sold in application of Articles 81 et seq. of the above-mentioned Act No. 85-98 of January 25, 1985, the purchaser shall be held to the obligations of the seller.

Where the activities of the enterprise have ceased more than three months earlier or where judicial liquidation is pronounced, the author may request termination of the contract.

The liquidator may not sell at reduced price or sell out the manufactured copies in accordance with Articles 155 and 156 of Act No. 85-98 of January 25, 1985, referred to above, until at least 15 days after having notified the author of his intention by means of a registered letter with acknowledgment of receipt.

The author shall have a right of preemption on all or part of the copies. Failing agreement, the price shall be fixed by expert opinion.

### Article L132-16

The publisher may not transmit the benefits of the publishing contract to a third party, for or without payment, or as a contribution to the assets of a partnership, independently of the business, without first having obtained the authorization of the author.

In the event of transfer of the business in such a way as to seriously compromise the material and moral interests of the author, the latter shall be entitled to obtain reparation even by means of termination of the contract.

Where the publishing business was run as a company or a coparcenary, the allocation of the business to one of the former partners or one of the coparceners, as a consequence of liquidation or division, shall in no case be considered a transfer.

### Article L132-17

The publishing contract shall end, independently of the cases laid down in the general rules of law or in the preceding Articles, when the publisher carries out the complete destruction of the copies.

The contract shall terminate automatically if, upon formal notice by the author fixing a reasonable period of time, the

INTELLECTUAL PROPERTY CODE

publisher has not effected publication of the work or, should the work be out of print, its republication.

The work shall be deemed out of print if two orders for delivery of copies addressed to the publisher have not been met within three months.

If, in the event of the author's death, the work is incomplete, the contract shall be rescinded as regards the unfinished part of the work, except as otherwise agreed between the publisher and the author's successors in title.

SECTION II

Performance Contracts                                                   Articles L132-18 to
                                                                         L132-22

## Article L132-18

A performance contract is a contract under which the author of a work of the mind or his successors in title authorize a natural or legal person to perform such a work under the conditions they stipulate. A general performance contract means a contract under which a professional body of authors grants to an entertainment promoter the right to perform, for the duration of the contract, the existing or future works constituting the repertoire of such body under the conditions stipulated by the author or his successors in title.

In the case referred to in the preceding paragraph, the requirements of Article L131-1 may be waived.

## Article L132-19

A performance contract shall be concluded for a limited duration or for a specific number of communications to the public.

Unless exclusive rights are expressly stipulated, it shall not afford the entertainment promoter an exploitation monopoly.

The validity of the exclusive rights afforded by a playwright may not exceed five years; the interruption of performances for two consecutive years shall automatically terminate the contract.

An entertainment promoter may not transfer the benefit of his contract without formal consent given in writing by the author or his representative.

## Article L132-20

Unless otherwise agreed:

1°.authorization to telediffuse a work by electromagnetic waves shall not include cable distribution of such telediffusion, unless made simultaneously and integrally by the organization holding the authorization and without extension of the contractually stipulated geographical area;

2°.authorization to telediffuse the work shall not constitute an authorization to communicate the telediffusion of the work in a place to which the public has access;

3°.authorization to telediffuse the work by electromagnetic waves shall not include its transmission towards a satellite enabling the work to be received by the intermediary of other organizations unless the authors or their successors in title have contractually authorized the latter organizations to communicate the work to the public; in such case, the emitting organization shall be exempted from paying any remuneration.

## Article L132-20-1
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 2 Official Journal of 28 Mars 1997)*

I. As from the date of the entry into force of Act No. 97-283 of March 27, 1997, the right to authorize the simultaneous, complete and unchanged cable retransmission on the national territory of a work broadcast from a Member State of the European Community may be exercised only through a royalty collection and distribution society. If that society is governed by Title II of Book III, it shall be approved for the purpose by the Minister responsible for culture.

Where the owner of the rights has not already entrusted the management of those rights to such a society, he shall designate that to which he entrusts the exercise thereof. He shall notify the designation in writing to the society, which may not refuse it.

The contract authorizing the broadcasting of a work on the national territory shall mention the society responsible for exercising the right to authorize the simultaneous, complete and unchanged cable retransmission thereof in Member States of the European Community.

The approval provided for in the first paragraph shall be granted in consideration of:

1°.the professional qualifications of the directors of the societies, and the means that the societies are able to bring to bear for the exercise of the rights specified in the first paragraph and the exploitation of works in their repertoire;

2°.the size of their repertoire;

3°.their observance of the obligations imposed on them by the provisions of Title II of Book III.

A Conseil d'Etat decree shall lay down the conditions for the grant and revocation of approval. It shall also, in the case provided in the second paragraph, lay down the procedure for the designation of the society responsible for the management of the right of retransmission.

II. Notwithstanding paragraph I, the owner of the rights may license those rights to an audiovisual communication enterprise.

The provisions of paragraph I shall not apply to rights licensed to an audiovisual communication enterprise.

## Article L132-20-2
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 2 Official Journal of 28 Mars 1997)*

Mediators shall be appointed, without prejudice to the right of the parties to go to court, in order to promote the

INTELLECTUAL PROPERTY CODE

settlement of disputes concerning the grant of authorization for the simultaneous, complete and unchanged cable retransmission of a work.

In the absence of an amicable settlement, the mediator may propose to the parties the solution that seems appropriate to him, which the said parties shall be deemed to have accepted if they have not expressed their opposition in writing within a period of three months.

A Conseil d'Etat decree shall specify the conditions for the application of this Article and lay down the procedure for the designation of mediators.

**Article L132-21**

An entertainment promoter shall be required to notify to the author or his representatives the exact program of public performances and to supply to them a documented statement of receipts. He shall pay into the hands of the author or his representatives at the agreed times the amount of the stipulated royalties.

However, when municipalities organize local and public celebrations and when societies for popular education, recognized by the administrative authorities, organize gatherings within the scope of their activities, they shall enjoy a reduction in those royalties.

**Article L132-22**

An entertainment promoter shall ensure that public performance takes place under technical conditions that guarantee respect for the author's intellectual and moral rights.

SECTION III

Audiovisual Production Contracts                                                Articles L132-23 to L132-30

**Article L132-23**

The natural or legal person who takes the initiative and responsibility for making the work shall be deemed the producer of an audiovisual work.

**Article L132-24**

Contracts binding the producer and the authors of an audiovisual work, other than the author of a musical composition with or without words, shall imply, unless otherwise stipulated and notwithstanding the rights afforded to the author by Articles L111-3, L121-4, L121-5, L122-1 to L122-7, L123-7, L131-2 to L131-7, L132-4 and L132-7, assignment to the producer of the exclusive exploitation rights in the audiovisual work.

Audiovisual production contracts shall not imply assignment to the producer of the graphic rights and theatrical rights in the work.

Contracts shall lay down the list of those elements that have served to make the work that are to be conserved as also the conditions of conservation.

**Article L132-25**

Remuneration shall be due to the authors for each exploitation mode.

Subject to Article L131-4, where the public pays a price to receive communication of a given, individually identifiable audiovisual work, remuneration shall be proportional to such price, subject to any decreasing tariffs afforded by the distributor to the operator; the remuneration shall be paid to the authors by the producer.

**Article L132-26**

The author shall guarantee to the producer the undisturbed exercise of the rights assigned.

**Article L132-27**

The producer shall be required to exploit the audiovisual work in conformity with the practice of the trade.

**Article L132-28**

The producer shall furnish at least once a year to the author and the joint authors a statement of revenue from exploitation of the work in respect of each exploitation mode.

At their request, he shall furnish to them all evidence necessary to establish the accuracy of the accounts, in particular copies of the contracts in which he assigns to third parties all or a part of the rights he enjoys.

**Article L132-29**

Unless agreed otherwise, each of the authors of an audiovisual work may freely dispose of the part of the work that constitutes his personal contribution, for the purpose of exploiting it in a different field, within the limits laid down in Article L113-3.

**Article L132-30**

Judicial rehabilitation of the producer shall not imply termination of the audiovisual production contract.

Where the making or exploitation of the work is continued under Articles 31 et seq. of Act No. 85-98 of January 25, 1985, on the Judicial Rehabilitation and Liquidation of Enterprises, the receiver shall be required to respect all of the producer's commitments, particularly as regards the joint authors.

In the event of sale of all or a part of the enterprise or of liquidation, the receiver, the debtor or the liquidator, as appropriate, shall be required to establish a separate lot for each audiovisual work that may be subject to assignment or to auction. He shall be required to inform, on pain of nullity, each of the authors and coproducers of the work by registered letter one month before any decision on assignment or any procedure for sale by auction of property held

INTELLECTUAL PROPERTY CODE

indivisum. The acquirer shall similarly be held to the obligations of the seller.

The author and the joint authors shall have a right of preemption in respect of the work unless one of the coproducers states his intention to acquire. Failing agreement, the purchase price shall be fixed by expert opinion.

Where the activities of the enterprise have ceased for more than three months or where liquidation is ordered, the author and the joint authors may require termination of the audiovisual production contract.

SECTION IV

Commission Contracts for Advertising                                           Articles L132-31 to
                                                                                L132-33

**Article L132-31**

In the case of a commissioned work used for advertising, the contract between the producer and the author shall imply, unless otherwise stipulated, assignment to the producer of the exploitation rights in the work on condition that the contract specify the separate remuneration payable for each mode of exploitation of the work as a function, in particular, of the geographical area, the duration of exploitation, the size of the printing and the nature of the medium.

An agreement between the organizations representing the authors and the organizations representing the advertising producers shall lay down the basic elements used to form the remuneration that corresponds to the various uses of works.

The term of the agreement shall be of between one and five years.

Its provisions may be made compulsory for all the parties by way of decree.

**Article L132-32**

Failing agreement concluded either prior to April 4, 1986, or on the date of expiry of the preceding agreement, the bases for the remuneration referred to in the second paragraph of Article L132-31 shall be determined by a committee chaired by a magistrate of the judiciary designated by the First President of the Cour de Cassation, and composed, in addition, of one member of the Conseil d'Etat designated by the Vice President of the Conseil d'Etat, one qualified person designated by the Minister responsible for culture, on the one hand, and an equal number of members designated by the organizations representing the authors and of members designated by the organizations representing the advertising producers, on the other.

**Article L132-33**

The organizations entitled to designate members of the Committee and the number of persons each organization shall be entitled to designate shall be specified by an order of the Minister responsible for culture.

The Committee shall take its decisions on a majority of the members present. In the event of an equally divided vote, the Chairman shall have a casting vote.

The Committee's decisions shall be enforceable if, within one month, its Chairman has not requested a second decision.

The decisions of the Committee shall be published in the Official Journal of the French Republic.

SECTION V

Pledging the Right to Exploit Software                                          Article L132-34

**Article L132-34**
*(inserted by Act No. 94-361 of 10 May 1994 art. 7 Official Journal of 11 May 1994)*

Notwithstanding the provisions of the Act of March 17, 1909, on the Sale and Mortgaging of Businesses, the right of exploitation of an author of software, as defined in Article L122-6, may be pledged subject to the following conditions:

The pledge shall be set out in writing on pain of nullity.

The pledge shall be entered, failing which it shall not be invokable, in a special register kept by the National Institute of Industrial Property. The entry shall state precisely the basis for the security and, particularly, the source codes and operating documents.

The ranking of entries shall be determined by the order in which they are requested.

The entries of pledges shall lapse, unless renewed beforehand, on expiry of a period of five years.

A Conseil d'Etat decree shall lay down the implementing conditions for this Article.

CHAPTER III

The payment for book lending in a library                                       Articles L133-1 to
                                                                                L133-4

**Article L133-1**
*(Act n° 2003-517 of 18 June 2003, Art.1, Official journal of 19 June 2003, in force on 1 august 2003)*

When a work is subject to a publishing contract for its publication and distribution in a book form, the author may not object to the lending of copies of this publication by a library open to the public.

The lending creates a right for payment in favour of the author in accordance with the conditions set in Article L133-4.

**Article L133-2**
*(Act n° 2003-517 of June 2003, Art. 1, Official Journal of 19 June 2003, in force on 1 august 2003)*

The payment stipulated in article L133-1 shall be collected by one or several collection and distribution companies

INTELLECTUAL PROPERTY CODE

of royalties who are governed by Title II of Book III and licensed by the Minister responsible for culture.

The licenses stipulated in the first paragraph shall be delivered in consideration:

- of the diversity of partners
- of the professional qualification of the managers
- of the means that the company puts in place to insure the collection and distribution of the payment for lending in library;
- of the equitable representation of authors and publishers among the partners and within the management organs.

A decree in Conseil d'Etat shall determine the conditions for the delivery and withdrawal of licences.

## Article L133-3
*(Act n° 2003-517 of June 2003, Art. 1, Official Journal of June 2003, in force on 1 august 2003)*

The payment stipulated in the second paragraph of Article L133-1 shall comprise two parts.

The first part, borne by the State, shall be determined on the basis of a fixed contribution paid by each subscribed user of libraries open to the public for lending with the exception of school libraries. A decree in Conseil d'Etat shall determine the amount of the contribution, which may be different for libraries of higher institutions, and the conditions to determine the number of subscribed users to be taken into account for the computation of this part.

The second part shall be fixed on the basis of public price before taxes of books bought by legal persons, mentioned in the third paragraph (2°) of Article 3 of Act n° 81-766 of 10 August 1981 on book price, for their libraries open to the public for lending. This part is paid by the suppliers who operate these sales. The rate of the payment is 6% of the market price of the sale.

## Article L133-4
*(Act n° 2003-517 of 18 June 2003, Art. 1, Official Journal f 19 June 2003, in force on 1 august 2003)*

The payment for book lending in a library is divided according to the following criteria.

1° A first part shall be divided on equal shares between authors and publishers in proportion to the number of books bought each year by legal persons, mentioned in the third paragraph (2°) of article 3 of Act n° 81-766 of 10 August 1981 aforementioned, for their libraries, fixed on the basis of the information that these persons and their suppliers communicate to the company or companies mentioned in Article L133-2.

2° A second part, which may not exceed half of the total, shall be allocated to take in charge of a fraction of the contributions, owed for complementary pension, by the persons mentioned in the second paragraph of article L382-12 of the Social Security Code.

| | |
|---|---|
| **BOOK II** | |
| **Neighbouring rights** | **Articles L211-1 to L217-3** |
| SOLE TITLE | Articles L211-1 to L217-3 |
| CHAPTER I<br>General Provisions | Articles L211-1 to L211-5 |

## Article L211-1
Neighboring rights shall not prejudice authors' rights. Consequently, no provision in this Title shall be interpreted in such a way as to limit the exercise of copyright by its owners.

## Article L211-2
In addition to any person having a justified interest, the Minister responsible for culture shall be entitled to take legal action, particularly where there is no known successor in title or where there is no heir or no spouse entitled to inherit.

## Article L211-3
The beneficiaries of the rights afforded by this Title may not prohibit:

1°.private and gratuitous performances carried out exclusively within the family circle;

2°.reproductions strictly reserved for private use by the person who has made them and not intended for any collective use;

3°.subject to adequate elements of identification of the source:

— analyses and brief quotations justified by the critical, polemic, educational, scientific or informatory nature of the work in which they are incorporated;

— press reviews;

— dissemination, even in full, for the purposes of current affairs information, of speeches intended for the public in political, administrative, judicial or academic assemblies and in public meetings of a political nature and in official ceremonies;

4°.parody, pastiche and caricature, observing the rules of the genre.

## Article L211-4
*(Act No. 97-283 of 27 Mars 1997 art. 11 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

INTELLECTUAL PROPERTY CODE

The term of the economic rights provided for in this Title shall be 50 years from January 1 of the calendar year following that of:

— the performance for performers;

— the first fixation of a sequence of sounds for phonogram producers, and of a sequence of images with or without sound for videogram producers;

— the first communication to the public of the programs referred to in Article L216-1 for audiovisual communication companies.

However, where a fixation of the performance, a phonogram or a videogram is included in a communication to the public during the term defined in the first three paragraphs, the economic rights of the performer or phonogram or videogram producer shall not expire until 50 years after January 1 of the calendar year following that of the said communication to the public.

**Article L211-5**

*(inserted by Act No. 97-283 of 27 Mars 1997 art. 12 Official Journal of 28 Mars 1997 in force on 1 July 1995)*

Subject to the provisions of international treaties to which France is party, the owners of neighboring rights who are not nationals of a Member State of the European Community shall be given the term of protection provided for in the country of which they are nationals, but that term may not exceed that provided for in Article L211-4.

CHAPTER II

Rights of Performers                                                                 Articles L212-1 to L212-10

**Article L212-1**

Save for ancillary performers, considered such by professional practice, performers shall be those persons who act, sing, deliver, declaim, play in or otherwise perform literary or artistic works, variety, circus or puppet acts.

**Article L212-2**

A performer shall have the right to respect for his name, his capacity and his performance.

This inalienable and imprescriptible right shall attach to his person.

It may be transmitted to his heirs in order to protect his performance and his memory after his death.

**Article L212-3**

The performer's written authorization shall be required for fixation of his performance, its reproduction and communication to the public as also for any separate use of the sounds or images of his performance where both the sounds and images have been fixed.

Such authorization and the remuneration resulting therefrom shall be governed by Articles L762-1 and L762-2 of the Labor Code, subject to Article L212-6 of this Code.

**Article L212-4**

The signature of a contract between the performer and a producer for the making of an audiovisual work shall imply the authorization to fix, reproduce and communicate to the public the performance of the performer.

Such contract shall lay down separate remuneration for each mode of exploitation of the work.

**Article L212-5**

Where neither a contract nor a collective agreement mention the remuneration for one or more modes of exploitation, the amount of such remuneration shall be determined by reference to the schedules established under specific agreements concluded, in each sector of activity, between the employees' and employers' organizations representing the profession.

**Article L212-6**

Article L762-2 of the Labor Code shall only apply to that part of the remuneration paid in accordance with the contract that exceeds the bases laid down in the collective agreement or specific agreement.

**Article L212-7**

Contracts concluded prior to January 1, 1986, between a performer and a producer of audiovisual works or their assignees shall be subject to the preceding provisions in respect of those modes of exploitation which they excluded. The corresponding remuneration shall not constitute a salary. This right of remuneration shall lapse at the death of the performer.

**Article L212-8**

The provisions of the agreements referred to in the preceding Articles may be made compulsory within each sector of activity for all the parties concerned by order of the responsible Minister.

**Article L212-9**

Failing agreement concluded in accordance with Articles L212-4 to L212-7, either prior to January 4, 1986, or at the date of expiry of the preceding agreement, the types and bases of remuneration for the performers shall be determined, for each sector of activity, by a committee chaired by a magistrate of the judiciary designated by the First President of the Cour de Cassation and composed, in addition, of one member of the Conseil d'Etat designated by the Vice President of the Conseil d'Etat, one qualified person designated by the Minister responsible for culture and an equal number of representatives of the employees' organizations and representatives of the employers' organizations.

INTELLECTUAL PROPERTY CODE

The Committee shall take its decisions on a majority of the members present. In the event of equally divided voting, the Chairman shall have a casting vote. The Committee shall decide within three months of the expiry of the time limit laid down in the first paragraph of this Article.

Its decision shall have effect for a duration of three years, unless the parties concerned reach an agreement prior to that date.

### Article L212-10

Performers may not prohibit the reproduction and public communication of their performance if it is accessory to an event that constitutes the main subject of a sequence within a work or an audiovisual document.

CHAPTER III

Rights of Phonogram Producers                                                        Article L213-1

### Article L213-1

The natural or legal person who takes the initiative and responsibility for the initial fixation of a sequence of sounds shall be deemed the phonogram producer.

The authorization of the phonogram producer shall be required prior to any reproduction, making available to the public by way of sale, exchange or rental, or communication to the public of his phonogram, other than those referred to in Article L214-1.

CHAPTER IV

Provisions Common to Performers and Phonogram Producers                  Articles L214-1 to
                                                                                                                        L214-5

### Article L214-1

Where a phonogram has been published for commercial purposes, neither the performer nor the producer may oppose:

1°.its direct communication in a public place where it is not used in an entertainment;

2°.its broadcasting or the simultaneous and integral cable distribution of such broadcast.

Such uses of phonograms published for commercial purposes shall entitle the performers and producers to remuneration whatever the place of fixation of such phonograms.

Such remuneration shall be paid by the persons who use the phonograms published for commercial purposes under the conditions set out in items 1 and 2 of this Article.

It shall be based on the revenue from exploitation or, failing that, calculated as a lump sum in the cases laid down in Article L131-4.

It shall be shared half each between the performers and the phonogram producers.

### Article L214-2

Subject to the international conventions, the right to remuneration afforded by Article L214-1 shall be shared between the performers and phonogram producers for phonograms fixed for the first time in France.

### Article L214-3

The schedule of remuneration and the conditions of payment of the remuneration shall be laid down by specific agreements for each branch of activity between the organizations representing the performers, the phonogram producers and the persons using phonograms as laid down in items 1 and 2 of Article L214-1.

Such agreements shall set out the terms under which the persons using phonograms under such conditions shall satisfy their obligation to furnish to the royalty collection and distribution societies the precise program of the uses which they make and all the documentary elements that are indispensable for distributing the royalties.

The provisions of such agreements may be made compulsory for all the parties concerned by order of the Minister responsible for culture.

The term of such agreements shall be of between one and five years.

### Article L214-4

*(Order No. 2004-637 of 1 July 2004, Article 4 1, Official Journal of 2 July 2004)*

Failing agreement prior to 30 June 1986, or if No. agreement has been reached on expiry of the preceding agreement, the schedule of remuneration and the conditions for paying the remuneration shall be decided by a Committee chaired by a State's representative and composed of an equal number of, on the one hand, members designated by the organizations representing the beneficiaries of the right to remuneration and, on the other hand, members designated by the organizations representing those persons who, in the branch of activity concerned, use the phonograms in accordance with the conditions laid down at (1°) and (2°) of Article L214-1.

The organizations entitled to designate members of the Committee and the number of persons each organization is entitled to designate shall be laid down by an order of the Minister responsible for culture.

The Committee shall take its decisions on a majority of the members present. In the event of equally divided voting, the Chairman shall have a casting vote.

The deliberations of the Committee shall be enforceable if, within a period of one month, its Chairman has not requested a second deliberation.

The decisions of the Committee shall be published in the Official Journal of the French Republic.

### Article L214-5

INTELLECTUAL PROPERTY CODE

The remuneration referred to in Article L214-1 shall be collected on behalf of the entitled persons and distributed among them by one or more bodies as referred to in Title II of Book III.

CHAPTER V
Rights of Videogram Producers                                                    Article L215-1

**Article L215-1**

The natural or legal person who takes the initiative and the responsibility for the initial fixation of a sequence of images, whether accompanied by sounds or not, shall be deemed the videogram producer.

The authorization of the videogram producer shall be required prior to any reproduction, any making available to the public by means of sale, exchange or rental, or any communication to the public of his videogram.

The rights afforded to a videogram producer under the preceding paragraph, the authors' rights and the performers' rights of which he disposes in respect of the work fixed on the videogram may not be separately assigned.

CHAPTER VI
Rights of Audiovisual Communication Companies                        Article L216-1

**Article L216-1**

The authorization of the audiovisual communication enterprise shall be required for any reproduction of its programs, any making them available to the public by sale, rental or exchange, any telediffusion and communication to the public in a place to which the latter has access in exchange for the payment of an entry fee.

Those bodies that exploit an audiovisual communication service within the meaning of Act No. 86-1067 of September 30, 1986, on the Freedom of Communication, whatever the arrangements applicable to that service, shall be designated audiovisual communication enterprises.

CHAPTER VI
Provisions Applicable to Satellite Broadcasting and Cable Retransmission    Articles L217-1 to
L217-3

**Article L217-1**
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 3 Official Journal of 28 Mars 1997)*

The rights neighboring on copyright that relate to the satellite broadcasting of a performer's performance, a phonogram, a videogram or the programs of an audiovisual communication enterprise shall be governed by the provisions of this Code in so far as the broadcasting takes place under the conditions specified in Articles L122-2-1 and L122-2-2.

In the cases provided for in Article L122-2-2, those rights may be exercised in relation to the persons referred to in subparagraphs (i) and (ii) of that Article.

**Article L217-2**
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 3 Official Journal of 28 Mars 1997)*

I. Where it is provided for in this Code, the right to authorize the simultaneous, complete and unchanged cable retransmission, on the national territory, of a performer's performance, a phonogram or a videogram broadcast from a Member State of the European Community may only be exercised, as from the date of the entry into force of Act No. 97-283 of March 27, 1997, by a royalty collection and distribution. If the society in question is governed by Title II of Book III, it must be approved for the purpose by the Minister responsible for culture.

Where the owner of the rights has not entrusted their management to a royalty collection and distribution society, he shall designate that to which he entrusts the exercise thereof. He shall notify the designation in writing to the society, which may not refuse it.

The contract authorizing the broadcasting on the national territory of a performer's performance, a phonogram or a videogram shall mention the society, if any, responsible for exercising the right to authorize the simultaneous, complete and unchanged cable retransmission thereof in the Member States of the European Community.

The approval provided for in the first paragraph shall be granted in consideration of the criteria listed in Article L132-20-1.

A Conseil d'Etat decree shall lay down the conditions for the grant and revocation of approval. It shall also, in the case provided for in the second paragraph, lay down the procedure for the designation of the society responsible for the management of the right of retransmission.

II. Notwithstanding paragraph I, the owner of the rights may license those rights to an audiovisual communication enterprise.

The provisions of paragraph I shall not apply to rights licensed to an audiovisual communication enterprise.

**Article L217-3**
*(inserted by Act No. 97-283 of 27 Mars 1997 art. 3 Official Journal of 28 Mars 1997)*

Mediators shall be appointed, without prejudice to the right of the parties to go to court, in order to promote the settlement of disputes concerning the grant of authorization, where required, for the simultaneous, complete and unchanged cable retransmission of subject matter protected by the rights laid down in this Title.

In the absence of an amicable settlement, the mediator may propose to the parties the solution which seems appropriate to him, which the parties shall be deemed to have accepted if they have not expressed their opposition in writing within a period of three months.

INTELLECTUAL PROPERTY CODE

A Conseil d'Etat decree shall specify the conditions for the application of this Article and lay down the procedure for the designation of mediators.

**BOOK III**

| **General Provisions relative to copyrights, to neighbouring rights and to the rights of database producers** | **Articles L311-1 to L343-4** |
| --- | --- |
| TITLE I<br>Remuneration for Private Copying | Articles L311-1 to L311-8 |
| SOLE CHAPTER | Articles L311-1 to L311-8 |

**Article L311-1**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2001-624 of 17 July 2001 art. 15 I Official Journal of 18 July 2001)*

The authors and performers of works fixed on phonograms or videograms and the producers of such phonograms or videograms shall be entitled to remuneration for the reproduction of those works made in accordance with item 2 of Article L122-5 and item 2 of Article L211-3.

The authors and publishers of works fixed on any other medium are also entitled to remuneration for the reproduction of those works made in accordance with item 2 of Article L122-5 and item 2 of Article L211-3, on a digital recording medium.

**Article L311-2**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2001-624 of 17 July 2001 art. 15 II  Official Journal of 18 July 2001)*

Subject to the international conventions, the right to remuneration referred to in Articles L214-1 and in the first paragraph of article L311-1, shall be shared between the authors, performers, phonogram or videogram producers in respect of phonograms and videograms fixed for the first time in France.

**Article L311-3**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The remuneration for private copying shall be assessed, under the conditions defined below, as a lump sum as laid down in the second paragraph of Article L131-4.

**Article L311-4**
*(Act No. 92-677 of 17 July 1992 art. 119 Official Journal of 19 July 1992 in force on 1 January 1993)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2001-624 of 17 July 2001 art. 15 III Official Journal of 18 July 2001)*

The remuneration provided for in Article L.311-3 shall be paid by the manufacturer, the importer or the person making an intra-Community acquisition, within the meaning of paragraph 3 of point I of Article 256 bis of the Code général des impôts, of recording mediums that may be used for reproduction of works for private use, at the time these mediums enter into circulation in France.

The amount of the remuneration shall depend on the type of medium and the recording time it provides.

**Article L311-5**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The types of medium, the rates of remuneration and the conditions of payment of such remuneration shall be determined by a Committee chaired by a representative of the State and composed, in addition, in half of persons designated by organizations representing the beneficiaries of the right of remuneration, in quarter of persons designated by the organizations representing the manufacturers or importers of the mediums referred to in the first paragraph of the preceding Article and in quarter of persons designated by the organizations representing the consumers.

The organizations entitled to designate members of the Committee and the number of persons that each organization shall be entitled to designate shall be determined by an order of the Minister responsible for culture.

The Committee shall take its decisions on a majority of the members present. In the event of equally divided voting, the Chairman shall have a casting vote.

The decisions of the Committee shall be enforceable if, within one month, its Chairman has not requested a second decision.

The decisions of the Committee shall be published in the Official Journal of the French Republic.

**Article L311-6**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The remuneration referred to in Article L311-1 shall be collected on behalf of the entitled persons by one or more bodies as referred to in Title II of this Book.

It shall be distributed between the entitled persons by the bodies referred to in the preceding paragraph as a function of the private reproductions of which each work has been the subject.

INTELLECTUAL PROPERTY CODE

**Article L311-7**

*(Act No. 95-4 of 3 January 1995 art. 2 Official Journal of 4 January 1995)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2001-624 of 17 July 2001 art. 15 IV  Official Journal of 18 July 2001)*

The remuneration for private copying of phonograms shall belong in half to the authors within the meaning of this Code, in quarter to the performers and in quarter to the producers.

The remuneration for private copying of videograms shall belong in equal parts to the authors within the meaning of this Code, the performers and the producers.

The remuneration for private copying of the works referred to in Article L311-1 shall belong in equal parts to the authors and the publishers.

**Article L311-8**

*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2001-624 of 17 July 2001 art. 15 V  Official Journal of 18 July 2001)*

The remuneration for private copying shall be refunded when the recording medium is acquired for their own use or production by:

1°.audiovisual communication enterprises;

2°.phonogram or videogram producers and persons who carry out the reproduction of phonograms or videograms on behalf of the producers;

2° bis. The publishers of works published on digital mediums;

3°.legal persons or bodies, of which the list shall be established by the Minister responsible for culture, that use recording mediums for the purpose of assisting persons with sight or hearing disability.

| | |
|---|---|
| TITLE II | |
| Royalty Collection and Distribution Societies | Articles L321-1 to L321-13 |
| SOLE CHAPTER | |
| | Articles L321-1 to L321-13 |

**Article L321-1**

*(Act No. 97-283 of 27 Mars 1997 art. 4 I Official Journal of 28 Mars 1997)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The societies for the collection and distribution of authors' royalties and the royalties of performers and phonogram and videogram producers shall be established in the form of civil law companies.

The members must be authors, performers, phonogram or videogram producers, publishers or their successors in title. Such duly established civil law societies shall be entitled to take legal action to defend the rights for which they are responsible under their statutes.

Actions seeking the payment of the royalties charged by such civil law companies shall be statute-barred after ten years from the date on which they were charged, that period being suspended until the date of their allocation.

**Article L321-2**

*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Contracts concluded by the civil law societies of authors or of owners of neighboring rights, in implementation of their purpose, with the users of all or part of their repertoire shall constitute civil law instruments.

**Article L321-3**

*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The draft statutes and general regulations of the royalty collection and distribution societies shall be addressed to the Minister responsible for culture.

Within one month of receipt, the Minister may apply to the first instance court in the event of substantial and earnest reasons opposing the incorporation of one of these societies.

The court shall assess the professional qualifications of the founders of such society, the human and material means that they intend to use to collect royalties and to exploit their repertoire.

**Article L321-4**

*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The royalty collection and distribution societies shall be required to appoint at least one auditor and one alternate from the list referred to in Article 219 of Act No. 66-537 of July 24, 1966, on Commercial Companies, who shall carry out their duties in compliance with the provisions laid down in the above-mentioned Law, subject to the rules specific to them. Article 457 of the above-mentioned Act No. 66-537 of July 24, 1966, shall be of application.

Article 29 of Act No. 84-148 of March 1, 1984, on the Prevention and Amicable Settlement of Difficulties in Enterprises shall be of application.

**Article L321-5**

*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2000-719 of 1 August 2000 art. 12 Official Journal of 2 August 2000)*

INTELLECTUAL PROPERTY CODE

The right to communication provided for in Article 1855 of the Civil Code shall apply to royalty collection and distribution societies, but without a member being able to obtain communication of the amount of royalties distributed on an individual basis to any other rightholder than himself. A decree by the Conseil d'Etat shall determine the conditions of exercise of this right.

### Article L321-6
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Any group of members representing at least one-tenth of the membership may take legal action for the designation of one or more experts to be entrusted with submitting a report on one or more administrative operations.

The public prosecutor and the works council shall be entitled to act in the same way.

The report shall be addressed to the requester, to the public prosecutor, to the works council, to the auditors and to the administrative council. The report shall be annexed to the report drawn up by the auditors for the purposes of the first general meeting; it shall be given the same publicity.

### Article L321-7
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The royalty collection and distribution societies shall hold available for potential users the complete repertoire of the French and foreign authors and composers they represent.

### Article L321-8
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The statutes of the royalty collection and distribution societies shall lay down the conditions under which associations of general interest shall enjoy, in respect of events for which no entrance fee is charged, a reduction on the amount of authors' royalties and of the royalties of performers and phonogram producers which they are required to pay.

### Article L321-9
*(Act No. 97-283 of 27 Mars 1997 art. 4 II Official Journal of 28 Mars 1997)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
*(Act No. 2000-719 of 1 August 2000 art. 11 Official Journal of 2 August 2000)*

These societies shall use, for action to assist creation and promote live entertainment and for training schemes for performers :

1°. 25% of amounts obtained from the remuneration for private copying;

2°. All of the amounts collected in application of Articles L. 122-10, L. 132-20-1, L. 214-1, L. 217-2 and L. 311-1 that have not been allocated either in application of the international conventions to which France is a party, or because their recipients could not be identified or found prior by or before the expiry of the period provided for in the last paragraph of Article L. 321-1.

They may use for the said action all or part of the amounts referred to under item 2 as from the end of the fifth year following the date of their intended allocation, without prejudice to claims for payment of non-statute-barred royalties. The distribution of the corresponding amounts, which shall not be to the benefit of just a single body, shall be subject to a vote at the general meeting of the society, deciding on a two-thirds majority. Failing such majority, a new general meeting, convened specifically for that purpose, shall take a decision on a simple majority.

The amount and use of these sums of money shall be the subject of a yearly report by the collecting societies to the Minister responsible for culture. The auditor shall verify the information contained in that report for honesty and consistency with the accounting documents of the society. He shall draw up a special report to that end.

### Article L321-10
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The societies that collect and distribute the royalties of phonogram and videogram producers and performers shall have the faculty, within the limits of the instructions given to them by all or part of the members, or by foreign bodies having the same purpose, to collectively exercise the rights afforded by Articles L213-1 and L215-1 by concluding general contracts of joint interest with the users of phonograms or videograms for the purpose of improving the dissemination of the latter or of promoting technical or economic progress.

### Article L321-11
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Notwithstanding the general provisions applicable to civil law companies, the request for dissolution of a royalty collection and distribution society may be submitted to the court by the Minister responsible for culture.

In the event of infringement of the law, the court may order a society to cease exercising its collection activities in one sector of activity or for one mode of exploitation.

### Article L321-12
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The royalty collection and distribution society shall communicate its annual statement of accounts to the Minister responsible for culture and shall bring to his notice, two months at least before examination by the general meeting, any draft amendment to the statutes or rules for the collection and distribution of royalties.

It shall address to the Minister responsible for culture, at the latter's request, any document relating to the collection and distribution of royalties, or copy of agreements concluded with third parties.

The Minister responsible for culture or his representative may obtain, from documents or on the spot, the

INTELLECTUAL PROPERTY CODE
information referred to in this Article.

### Article L321-13
*(inserted by Act No. 2000-719 of 1 August 2000 art. 12 Official Journal of 2 August 2000)*

I. – A standing committee shall be created to oversee the royalty collection and distribution societies composed of five members appointed by decree for a term of five years.

- a conseiller maître to the Cour des Comptes, chairman, designated by the premier président of the Cour des Comptes;

- a conseiller d'Etat, designated by the vice-président of the Conseil d'Etat;

- a conseiller to the Cour de Cassation, designated by the premier président of the Cour de Cassation;

- a member of the Inspection générale des finances, designated by the Minister responsible for finance;

- a member of the Inspection générale de l'administration des affaires culturelles, designated by the Minister responsible for culture;

The committee may be assisted by rapporteurs designated from amongst the members of the Conseil d'Etat and the body of counsellors of administrative courts and administrative courts of appeal, the judges of the Cour de Cassation and of the courts and tribunals, the judges of the Cour des Comptes and of the Chambres régionales des comptes, the members of the Inspection générale des finances and the members of the body of administrateurs civils. It may also benefit from civil servants made available to it and seek the assistance of experts designated by its chairman.

II. – The committee audits the accounts and the management of the royalty collection and distribution societies as well as those of their subsidiaries and any organisations controlled by them.

To this end, the directors of these societies, subsidiaries and organisations are under the duty to lend it their assistance, communicate any documents to it and answer any request for information required for the performance of its mission. For operations involving information technology, the right of communication supposes access to software and data, as well as the right to request their transcription by any suitable processing method in the documents directly usable for auditing purposes.

The committee may request the auditor to provide it with information on the collecting societies audited by him. In this case the auditor will be released from his duty of professional secrecy as regards the committee members.

It may carry out its audit of the societies or organisations mentioned in the first sentence of this paragraph [item II] based on records or on the spot.

III. – The supervising committee of royalty collection and distribution societies shall present an annual report to Parliament, to Government and to the general assemblies of members of the royalty collection and distribution societies.

IV. – Failure by any director of a society or of an organisation subject to the control of the supervising committee of royalty collection and distribution societies to satisfy information requests made by the committee, the hindrance in any way of the committee in the performance of its mission or the intentional communication to it of inaccurate information shall be punishable by a prison term of one year and a fine of FRF 100,000.

V. – The committee shall be headquartered in the premises of the Cour des Comptes, which shall ensure its secretariat.

VI. - A Conseil d'Etat decree shall determine the organisation and the operation of the committee, as well the procedures applicable before it.

| | |
|---|---|
| TITLE III | |
| Procedure and Sanctions | Articles L331-1 to L335-10 |
| CHAPTER I | |
| General Provisions | Articles L331-1 to L331-4 |

### Article L331-1
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

All disputes relative to the application of the provisions of Part One of this Code which are within the jurisdiction of the civil courts shall be submitted to the competent courts, without prejudice to the right of the injured party to institute criminal proceedings under the general rules of law.

Regularly constituted bodies for professional defense shall be entitled to institute legal proceedings to defend the interests entrusted to them under their statutes.

### Article L331-2
*(Act No. 94-361 of 10 May 1994 art. 10 I Official Journal of 11 May 1994)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Apart from the reports drawn up by police investigators, the proof of the existence of any infringement of the provisions of Books I, II and III of this Code and of Article 52 of Act No. 85-660 of July 3, 1985, on Authors' Rights and on the Rights of Performers, Producers of Phonograms and Videograms and Audiovisual Communication Enterprises may be provided by the statement of a sworn agent designated, as appropriate, by the National Center for Cinematography, by the professional bodies of authors or by the societies referred to in Title II of this Book. Such agents shall be approved by the Minister responsible for culture subject to the conditions laid down by a Conseil d'Etat decree.

### Article L331-3

INTELLECTUAL PROPERTY CODE
*(Act No. 94-361 of 10 May 1994 art. 10 II Official Journal of 11 May 1994)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
The National Center for Cinematography may exercise the rights acknowledged for the civil party with respect to the offense of infringement, within the meaning of Article L335-3, of an audiovisual work where the public proceedings have been initiated by the public prosecutor or by the injured party.

### Article L331-4
*(inserted by Act No. 98-536 of 1 July 1998 art. 6 Official Journal of 2 July 1998)*
The rights mentioned in part one of this Code shall not prevail over any acts necessary for the accomplishment of a jurisdictional or administrative procedure provided by law, or undertaken for public safety reasons.

CHAPTER II

Infringement Seizure
Articles L332-1 to L332-4

### Article L332-1
*(Act No. 98-536 of 1 July 1998, Article 4, Official Journal of 2 July 1998)*
*(Act No. 2004-575 of 21 June 2004, Article 81, Official Journal of 22 June 2004)*
Police commissioners and, in those places where there are No. police commissioners, the courts shall be required, at the request of an author of a work protected under Book I or entitled beneficiaries or assigns, to seize copies constituting an unlawful reproduction of the work.
If such seizure delays or suspends public performances which are in progress or which have already been advertised, a special authorization must be obtained from the president of the Tribunal de grande instance (High Court), by an order issued upon petition. The president of the Tribunal de grande instance (High Court) may also order, in the same form:
1°.the suspension of any manufacturing in progress for the unlawful reproduction of a work;
2°.the seizure, whatever the day or time, of the copies constituting an unlawful reproduction of a work, whether already manufactured or in the process of manufacturing, of the receipts obtained and of copies unlawfully used;
3°.the seizure of receipts from any reproduction, performance or dissemination, by any means whatsoever, of a work of the mind, carried out in violation of the copyright (author's rights).
4°. the suspension, by any means, of the streaming of on-line public communication services affecting copyright, including by ordering to cease to store the streaming or, failing that, to cease allowing to have access to it. In this case, the time limit provided for under Article L332-2 shall be reduced to fifteen days.
The president of the Tribunal de grande instance (High Court) may, in the same manner, order the measures set out at (1°) to (4°) at the request of the holder of performing rights.
In the orders referred to above, the president of the Tribunal de grande instance (High Court) may order the distrainer to provide first adequate guaranty.

### Article L332-2
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
Within 30 days of the report of seizure referred to in the first paragraph of Article L332-1 or of the date of the order referred to in that same Article, the distrainee or the garnishee may request the president of the first instance court to order the lifting of the seizure or to limit its effect or again to authorize resumption of manufacture or of the public performances, under the authority of an administrator appointed as receiver, to hold the proceeds from such manufacture or performance on behalf of the person to whom the work belongs.
The president of the first instance court, acting in chambers, may order, if he allows the request of the distrainee or garnishee, the petitioner to deposit a sum as a guarantee for any damages to which the author might be entitled.

### Article L332-3
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*
If the distrainer fails to submit the matter to the competent court within 30 days of seizure, the lifting of the seizure may be ordered by the president of the first instance court, acting in chambers.

### Article L332-4
*(Act No. 98-536 of 1 July 1998 art. 4 and art. 7 Official Journal of 2 July 1998)*
In respect of software and databases, infringement seizures shall be carried out under an order issued, upon application, by the président of the court of first instance. The président shall authorise, if required, an actual seizure.
The officiating bailiff or the police commissioner may be assisted by an expert designated by the petitioner.
Failing a writ of summons within 15 days of the seizure, the infringement seizure shall be invalid.
In addition, the police commissioners shall be required, at the request of any holder of rights over software or a database, to carry out a descriptive seizure of the infringing software or database, which may take the physical form of a copy.

CHAPTER III

Seizure Order
Articles L333-1 to L333-4

### Article L333-1

INTELLECTUAL PROPERTY CODE
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Where the proceeds of exploitation which are due to the author of a work of the mind have been the subject of a seizure order, the president of the first instance court may order payment to the author, as an allowance for maintenance, of a certain sum or of a specified proportion of the amounts seized.

**Article L333-2**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Amounts due, on account of exploitation for gain or following assignment of literary or artistic property rights, to authors, composers or artists or to a surviving spouse against whom there exists no final decision of separation or under-age children in their capacity of successors in title, shall not be subject to seizure insofar as they constitute maintenance.

**Article L333-3**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The proportion of such amounts not subject to seizure may not, in any event, be less than four-fifths in those cases where the annual amount is at most equal to the highest level of resources in accordance with Chapter V of Title IV of Book I of the Labor Code.

**Article L333-4**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

The provisions under this Chapter shall not prevent seizure ordered under the provisions of the Civil Code relating to unpaid maintenance.

CHAPTER IV
Resale Royalty Right                                                      Article L334-1

**Article L334-1**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

In the event of infringement of Article L122-8, the acquirer and the law officials may be pronounced jointly liable for damages in favor of the beneficiaries of the resale royalty right.

CHAPTER V
Penal Provisions                                                         Articles L335-1 to
L335-10

**Article L335-1**
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

As soon as offenses under Article L335-4 of this Code have been established, the competent police officers may effect seizure of the unlawfully reproduced phonograms and videograms, of the copies and articles manufactured or imported unlawfully and of the equipment specially installed for the purpose of such acts.

**Article L335-2**
*(Act No. 94-102 of 5 February 1994Article 1 Official, Journal of 8 February 1994)*
*(Act No. 98-536 of 1 July 1998, Article 4 Official Journal of 2 July 1998)*
*(Order No. 2004-916 of 19 September 2000, Article 3, Official Journal of 22 September 2000, in force1 January 2002)*
*(Act No. 2004-204 of 9 March 2004, Article 34 I, Official Journal of 10 March 2004)*

Any edition of writings, musical compositions, drawings, paintings or other printed or engraved production made in whole or in part regardless of the laws and regulations governing the ownership of authors shall constitute an infringement. Any infringement shall constitute an offence.

Infringement in France of works published in France or abroad shall be liable to a three-year imprisonment and a fine of € 300.000.

The sale, exportation and importation of infringing works shall be subject to the same penalties.

Where offences provided for by this Article are committed by an organised criminal group, the penalties will be increased to five-year imprisonment and a fine of € 500.000.

**Article L335-3**
*(Act No. 94-361 of 10 May 1994 art. 8 Official Journal of 11 May 1994)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Any reproduction, performance or dissemination of a work of the mind, by any means whatsoever, in violation of the author's rights as defined and regulated by law shall also constitute an infringement.

The violation of any of the rights of an author of software as defined in Article L122-6 shall also constitute an infringement.

**Article L335-4**
*(Act No. 94-102 of 5 February 1994, Article 2, Official Journal of 8 February 1994)*
*(Act No. 98-536 of 1 July 1998, Article 2, Official Journal of 2 July 1998)*
*(Order No. 2004-916 of 19 September 2000, Article 3, Official Journal of 22 September 2000, in force1 January 2002*
*(Act No. 2003-571 of 18 June 2003, Article 1, Official Journal of 19 June 2003, in force 1 August 2003))*
*(Act No. 2004-204 of 9 March 2004, Article 34 II, Official Journal of 10 March 2004)*

INTELLECTUAL PROPERTY CODE

Any fixation, reproduction, communication or making available to the public, on payment or free of charge, or any telediffusion of a performance, a phonogram, a videogram or a program made without authorization of the performer, that of the phonogram or videogram producer or that of the audiovisual communication enterprise, where such authorization is required, shall be liable to a three-year imprisonment and a fine of € 300.000.

Any importation or exportation of phonograms or videograms made without the authorization of the producer or the performer, where such authorisation is required, shall be subject to the same penalties.

Failure to pay the remuneration due to the author, the performer or the phonogram or videogram producer as a private copying or a public communication or of the telediffusion of phonograms shall be subject to the fine laid down in the first paragraph above.

Failure to pay the previous deductions provided for in the third paragraph of Article L.133-3 shall be subject to the fine provided for in the first paragraph.

Where the offences provided for under this Article are committed by an organised criminal group, the penalties will be increased to five-year imprisonment and a fine of € 500.000.

### Article L335-5
*(Act No. 94-102 of 5 February 1994 Art. 3 Official Journal of 8 February 1994)*
*(Act No. 98-536 of 1 July 1998 art. 3 Official Journal of 2 July 1998)*

In the event of conviction for one of the offenses defined in the preceding three Articles, the court may order the total or partial, permanent or temporary closure, for a period not exceeding five years, of the establishment that has served for the commission of the offense.

Temporary closure may not be a cause of either termination or suspension of employment contracts, or of any monetary consequence prejudicial to the employees concerned. Where permanent closure causes the dismissal of staff, it shall give rise, over and above the indemnity in lieu of notice and the termination indemnity, to damages as provided in Articles L122-14-4 and L122-14-5 of the Labor Code for the breach of employment contracts. Failure to pay those indemnities shall be punishable with a six-month prison term and a fine of FRF 25,000.

### Article L335-6
*(Act No.92-1336 of 16 December 1992 Article 331 Official Journal of 23 December 1992 in force on 1 March 1994)*
*(Act No. 98-536 of 1 July 1998, Article 4 Official Journal of 2 July 1998*
*(Act No. 98-536 of 1 July 1998, Article 4, Official Journal of 2 July 1998)*
*(Act No. 2004-575 of 21 June 2004, Article 8 II, Official Journal of 22 June 2004)*

In the cases referred to in the four preceding Articles, the court may order the confiscation of all or part of the receipts obtained by reason of the infringement and the confiscation of all phonograms, videograms, articles and copies that are infringing or have been unlawfully reproduced and of the equipment specifically installed for the purpose of committing the offence.

It may also order, at the cost of the convicted person, the posting of the judgment in compliance with the conditions and subject to the penalties laid down in Article 131-35 of the Penal Code, and its publication in full or as extracts in such newspapers as it may designate, without however the costs of such publication exceeding the maximum amount of the fine incurred.

### Article L335-7
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

In the cases referred to in the five preceding Articles, the equipment, the infringing articles and the receipts that have been confiscated shall be handed to the victim or his successors in title to compensate them for the prejudice they have suffered; the remaining indemnity, or the entire indemnity if there is no confiscation of equipment, infringing articles or of receipts, shall be settled through ordinary channels.

### Article L335-8
*(Act No.92-1336 of 16 December 1992 art. 203 Official Journal of 23 December 1992 in force on 1 March 1994)*
*(Act No.94-102 of 5 February 1994 Art. 4 Official Journal of 8 February 1994)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

Legal persons may be declared penally liable, in accordance with Article 121-2 of the Penal Code, for the infringements defined in Articles L335-2 to L335-4 of this Code.

Legal persons shall be liable to the following penalties:
1°.a fine determined in accordance with Article 131-38;
2°.the penalties referred to in Article 131-39.

The prohibition referred to in item 2 of Article 131-39 concerns the activity in the exercise of which or on the occasion of the exercise of which the infringement was committed.

### Article L335-9
*(Act No.94-102 of 5 February 1994 Art. 5 Official Journal of 8 February 1994)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

In the event of repetition of the offenses defined in Articles L335-2 to L335-4, or if the offender is or has been contractually bound to the aggrieved party, the penalties involved shall be doubled.

### Article L335-10
*(Act No.94-102 of 5 February 1994 Art. 5 Official Journal of 8 February 1994)*
*(Act No. 98-536 of 1 July 1998 art. 4 Official Journal of 2 July 1998)*

INTELLECTUAL PROPERTY CODE
*(Act n° 2003-706 of 1 August 2003, Art. 84, Official Journal of 2 August 2003)*

The customs administration may, at the written request of an owner of copyright or a neighbouring right, which request shall be accompanied by proof of his right as provided by Conseil d'Etat decree, withhold in the course of its inspections any goods alleged by him to be infringing that right.

The Public Prosecutor, the plaintiff and the party declaring or in possession of the goods shall be informed without delay by the customs service of the withholding measure that they have taken.

The withholding measure shall be lifted as of right where the plaintiff fails, within 10 working days following notification of the withholding of the goods, to prove to the customs service:

— either that precautionary measures under Article L332-1 have been taken;

— or that he has instituted proceedings before the civil court or the court of misdemeanours and has provided the necessary guarantees to cover his liability in the event of the infringement claim being eventually considered unfounded.

For the purpose of the institution of the legal proceedings referred to in the foregoing paragraph, the plaintiff may require the customs administration to communicate the names and addresses of the sender, the importer and the consignee of the goods withheld, or of the holder thereof, and also the quantity thereof, notwithstanding the provisions of Article 59bis of the Customs Code concerning the professional secrecy to which officials of the customs administration are bound.

The withholding mentioned in the first paragraph shall not concern the goods that have European status, which are legally produced or released for free circulation in the member state of the European Community and intended, having entered by a Customs territory as defined in the first article of Customs Code, to be released in the market of another member state of the European Community, to be legally commercialised.

| | |
|---|---|
| TITLE IV | |
| Rights of Database Producers | Articles L341-1 to L343-4 |
| | |
| CHAPTER I | |
| Field of application | Articles L341-1 to L341-2 |

**Article L341-1**
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

The producer of a database, understood as the person who takes the initiative and the risk of the corresponding investments, benefits from protection of the contents of the database when its constitution, verification or presentation shows that there has been a substantial financial, technical or human investment.

This protection is independent and applies without prejudice to the protection of copyright or any other right over the database or one of its component elements.

**Article L341-2**
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

Shall be eligible for the benefit of this Title:

1°. Producers of databases, nationals of a Member State of the European Community or of a State party to the Agreement on the European Economic Area, or who have their principal residence in such State;

2°. Companies and enterprises formed in accordance with the law of a Member State and having their registered office, central administration or principal place of business within the Community or a State party to the Agreement on the European Economic Area; however, where such a company or enterprise has only its statutory head office in the territory of such State, its operations must be genuinely linked on an ongoing basis with either the economy of this Member State or State within the European Economic Area.

Producers of databases who do not satisfy the conditions indicated above shall be eligible for protection under this Title where a special agreement has between concluded between the State of which they are a national and the Council of the European Community.

| | |
|---|---|
| CHAPTER II | |
| Scope of protection | Articles L342-1 to L342-5 |

**Article L342-1**
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

The producer of a database has the right to prohibit:

1°. The extraction, by the permanent or temporary transfer of all or a substantial part, qualitatively or quantitatively, of the contents of a database to another medium, by any means or in any form;

2°. The reuse, by making available to the public all or a substantial part, qualitatively or quantitatively, of the contents of a database, in any form whatsoever.

These rights can be transferred, assigned or licensed.

Public lending is not an act of extraction or reuse.

**Article L342-2**
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

INTELLECTUAL PROPERTY CODE

The producer may also prohibit the repeated and systematic extraction or reuse of insubstantial parts, qualitatively or quantitatively, of the contents of the database when such operations manifestly go beyond the conditions of normal use of the database.

### Article L342-3
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

When a database is made available to the public by the rightholder, he may not prohibit:

1°. The extraction or the reuse of an insubstantial part, evaluated qualitatively or quantitatively, of the contents of the database, by a person having lawful access;

2°. The extraction for private purposes of a qualitatively or quantitatively substantial part of the contents of a non-electronic database, subject to compliance with the copyrights or neighbouring rights over the works or materials incorporated into the database.

Any provision that is contrary to item 1° above shall be null and void.

### Article L342-4
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

The first sale in the territory of a Member State of the European Community or of a State party to the Agreement on the European Economic Area of a physical copy of the database by the rightholder or with his consent shall exhaust the right to control resale of that physical copy within all Member States;

However, online transmission of a database shall not exhaust the right of the producer to control resale of a physical copy or this database or a part thereof in any of the Member States.

### Article L342-5
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

The rights provided for in Article L. 342-1 shall become effective from the date of completion of the production of the database.  They shall expire fifteen years from the 1st of January of the calendar year following that of completion.

When a database has been made available to the public before the expiry of the period set forth in the paragraph above, the rights shall expire fifteen years from the 1st of January of the calendar year following the date when the database was first made available to the public.

However, in case a protected database is the subject of a new substantial investment, its protection shall expire fifteen years from the 1st of January of the calendar year following that in which this new investment was made.

CHAPTER III
Sanctions

Articles L343-1 to L343-4

### Article L343-1
*(Act No. 98-536 of 1 July 1998, Article 5 Official Journal of 2 July 1998 in force on 1 January 1998)*
*(Order No. 2004-916 of 19 September 2000, Article 3, Official Journal of 22 September 2000, in force1 January 2002*
*(Act No. 2004-204 of 9 March 2004, Article 34 III, Official Journal of 10 March 2004)*

The infringement of the rights of the producer of a database, as defined in Article L. 342-1, shall be punishable by a three-year imprisonment and a fine of € 300.000.

Where the offence is committed by an organised criminal group, the penalties will be increased to a five-year imprisonment and a fine of € 500.000.

### Article L343-2
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

Legal persons may be declared penally liable, in accordance with Article 121-2 of the Penal Code for the infringements defined in Article L. 343-1. Legal persons may incur the following penalties:

1°. A fine determined in accordance with Article 131-38 of the Penal Code;

2°. The penalties provided for in Article 131-39 of same; the prohibition provided for in item 2 of this Article concerns the activity in the exercise of which or on the occasion of the exercise of which the infringement was committed.

### Article L343-3
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

In the event of the repetition of the offences defined in Article L. 343-1, or if the offender is or has been contractually bound to the aggrieved party, the penalties involved shall be doubled.

Guilty parties may, in addition, be deprived for a period not exceeding five years, of the right to elect and be elected to commercial courts, chamber of commerce and industry and professional chambers and to joint labour dispute conciliation boards.

### Article L343-4
*(inserted by Act No. 98-536 of 1 July 1998 art. 5 Official Journal of 2 July 1998 in force on 1 January 1998)*

Apart from the reports drawn up by police investigators, the proof of the existence of the infringements defined in this Chapter may be provided by the statement of a sworn agent designated by professional organisations of producers. These agents shall be approved by the Minister responsible for culture under the same conditions as those provided for agents under Article L. 331-2.

# PART II

# Code de la propriété intellectuelle

## Partie législative

## Première partie : La propriété littéraire et artistique

## Livre Ier : Le droit d'auteur

## Titre Ier : Objet du droit d'auteur

## Chapitre Ier : Nature du droit d'auteur

### Article L111-1

L'auteur d'une oeuvre de l'esprit jouit sur cette oeuvre, du seul fait de sa création, d'un droit de propriété incorporelle exclusif et opposable à tous.

Ce droit comporte des attributs d'ordre intellectuel et moral ainsi que des attributs d'ordre patrimonial, qui sont déterminés par les livres Ier et III du présent code.

L'existence ou la conclusion d'un contrat de louage d'ouvrage ou de service par l'auteur d'une oeuvre de l'esprit n'emporte pas dérogation à la jouissance du droit reconnu par le premier alinéa, sous réserve des exceptions prévues par le présent code. Sous les mêmes réserves, il n'est pas non plus dérogé à la jouissance de ce même droit lorsque l'auteur de l'oeuvre de l'esprit est un agent de l'Etat, d'une collectivité territoriale, d'un établissement public à caractère administratif, d'une autorité administrative indépendante dotée de la personnalité morale ou de la Banque de France.

Les dispositions des articles L. 121-7-1 et L. 131-3-1 à L. 131-3-3 ne s'appliquent pas aux agents auteurs d'oeuvres dont la divulgation n'est soumise, en vertu de leur statut ou des règles qui régissent leurs fonctions, à aucun contrôle préalable de l'autorité hiérarchique.

### Article L111-2

L'oeuvre est réputée créée, indépendamment de toute divulgation publique, du seul fait de la réalisation, même inachevée, de la conception de l'auteur.

### Article L111-3

La propriété incorporelle définie par l'article L. 111-1 est indépendante de la propriété de l'objet matériel.

L'acquéreur de cet objet n'est investi, du fait de cette acquisition, d'aucun des droits prévus par le présent code, sauf dans les cas prévus par les dispositions des deuxième et troisième alinéas de l'article L. 123-4. Ces droits subsistent en la personne de l'auteur ou de ses ayants droit qui, pourtant, ne pourront exiger du propriétaire de l'objet matériel la mise à leur disposition de cet objet pour l'exercice desdits droits. Néanmoins, en cas d'abus notoire du propriétaire empêchant l'exercice du droit de divulgation, le tribunal judiciaire peut prendre toute mesure appropriée, conformément aux dispositions de l'article L. 121-3.

## Article L111-4

Sous réserve des dispositions des conventions internationales auxquelles la France est partie, dans le cas où, après consultation du ministre des affaires étrangères, il est constaté qu'un Etat n'assure pas aux oeuvres divulguées pour la première fois en France sous quelque forme que ce soit une protection suffisante et efficace, les oeuvres divulguées pour la première fois sur le territoire de cet Etat ne bénéficient pas de la protection reconnue en matière de droit d'auteur par la législation française.

Toutefois, aucune atteinte ne peut être portée à l'intégrité ni à la paternité de ces oeuvres.

Dans l'hypothèse prévue à l'alinéa 1er ci-dessus, les droits d'auteur sont versés à des organismes d'intérêt général désignés par décret.

## Article L111-5

Sous réserve des conventions internationales, les droits reconnus en France aux auteurs de logiciels par le présent code sont reconnus aux étrangers sous la condition que la loi de l'Etat dont ils sont les nationaux ou sur le territoire duquel ils ont leur domicile, leur siège social ou un établissement effectif accorde sa protection aux logiciels créés par les nationaux français et par les personnes ayant en France leur domicile ou un établissement effectif.

# Chapitre II : Oeuvres protégées

## Article L112-1

Les dispositions du présent code protègent les droits des auteurs sur toutes les oeuvres de l'esprit, quels qu'en soient le genre, la forme d'expression, le mérite ou la destination.

## Article L112-2

Sont considérés notamment comme oeuvres de l'esprit au sens du présent code :

1° Les livres, brochures et autres écrits littéraires, artistiques et scientifiques ;

2° Les conférences, allocutions, sermons, plaidoiries et autres oeuvres de même nature ;

3° Les oeuvres dramatiques ou dramatico-musicales ;

4° Les oeuvres chorégraphiques, les numéros et tours de cirque, les pantomimes, dont la mise en oeuvre est fixée par écrit ou autrement ;

5° Les compositions musicales avec ou sans paroles ;

6° Les oeuvres cinématographiques et autres oeuvres consistant dans des séquences animées d'images, sonorisées ou non, dénommées ensemble oeuvres audiovisuelles ;

7° Les oeuvres de dessin, de peinture, d'architecture, de sculpture, de gravure, de lithographie ;

8° Les oeuvres graphiques et typographiques ;

9° Les oeuvres photographiques et celles réalisées à l'aide de techniques analogues à la photographie ;

10° Les oeuvres des arts appliqués ;

11° Les illustrations, les cartes géographiques ;

12° Les plans, croquis et ouvrages plastiques relatifs à la géographie, à la topographie, à l'architecture et aux sciences ;

13° Les logiciels, y compris le matériel de conception préparatoire ;

14° Les créations des industries saisonnières de l'habillement et de la parure. Sont réputées industries saisonnières de l'habillement et de la parure les industries qui, en raison des exigences de la mode, renouvellent fréquemment la forme de leurs produits, et notamment la couture, la fourrure, la lingerie, la broderie, la mode, la chaussure, la ganterie, la maroquinerie, la fabrique de tissus de haute nouveauté ou spéciaux à la haute couture, les productions des paruriers et des bottiers et les fabriques de tissus d'ameublement.

# Article L112-3

Les auteurs de traductions, d'adaptations, transformations ou arrangements des oeuvres de l'esprit jouissent de la protection instituée par le présent code sans préjudice des droits de l'auteur de l'oeuvre originale. Il en est de même des auteurs d'anthologies ou de recueils d'oeuvres ou de données diverses, tels que les bases de données, qui, par le choix ou la disposition des matières, constituent des créations intellectuelles.

On entend par base de données un recueil d'oeuvres, de données ou d'autres éléments indépendants, disposés de manière systématique ou méthodique, et individuellement accessibles par des moyens électroniques ou par tout autre moyen.

## Article L112-4

Le titre d'une oeuvre de l'esprit, dès lors qu'il présente un caractère original, est protégé comme l'oeuvre elle-même.

Nul ne peut, même si l'oeuvre n'est plus protégée dans les termes des articles L. 123-1 à L. 123-3, utiliser ce titre pour individualiser une oeuvre du même genre, dans des conditions susceptibles de provoquer une confusion.

# Chapitre III : Titulaires du droit d'auteur

## Article L113-1

La qualité d'auteur appartient, sauf preuve contraire, à celui ou à ceux sous le nom de qui l'oeuvre est divulguée.

## Article L113-2

Est dite de collaboration l'oeuvre à la création de laquelle ont concouru plusieurs personnes physiques.

Est dite composite l'oeuvre nouvelle à laquelle est incorporée une oeuvre préexistante sans la collaboration de l'auteur de cette dernière.

Est dite collective l'oeuvre créée sur l'initiative d'une personne physique ou morale qui l'édite, la publie et la divulgue sous sa direction et son nom et dans laquelle la contribution personnelle des divers auteurs participant à son élaboration se fond dans l'ensemble en vue duquel elle est conçue, sans qu'il soit possible d'attribuer à chacun d'eux un droit distinct sur l'ensemble réalisé.

## Article L113-3

L'oeuvre de collaboration est la propriété commune des coauteurs.

Les coauteurs doivent exercer leurs droits d'un commun accord.

En cas de désaccord, il appartient à la juridiction civile de statuer.

Lorsque la participation de chacun des coauteurs relève de genres différents, chacun peut, sauf convention contraire, exploiter séparément sa contribution personnelle, sans toutefois porter préjudice à l'exploitation de l'oeuvre commune.

## Article L113-4

L'oeuvre composite est la propriété de l'auteur qui l'a réalisée, sous réserve des droits de l'auteur de l'oeuvre préexistante.

## Article L113-5

L'oeuvre collective est, sauf preuve contraire, la propriété de la personne physique ou morale sous le nom de laquelle elle est divulguée.

Cette personne est investie des droits de l'auteur.

## Article L113-6

Les auteurs des oeuvres pseudonymes et anonymes jouissent sur celles-ci des droits reconnus par l'article L. 111-1.

Ils sont représentés dans l'exercice de ces droits par l'éditeur ou le publicateur originaire, tant qu'ils n'ont pas fait connaître leur identité civile et justifié de leur qualité.

La déclaration prévue à l'alinéa précédent peut être faite par testament ; toutefois, sont maintenus les droits qui auraient pu être acquis par des tiers antérieurement.

Les dispositions des deuxième et troisième alinéas ne sont pas applicables lorsque le pseudonyme adopté par l'auteur ne laisse aucun doute sur son identité civile.

## Article L113-7

Ont la qualité d'auteur d'une oeuvre audiovisuelle la ou les personnes physiques qui réalisent la création intellectuelle de cette oeuvre.

Sont présumés, sauf preuve contraire, coauteurs d'une oeuvre audiovisuelle réalisée en collaboration :

1° L'auteur du scénario ;

2° L'auteur de l'adaptation ;

3° L'auteur du texte parlé ;

4° L'auteur des compositions musicales avec ou sans paroles spécialement réalisées pour l'oeuvre ;

5° Le réalisateur.

Lorsque l'oeuvre audiovisuelle est tirée d'une oeuvre ou d'un scénario préexistants encore protégés, les auteurs de l'oeuvre originaire sont assimilés aux auteurs de l'oeuvre nouvelle.

## Article L113-8

Ont la qualité d'auteur d'une oeuvre radiophonique la ou les personnes physiques qui assurent la création intellectuelle de cette oeuvre.

Les dispositions du dernier alinéa de l'article L. 113-7 et celles de l'article L. 121-6 sont applicables aux oeuvres radiophoniques.

## Article L113-9

Sauf dispositions statutaires ou stipulations contraires, les droits patrimoniaux sur les logiciels et leur documentation créés par un ou plusieurs employés dans l'exercice de leurs fonctions ou d'après les instructions de leur employeur sont dévolus à l'employeur qui est seul habilité à les exercer.

Toute contestation sur l'application du présent article est soumise au tribunal judiciaire du siège social de l'employeur.

Les dispositions du premier alinéa du présent article sont également applicables aux agents de l'Etat, des collectivités publiques et des établissements publics à caractère administratif.

### Article L113-10

L'œuvre orpheline est une œuvre protégée et divulguée, dont le titulaire des droits ne peut pas être identifié ou retrouvé, malgré des recherches diligentes, avérées et sérieuses.

Lorsqu'une œuvre a plus d'un titulaire de droits et que l'un de ces titulaires a été identifié et retrouvé, elle n'est pas considérée comme orpheline.

## Titre II : Droits des auteurs

## Chapitre Ier : Droits moraux

### Article L121-1

L'auteur jouit du droit au respect de son nom, de sa qualité et de son oeuvre.

Ce droit est attaché à sa personne.

Il est perpétuel, inaliénable et imprescriptible.

Il est transmissible à cause de mort aux héritiers de l'auteur.

L'exercice peut être conféré à un tiers en vertu de dispositions testamentaires.

### Article L121-2

L'auteur a seul le droit de divulguer son oeuvre. Sous réserve des dispositions de l'article L. 132-24, il détermine le procédé de divulgation et fixe les conditions de celle-ci.

Après sa mort, le droit de divulgation de ses oeuvres posthumes est exercé leur vie durant par le ou les exécuteurs testamentaires désignés par l'auteur. A leur défaut, ou après leur décès, et sauf volonté contraire de l'auteur, ce droit est exercé dans l'ordre suivant : par les descendants, par le conjoint contre lequel n'existe pas un jugement passé en force de chose jugée de séparation de corps ou qui n'a pas contracté un nouveau mariage, par les héritiers autres que les descendants qui recueillent tout ou partie de la succession et par les légataires universels ou donataires de l'universalité des biens à venir.

Ce droit peut s'exercer même après l'expiration du droit exclusif d'exploitation déterminé à l'article L. 123-1.

### Article L121-3

En cas d'abus notoire dans l'usage ou le non-usage du droit de divulgation de la part des représentants de l'auteur décédé visés à l'article L. 121-2, le tribunal judiciaire peut ordonner toute mesure appropriée. Il en est de même s'il y a conflit entre lesdits représentants, s'il n'y a pas d'ayant droit connu ou en cas de vacance ou de déshérence.

Le tribunal peut être saisi notamment par le ministre chargé de la culture.

## Article L121-4

Nonobstant la cession de son droit d'exploitation, l'auteur, même postérieurement à la publication de son oeuvre, jouit d'un droit de repentir ou de retrait vis-à-vis du cessionnaire. Il ne peut toutefois exercer ce droit qu'à charge d'indemniser préalablement le cessionnaire du préjudice que ce repentir ou ce retrait peut lui causer. Lorsque, postérieurement à l'exercice de son droit de repentir ou de retrait, l'auteur décide de faire publier son oeuvre, il est tenu d'offrir par priorité ses droits d'exploitation au cessionnaire qu'il avait originairement choisi et aux conditions originairement déterminées.

## Article L121-5

L'oeuvre audiovisuelle est réputée achevée lorsque la version définitive a été établie d'un commun accord entre, d'une part, le réalisateur ou, éventuellement, les coauteurs et, d'autre part, le producteur.

Il est interdit de détruire la matrice de cette version.

Toute modification de cette version par addition, suppression ou changement d'un élément quelconque exige l'accord des personnes mentionnées au premier alinéa.

Tout transfert de l'oeuvre audiovisuelle sur un autre type de support en vue d'un autre mode d'exploitation doit être précédé de la consultation du réalisateur.

Les droits propres des auteurs, tels qu'ils sont définis à l'article L. 121-1, ne peuvent être exercés par eux que sur l'oeuvre audiovisuelle achevée.

## Article L121-6

Si l'un des auteurs refuse d'achever sa contribution à l'oeuvre audiovisuelle ou se trouve dans l'impossibilité d'achever cette contribution par suite de force majeure, il ne pourra s'opposer à l'utilisation, en vue de l'achèvement de l'oeuvre, de la partie de cette contribution déjà réalisée.
Il aura, pour cette contribution, la qualité d'auteur et jouira des droits qui en découlent.

## Article L121-7

Sauf stipulation contraire plus favorable à l'auteur d'un logiciel, celui-ci ne peut :

1° S'opposer à la modification du logiciel par le cessionnaire des droits mentionnés au 2° de l'article L. 122-6, lorsqu'elle n'est préjudiciable ni à son honneur ni à sa réputation ;

2° Exercer son droit de repentir ou de retrait.

## Article L121-7-1

Le droit de divulgation reconnu à l'agent mentionné au troisième alinéa de l'article L. 111-1, qui a créé une oeuvre de l'esprit dans l'exercice de ses fonctions ou d'après les instructions reçues, s'exerce dans le respect des règles auxquelles il est soumis en sa qualité d'agent et de celles qui régissent l'organisation, le fonctionnement et l'activité de la personne publique qui l'emploie.

L'agent ne peut :

1° S'opposer à la modification de l'oeuvre décidée dans l'intérêt du service par l'autorité investie du pouvoir hiérarchique, lorsque cette modification ne porte pas atteinte à son honneur ou à sa réputation ;

2° Exercer son droit de repentir et de retrait, sauf accord de l'autorité investie du pouvoir hiérarchique.

## Article L121-8

L'auteur seul a le droit de réunir ses articles et ses discours en recueil et de les publier ou d'en autoriser la publication sous cette forme.

Pour toutes les œuvres publiées dans un titre de presse au sens de l'article L. 132-35, l'auteur conserve, sauf stipulation contraire, le droit de faire reproduire et d'exploiter ses œuvres sous quelque forme que ce soit, sous réserve des droits cédés dans les conditions prévues à la section 6 du chapitre II du titre III du livre Ier.

Dans tous les cas, l'exercice par l'auteur de son droit suppose que cette reproduction ou cette exploitation ne soit pas de nature à faire concurrence à ce titre de presse.

## Article L121-9

Sous tous les régimes matrimoniaux et à peine de nullité de toutes clauses contraires portées au contrat de mariage, le droit de divulguer l'oeuvre, de fixer les conditions de son exploitation et d'en défendre l'intégrité reste propre à l'époux auteur ou à celui des époux à qui de tels droits ont été transmis. Ce droit ne peut être apporté en dot, ni acquis par la communauté ou par une société d'acquêts.

Les produits pécuniaires provenant de l'exploitation d'une oeuvre de l'esprit ou de la cession totale ou partielle du droit d'exploitation sont soumis au droit commun des régimes matrimoniaux, uniquement lorsqu'ils ont été acquis pendant le mariage ; il en est de même des économies réalisées de ces chefs.

Les dispositions prévues à l'alinéa précédent ne s'appliquent pas lorsque le mariage a été célébré antérieurement au 12 mars 1958.

Les dispositions législatives relatives à la contribution des époux aux charges du ménage sont applicables aux produits pécuniaires visés au deuxième alinéa du présent article.

# Chapitre II : Droits patrimoniaux

## Article L122-1

Le droit d'exploitation appartenant à l'auteur comprend le droit de représentation et le droit de reproduction.

## Article L122-2

La représentation consiste dans la communication de l'oeuvre au public par un procédé quelconque, et notamment :

1° Par récitation publique, exécution lyrique, représentation dramatique, présentation publique, projection publique et transmission dans un lieu public de l'oeuvre télédiffusée ;

2° Par télédiffusion.

La télédiffusion s'entend de la diffusion par tout procédé de télécommunication de sons, d'images, de documents, de données et de messages de toute nature.

Est assimilée à une représentation l'émission d'une oeuvre vers un satellite.

## Article L122-2-1

Le droit de représentation d'une oeuvre télédiffusée par satellite est régi par les dispositions du présent code dès lors que l'oeuvre est émise vers le satellite à partir du territoire national.

## Article L122-2-2

Est également régi par les dispositions du présent code le droit de représentation d'une oeuvre télédiffusée par satellite émise à partir du territoire d'un Etat non membre de la Communauté européenne qui n'assure pas un niveau de protection des droits d'auteur équivalent à celui garanti par le présent code :

1° Lorsque la liaison montante vers le satellite est effectuée à partir d'une station située sur le territoire national. Les droits prévus par le présent code peuvent alors être exercés à l'égard de l'exploitant de la station ;

2° Lorsque la liaison montante vers le satellite n'est pas effectuée à partir d'une station située dans un Etat membre de la Communauté européenne et lorsque l'émission est réalisée à la demande, pour le compte ou sous le contrôle d'une entreprise de communication audiovisuelle ayant son principal établissement sur le territoire national. Les droits prévus par le présent code peuvent alors être exercés à l'égard de l'entreprise de communication audiovisuelle.

## Article L122-3

La reproduction consiste dans la fixation matérielle de l'oeuvre par tous procédés qui permettent de la communiquer au public d'une manière indirecte.

Elle peut s'effectuer notamment par imprimerie, dessin, gravure, photographie, moulage et tout procédé des arts graphiques et plastiques, enregistrement mécanique, cinématographique ou magnétique.

Pour les oeuvres d'architecture, la reproduction consiste également dans l'exécution répétée d'un plan ou d'un projet type.

## Article L122-3-1

Dès lors que la première vente d'un ou des exemplaires matériels d'une oeuvre a été autorisée par l'auteur ou ses ayants droit sur le territoire d'un Etat membre de la Communauté européenne ou d'un autre Etat partie à l'accord sur l'Espace économique européen, la vente de ces exemplaires de cette oeuvre ne peut plus être interdite dans les Etats membres de la Communauté européenne et les Etats parties à l'accord sur l'Espace économique européen.

## Article L122-4

Toute représentation ou reproduction intégrale ou partielle faite sans le consentement de l'auteur ou de ses ayants droit ou ayants cause est illicite. Il en est de même pour la traduction, l'adaptation ou la transformation, l'arrangement ou la reproduction par un art ou un procédé quelconque.

## Article L122-5

Lorsque l'oeuvre a été divulguée, l'auteur ne peut interdire :

1° Les représentations privées et gratuites effectuées exclusivement dans un cercle de famille ;

2° Les copies ou reproductions réalisées à partir d'une source licite et strictement réservées à l'usage privé du copiste et non destinées à une utilisation collective, à l'exception des copies des oeuvres d'art destinées à être utilisées pour des fins identiques à celles pour lesquelles l'oeuvre originale a été créée et des copies d'un logiciel autres que la copie de sauvegarde établie dans les conditions prévues au II de l'article L. 122-6-1 ainsi que des copies ou des reproductions d'une base de données électronique ;

3° Sous réserve que soient indiqués clairement le nom de l'auteur et la source :

a) Les analyses et courtes citations justifiées par le caractère critique, polémique, pédagogique, scientifique ou d'information de l'oeuvre à laquelle elles sont incorporées ;

b) Les revues de presse ;

c) La diffusion, même intégrale, par la voie de presse ou de télédiffusion, à titre d'information d'actualité, des discours destinés au public prononcés dans les assemblées politiques, administratives, judiciaires ou académiques, ainsi que dans les réunions publiques d'ordre politique et les cérémonies officielles ;

d) Les reproductions, intégrales ou partielles d'oeuvres d'art graphiques ou plastiques destinées à figurer dans le catalogue d'une vente judiciaire effectuée en France pour les exemplaires mis à la disposition du public avant la vente dans le seul but de décrire les oeuvres d'art mises en vente ;

e) La représentation ou la reproduction d'extraits d'oeuvres, sous réserve des oeuvres conçues à des fins pédagogiques et des partitions de musique, à des fins exclusives d'illustration dans le cadre de l'enseignement et de la recherche, y compris pour l'élaboration et la diffusion de sujets d'examens ou de concours organisés dans la prolongation des enseignements à l'exclusion de toute activité ludique ou récréative, dès lors que cette représentation ou cette reproduction est destinée, notamment au moyen d'un espace numérique de travail, à un public composé majoritairement d'élèves, d'étudiants, d'enseignants ou de chercheurs directement concernés par l'acte d'enseignement, de formation ou l'activité de recherche nécessitant cette représentation ou cette reproduction, qu'elle ne fait l'objet d'aucune publication ou diffusion à un tiers au public ainsi constitué, que l'utilisation de cette représentation ou cette reproduction ne donne lieu à aucune exploitation commerciale et qu'elle est compensée par une rémunération négociée sur une base forfaitaire sans préjudice de la cession du droit de reproduction par reprographie mentionnée à l'article L. 122-10 ;

4° La parodie, le pastiche et la caricature, compte tenu des lois du genre ;

5° Les actes nécessaires à l'accès au contenu d'une base de données électronique pour les besoins et dans les limites de l'utilisation prévue par contrat ;

6° La reproduction provisoire présentant un caractère transitoire ou accessoire, lorsqu'elle est une partie intégrante et essentielle d'un procédé technique et qu'elle a pour unique objet de permettre l'utilisation licite

de l'oeuvre ou sa transmission entre tiers par la voie d'un réseau faisant appel à un intermédiaire ; toutefois, cette reproduction provisoire qui ne peut porter que sur des oeuvres autres que les logiciels et les bases de données ne doit pas avoir de valeur économique propre ;

7° Dans les conditions prévues aux articles L. 122-5-1 et L. 122-5-2, la reproduction et la représentation par des personnes morales et par les établissements ouverts au public, tels que les bibliothèques, les archives, les centres de documentation et les espaces culturels multimédia, en vue d'une consultation strictement personnelle de l'œuvre par des personnes atteintes d'une ou de plusieurs déficiences des fonctions motrices, physiques, sensorielles, mentales, cognitives ou psychiques et empêchées, du fait de ces déficiences, d'accéder à l'œuvre dans la forme sous laquelle l'auteur la rend disponible au public ;

Ces personnes empêchées peuvent également, en vue d'une consultation strictement personnelle de l'œuvre, réaliser, par elles-mêmes ou par l'intermédiaire d'une personne physique agissant en leur nom, des actes de reproduction et de représentation ;

8° La reproduction d'une œuvre et sa représentation effectuées à des fins de conservation ou destinées à préserver les conditions de sa consultation à des fins de recherche ou d'études privées par des particuliers, dans les locaux de l'établissement et sur des terminaux dédiés par des bibliothèques accessibles au public, par des musées ou par des services d'archives, sous réserve que ceux-ci ne recherchent aucun avantage économique ou commercial ;

9° La reproduction ou la représentation, intégrale ou partielle, d'une oeuvre d'art graphique, plastique ou architecturale, par voie de presse écrite, audiovisuelle ou en ligne, dans un but exclusif d'information immédiate et en relation directe avec cette dernière, sous réserve d'indiquer clairement le nom de l'auteur.

Le premier alinéa du présent 9° ne s'applique pas aux oeuvres, notamment photographiques ou d'illustration, qui visent elles-mêmes à rendre compte de l'information ;

10° Les copies ou reproductions numériques réalisées à partir d'une source licite, en vue de l'exploration de textes et de données incluses ou associées aux écrits scientifiques pour les besoins de la recherche publique, à l'exclusion de toute finalité commerciale. Un décret fixe les conditions dans lesquelles l'exploration des textes et des données est mise en œuvre, ainsi que les modalités de conservation et de communication des fichiers produits au terme des activités de recherche pour lesquelles elles ont été produites ; ces fichiers constituent des données de la recherche ;

11° Les reproductions et représentations d'œuvres architecturales et de sculptures, placées en permanence sur la voie publique, réalisées par des personnes physiques, à l'exclusion de tout usage à caractère commercial.

Les reproductions ou représentations qui, notamment par leur nombre ou leur format, ne seraient pas en stricte proportion avec le but exclusif d'information immédiate poursuivi ou qui ne seraient pas en relation directe avec cette dernière donnent lieu à rémunération des auteurs sur la base des accords ou tarifs en vigueur dans les secteurs professionnels concernés.

Les exceptions énumérées par le présent article ne peuvent porter atteinte à l'exploitation normale de l'oeuvre ni causer un préjudice injustifié aux intérêts légitimes de l'auteur.

Les modalités d'application du présent article, notamment les caractéristiques et les conditions de distribution des documents mentionnés au d du 3°, sont précisées par décret en Conseil d'Etat.

## Article L122-5-1

La reproduction et la représentation mentionnées au premier alinéa du 7° de l'article L. 122-5 sont assurées, à des fins non lucratives et dans la mesure requise par le handicap, dans les conditions suivantes :

1° La reproduction et la représentation sont assurées par des personnes morales ou des établissements figurant sur une liste arrêtée conjointement par les ministres chargés de la culture et des personnes handicapées. La liste de ces personnes morales et de ces établissements est établie au vu de leur activité professionnelle effective de conception, de réalisation ou de communication de documents adaptés au bénéfice des personnes physiques mentionnées au 7° du même article L. 122-5 et par référence à leur objet social, à l'importance des effectifs de leurs membres ou de leurs usagers, aux moyens matériels et humains dont ils disposent, aux services qu'ils rendent ainsi qu'aux moyens de sécurisation qu'ils mettent en œuvre pour empêcher et prévenir la distribution, la communication ou la mise à disposition à des personnes non autorisées ;

2° La reproduction et la représentation peuvent également porter sur toute œuvre dont le fichier numérique est déposé par l'éditeur, dans un format facilitant la production de documents adaptés, auprès de la Bibliothèque nationale de France qui le met à la disposition des personnes morales et des établissements figurant sur la liste mentionnée au 1° du présent article et agréés à cet effet.

Pour l'application du présent 2° :

a) L'agrément est accordé conjointement par les ministres chargés de la culture et des personnes handicapées à ceux, parmi les personnes morales et établissements mentionnés au 1°, qui présentent des garanties et des capacités de sécurisation et de confidentialité des fichiers susceptibles d'être mis à leur disposition puis transmis par eux aux personnes bénéficiaires de la reproduction ou de la représentation ;

b) Ce dépôt est obligatoire pour les éditeurs :

-en ce qui concerne les livres scolaires, pour ceux dont le dépôt légal ou la publication sous forme de livre numérique, au sens de la loi n° 2011-590 du 26 mai 2011 relative au prix du livre numérique, sont postérieurs au 1er janvier 2016, au plus tard le jour de leur mise à la disposition du public ;

-pour les autres œuvres, sur demande d'une des personnes morales et des établissements mentionnés au même 1° formulée dans les dix ans suivant le dépôt légal des œuvres imprimées quand celui-ci est postérieur au 4 août 2006 ou dès lors que des œuvres sont publiées sous forme de livre numérique, au sens de la loi n° 2011-590 du 26 mai 2011 précitée ;

c) Le ministre chargé de la culture arrête la liste des formats mentionnés au premier alinéa du présent 2°, après avis de la Bibliothèque nationale de France, des personnes morales et des établissements mentionnés au présent 2° et des organisations représentatives des titulaires de droit d'auteur et des personnes handicapées concernées ;

d) La Bibliothèque nationale de France conserve sans limitation de durée les fichiers déposés par les éditeurs. Elle garantit la confidentialité de ces fichiers et la sécurisation de leur accès ;

e) Les personnes morales et les établissements agréés en application du premier alinéa du présent 2° détruisent les fichiers mis à leur disposition une fois effectué le travail de conception, de réalisation et de communication de documents adaptés au bénéfice des personnes physiques mentionnées au 7° de l'article L. 122-5 ;

f) Les fichiers des documents adaptés sous forme numérique sont transmis à la Bibliothèque nationale de France par les personnes morales et les établissements mentionnés au 1° du présent article qui les ont réalisés. La Bibliothèque nationale de France les met à la disposition des autres personnes morales et établissements. Elle procède à une sélection des fichiers qu'elle conserve. Elle rend compte de cette activité de sélection et de conservation dans un rapport annuel rendu public ;

g) La mise à disposition de documents adaptés est autorisée entre les personnes morales et les établissements mentionnés au même 1°.

Les modalités d'application du présent article, notamment les modalités d'établissement de la liste mentionnée audit 1° et de l'agrément prévu au présent 2°, les caractéristiques des livres scolaires mentionnés au b du même 2°, les critères de la sélection prévue au f dudit 2° ainsi que les conditions d'accès aux fichiers numériques mentionnés au premier alinéa et au f du même 2° sont précisées par décret en Conseil d'Etat.

## Article L122-5-2

Les personnes morales et les établissements figurant sur la liste mentionnée au 1° de l'article L. 122-5-1 fournissent, sur demande, aux personnes atteintes d'une déficience qui les empêche de lire, aux auteurs et aux autres entités autorisées la liste et les formats disponibles des documents adaptés dont ils disposent, ainsi que le nom et les coordonnées des entités autorisées avec lesquelles ils procèdent à des échanges de tels documents.

Ces personnes et établissements peuvent recevoir des documents adaptés ou en mettre à disposition d'une entité autorisée établie dans un autre Etat membre de l'Union européenne ou un autre Etat partie au traité de Marrakech adopté le 27 juin 2013 visant à faciliter l'accès des aveugles, des déficients visuels et des personnes ayant d'autres difficultés de lecture des textes imprimés aux œuvres publiées, en vue de leur consultation par des personnes atteintes d'une déficience qui les empêche de lire.

Les personnes atteintes de ce type de déficience peuvent également, en vue d'une telle consultation, obtenir communication de documents adaptés auprès d'une entité autorisée mentionnée au deuxième alinéa du présent article.

On entend par entité autorisée, au sens du présent article, toute personne morale ou tout établissement autorisé ou reconnu par un Etat ayant pour mission d'offrir, à titre non lucratif, aux personnes physiques atteintes d'une déficience qui les empêche de lire, des services en matière d'enseignement, de formation pédagogique, de lecture adaptée ou d'accès à l'information. Cette dénomination désigne également un organisme public ou une organisation à but non lucratif dont l'une des activités principales, obligations institutionnelles ou missions d'intérêt public est de fournir les mêmes services à ces personnes.

Les modalités d'application du présent article sont précisées par décret en Conseil d'Etat.

## Article L122-6

Sous réserve des dispositions de l'article L. 122-6-1, le droit d'exploitation appartenant à l'auteur d'un logiciel comprend le droit d'effectuer et d'autoriser :

1° La reproduction permanente ou provisoire d'un logiciel en tout ou partie par tout moyen et sous toute forme. Dans la mesure où le chargement, l'affichage, l'exécution, la transmission ou le stockage de ce logiciel nécessitent une reproduction, ces actes ne sont possibles qu'avec l'autorisation de l'auteur ;

2° La traduction, l'adaptation, l'arrangement ou toute autre modification d'un logiciel et la reproduction du logiciel en résultant ;

3° La mise sur le marché à titre onéreux ou gratuit, y compris la location, du ou des exemplaires d'un logiciel par tout procédé. Toutefois, la première vente d'un exemplaire d'un logiciel dans le territoire d'un Etat

membre de la Communauté européenne ou d'un Etat partie à l'accord sur l'Espace économique européen par l'auteur ou avec son consentement épuise le droit de mise sur le marché de cet exemplaire dans tous les Etats membres à l'exception du droit d'autoriser la location ultérieure d'un exemplaire.

## Article L122-6-1

I. Les actes prévus aux 1° et 2° de l'article L. 122-6 ne sont pas soumis à l'autorisation de l'auteur lorsqu'ils sont nécessaires pour permettre l'utilisation du logiciel, conformément à sa destination, par la personne ayant le droit de l'utiliser, y compris pour corriger des erreurs.

Toutefois, l'auteur est habilité à se réserver par contrat le droit de corriger les erreurs et de déterminer les modalités particulières auxquelles seront soumis les actes prévus aux 1° et 2° de l'article L. 122-6, nécessaires pour permettre l'utilisation du logiciel, conformément à sa destination, par la personne ayant le droit de l'utiliser.

II. La personne ayant le droit d'utiliser le logiciel peut faire une copie de sauvegarde lorsque celle-ci est nécessaire pour préserver l'utilisation du logiciel.

III. La personne ayant le droit d'utiliser le logiciel peut sans l'autorisation de l'auteur observer, étudier ou tester le fonctionnement ou la sécurité de ce logiciel afin de déterminer les idées et principes qui sont à la base de n'importe quel élément du logiciel lorsqu'elle effectue toute opération de chargement, d'affichage, d'exécution, de transmission ou de stockage du logiciel qu'elle est en droit d'effectuer.

IV. La reproduction du code du logiciel ou la traduction de la forme de ce code n'est pas soumise à l'autorisation de l'auteur lorsque la reproduction ou la traduction au sens du 1° ou du 2° de l'article L. 122-6 est indispensable pour obtenir les informations nécessaires à l'interopérabilité d'un logiciel créé de façon indépendante avec d'autres logiciels, sous réserve que soient réunies les conditions suivantes :

1° Ces actes sont accomplis par la personne ayant le droit d'utiliser un exemplaire du logiciel ou pour son compte par une personne habilitée à cette fin ;

2° Les informations nécessaires à l'interopérabilité n'ont pas déjà été rendues facilement et rapidement accessibles aux personnes mentionnées au 1° ci-dessus ;

3° Et ces actes sont limités aux parties du logiciel d'origine nécessaires à cette interopérabilité.

Les informations ainsi obtenues ne peuvent être :

1° Ni utilisées à des fins autres que la réalisation de l'interopérabilité du logiciel créé de façon indépendante ;

2° Ni communiquées à des tiers sauf si cela est nécessaire à l'interopérabilité du logiciel créé de façon indépendante ;

3° Ni utilisées pour la mise au point, la production ou la commercialisation d'un logiciel dont l'expression est substantiellement similaire ou pour tout autre acte portant atteinte au droit d'auteur.

V. Le présent article ne saurait être interprété comme permettant de porter atteinte à l'exploitation normale du logiciel ou de causer un préjudice injustifié aux intérêts légitimes de l'auteur.

Toute stipulation contraire aux dispositions prévues aux II, III et IV du présent article est nulle et non avenue.

## Article L122-6-2

Toute publicité ou notice d'utilisation relative aux moyens permettant la suppression ou la neutralisation de tout dispositif technique protégeant un logiciel doit mentionner que l'utilisation illicite de ces moyens est passible des sanctions prévues en cas de contrefaçon.

Un décret en Conseil d'Etat fixera les conditions d'application du présent article.

## Article L122-7

Le droit de représentation et le droit de reproduction sont cessibles à titre gratuit ou à titre onéreux.

La cession du droit de représentation n'emporte pas celle du droit de reproduction.

La cession du droit de reproduction n'emporte pas celle du droit de représentation.

Lorsqu'un contrat comporte cession totale de l'un des deux droits visés au présent article, la portée en est limitée aux modes d'exploitation prévus au contrat.

## Article L122-7-1

L'auteur est libre de mettre ses oeuvres gratuitement à la disposition du public, sous réserve des droits des éventuels coauteurs et de ceux des tiers ainsi que dans le respect des conventions qu'il a conclues.

## Article L122-8

Les auteurs d'oeuvres originales graphiques et plastiques ressortissants d'un Etat membre de la Communauté européenne ou d'un Etat partie à l'accord sur l'Espace économique européen bénéficient d'un droit de suite,

qui est un droit inaliénable de participation au produit de toute vente d'une oeuvre après la première cession opérée par l'auteur ou par ses ayants droit, lorsque intervient en tant que vendeur, acheteur ou intermédiaire un professionnel du marché de l'art. Par dérogation, ce droit ne s'applique pas lorsque le vendeur a acquis l'oeuvre directement de l'auteur moins de trois ans avant cette vente et que le prix de vente ne dépasse pas 10 000 euros.

On entend par oeuvres originales au sens du présent article les oeuvres créées par l'artiste lui-même et les exemplaires exécutés en quantité limitée par l'artiste lui-même ou sous sa responsabilité.

Le droit de suite est à la charge du vendeur. La responsabilité de son paiement incombe au professionnel intervenant dans la vente et, si la cession s'opère entre deux professionnels, au vendeur.

Les professionnels du marché de l'art visés au premier alinéa doivent délivrer à l'auteur ou à un organisme de gestion collective du droit de suite toute information nécessaire à la liquidation des sommes dues au titre du droit de suite pendant une période de trois ans à compter de la vente.

Les auteurs non ressortissants d'un Etat membre de la Communauté européenne ou d'un Etat partie à l'accord sur l'Espace économique européen et leurs ayants droit sont admis au bénéfice de la protection prévue au présent article si la législation de l'Etat dont ils sont ressortissants admet la protection du droit de suite des auteurs des Etats membres et de leurs ayants droit.

Un décret en Conseil d'Etat précise les conditions d'application du présent article et notamment le montant et les modalités de calcul du droit à percevoir, ainsi que le prix de vente au-dessus duquel les ventes sont soumises à ce droit. Il précise également les conditions dans lesquelles les auteurs non ressortissants d'un Etat membre de la Communauté européenne ou d'un Etat partie à l'accord sur l'Espace économique européen qui ont leur résidence habituelle en France et ont participé à la vie de l'art en France pendant au moins cinq ans peuvent demander à bénéficier de la protection prévue au présent article.

## Article L122-9

En cas d'abus notoire dans l'usage ou le non-usage des droits d'exploitation de la part des représentants de l'auteur décédé visés à l'article L. 121-2, le tribunal judiciaire peut ordonner toute mesure appropriée. Il en est de même s'il y a conflit entre lesdits représentants, s'il n'y a pas d'ayant droit connu ou en cas de vacance ou de déshérence.

Le tribunal peut être saisi notamment par le ministre chargé de la culture.

## Article L122-10

La publication d'une oeuvre emporte cession du droit de reproduction par reprographie à un organisme de gestion collective régi par le titre II du livre III et agréé à cet effet par le ministre chargé de la culture. Les organismes agréés peuvent seuls conclure toute convention avec les utilisateurs aux fins de gestion du droit

ainsi cédé, sous réserve, pour les stipulations autorisant les copies aux fins de vente, de location, de publicité ou de promotion, de l'accord de l'auteur ou de ses ayants droit.

A défaut de désignation par l'auteur ou son ayant droit à la date de la publication de l'oeuvre, un des organismes agréés est réputé cessionnaire de ce droit.

La reprographie s'entend de la reproduction sous forme de copie sur papier ou support assimilé par une technique photographique ou d'effet équivalent permettant une lecture directe.

Les dispositions du premier alinéa ne font pas obstacle au droit de l'auteur ou de ses ayants droit de réaliser des copies aux fins de vente, de location, de publicité ou de promotion.

Nonobstant toute stipulation contraire, les dispositions du présent article s'appliquent à toutes les oeuvres protégées quelle que soit la date de leur publication.

## Article L122-11

Les conventions mentionnées à l'article L. 122-10 peuvent prévoir une rémunération forfaitaire dans les cas définis aux 1° à 3° de l'article L. 131-4.

## Article L122-12

L'agrément des organismes mentionnés au premier alinéa de l'article L. 122-10 est délivré en considération :

-de la diversité des membres ;

-de la qualification professionnelle des dirigeants ;

-des moyens humains et matériels qu'ils proposent de mettre en oeuvre pour assurer la gestion du droit de reproduction par reprographie ;

-du caractère équitable des modalités prévues pour la répartition des sommes perçues.

Un décret en Conseil d'Etat fixe les modalités de la délivrance et du retrait de cet agrément ainsi que du choix des organismes cessionnaires en application de la dernière phrase du premier alinéa de l'article L. 122-10.

# Chapitre III : Durée de la protection

## Article L123-1

L'auteur jouit, sa vie durant, du droit exclusif d'exploiter son oeuvre sous quelque forme que ce soit et d'en tirer un profit pécuniaire.

Au décès de l'auteur, ce droit persiste au bénéfice de ses ayants droit pendant l'année civile en cours et les soixante-dix années qui suivent.

## Article L123-2

Pour les oeuvres de collaboration, l'année civile prise en considération est celle de la mort du dernier vivant des collaborateurs.

Pour les oeuvres audiovisuelles, l'année civile prise en considération est celle de la mort du dernier vivant des collaborateurs suivants : l'auteur du scénario, l'auteur du texte parlé, l'auteur des compositions musicales avec ou sans paroles spécialement réalisées pour l'oeuvre, le réalisateur principal.

## Article L123-3

Pour les oeuvres pseudonymes, anonymes ou collectives, la durée du droit exclusif est de soixante-dix années à compter du 1er janvier de l'année civile suivant celle où l'oeuvre a été publiée. La date de publication est déterminée par tout mode de preuve de droit commun, et notamment par le dépôt légal.

Au cas où une oeuvre pseudonyme, anonyme ou collective est publiée de manière échelonnée, le délai court à compter du 1er janvier de l'année civile qui suit la date à laquelle chaque élément a été publié.

Lorsque le ou les auteurs d'oeuvres anonymes ou pseudonymes se sont fait connaître, la durée du droit exclusif est celle prévue aux articles L. 123-1 ou L. 123-2.

Les dispositions du premier et du deuxième alinéa ne sont applicables qu'aux oeuvres pseudonymes, anonymes ou collectives publiées pendant les soixante-dix années suivant l'année de leur création.

Toutefois, lorsqu'une oeuvre pseudonyme, anonyme ou collective est divulguée à l'expiration de la période mentionnée à l'alinéa précédent, son propriétaire, par succession ou à d'autres titres, qui en effectue ou fait

effectuer la publication jouit d'un droit exclusif de vingt-cinq années à compter du 1er janvier de l'année civile suivant celle de la publication.

## Article L123-4

Pour les oeuvres posthumes, la durée du droit exclusif est celle prévue à l'article L. 123-1. Pour les oeuvres posthumes divulguées après l'expiration de cette période, la durée du droit exclusif est de vingt-cinq années à compter du 1er janvier de l'année civile suivant celle de la publication.

Le droit d'exploitation des oeuvres posthumes appartient aux ayants droit de l'auteur si l'oeuvre est divulguée au cours de la période prévue à l'article L. 123-1.

Si la divulgation est effectuée à l'expiration de cette période, il appartient aux propriétaires, par succession ou à d'autres titres, de l'oeuvre, qui effectuent ou font effectuer la publication.

Les oeuvres posthumes doivent faire l'objet d'une publication séparée, sauf dans le cas où elles ne constituent qu'un fragment d'une oeuvre précédemment publiée. Elles ne peuvent être jointes à des oeuvres du même auteur précédemment publiées que si les ayants droit de l'auteur jouissent encore sur celles-ci du droit d'exploitation.

## Article L123-6

Pendant la période prévue à l'article L. 123-1, le conjoint survivant, contre lequel n'existe pas un jugement passé en force de chose jugée de séparation de corps, bénéficie, quel que soit le régime matrimonial et indépendamment des droits qu'il tient des articles 756 à 757-3 et 764 à 766 du code civil sur les autres biens de la succession, de l'usufruit du droit d'exploitation dont l'auteur n'aura pas disposé. Toutefois, si l'auteur laisse des héritiers à réserve, cet usufruit est réduit au profit des héritiers, suivant les proportions et distinctions établies par l'article 913 du code civil.

Ce droit s'éteint au cas où le conjoint contracte un nouveau mariage.

## Article L123-7

I.-Après le décès de l'auteur, le droit de suite mentionné à l'article L. 122-8 subsiste au profit de ses héritiers et, pour l'usufruit prévu à l'article L. 123-6, de son conjoint, pendant l'année civile en cours et les soixante-dix années suivantes.

Sous réserve des droits des descendants et du conjoint survivant non divorcé, l'auteur peut transmettre le droit de suite par legs.

En l'absence d'héritier et de legs du droit de suite, ce dernier revient au légataire universel ou, à défaut, au détenteur du droit moral.

II.-En l'absence d'ayant droit connu, ou en cas de vacance ou de déshérence, le tribunal judiciaire peut confier le bénéfice du droit de suite à un organisme de gestion collective régi par le titre II du livre III de la présente partie, agréé à cet effet par arrêté du ministre chargé de la culture. Le tribunal peut être saisi par le ministre chargé de la culture ou par l'organisme agréé.

Les sommes perçues par l'organisme agréé sont affectées à la prise en charge d'une fraction des cotisations dues par les auteurs des arts graphiques et plastiques au titre de la retraite complémentaire.

La gestion du droit de suite prévue au premier alinéa du présent II prend fin lorsqu'un ayant droit justifiant de sa qualité se fait connaître auprès de l'organisme agréé.

III.-L'agrément des organismes prévu au II est délivré en considération :

1° De la diversité des membres ;

2° De la qualification professionnelle des dirigeants ;

3° De l'importance de leur répertoire et de la représentation des auteurs d'œuvres originales graphiques et plastiques bénéficiaires du droit de suite, au sens de l'article L. 122-8, au sein des organes dirigeants ;

4° Des moyens humains et matériels qu'ils proposent de mettre en œuvre pour permettre la prise en charge du droit de suite prévue au deuxième alinéa du II du présent article.

IV.-Les modalités d'application du présent article, notamment de la délivrance et du retrait de l'agrément prévu au II, sont précisées par décret en Conseil d'Etat.

# Article L123-8

Les droits accordés par la loi du 14 juillet 1866 sur les droits des héritiers et des ayants cause des auteurs aux héritiers et autres ayants cause des auteurs, compositeurs ou artistes sont prorogés d'un temps égal à celui qui s'est écoulé entre le 2 août 1914 et la fin de l'année suivant le jour de la signature du traité de paix pour toutes les oeuvres publiées avant cette dernière date et non tombées dans le domaine public le 3 février 1919.

# Article L123-9

Les droits accordés par la loi du 14 juillet 1866 précitée et l'article L. 123-8 aux héritiers et ayants cause des auteurs, compositeurs ou artistes sont prorogés d'un temps égal à celui qui s'est écoulé entre le 3 septembre

1939 et le 1er janvier 1948, pour toutes les oeuvres publiées avant cette date et non tombées dans le domaine public à la date du 13 août 1941.

## Article L123-10

Les droits mentionnés à l'article précédent sont prorogés, en outre, d'une durée de trente ans lorsque l'auteur, le compositeur ou l'artiste est mort pour la France, ainsi qu'il résulte de l'acte de décès.

Au cas où l'acte de décès ne doit être ni dressé ni transcrit en France, un arrêté du ministre chargé de la culture peut étendre aux héritiers ou autres ayants cause du défunt le bénéfice de la prorogation supplémentaire de trente ans ; cet arrêté, pris après avis des autorités visées à l'article 1er de l'ordonnance n ° 45-2717 du 2 novembre 1945, ne pourra intervenir que dans les cas où la mention " mort pour la France " aurait dû figurer sur l'acte de décès si celui-ci avait été dressé en France.

## Article L123-11

Lorsque les droits prorogés par l'effet de l'article L. 123-10 ont été cédés à titre onéreux, les cédants ou leurs ayants droit pourront, dans un délai de trois ans à compter du 25 septembre 1951, demander au cessionnaire ou à ses ayants droit une révision des conditions de la cession en compensation des avantages résultant de la prorogation.

## Article L123-12

Lorsque le pays d'origine de l'oeuvre, au sens de l'acte de Paris de la convention de Berne, est un pays tiers à la Communauté européenne et que l'auteur n'est pas un ressortissant d'un Etat membre de la Communauté, la durée de protection est celle accordée dans le pays d'origine de l'oeuvre sans que cette durée puisse excéder celle prévue à l'article L. 123-1.

# Titre III : Exploitation des droits

# Chapitre Ier : Dispositions générales

## Article L131-1

La cession globale des oeuvres futures est nulle.

Copyright (C) 2007-2020 Legifrance

## Article L131-2

Les contrats de représentation, d'édition et de production audiovisuelle définis au présent titre doivent être constatés par écrit. Il en est de même des autorisations gratuites d'exécution.

Les contrats par lesquels sont transmis des droits d'auteur doivent être constatés par écrit.

Dans tous les autres cas, les dispositions des articles 1359 à 1362 du code civil sont applicables.

## Article L131-3

La transmission des droits de l'auteur est subordonnée à la condition que chacun des droits cédés fasse l'objet d'une mention distincte dans l'acte de cession et que le domaine d'exploitation des droits cédés soit délimité quant à son étendue et à sa destination, quant au lieu et quant à la durée.

Lorsque des circonstances spéciales l'exigent, le contrat peut être valablement conclu par échange de télégrammes, à condition que le domaine d'exploitation des droits cédés soit délimité conformément aux termes du premier alinéa du présent article.

Les cessions portant sur les droits d'adaptation audiovisuelle doivent faire l'objet d'un contrat écrit sur un document distinct du contrat relatif à l'édition proprement dite de l'oeuvre imprimée.

Le bénéficiaire de la cession s'engage par ce contrat à rechercher une exploitation du droit cédé conformément aux usages de la profession et à verser à l'auteur, en cas d'adaptation, une rémunération proportionnelle aux recettes perçues.

## Article L131-3-1

Dans la mesure strictement nécessaire à l'accomplissement d'une mission de service public, le droit d'exploitation d'une oeuvre créée par un agent de l'Etat dans l'exercice de ses fonctions ou d'après les instructions reçues est, dès la création, cédé de plein droit à l'Etat.

Pour l'exploitation commerciale de l'oeuvre mentionnée au premier alinéa, l'Etat ne dispose envers l'agent auteur que d'un droit de préférence. Cette disposition n'est pas applicable dans le cas d'activités de recherche scientifique d'un établissement public à caractère scientifique et technologique ou d'un établissement public à caractère scientifique, culturel et professionnel, lorsque ces activités font l'objet d'un contrat avec une personne morale de droit privé.

## Article L131-3-2

Les dispositions de l'article L. 131-3-1 s'appliquent aux collectivités territoriales, aux établissements publics à caractère administratif, aux autorités administratives indépendantes dotées de la personnalité morale et à la Banque de France à propos des oeuvres créées par leurs agents dans l'exercice de leurs fonctions ou d'après les instructions reçues.

## Article L131-3-3

Un décret en Conseil d'Etat fixe les modalités d'application des articles L. 131-3-1 et L. 131-3-2. Il définit en particulier les conditions dans lesquelles un agent, auteur d'une oeuvre, peut être intéressé aux produits tirés de son exploitation quand la personne publique qui l'emploie, cessionnaire du droit d'exploitation, a retiré un avantage d'une exploitation non commerciale de cette oeuvre ou d'une exploitation commerciale dans le cas prévu par la dernière phrase du dernier alinéa de l'article L. 131-3-1.

## Article L131-4

La cession par l'auteur de ses droits sur son oeuvre peut être totale ou partielle. Elle doit comporter au profit de l'auteur la participation proportionnelle aux recettes provenant de la vente ou de l'exploitation.

Toutefois, la rémunération de l'auteur peut être évaluée forfaitairement dans les cas suivants :

1° La base de calcul de la participation proportionnelle ne peut être pratiquement déterminée ;

2° Les moyens de contrôler l'application de la participation font défaut ;

3° Les frais des opérations de calcul et de contrôle seraient hors de proportion avec les résultats à atteindre ;

4° La nature ou les conditions de l'exploitation rendent impossible l'application de la règle de la rémunération proportionnelle, soit que la contribution de l'auteur ne constitue pas l'un des éléments essentiels de la création intellectuelle de l'oeuvre, soit que l'utilisation de l'oeuvre ne présente qu'un caractère accessoire par rapport à l'objet exploité ;

5° En cas de cession des droits portant sur un logiciel ;

6° Dans les autres cas prévus au présent code.

Est également licite la conversion entre les parties, à la demande de l'auteur, des droits provenant des contrats en vigueur en annuités forfaitaires pour des durées à déterminer entre les parties.

## Article L131-5

En cas de cession du droit d'exploitation, lorsque l'auteur aura subi un préjudice de plus de sept douzièmes dû à une lésion ou à une prévision insuffisante des produits de l'oeuvre, il pourra provoquer la révision des conditions de prix du contrat.

Cette demande ne pourra être formée que dans le cas où l'oeuvre aura été cédée moyennant une rémunération forfaitaire.

La lésion sera appréciée en considération de l'ensemble de l'exploitation par le cessionnaire des oeuvres de l'auteur qui se prétend lésé.

## Article L131-6

La clause d'une cession qui tend à conférer le droit d'exploiter l'oeuvre sous une forme non prévisible ou non prévue à la date du contrat doit être expresse et stipuler une participation corrélative aux profits d'exploitation.

## Article L131-7

En cas de cession partielle, l'ayant cause est substitué à l'auteur dans l'exercice des droits cédés, dans les conditions, les limites et pour la durée prévues au contrat, et à charge de rendre compte.

## Article L131-8

En vue du paiement des redevances et rémunérations qui leur sont dues pour les trois dernières années à l'occasion de la cession, de l'exploitation ou de l'utilisation de leurs oeuvres, telles qu'elles sont définies à l'article L. 112-2 du présent code, les auteurs, compositeurs et artistes bénéficient du privilège prévu au 4° de l'article 2331 et à l'article 2375 du code civil.

## Article L131-9

Le contrat mentionne la faculté pour le producteur de recourir aux mesures techniques prévues à l'article L. 331-5 ainsi qu'aux informations sous forme électronique prévues à l'article L. 331-11 en précisant les objectifs poursuivis pour chaque mode d'exploitation, de même que les conditions dans lesquelles l'auteur peut avoir accès aux caractéristiques essentielles desdites mesures techniques ou informations sous forme électronique auxquelles le producteur a effectivement recours pour assurer l'exploitation de l'oeuvre.

# Chapitre II : Dispositions particulières à certains contrats

# Section 1 : Contrat d'édition

# Sous-section 1 : Dispositions générales

## Article L132-1

Le contrat d'édition est le contrat par lequel l'auteur d'une oeuvre de l'esprit ou ses ayants droit cèdent à des conditions déterminées à une personne appelée éditeur le droit de fabriquer ou de faire fabriquer en nombre des exemplaires de l'oeuvre ou de la réaliser ou faire réaliser sous une forme numérique, à charge pour elle d'en assurer la publication et la diffusion.

## Article L132-2

Ne constitue pas un contrat d'édition, au sens de l'article L. 132-1, le contrat dit à compte d'auteur.

Par un tel contrat, l'auteur ou ses ayants droit versent à l'éditeur une rémunération convenue, à charge par ce dernier de fabriquer en nombre, dans la forme et suivant les modes d'expression déterminés au contrat, des exemplaires de l'oeuvre ou de la réaliser ou faire réaliser sous une forme numérique et d'en assurer la publication et la diffusion.

Ce contrat constitue un louage d'ouvrage régi par la convention, les usages et les dispositions des articles 1787 et suivants du code civil.

## Article L132-3

Ne constitue pas un contrat d'édition, au sens de l'article L. 132-1, le contrat dit de compte à demi.

Par un tel contrat, l'auteur ou ses ayants droit chargent un éditeur de fabriquer, à ses frais et en nombre, des exemplaires de l'oeuvre ou de la réaliser ou faire réaliser sous une forme numérique, dans la forme et suivant les modes d'expression déterminés au contrat, et d'en assurer la publication et la diffusion, moyennant l'engagement réciproquement contracté de partager les bénéfices et les pertes d'exploitation, dans la proportion prévue.

Ce contrat constitue une société en participation. Il est régi, sous réserve des dispositions prévues aux articles 1871 et suivants du code civil, par la convention et les usages.

## Article L132-4

Est licite la stipulation par laquelle l'auteur s'engage à accorder un droit de préférence à un éditeur pour l'édition de ses oeuvres futures de genres nettement déterminés.

Ce droit est limité pour chaque genre à cinq ouvrages nouveaux à compter du jour de la signature du contrat d'édition conclu pour la première oeuvre ou à la production de l'auteur réalisée dans un délai de cinq années à compter du même jour.

L'éditeur doit exercer le droit qui lui est reconnu en faisant connaître par écrit sa décision à l'auteur, dans le délai de trois mois à dater du jour de la remise par celui-ci de chaque manuscrit définitif.

Lorsque l'éditeur bénéficiant du droit de préférence aura refusé successivement deux ouvrages nouveaux présentés par l'auteur dans le genre déterminé au contrat, l'auteur pourra reprendre immédiatement et de plein droit sa liberté quant aux oeuvres futures qu'il produira dans ce genre.
Il devra toutefois, au cas où il aurait reçu ses oeuvres futures des avances du premier éditeur, effectuer préalablement le remboursement de celles-ci.

## Article L132-5

Le contrat peut prévoir soit une rémunération proportionnelle aux produits d'exploitation, soit, dans les cas prévus aux articles L. 131-4 et L. 132-6, une rémunération forfaitaire.

## Article L132-6

En ce qui concerne l'édition de librairie, la rémunération de l'auteur peut faire l'objet d'une rémunération forfaitaire pour la première édition, avec l'accord formellement exprimé de l'auteur, dans les cas suivants :

1° Ouvrages scientifiques ou techniques ;

2° Anthologies et encyclopédies ;

3° Préfaces, annotations, introductions, présentations ;

4° Illustrations d'un ouvrage ;

5° Editions de luxe à tirage limité ;

6° Livres de prières ;

7° A la demande du traducteur pour les traductions ;

8° Editions populaires à bon marché ;

9° Albums bon marché pour enfants.

Peuvent également faire l'objet d'une rémunération forfaitaire les cessions de droits à ou par une personne ou une entreprise établie à l'étranger.

En ce qui concerne les oeuvres de l'esprit publiées dans les journaux et recueils périodiques de tout ordre et par les agences de presse, la rémunération de l'auteur, lié à l'entreprise d'information par un contrat de louage d'ouvrage ou de services, peut également être fixée forfaitairement.

## Article L132-7

Le consentement personnel et donné par écrit de l'auteur est obligatoire.

Sans préjudice des dispositions qui régissent les contrats passés par les mineurs et les majeurs en curatelle, le consentement est même exigé lorsqu'il s'agit d'un auteur légalement incapable, sauf si celui-ci est dans l'impossibilité physique de donner son consentement.

Les dispositions de l'alinéa précédent ne sont pas applicables lorsque le contrat d'édition est souscrit par les ayants droit de l'auteur.

## Article L132-8

L'auteur doit garantir à l'éditeur l'exercice paisible et, sauf convention contraire, exclusif du droit cédé.

Il est tenu de faire respecter ce droit et de le défendre contre toutes atteintes qui lui seraient portées.

## Article L132-9

L'auteur doit mettre l'éditeur en mesure de fabriquer et de diffuser les exemplaires de l'oeuvre ou de réaliser l'œuvre sous une forme numérique.

Il doit remettre à l'éditeur, dans le délai prévu au contrat, l'objet de l'édition en une forme qui permette la fabrication ou la réalisation de l'œuvre sous une forme numérique.

Sauf convention contraire ou impossibilités d'ordre technique, l'objet de l'édition fournie par l'auteur reste la propriété de celui-ci. L'éditeur en est responsable pendant le délai d'un an après l'achèvement de la fabrication ou de la réalisation sous une forme numérique.

## Article L132-10

Le contrat d'édition doit indiquer le nombre minimum d'exemplaires constituant le premier tirage. Toutefois, cette obligation ne s'applique pas aux contrats prévoyant un minimum de droits d'auteur garantis par l'éditeur.

# Article L132-11

L'éditeur est tenu d'effectuer ou de faire effectuer la fabrication ou la réalisation sous une forme numérique selon les conditions, dans la forme et suivant les modes d'expression prévus au contrat.

Il ne peut, sans autorisation écrite de l'auteur, apporter à l'oeuvre aucune modification.

Il doit, sauf convention contraire, faire figurer sur chacun des exemplaires ou sur l'œuvre réalisée sous une forme numérique le nom, le pseudonyme ou la marque de l'auteur.

A défaut de convention spéciale, l'éditeur doit réaliser l'édition dans un délai fixé par les usages de la profession.

En cas de contrat à durée déterminée, les droits du cessionnaire s'éteignent de plein droit à l'expiration du délai sans qu'il soit besoin de mise en demeure.

L'éditeur pourra toutefois procéder, pendant trois ans après cette expiration, à l'écoulement, au prix normal, des exemplaires restant en stock, à moins que l'auteur ne préfère acheter ces exemplaires moyennant un prix qui sera fixé à dire d'experts à défaut d'accord amiable, sans que cette faculté reconnue au premier éditeur interdise à l'auteur de faire procéder à une nouvelle édition dans un délai de trente mois.

# Article L132-12

L'éditeur est tenu d'assurer à l'oeuvre une exploitation permanente et suivie et une diffusion commerciale, conformément aux usages de la profession.

# Article L132-13

L'éditeur est tenu de rendre compte.

L'auteur pourra, à défaut de modalités spéciales prévues au contrat, exiger au moins une fois l'an la production par l'éditeur d'un état mentionnant le nombre d'exemplaires fabriqués en cours d'exercice et précisant la date et l'importance des tirages et le nombre des exemplaires en stock.

Sauf usage ou conventions contraires, cet état mentionnera également le nombre des exemplaires vendus par l'éditeur, celui des exemplaires inutilisables ou détruits par cas fortuit ou force majeure, ainsi que le montant des redevances dues ou versées à l'auteur.

## Article L132-14

L'éditeur est tenu de fournir à l'auteur toutes justifications propres à établir l'exactitude de ses comptes.

Faute par l'éditeur de fournir les justifications nécessaires, il y sera contraint par le juge.

## Article L132-15

La procédure de sauvegarde ou de redressement judiciaire de l'éditeur n'entraîne pas la résiliation du contrat.

Lorsque l'activité est poursuivie en application des articles L. 621-22 et suivants du code de commerce, toutes les obligations de l'éditeur à l'égard de l'auteur doivent être respectées.

En cas de cession de l'entreprise d'édition en application des articles L. 621-83 et suivants du code de commerce précité, l'acquéreur est tenu des obligations du cédant.

Lorsque l'activité de l'entreprise a cessé depuis plus de trois mois ou lorsque la liquidation judiciaire est prononcée, l'auteur peut demander la résiliation du contrat.

Le liquidateur ne peut procéder à la vente en solde des exemplaires fabriqués ni à leur réalisation dans les conditions prévues aux articles L. 622-17 et L. 622-18 du code de commerce précité que quinze jours après avoir averti l'auteur de son intention, par lettre recommandée avec demande d'accusé de réception.

L'auteur possède, sur tout ou partie des exemplaires, un droit de préemption. A défaut d'accord, le prix de rachat sera fixé à dire d'expert.

## Article L132-16

L'éditeur ne peut transmettre, à titre gratuit ou onéreux, ou par voie d'apport en société, le bénéfice du contrat d'édition à des tiers, indépendamment de son fonds de commerce, sans avoir préalablement obtenu l'autorisation de l'auteur.

En cas d'aliénation du fonds de commerce, si celle-ci est de nature à compromettre gravement les intérêts matériels ou moraux de l'auteur, celui-ci est fondé à obtenir réparation même par voie de résiliation du contrat.

Lorsque le fonds de commerce d'édition était exploité en société ou dépendait d'une indivision, l'attribution du fonds à l'un des ex-associés ou à l'un des co-indivisaires en conséquence de la liquidation ou du partage ne sera, en aucun cas, considérée comme une cession.

## Article L132-17

Le contrat d'édition prend fin, sans préjudice des cas prévus par le droit commun, par les articles précédents de la présente sous-section ou par les articles de la sous-section 2, lorsque :

1° L'éditeur procède à la destruction totale des exemplaires ;

2° L'éditeur, sur mise en demeure de l'auteur lui impartissant un délai convenable, n'a pas procédé à la publication de l'œuvre ou, en cas d'épuisement, à sa réédition. Dans ce cas, la résiliation a lieu de plein droit. L'édition est considérée comme épuisée si deux demandes de livraison d'exemplaires adressées à l'éditeur ne sont pas satisfaites dans les trois mois.

En cas de mort de l'auteur, si l'oeuvre est inachevée, le contrat est résolu en ce qui concerne la partie de l'oeuvre non terminée, sauf accord entre l'éditeur et les ayants droit de l'auteur.

## Sous-section 2 : Dispositions particulières applicables à l'édition d'un livre

## Paragraphe 1 : Dispositions communes à l'édition d'un livre sous une forme imprimée et sous une forme numérique

### Article L132-17-1

Lorsque le contrat d'édition a pour objet l'édition d'un livre à la fois sous une forme imprimée et sous une forme numérique, les conditions relatives à la cession des droits d'exploitation sous une forme numérique sont déterminées dans une partie distincte du contrat, à peine de nullité de la cession de ces droits.

### Article L132-17-2

I.-L'éditeur est tenu d'assurer une exploitation permanente et suivie du livre édité sous une forme imprimée ou sous une forme numérique.

II.-La cession des droits d'exploitation sous une forme imprimée est résiliée de plein droit lorsque, après une mise en demeure de l'auteur adressée par lettre recommandée avec demande d'avis de réception, l'éditeur ne satisfait pas dans un délai de six mois à compter de cette réception aux obligations qui lui incombent à ce titre.

Cette résiliation n'a pas d'effet sur la partie distincte du contrat d'édition relative à la cession des droits d'exploitation du livre sous une forme numérique.

III.-La cession des droits d'exploitation sous une forme numérique est résiliée de plein droit lorsque, après une mise en demeure de l'auteur adressée par lettre recommandée avec demande d'avis de réception, l'éditeur ne satisfait pas dans un délai de six mois à compter de cette réception, aux obligations qui lui incombent à ce titre.

Cette résiliation n'a d'effet que sur la partie distincte du contrat d'édition relative à la cession des droits d'exploitation du livre sous une forme numérique.

IV.-Les résiliations prévues aux II et III sont sans effet sur les contrats d'adaptation audiovisuelle prévus à l'article L. 131-3.

## Article L132-17-3

I.-L'éditeur est tenu pour chaque livre de rendre compte à l'auteur du calcul de sa rémunération de façon explicite et transparente.

A cette fin, l'éditeur adresse à l'auteur, ou met à sa disposition par un procédé de communication électronique, un état des comptes mentionnant :

1° Lorsque le livre est édité sous une forme imprimée, le nombre d'exemplaires fabriqués en cours d'exercice, le nombre des exemplaires en stock en début et en fin d'exercice, le nombre des exemplaires vendus par l'éditeur, le nombre des exemplaires hors droits et détruits au cours de l'exercice ;

2° Lorsque le livre est édité sous une forme numérique, les revenus issus de la vente à l'unité et de chacun des autres modes d'exploitation du livre ;

3° Dans tous les cas, la liste des cessions de droits réalisées au cours de l'exercice, le montant des redevances correspondantes dues ou versées à l'auteur ainsi que les assiettes et les taux des différentes rémunérations prévues au contrat d'édition.

Une partie spécifique de cet état des comptes est consacrée à l'exploitation du livre sous une forme numérique.

La reddition des comptes est effectuée au moins une fois par an, à la date prévue au contrat ou, en l'absence de date, au plus tard six mois après l'arrêté des comptes.

II.-Si l'éditeur n'a pas satisfait à son obligation de reddition des comptes selon les modalités et dans les délais prévus au I, l'auteur dispose d'un délai de six mois pour mettre en demeure l'éditeur d'y procéder.

Lorsque cette mise en demeure n'est pas suivie d'effet dans un délai de trois mois, le contrat est résilié de plein droit.

III.-Lorsque l'éditeur n'a satisfait, durant deux exercices successifs, à son obligation de reddition des comptes que sur mise en demeure de l'auteur, le contrat est résilié de plein droit trois mois après la seconde mise en demeure.

IV.-L'éditeur reste tenu, même en l'absence de mise en demeure par l'auteur, de respecter ses obligations légales et contractuelles de reddition des comptes.

## Article L132-17-3-1

L'éditeur procède au paiement des droits au plus tard six mois après l'arrêté des comptes, sauf convention contraire précisée par l'accord rendu obligatoire mentionné à l'article L. 132-17-8.

Si l'éditeur n'a pas satisfait à son obligation de paiement des droits dans les délais prévus au premier alinéa du présent article, l'auteur dispose d'un délai de douze mois pour mettre en demeure l'éditeur d'y procéder.

Lorsque cette mise en demeure n'est pas suivie d'effet dans un délai de trois mois, le contrat est résilié de plein droit.

## Article L132-17-4

I.-Le contrat d'édition prend fin à l'initiative de l'auteur ou de l'éditeur, si, pendant deux années consécutives au-delà d'un délai de quatre ans après la publication de l'œuvre, les états de comptes ne font apparaître de droits versés, ou crédités en compensation d'un à-valoir, au titre d'aucune des opérations suivantes :

1° Vente à l'unité du livre dans son intégralité sous une forme imprimée, à l'exception de la vente issue de systèmes de distribution réservés à des abonnés ou à des adhérents ;

2° Vente ou de l'accès payant à l'unité du livre dans son intégralité sous une forme numérique ;

3° Consultation numérique payante du livre disponible dans son intégralité, pour les secteurs éditoriaux reposant essentiellement sur ce modèle de mise à disposition ;

4° Traductions intégrales du livre sous une forme imprimée ou sous une forme numérique.

La résiliation est notifiée à l'autre partie par lettre recommandée avec demande d'avis de réception dans un délai de douze mois suivant la date limite d'envoi de l'état des comptes par l'éditeur ou de sa mise à disposition de l'auteur par un procédé de communication électronique.

Le délai de préavis applicable à la résiliation est de trois mois. A l'expiration du délai de préavis, le contrat est résilié de plein droit.

II.-Les dispositions du I ne sont pas applicables à certaines modalités d'exploitation d'un livre précisées par l'accord rendu obligatoire mentionné à l'article L. 132-17-8.

## Paragraphe 2 : Dispositions particulières à l'édition d'un livre sous une forme numérique

## Article L132-17-5

L'éditeur réalise l'édition d'un livre sous une forme numérique dans les conditions fixées par l'accord rendu obligatoire mentionné à l'article L. 132-17-8.

Lorsque l'éditeur n'a pas procédé à cette réalisation, la cession des droits d'exploitation sous une forme numérique est résiliée de plein droit.

## Article L132-17-6

Le contrat d'édition garantit à l'auteur une rémunération juste et équitable sur l'ensemble des recettes provenant de la commercialisation et de la diffusion d'un livre édité sous une forme numérique.

En cas de vente à l'unité, la participation proportionnelle aux recettes au profit de l'auteur est calculée en fonction du prix de vente au public hors taxes.

Dans les cas où le modèle économique mis en œuvre par l'éditeur pour l'exploitation de l'édition sous une forme numérique repose en tout ou partie sur la publicité ou sur toutes autres recettes liées indirectement au livre, une rémunération est due à l'auteur à ce titre.

Dans les cas prévus de recours à un forfait, ce dernier ne saurait être versé à l'auteur en contrepartie de la cession de l'ensemble de ses droits d'exploitation sous une forme numérique et pour tous les modes d'exploitation numérique du livre. Dans les cas de contributions à caractère accessoire ou non essentiel mentionnés au 4° de l'article L. 131-4, une telle cession est possible.

Le forfait ne peut être justifié que pour une opération déterminée et toute nouvelle opération permettant le recours à un forfait s'accompagne de sa renégociation.

## Article L132-17-7

Le contrat d'édition comporte une clause de réexamen des conditions économiques de la cession des droits d'exploitation du livre sous une forme numérique.

## Paragraphe 3 : Accord entre organisations professionnelles

## Article L132-17-8

I.-Lorsque les organisations professionnelles représentatives des auteurs et des éditeurs du secteur du livre concluent un accord portant sur toutes les dispositions mentionnées au II, cet accord peut être rendu obligatoire à l'ensemble des auteurs et des éditeurs de ce secteur par arrêté du ministre chargé de la culture.

II.-L'accord mentionné au I fixe les modalités d'application des dispositions :

1° Relatives aux conditions de cession des droits d'exploitation de l'édition numérique d'un livre ;

2° Du deuxième alinéa de l'article L. 132-11 lorsqu'elles s'appliquent à l'édition d'un livre sous une forme numérique ;

3° De l'article L. 132-17-2 relatives à l'exploitation permanente et suivie d'un livre édité sous une forme imprimée et sous une forme numérique ;

4° De l'article L. 132-17-3 relatives à la reddition des comptes afin de préciser la forme de cette reddition, les règles applicables au versement des droits à l'auteur ainsi que les modalités d'information de celui-ci ;

5° Du II de l'article L. 132-17-4 relatives aux dérogations à certaines modalités de résiliation du contrat d'édition d'un livre ;

6° De l'article L. 132-17-5 relatives à la réalisation de l'édition d'un livre sous une forme numérique ;

7° De l'article L. 132-17-6 relatives au calcul de la rémunération de l'auteur provenant de la commercialisation et de la diffusion d'un livre édité sous une forme numérique, en l'absence de prix de vente à l'unité ;

8° De l'article L. 132-17-7 relatives au réexamen des conditions économiques de la cession des droits d'exploitation d'un livre sous forme numérique, notamment la périodicité de ce réexamen, son objet et son régime ainsi que les modalités de règlement des différends ;

9° De l'article L. 132-17-3-1 relatives au délai de paiement des droits et aux dérogations contractuelles à ce délai.

III.-En l'absence d'un accord rendu obligatoire en vertu du I, les modalités d'application mentionnées au II sont fixées par décret en Conseil d'Etat.

Lorsqu'un accord est conclu après l'édiction de ce décret, les dispositions de celui-ci cessent de produire leurs effets à la date de l'entrée en vigueur de l'arrêté rendant obligatoire l'accord à l'ensemble des auteurs et des éditeurs du secteur du livre.

Le ministre chargé de la culture peut mettre fin au caractère obligatoire de l'accord pour l'ensemble des auteurs et des éditeurs du secteur du livre, en raison d'un changement dans les circonstances de fait ou de droit ou pour un motif d'intérêt général.

# Section 2 : Contrat de représentation

## Article L132-18

Le contrat de représentation est celui par lequel l'auteur d'une oeuvre de l'esprit et ses ayants droit autorisent une personne physique ou morale à représenter ladite oeuvre à des conditions qu'ils déterminent. Est dit contrat général de représentation le contrat par lequel un organisme professionnel d'auteurs confère à un entrepreneur de spectacles la faculté de représenter, pendant la durée du contrat, les oeuvres actuelles ou futures, constituant le répertoire dudit organisme aux conditions déterminées par l'auteur ou ses ayants droit.

Dans le cas prévu à l'alinéa précédent, il peut être dérogé aux dispositions de l'article L. 131-1.

## Article L132-19

Le contrat de représentation est conclu pour une durée limitée ou pour un nombre déterminé de communications au public.

Sauf stipulation expresse de droits exclusifs, il ne confère à l'entrepreneur de spectacles aucun monopole d'exploitation.

La validité des droits exclusifs accordés par un auteur dramatique ne peut excéder cinq années ; l'interruption des représentations au cours de deux années consécutives y met fin de plein droit.

Copyright (C) 2007-2020 Legifrance

L'entrepreneur de spectacles ne peut transférer le bénéfice de son contrat sans l'assentiment formel et donné par écrit de l'auteur ou de son représentant.

## Article L132-20

Sauf stipulation contraire :

1° L'autorisation de télédiffuser une oeuvre par voie hertzienne ne comprend pas la distribution par câble de cette télédiffusion, à moins qu'elle ne soit faite en simultané et intégralement par l'organisme bénéficiaire de cette autorisation et sans extension de la zone géographique contractuellement prévue ;

2° L'autorisation de télédiffuser l'oeuvre ne vaut pas autorisation de communiquer la télédiffusion de cette oeuvre dans un lieu accessible au public ;

3° L'autorisation de télédiffuser l'oeuvre par voie hertzienne ne comprend pas son émission vers un satellite permettant la réception de cette oeuvre par l'intermédiaire d'organismes tiers, à moins que les auteurs ou leurs ayants droit aient contractuellement autorisé ces organismes à communiquer l'oeuvre au public ; dans ce cas, l'organisme d'émission est exonéré du paiement de toute rémunération ;

4° L'autorisation de télédiffuser une oeuvre par voie hertzienne comprend la distribution à des fins non commerciales de cette télédiffusion sur les réseaux internes aux immeubles ou ensembles d'immeubles collectifs à usage d'habitation installés par leurs propriétaires ou copropriétaires, ou par les mandataires de ces derniers, à seule fin de permettre le raccordement de chaque logement de ces mêmes immeubles ou ensembles d'immeubles collectifs à usage d'habitation à des dispositifs collectifs de réception des télédiffusions par voie hertzienne normalement reçues dans la zone.

## Article L132-20-1

I.-A compter de la date d'entrée en vigueur de la loi n° 97-283 du 27 mars 1997, le droit d'autoriser la retransmission par câble, simultanée, intégrale et sans changement, sur le territoire national, d'une oeuvre télédiffusée à partir d'un Etat membre de la Communauté européenne ne peut être exercé que par un organisme de gestion collective. Si cet organisme est régi par le titre II du livre III, il doit être agréé à cet effet par le ministre chargé de la culture.

Si le titulaire du droit n'en a pas déjà confié la gestion à l'un de ces organismes, il désigne celui qu'il charge de l'exercer. Il notifie par écrit cette désignation à l'organisme, qui ne peut refuser.

Le contrat autorisant la télédiffusion d'une oeuvre sur le territoire national mentionne l'organisme chargé d'exercer le droit d'autoriser sa retransmission par câble, simultanée, intégrale et sans changement, dans les Etats membres de la Communauté européenne.

L'agrément prévu au premier alinéa est délivré en considération :

1° De la qualification professionnelle des dirigeants des organismes et des moyens que ceux-ci peuvent mettre en oeuvre pour assurer le recouvrement des droits définis au premier alinéa et l'exploitation de leur répertoire ;

2° De l'importance de leur répertoire ;

3° De leur respect des obligations que leur imposent les dispositions du titre II du livre III.

Un décret en Conseil d'Etat fixe les conditions de délivrance et de retrait de l'agrément. Il fixe également, dans le cas prévu au deuxième alinéa, les modalités de désignation de l'organisme chargé de la gestion du droit de retransmission.

II.-Par dérogation au I, le titulaire du droit peut céder celui-ci à une entreprise de communication audiovisuelle.

Les dispositions du I ne s'appliquent pas aux droits dont est cessionnaire une entreprise de communication audiovisuelle.

## Article L132-20-2

Des médiateurs sont institués afin de favoriser, sans préjudice du droit des parties de saisir le juge, la résolution des litiges relatifs à l'octroi de l'autorisation de retransmission, simultanée, intégrale et sans changement, d'une oeuvre par câble.

A défaut d'accord amiable, le Médiateur peut proposer aux parties la solution qui lui paraît appropriée, que celles-ci sont réputées avoir acceptée faute d'avoir exprimé leur opposition par écrit dans un délai de trois mois.

Un décret en Conseil d'Etat précise les conditions d'application du présent article et les modalités de désignation des médiateurs.

## Article L132-21

L'entrepreneur de spectacles est tenu de déclarer à l'auteur ou à ses représentants le programme exact des représentations ou exécutions publiques et de leur fournir un état justifié de ses recettes. Il doit acquitter aux échéances prévues, entre les mains de l'auteur ou de ses représentants, le montant des redevances stipulées.

Toutefois, les communes, pour l'organisation de leurs fêtes locales et publiques, et les sociétés d'éducation populaire, agréées par l'autorité administrative, pour les séances organisées par elles dans le cadre de leurs activités, doivent bénéficier d'une réduction de ces redevances.

Copyright (C) 2007-2020 Legifrance

## Article L132-22

L'entrepreneur de spectacles doit assurer la représentation ou l'exécution publique dans des conditions techniques propres à garantir le respect des droits intellectuels et moraux de l'auteur.

# Section 3 : Contrat de production audiovisuelle

## Article L132-23

Le producteur de l'oeuvre audiovisuelle est la personne physique ou morale qui prend l'initiative et la responsabilité de la réalisation de l'oeuvre.

## Article L132-24

Le contrat qui lie le producteur aux auteurs d'une oeuvre audiovisuelle, autres que l'auteur de la composition musicale avec ou sans paroles, emporte, sauf clause contraire et sans préjudice des droits reconnus à l'auteur par les dispositions des articles L. 111-3, L. 121-4, L. 121-5, L. 122-1 à L. 122-7, L. 123-7, L. 131-2 à L. 131-7, L. 132-4 et L. 132-7, cession au profit du producteur des droits exclusifs d'exploitation de l'oeuvre audiovisuelle.

Le contrat de production audiovisuelle n'emporte pas cession au producteur des droits graphiques et théâtraux sur l'oeuvre.

Ce contrat prévoit la liste des éléments ayant servi à la réalisation de l'oeuvre qui sont conservés ainsi que les modalités de cette conservation.

## Article L132-25

La rémunération des auteurs est due pour chaque mode d'exploitation.

Sous réserve des dispositions de l'article L. 131-4, lorsque le public paie un prix pour recevoir communication d'une oeuvre audiovisuelle déterminée et individualisable, la rémunération est proportionnelle à ce prix, compte tenu des tarifs dégressifs éventuels accordés par le distributeur à l'exploitant ; elle est versée aux auteurs par le producteur.

## Article L132-25-1

Les accords relatifs à la rémunération des auteurs, ainsi que ceux traitant des pratiques contractuelles ou des usages professionnels entre auteurs et producteurs, conclus entre les organismes professionnels d'auteurs ou les organismes de gestion collective mentionnés au titre II du livre III de la présente partie, les organisations professionnelles représentatives des producteurs et, le cas échéant, les organisations représentatives d'autres secteurs d'activité peuvent être étendus à l'ensemble des intéressés par arrêté du ministre chargé de la culture.

## Article L132-26

L'auteur garantit au producteur l'exercice paisible des droits cédés.

## Article L132-27

Le producteur est tenu de rechercher une exploitation suivie de l'œuvre audiovisuelle, conforme aux usages de la profession.

Le champ et les conditions de mise en œuvre de cette obligation ainsi que, le cas échéant, les dispositions convenues entre le producteur et ses cessionnaires ou mandataires sont définis par voie d'accord professionnel conclu entre, d'une part, les organismes professionnels d'auteurs ou les organismes de gestion collective mentionnés au titre II du livre III de la présente partie et, d'autre part, les organisations représentatives des producteurs d'œuvres audiovisuelles, les organisations représentatives des éditeurs de services de communication audiovisuelle ou un ensemble d'éditeurs de services de communication audiovisuelle représentatifs ainsi que, le cas échéant, un ensemble d'éditeurs de services de communication au public en ligne représentatifs et les organisations représentatives d'autres secteurs d'activité. L'accord peut être rendu obligatoire pour l'ensemble des intéressés des secteurs d'activité concernés par arrêté du ministre chargé de la culture. A défaut d'accord professionnel rendu obligatoire dans le délai de trois mois à compter de la promulgation de la loi n° 2016-925 du 7 juillet 2016 relative à la liberté de la création, à l'architecture et au patrimoine, le champ et les conditions de mise en œuvre de cette obligation sont fixés par décret en Conseil d'Etat.

## Article L132-28

Le producteur fournit, au moins une fois par an, à l'auteur et aux coauteurs un état des recettes provenant de l'exploitation de l'oeuvre selon chaque mode d'exploitation.

A leur demande, il leur fournit toute justification propre à établir l'exactitude des comptes, notamment la copie des contrats par lesquels il cède à des tiers tout ou partie des droits dont il dispose.

Toute cession du bénéfice d'un contrat de production audiovisuelle à un tiers ne peut intervenir qu'après une information préalable des coauteurs par le cédant dans un délai minimal d'un mois avant la date effective de la cession. Tout contrat de production audiovisuelle fait mention de l'obligation prévue au présent alinéa

## Article L132-29

Sauf convention contraire, chacun des auteurs de l'oeuvre audiovisuelle peut disposer librement de la partie de l'oeuvre qui constitue sa contribution personnelle en vue de son exploitation dans un genre différent et dans les limites fixées par l'article L. 113-3.

## Article L132-30

La procédure de sauvegarde ou de redressement judiciaire du producteur n'entraîne pas la résiliation du contrat de production audiovisuelle.

Lorsque la réalisation ou l'exploitation de l'oeuvre est continuée en application des articles L. 621-22 et suivants du code de commerce, l'administrateur est tenu au respect de toutes les obligations du producteur, notamment à l'égard des coauteurs.

En cas de cession de tout ou partie de l'entreprise ou de liquidation, l'administrateur, le débiteur, le liquidateur, selon le cas, est tenu d'établir un lot distinct pour chaque oeuvre audiovisuelle pouvant faire l'objet d'une cession ou d'une vente aux enchères. Il a l'obligation d'aviser, à peine de nullité, chacun des auteurs et des coproducteurs de l'oeuvre par lettre recommandée, un mois avant toute décision sur la cession ou toute procédure de licitation. L'acquéreur est, de même, tenu aux obligations du cédant.

L'auteur et les coauteurs possèdent un droit de préemption sur l'oeuvre, sauf si l'un des coproducteurs se déclare acquéreur. A défaut d'accord, le prix d'achat est fixé à dire d'expert.

Lorsque l'activité de l'entreprise a cessé depuis plus de trois mois ou lorsque la liquidation est prononcée, l'auteur et les coauteurs peuvent demander la résiliation du contrat de production audiovisuelle.

# Section 4 : Contrat de commande pour la publicité

## Article L132-31

Dans le cas d'une oeuvre de commande utilisée pour la publicité, le contrat entre le producteur et l'auteur entraîne, sauf clause contraire, cession au producteur des droits d'exploitation de l'oeuvre, dès lors que ce contrat précise la rémunération distincte due pour chaque mode d'exploitation de l'oeuvre en fonction notamment de la zone géographique, de la durée de l'exploitation, de l'importance du tirage et de la nature du support.

Un accord entre les organisations représentatives d'auteurs et les organisations représentatives des producteurs en publicité fixe les éléments de base entrant dans la composition des rémunérations correspondant aux différentes utilisations des oeuvres.

La durée de l'accord est comprise entre un et cinq ans.

Ses stipulations peuvent être rendues obligatoires pour l'ensemble des intéressés par décret.

# Section 5 : Contrat de nantissement du droit d'exploitation des logiciels

## Article L132-34

Sans préjudice des dispositions de la loi du 17 mars 1909 relative à la vente et au nantissement des fonds de commerce, le droit d'exploitation de l'auteur d'un logiciel défini à l'article L. 122-6 peut faire l'objet d'un nantissement dans les conditions suivantes :

Le contrat de nantissement est, à peine de nullité, constaté par un écrit.

Le nantissement est inscrit, à peine d'inopposabilité, sur un registre spécial tenu par l'Institut national de la propriété industrielle. L'inscription indique précisément l'assiette de la sûreté et notamment les codes source et les documents de fonctionnement.

Le rang des inscriptions est déterminé par l'ordre dans lequel elles sont requises.

Les inscriptions de nantissement sont, sauf renouvellement préalable, périmées à l'expiration d'une durée de cinq ans.

Un décret en Conseil d'Etat fixera les conditions d'application du présent article.

# Section 6 : Droit d'exploitation des œuvres des journalistes

## Article L132-35

On entend par titre de presse, au sens de la présente section, l'organe de presse à l'élaboration duquel le journaliste professionnel a contribué, ainsi que l'ensemble des déclinaisons du titre, quels qu'en soient le support, les modes de diffusion et de consultation. Sont exclus les services de communication audiovisuelle au sens de l'article 2 de la loi n° 86-1067 du 30 septembre 1986 relative à la liberté de communication.

Est assimilée à la publication dans le titre de presse la diffusion de tout ou partie de son contenu par un service de communication au public en ligne ou par tout autre service, édité par un tiers, dès lors que cette diffusion est faite sous le contrôle éditorial du directeur de la publication dont le contenu diffusé est issu ou dès lors qu'elle figure dans un espace dédié au titre de presse dont le contenu diffusé est extrait.

Est également assimilée à la publication dans le titre de presse la diffusion de tout ou partie de son contenu par un service de communication au public en ligne édité par l'entreprise de presse ou par le groupe auquel elle appartient ou édité sous leur responsabilité, la mention dudit titre de presse devant impérativement figurer.

## Article L132-36

Par dérogation à l'article L. 131-1 et sous réserve des dispositions de l'article L. 121-8, la convention liant un journaliste professionnel ou assimilé au sens des articles L. 7111-3 et suivants du code du travail, qui contribue, de manière permanente ou occasionnelle, à l'élaboration d'un titre de presse, et l'employeur emporte, sauf stipulation contraire, cession à titre exclusif à l'employeur des droits d'exploitation des œuvres du journaliste réalisées dans le cadre de ce titre, qu'elles soient ou non publiées.

## Article L132-37

L'exploitation de l'œuvre du journaliste sur différents supports, dans le cadre du titre de presse défini à l'article L. 132-35 du présent code, a pour seule contrepartie le salaire, pendant une période fixée par un accord d'entreprise ou, à défaut, par tout autre accord collectif, au sens des articles L. 2222-1 et suivants du code du travail.

Cette période est déterminée en prenant notamment en considération la périodicité du titre de presse et la nature de son contenu.

## Article L132-38

L'exploitation de l'œuvre dans le titre de presse, au-delà de la période prévue à l'article L. 132-37, est rémunérée, à titre de rémunération complémentaire sous forme de droits d'auteur ou de salaire, dans des conditions déterminées par l'accord d'entreprise ou, à défaut, par tout autre accord collectif.

## Article L132-39

Lorsque la société éditrice ou la société qui la contrôle, au sens de l'article L. 233-16 du code de commerce, édite plusieurs titres de presse, un accord d'entreprise peut prévoir la diffusion de l'œuvre par d'autres titres de cette société ou du groupe auquel elle appartient, à condition que ces titres et le titre de presse initial appartiennent à une même famille cohérente de presse. Cet accord définit la notion de famille cohérente de presse ou fixe la liste de chacun des titres de presse concernés.

L'exploitation de l'œuvre du journaliste au sein de la famille cohérente de presse doit comporter des mentions qui permettent une identification dudit journaliste et, si l'accord le prévoit, du titre de presse dans lequel l'œuvre a été initialement publiée.

Ces exploitations hors du titre de presse tel que défini à l'article L. 132-35 du présent code donnent lieu à rémunération complémentaire, sous forme de droits d'auteur ou de salaire, dans des conditions déterminées par l'accord d'entreprise mentionné au premier alinéa du présent article.

## Article L132-40

Toute cession de l'œuvre en vue de son exploitation hors du titre de presse initial ou d'une famille cohérente de presse est soumise à l'accord exprès et préalable de son auteur exprimé à titre individuel ou dans un accord collectif, sans préjudice, dans ce deuxième cas, de l'exercice de son droit moral par le journaliste.

Ces exploitations donnent lieu à rémunération sous forme de droits d'auteur, dans des conditions déterminées par l'accord individuel ou collectif.

## Article L132-41

Lorsque l'auteur d'une image fixe est un journaliste professionnel qui tire le principal de ses revenus de l'exploitation de telles œuvres et qui collabore de manière occasionnelle à l'élaboration d'un titre de presse,

Copyright (C) 2007-2020 Legifrance

la cession des droits d'exploitation telle que prévue à l'article L. 132-36 ne s'applique que si cette œuvre a été commandée par l'entreprise de presse.

Les conditions dans lesquelles le second alinéa de l'article L. 121-8 s'applique aux œuvres cédées en application du premier alinéa du présent article sont précisées par un accord collectif ou individuel.

## Article L132-42

Les droits d'auteur mentionnés aux articles L. 132-38 et suivants n'ont pas le caractère de salaire. Ils sont déterminés conformément aux articles L. 131-4 et L. 132-6.

## Article L132-42-1

Par dérogation à l'article L. 2232-24 du code du travail, dans les entreprises non assujetties à l'obligation d'organiser les élections prévues au livre III de la deuxième partie du même code, les accords mentionnés aux articles L. 132-37 à L. 132-41, L. 132-43 et L. 132-44 du présent code peuvent être négociés et conclus, dans les conditions prévues aux articles L. 2232-25 et L. 2232-26 du code du travail, par un ou plusieurs journalistes professionnels au sens des articles L. 7111-3 à L. 7111-5 du même code collaborant de manière régulière à l'entreprise de presse et mandatés par une ou plusieurs organisations syndicales de journalistes professionnels représentatives mentionnées à l'article L. 132-44 du présent code. Ces accords sont approuvés à la majorité des suffrages exprimés par les seuls journalistes professionnels au sens des articles L. 7111-3 à L. 7111-5 du code du travail collaborant de manière régulière à l'entreprise de presse, dans les conditions prévues à l'article L. 2232-27 du même code.

## Article L132-43

Les accords collectifs peuvent prévoir de confier la gestion des droits mentionnés aux articles L. 132-38 et suivants à un ou plusieurs organismes de gestion collective régis par le titre II du livre III.

## Article L132-44

Il est créé une commission, présidée par un représentant de l'Etat, et composée, en outre, pour moitié de représentants des organisations professionnelles de presse représentatives et pour moitié de représentants des organisations syndicales de journalistes professionnels représentatives.

Le représentant de l'Etat est nommé parmi les membres de la Cour de cassation, du Conseil d'Etat ou de la Cour des comptes, par arrêté du ministre chargé de la communication.

Par dérogation au dernier alinéa de l'article L. 2232-21 et à l'article L. 2232-22 du code du travail, la commission se prononce, en lieu et place de la commission paritaire de branche, sur la validité des accords relatifs aux droits d'auteur des journalistes conclus dans les conditions prévues à l'article L. 2232-21 du même code, dans les deux mois qui suivent leur transmission ; à défaut, les accords sont réputés avoir été validés. La commission contrôle que ces accords collectifs n'enfreignent pas les dispositions législatives, réglementaires ou conventionnelles applicables.

A défaut de conclusion d'un accord d'entreprise dans un délai de six mois à compter de la publication de la loi n° 2009-669 du 12 juin 2009 favorisant la diffusion et la protection de la création sur internet, et en l'absence de tout autre accord collectif applicable, l'une des parties à la négociation de l'accord d'entreprise peut saisir la commission aux fins de déterminer les modes et bases de la rémunération due en contrepartie

des droits d'exploitation. La demande peut également porter sur l'identification des titres composant une famille cohérente de presse au sein du groupe, en application de l'article L. 132-39.

En l'absence d'engagement de négociation, sont considérés comme des parties à la négociation de l'accord d'entreprise l'employeur et le délégué syndical. En l'absence de délégué syndical, peuvent saisir la commission :

# les institutions représentatives du personnel ;

# à défaut, tout salarié mandaté par une organisation syndicale de journalistes professionnels au sens de l'article L. 7111-3 du code du travail ;

# à défaut, tout journaliste professionnel au sens du même article L. 7111-3 collaborant de manière régulière à l'entreprise de presse.

Pour les accords d'entreprise conclus pour une durée déterminée qui arrivent à échéance ou pour ceux qui sont dénoncés par l'une des parties, la commission peut être saisie dans les mêmes conditions et sur les mêmes questions qu'au précédent alinéa, à défaut de la conclusion d'un nouvel accord d'entreprise dans les six mois suivant la date d'expiration de l'accord à durée déterminée ou à défaut de la conclusion d'un accord de substitution dans les délais prévus à l'article L. 2261-10 du code du travail à la suite de la dénonciation du précédent accord.

La commission recherche avec les parties une solution de compromis afin de parvenir à un accord. Elle s'appuie, à cet effet, sur les accords existants pertinents au regard de la forme de presse considérée. Elle rend sa décision dans un délai de deux mois à compter de sa saisine.

La commission se détermine à la majorité de ses membres présents. En cas de partage des voix, le président a voix prépondérante.

Les décisions de la commission sont exécutoires si, dans un délai d'un mois, son président n'a pas demandé une seconde délibération. Elles sont notifiées aux parties et au ministre chargé de la communication, qui en assure la publicité.

L'intervention de la décision de la commission ne fait pas obstacle à ce que s'engage dans les entreprises de presse concernées une nouvelle négociation collective. L'accord collectif issu de cette négociation se substitue à la décision de la commission, après son dépôt par la partie la plus diligente auprès de l'autorité administrative, conformément à l'article L. 2231-6 du code du travail.

Un décret en Conseil d'Etat fixe les conditions d'application du présent article et notamment la composition, les modalités de saisine et de fonctionnement de la commission ainsi que les voies de recours juridictionnel contre ses décisions.

## Article L132-45

L'article L. 132-41 s'applique à compter de l'entrée en vigueur d'un accord de branche déterminant le salaire minimum des journalistes professionnels qui tirent le principal de leurs revenus de l'exploitation d'images fixes et qui collaborent de manière occasionnelle à l'élaboration d'un titre de presse. Cet accord prend en compte le caractère exclusif ou non de la cession.

A défaut d'accord dans un délai de deux ans à compter de la publication de la loi n° 2009-669 du 12 juin 2009 favorisant la diffusion et la protection de la création sur internet, un décret fixe les conditions de détermination de ce salaire minimum.

# Chapitre III : Rémunération au titre du prêt en bibliothèque

## Article L133-1

Lorsqu'une oeuvre a fait l'objet d'un contrat d'édition en vue de sa publication et de sa diffusion sous forme de livre, l'auteur ne peut s'opposer au prêt d'exemplaires de cette édition par une bibliothèque accueillant du public.

Ce prêt ouvre droit à rémunération au profit de l'auteur selon les modalités prévues à l'article L. 133-4.

## Article L133-2

La rémunération prévue par l'article L. 133-1 est perçue par un ou plusieurs organismes de gestion collective régis par le titre II du livre III et agréés à cet effet par le ministre chargé de la culture.

L'agrément prévu au premier alinéa est délivré en considération :

-de la diversité des membres ;

-de la qualification professionnelle des dirigeants ;

-des moyens que l'organisme propose de mettre en oeuvre pour assurer la perception et la répartition de la rémunération au titre du prêt en bibliothèque ;

-de la représentation équitable des auteurs et des éditeurs parmi ses membres et au sein de ses organes dirigeants.

Un décret en Conseil d'Etat fixe les conditions de délivrance et de retrait de cet agrément.

## Article L133-3

La rémunération prévue au second alinéa de l'article L. 133-1 comprend deux parts.

La première part, à la charge de l'Etat, est assise sur une contribution forfaitaire par usager inscrit dans les bibliothèques accueillant du public pour le prêt, à l'exception des bibliothèques scolaires. Un décret fixe le montant de cette contribution, qui peut être différent pour les bibliothèques des établissements d'enseignement supérieur, ainsi que les modalités de détermination du nombre d'usagers inscrits à prendre en compte pour le calcul de cette part.

La seconde part est assise sur le prix public de vente hors taxes des livres achetés, pour leurs bibliothèques accueillant du public pour le prêt, par les personnes morales mentionnées au troisième alinéa (2°) de l'article 3 de la loi n° 81-766 du 10 août 1981 relative au prix du livre ; elle est versée par les fournisseurs qui réalisent ces ventes. Le taux de cette rémunération est de 6 % du prix public de vente.

## Article L133-4

La rémunération au titre du prêt en bibliothèque est répartie dans les conditions suivantes :

1° Une première part est répartie à parts égales entre les auteurs et leurs éditeurs à raison du nombre d'exemplaires des livres achetés chaque année, pour leurs bibliothèques accueillant du public pour le prêt, par les personnes morales mentionnées au troisième alinéa (2°) de l'article 3 de la loi n° 81-766 du 10 août 1981 précitée, déterminé sur la base des informations que ces personnes et leurs fournisseurs communiquent à l'organisme ou aux organismes mentionnés à l'article L. 133-2 ;

2° Une seconde part, qui ne peut excéder la moitié du total, est affectée à la prise en charge d'une fraction des cotisations dues au titre de la retraite complémentaire par les personnes visées aux troisième et quatrième alinéas de l'article L. 382-12 du code de la sécurité sociale.

# Chapitre IV : Dispositions particulières relatives à l'exploitation numérique des livres indisponibles

## Article L134-1

On entend par livre indisponible au sens du présent chapitre un livre publié en France avant le 1er janvier 2001 qui ne fait plus l'objet d'une diffusion commerciale par un éditeur et qui ne fait pas actuellement l'objet d'une publication sous une forme imprimée ou numérique.

## Article L134-2

Il est créé une base de données publique, mise à disposition en accès libre et gratuit par un service de communication au public en ligne, qui répertorie les livres indisponibles. La Bibliothèque nationale de France veille à sa mise en œuvre, à son actualisation et à l'inscription des mentions prévues aux articles L. 134-4, L. 134-5 et L. 134-6.

Toute personne peut demander à la Bibliothèque nationale de France l'inscription d'un livre indisponible dans la base de données.

L'inscription d'un livre dans la base de données ne préjuge pas de l'application des articles L. 132-12 et L. 132-17.

## Article L134-3

I. # Lorsqu'un livre est inscrit dans la base de données mentionnée à l'article L. 134-2 depuis plus de six mois, le droit d'autoriser sa reproduction et sa représentation sous une forme numérique est exercé par un organisme de gestion collective régi par le titre II du livre III de la présente partie, agréé à cet effet par le ministre chargé de la culture.

Sauf dans le cas prévu au troisième alinéa de l'article L. 134-5, la reproduction et la représentation du livre sous une forme numérique sont autorisées, moyennant une rémunération, à titre non exclusif et pour une durée limitée à cinq ans, renouvelable.

II. # Les organismes agréés ont qualité pour ester en justice pour la défense des droits dont ils ont la charge.

III. # L'agrément prévu au I est délivré en considération :

1° De la diversité des membres de l'organisme ;

2° De la représentation paritaire des auteurs et des éditeurs parmi les membres et au sein des organes dirigeants ;

3° De la qualification professionnelle des dirigeants de l'organisme ;

4° Des moyens que l'organisme propose de mettre en œuvre pour assurer la perception des droits et leur répartition ;

5° Du caractère équitable des règles de répartition des sommes perçues entre les ayants droit, qu'ils soient ou non parties au contrat d'édition. Le montant des sommes perçues par le ou les auteurs du livre ne peut être inférieur au montant des sommes perçues par l'éditeur ;

6° Des moyens probants que l'organisme propose de mettre en œuvre afin d'identifier et de retrouver les titulaires de droits aux fins de répartir les sommes perçues ;

7° Des moyens que l'organisme propose de mettre en œuvre pour développer des relations contractuelles permettant d'assurer la plus grande disponibilité possible des œuvres ;

8° Des moyens que l'organisme propose de mettre en œuvre pour veiller à la défense des intérêts légitimes des ayants droit non parties au contrat d'édition.

IV. # Les organismes agréés remettent chaque année à la commission de contrôle des organismes de gestion mentionnée à l'article L. 327-1 un rapport rendant compte des moyens mis en œuvre et des résultats obtenus dans la recherche des titulaires de droits, qu'ils soient ou non parties au contrat d'édition.

La commission peut formuler toute observation ou recommandation d'amélioration des moyens mis en œuvre afin d'identifier et de retrouver les titulaires de droits.

La commission est tenue informée, dans le délai qu'elle fixe, des suites données à ses observations et recommandations.

La commission rend compte annuellement au Parlement, au Gouvernement et à l'assemblée générale des organismes agréés, selon des modalités qu'elle détermine, des observations et recommandations qu'elle a formulées et des suites qui leur ont été données.

## Article L134-4

I. # L'auteur d'un livre indisponible ou l'éditeur disposant du droit de reproduction sous une forme imprimée de ce livre peut s'opposer à l'exercice du droit d'autorisation mentionné au premier alinéa du I de l'article L. 134-3 par un organisme de gestion collective agréé. Cette opposition est notifiée par écrit à l'organisme mentionné au premier alinéa de l'article L. 134-2 au plus tard six mois après l'inscription du livre concerné dans la base de données mentionnée au même alinéa.

Mention de cette opposition est faite dans la base de données mentionnée au même article L. 134-2.

Après l'expiration du délai mentionné au premier alinéa du présent I, l'auteur d'un livre indisponible peut s'opposer à l'exercice du droit de reproduction ou de représentation de ce livre s'il juge que la reproduction ou la représentation de ce livre est susceptible de nuire à son honneur ou à sa réputation. Ce droit est exercé sans indemnisation.

II. # L'éditeur ayant notifié son opposition dans les conditions prévues au premier alinéa du I du présent article est tenu d'exploiter dans les deux ans suivant cette notification le livre indisponible concerné. Il doit apporter par tout moyen la preuve de l'exploitation effective du livre à l'organisme agréé en application de l'article L. 134-3. A défaut d'exploitation du livre dans le délai imparti, la mention de l'opposition est supprimée dans la base de données mentionnée à l'article L. 134-2 et le droit d'autoriser sa reproduction et sa représentation sous une forme numérique est exercé dans les conditions prévues au second alinéa du I de l'article L. 134-3.

La preuve de l'exploitation effective du livre, apportée par l'éditeur dans les conditions prévues au premier alinéa du présent II, ne préjuge pas de l'application des articles L. 132-12 et L. 132-17.

## Article L134-5

A défaut d'opposition notifiée par l'auteur ou l'éditeur à l'expiration du délai prévu au I de l'article L. 134-4, l'organisme de gestion collective propose une autorisation de reproduction et de représentation sous une forme numérique d'un livre indisponible à l'éditeur disposant du droit de reproduction de ce livre sous une forme imprimée.

Cette proposition est formulée par écrit. Elle est réputée avoir été refusée si l'éditeur n'a pas notifié sa décision par écrit dans un délai de deux mois à l'organisme de gestion collective.

L'autorisation d'exploitation mentionnée au premier alinéa est délivrée par l'organisme de gestion collective à titre exclusif pour une durée de dix ans tacitement renouvelable.

Mention de l'acceptation de l'éditeur est faite dans la base de données mentionnée à l'article L. 134-2.

A défaut d'opposition de l'auteur apportant par tout moyen la preuve que cet éditeur ne dispose pas du droit de reproduction d'un livre sous une forme imprimée, l'éditeur ayant notifié sa décision d'acceptation est tenu d'exploiter, dans les trois ans suivant cette notification, le livre indisponible concerné. Il doit apporter à cet organisme, par tout moyen, la preuve de l'exploitation effective du livre.

A défaut d'acceptation de la proposition mentionnée au premier alinéa ou d'exploitation de l'œuvre dans le délai prévu au cinquième alinéa du présent article, la reproduction et la représentation du livre sous une forme numérique sont autorisées par l'organisme de gestion collective dans les conditions prévues au second alinéa du I de l'article L. 134-3.

L'utilisateur auquel un organisme de gestion collective a accordé une autorisation d'exploitation dans les conditions prévues au même second alinéa est considéré comme éditeur de livre numérique au sens de l'article 2 de la loi n° 2011-590 du 26 mai 2011 relative au prix du livre numérique.

L'exploitation de l'œuvre dans les conditions prévues au présent article ne préjuge pas de l'application des articles L. 132-12 et L. 132-17.

## Article L134-6

L'auteur et l'éditeur disposant du droit de reproduction sous une forme imprimée d'un livre indisponible notifient conjointement à tout moment à l'organisme de gestion collective mentionné à l'article L. 134-3 leur décision de lui retirer le droit d'autoriser la reproduction et la représentation dudit livre sous forme numérique.

L'auteur d'un livre indisponible peut décider à tout moment de retirer à l'organisme de gestion collective mentionné au même article L. 134-3 le droit d'autoriser la reproduction et la représentation du livre sous une forme numérique s'il apporte la preuve qu'il est le seul titulaire des droits définis audit article L. 134-3. Il lui notifie cette décision.

Mention des notifications prévues aux deux premiers alinéas du présent article est faite dans la base de données mentionnée à l'article L. 134-2.

L'éditeur ayant notifié sa décision dans les conditions prévues au premier alinéa est tenu d'exploiter le livre concerné dans les dix-huit mois suivant cette notification. Il doit apporter à l'organisme de gestion collective, par tout moyen, la preuve de l'exploitation effective du livre.

L'organisme informe tous les utilisateurs auxquels il a accordé une autorisation d'exploitation du livre concerné des décisions mentionnées aux deux premiers alinéas du présent article. Les ayants droit ne peuvent s'opposer à la poursuite de l'exploitation dudit livre engagée avant la notification pendant la durée restant à courir de l'autorisation mentionnée au second alinéa du I de l'article L. 134-3 ou au troisième alinéa de l'article L. 134-5, à concurrence de cinq ans maximum et à titre non exclusif.

## Article L134-7

Les modalités d'application du présent chapitre, notamment les modalités d'accès à la base de données prévue à l'article L. 134-2, la nature ainsi que le format des données collectées et les mesures de publicité les plus appropriées pour garantir la meilleure information possible des ayants droit, les conditions de délivrance et de retrait de l'agrément des organismes de gestion collective prévu à l'article L. 134-3, sont précisées par décret en Conseil d'Etat.

## Article L134-9

Par dérogation aux dispositions des trois premiers alinéas de l'article L. 324-17, les organismes agréés mentionnées à l'article L. 134-3 utilisent à des actions d'aide à la création, à des actions de formation des auteurs de l'écrit et à des actions de promotion de la lecture publique mises en œuvre par les bibliothèques les sommes perçues au titre de l'exploitation des livres indisponibles et qui n'ont pu être réparties parce que leurs destinataires n'ont pu être identifiés ou retrouvés avant l'expiration du délai prévu au dernier alinéa de l'article L. 321-1.

Le montant et l'utilisation de ces sommes font l'objet, chaque année, d'un rapport des organismes de gestion collective au ministre chargé de la culture.

# Chapitre V : Dispositions particulières relatives à certaines utilisations d'œuvres orphelines

## Article L135-1

Sont soumises au présent chapitre :

1° Les œuvres orphelines, au sens de l'article L. 113-10, qui ont été initialement publiées ou radiodiffusées dans un Etat membre de l'Union européenne et qui appartiennent à l'une des catégories suivantes :

a) Les œuvres publiées sous la forme de livres, revues, journaux, magazines ou autres écrits faisant partie des collections des bibliothèques accessibles au public, des musées, des services d'archives, des institutions dépositaires du patrimoine cinématographique ou sonore ou des établissements d'enseignement, à l'exception des photographies et des images fixes qui existent en tant qu'œuvres indépendantes ;

b) Les œuvres audiovisuelles ou sonores faisant partie de ces collections ou qui ont été produites par des organismes de radiodiffusion de service public avant le 1er janvier 2003 et qui font partie de leurs archives.

Le fait pour un organisme mentionné aux a et b de rendre une œuvre accessible au public, avec l'accord des titulaires de droits, est assimilé à la publication ou à la radiodiffusion mentionnées au premier alinéa du présent 1°, sous réserve qu'il soit raisonnable de supposer que les titulaires de droits ne s'opposeraient pas aux utilisations de l'œuvre orpheline prévues à l'article L. 135-2 ;

2° Toute œuvre considérée comme orpheline dans un autre Etat membre en application de l'article 2 de la directive 2012/28/UE du Parlement européen et du Conseil, du 25 octobre 2012, sur certaines utilisations autorisées des œuvres orphelines.

## Article L135-2

Les organismes mentionnés au 1° de l'article L. 135-1 ne peuvent utiliser les œuvres mentionnées à ce même article que dans le cadre de leurs missions culturelles, éducatives et de recherche et à condition de ne poursuivre aucun but lucratif et de ne percevoir, le cas échéant et pour une durée ne pouvant excéder sept ans, que les recettes couvrant les frais découlant directement de la numérisation et de la mise à la disposition du public des œuvres orphelines qu'ils utilisent. Ils mentionnent le nom des titulaires de droits identifiés, respectent le droit moral de ces derniers et communiquent les informations prévues au 2° de l'article L. 135-3 ou à l'article L. 135-4. Cette utilisation est faite selon les modalités suivantes :

1° Mise à la disposition du public d'une œuvre orpheline de manière que chacun puisse y avoir accès de sa propre initiative ;

2° Reproduction d'une œuvre orpheline à des fins de numérisation, de mise à disposition, d'indexation, de catalogage, de préservation ou de restauration.

## Article L135-3

Un organisme mentionné au 1° de l'article L. 135-1 ne peut faire application de l'article L. 135-2 qu'après avoir :

1° Procédé à des recherches diligentes, avérées et sérieuses des titulaires de droits, en application du premier alinéa de l'article L. 113-10, dans l'Etat membre de l'Union européenne où a eu lieu la première publication ou, à défaut de celle-ci, la première radiodiffusion de l'œuvre. Ces recherches comportent la consultation des sources appropriées pour chaque catégorie d'œuvres. Lorsque l'œuvre n'a fait l'objet ni d'une publication, ni d'une radiodiffusion mais a été rendue accessible au public dans les conditions définies au dernier alinéa du 1° de l'article L. 135-1, ces recherches sont effectuées dans l'Etat membre où est établi l'organisme qui a rendu l'œuvre accessible au public. Pour les œuvres audiovisuelles, les recherches sont effectuées dans l'Etat membre où le producteur a son siège ou sa résidence habituelle ;

2° Communiqué le résultat des recherches mentionnées au 1°, ainsi que l'utilisation envisagée de l'œuvre orpheline, au ministre chargé de la culture, ou à l'organisme désigné à cette fin par celui-ci, qui le transmet sans délai à l'Office de l'harmonisation dans le marché intérieur mentionné au paragraphe 6 de l'article 3 de la directive 2012/28/UE du Parlement européen et du Conseil, du 25 octobre 2012, précitée aux fins de l'inscription de ces informations dans la base de données établie par cet office à cet effet.

## Article L135-4

Lorsqu'une œuvre orpheline est déjà inscrite dans la base de données mentionnée au 2° de l'article L. 135-3, l'organisme n'est pas tenu de procéder aux recherches mentionnées au même article. Il doit indiquer, dans les conditions prévues audit article, l'utilisation de l'œuvre orpheline qu'il envisage.

## Article L135-5

Lorsque les recherches diligentes, avérées et sérieuses mentionnées à l'article L. 135-3 ont permis d'identifier et de retrouver le ou les titulaires des droits sur une œuvre, celle-ci cesse d'être orpheline.

Lorsqu'une œuvre a plus d'un titulaire de droits et que tous ses titulaires n'ont pu être identifiés et retrouvés, l'utilisation de l'œuvre prévue à l'article L. 135-2 est subordonnée à l'autorisation du ou des titulaires identifiés et retrouvés.

## Article L135-6

Lorsqu'un titulaire de droits sur une œuvre orpheline justifie de ses droits auprès d'un organisme mentionné à l'article L. 135-3, ce dernier ne peut poursuivre l'utilisation de l'œuvre qu'avec l'autorisation du titulaire de droits.

L'organisme verse au titulaire de droits une compensation équitable du préjudice que celui-ci a subi du fait de cette utilisation. Cette compensation est fixée par accord entre l'organisme et le titulaire de droits. Elle peut tenir compte, lorsqu'ils existent, des accords ou tarifs en vigueur dans les secteurs professionnels concernés.

Le titulaire de droits peut se faire connaître à tout moment, nonobstant toute stipulation contraire.

L'organisme auprès duquel le titulaire de droits justifie de ses droits informe sans délai le ministre chargé de la culture, ou l'organisme désigné à cette fin par celui-ci, qui transmet cette information à l'Office de l'harmonisation dans le marché intérieur mentionné au 2° de l'article L. 135-3.

## Article L135-7

Un décret en Conseil d'Etat définit les modalités d'application du présent chapitre, notamment les sources d'informations appropriées pour chaque catégorie d'œuvres qui doivent être consultées au titre des recherches prévues au 1° de l'article L. 135-3.

# Chapitre VI : Dispositions applicables à la recherche et au référencement des œuvres d'art plastiques, graphiques ou photographiques

## Article L136-1

On entend par service automatisé de référencement d'images, au sens du présent chapitre, tout service de communication au public en ligne dans le cadre duquel sont reproduites et mises à la disposition du public, à des fins d'indexation et de référencement, des œuvres d'art plastiques, graphiques ou photographiques collectées de manière automatisée à partir de services de communication au public en ligne.

## Article L136-2

I.-La publication d'une œuvre d'art plastique, graphique ou photographique à partir d'un service de communication au public en ligne emporte la mise en gestion, au profit d'un ou plusieurs organismes de gestion collective régis par le titre II du livre III de la présente partie et agréés à cet effet par le ministre chargé de la culture, du droit de reproduire et de représenter cette œuvre dans le cadre de services automatisés de référencement d'images. A défaut de désignation par l'auteur ou par son ayant droit à la date de publication de l'œuvre, un des organismes agréés est réputé gestionnaire de ce droit.

II.-Les organismes agréés sont seuls habilités à conclure toute convention avec les exploitants de services automatisés de référencement d'images aux fins d'autoriser la reproduction et la représentation des œuvres d'art plastiques, graphiques ou photographiques dans le cadre de ces services et de percevoir les rémunérations correspondantes fixées selon les modalités prévues à l'article L. 136-4. Les conventions conclues avec ces exploitants prévoient les modalités selon lesquelles ils s'acquittent de leurs obligations de fournir aux organismes agréés le relevé des exploitations des œuvres et toutes informations nécessaires à la répartition des sommes perçues aux auteurs ou à leurs ayants droit.

## Article L136-3

L'agrément prévu au I de l'article L. 136-2 est délivré en considération :

1° De la diversité des associés ;

2° De la qualification professionnelle des dirigeants ;

3° Des moyens humains et matériels qu'ils proposent de mettre en œuvre pour assurer la gestion des droits de reproduction et de représentation des œuvres d'art plastiques, graphiques ou photographiques par des services automatisés de référencement d'images.

Un décret en Conseil d'Etat fixe les modalités de la délivrance et du retrait de cet agrément.

## Article L136-4

I.-La rémunération due au titre de la reproduction et de la représentation des œuvres d'art plastiques, graphiques ou photographiques par des services automatisés de référencement d'images est assise sur les recettes de l'exploitation ou, à défaut, évaluée forfaitairement dans les cas prévus à l'article L. 131-4.

Le barème et les modalités de versement de cette rémunération sont fixés par voie de convention entre les organismes agréés pour la gestion des droits des œuvres d'art plastiques, graphiques ou photographiques et les organisations représentant les exploitants des services automatisés de référencement d'images.

La durée de ces conventions est limitée à cinq ans.

II.-A défaut d'accord conclu dans les six mois suivant la publication du décret en Conseil d'Etat prévu à l'article L. 136-3, ou si aucun accord n'est intervenu à la date d'expiration d'un précédent accord, le barème de la rémunération et ses modalités de versement sont arrêtés par une commission présidée par un représentant de l'Etat et composée, en nombre égal, d'une part, de représentants des organismes agréés conformément au même article L. 136-3 et, d'autre part, des représentants des exploitants des services automatisés de référencement d'images.

Les organisations amenées à désigner les représentants membres de la commission, ainsi que le nombre de personnes que chacune est appelée à désigner, sont déterminés par arrêté du ministre chargé de la culture.

La commission se détermine à la majorité des membres présents. En cas de partage des voix, le président a voix prépondérante.

Les décisions de la commission sont publiées au Journal officiel.

# Livre II : Les droits voisins du droit d'auteur

## Titre unique

## Chapitre Ier : Dispositions générales

### Article L211-1

Les droits voisins ne portent pas atteinte aux droits des auteurs. En conséquence, aucune disposition du présent titre ne doit être interprétée de manière à limiter l'exercice du droit d'auteur par ses titulaires.

### Article L211-2

Outre toute personne justifiant d'un intérêt pour agir, le ministre chargé de la culture peut saisir l'autorité judiciaire, notamment s'il n'y a pas d'ayant droit connu, ou en cas de vacance ou déshérence.

### Article L211-3

Les bénéficiaires des droits ouverts au présent titre ne peuvent interdire :

1° Les représentations privées et gratuites effectuées exclusivement dans un cercle de famille ;

2° Les reproductions réalisées à partir d'une source licite, strictement réservées à l'usage privé de la personne qui les réalise et non destinées à une utilisation collective ;

3° Sous réserve d'éléments suffisants d'identification de la source :

-les analyses et courtes citations justifiées par le caractère critique, polémique, pédagogique, scientifique ou d'information de l'oeuvre à laquelle elles sont incorporées ;

-les revues de presse ;

-la diffusion, même intégrale, à titre d'information d'actualité, des discours destinés au public dans les assemblées politiques, administratives, judiciaires ou académiques, ainsi que dans les réunions publiques d'ordre politique et les cérémonies officielles ;

-la communication au public ou la reproduction d'extraits d'objets protégés par un droit voisin, sous réserve des objets conçus à des fins pédagogiques, à des fins exclusives d'illustration dans le cadre de l'enseignement et de la recherche, à l'exclusion de toute activité ludique ou récréative, dès lors que le public auquel cette communication ou cette reproduction est destinée est composé majoritairement d'élèves, d'étudiants, d'enseignants ou de chercheurs directement concernés, que l'utilisation de cette communication ou cette reproduction ne donne lieu à aucune exploitation commerciale et qu'elle est compensée par une rémunération négociée sur une base forfaitaire ;

4° La parodie, le pastiche et la caricature, compte tenu des lois du genre ;

5° La reproduction provisoire présentant un caractère transitoire ou accessoire, lorsqu'elle est une partie intégrante et essentielle d'un procédé technique et qu'elle a pour unique objet de permettre l'utilisation licite de l'objet protégé par un droit voisin ou sa transmission entre tiers par la voie d'un réseau faisant appel à un intermédiaire ; toutefois, cette reproduction provisoire ne doit pas avoir de valeur économique propre ;

6° La reproduction et la communication au public d'une interprétation, d'un phonogramme, d'un vidéogramme, d'un programme ou d'une publication de presse dans les conditions définies au 7° de l'article L. 122-5, au 1° de l'article L. 122-5-1 et à l'article L. 122-5-2 ;

7° Les actes de reproduction et de représentation d'une interprétation, d'un phonogramme, d'un vidéogramme, d'un programme ou d'une publication de presse réalisés à des fins de conservation ou destinés à préserver les conditions de sa consultation à des fins de recherche ou d'études privées par des particuliers, dans les locaux de l'établissement et sur des terminaux dédiés, effectués par des bibliothèques accessibles au public, par des musées ou par des services d'archives, sous réserve que ceux-ci ne recherchent aucun avantage économique ou commercial.

Les exceptions énumérées par le présent article ne peuvent porter atteinte à l'exploitation normale de l'interprétation, du phonogramme, du vidéogramme, du programme ou de la publication de presse ni causer un préjudice injustifié aux intérêts légitimes de l'artiste-interprète, du producteur, de l'entreprise de communication audiovisuelle, de l'éditeur de presse ou de l'agence de presse.

## Article L211-3-1

Les bénéficiaires des droits ouverts à l'article L. 218-2 ne peuvent interdire :

1° Les actes d'hyperlien ;

2° L'utilisation de mots isolés ou de très courts extraits d'une publication de presse. Cette exception ne peut affecter l'efficacité des droits ouverts au même article L. 218-2. Cette efficacite # est notamment affectée lorsque l'utilisation de très courts extraits se substitue a # la publication de presse elle-même ou dispense le lecteur de s'y référer.

## Article L211-4

I.-La durée des droits patrimoniaux des artistes-interprètes est de cinquante années à compter du 1er janvier de l'année civile suivant celle de l'interprétation.

Toutefois, si, durant cette période, une fixation de l'interprétation dans un vidéogramme ou un phonogramme fait l'objet d'une mise à la disposition du public, par des exemplaires matériels, ou d'une communication au public, les droits patrimoniaux de l'artiste-interprète expirent :

1° Pour une interprétation fixée dans un vidéogramme, cinquante ans après le 1er janvier de l'année civile suivant le premier de ces faits ;

2° Pour une interprétation fixée dans un phonogramme, soixante-dix ans après le 1er janvier de l'année civile qui suit le premier de ces faits.

II.-La durée des droits patrimoniaux des producteurs de phonogrammes est de cinquante années à compter du 1er janvier de l'année civile suivant celle de la première fixation d'une séquence de son.

Toutefois, si, durant cette période, un phonogramme fait l'objet d'une mise à la disposition du public par des exemplaires matériels ou d'une communication au public, les droits patrimoniaux du producteur de phonogrammes expirent soixante-dix ans après le 1er janvier de l'année civile suivant la mise à la disposition du public de ce phonogramme ou, à défaut, sa première communication au public. L'artiste-interprète peut exercer le droit de résiliation mentionné aux articles L. 212-3-1 et L. 212-3-2.

III.-La durée des droits patrimoniaux des producteurs de vidéogrammes est de cinquante années à compter du 1er janvier de l'année civile suivant celle de la première fixation d'une séquence d'images, sonorisées ou non.

Toutefois, si, durant cette période, un vidéogramme fait l'objet d'une mise à la disposition du public par des exemplaires matériels ou d'une communication au public, les droits patrimoniaux du producteur de vidéogrammes expirent cinquante ans après le 1er janvier de l'année civile suivant le premier de ces faits.

IV.-La durée des droits patrimoniaux des entreprises de communication audiovisuelle est de cinquante années à compter du 1er janvier de l'année civile suivant celle de la première communication au public des programmes mentionnés à l'article L. 216-1.

V.-La durée des droits patrimoniaux des éditeurs de presse et des agences de presse est de deux ans à compter du 1er janvier de l'année civile suivant celle de la première publication d'une publication de presse.

## Article L211-5

Sous réserve des dispositions des conventions internationales auxquelles la France est partie, les titulaires de droits voisins qui ne sont pas ressortissants d'un Etat membre de la Communauté européenne bénéficient de la durée de protection prévue dans le pays dont ils sont ressortissants sans que cette durée puisse excéder celle prévue à l'article L. 211-4.

## Article L211-6

Dès lors que la première vente d'un ou des exemplaires matériels d'une fixation protégée par un droit voisin a été autorisée par le titulaire du droit ou ses ayants droit sur le territoire d'un Etat membre de la Communauté européenne ou d'un autre Etat partie à l'accord sur l'Espace économique européen, la vente de ces exemplaires de cette fixation ne peut plus être interdite dans les Etats membres de la Communauté européenne et les Etats parties à l'accord sur l'Espace économique européen.

### Article L211-7

Le chapitre V du titre III du livre Ier est applicable aux droits voisins.

## Chapitre II : Droits des artistes-interprètes

## Section 1 : Dispositions communes

### Article L212-1

A l'exclusion de l'artiste de complément, considéré comme tel par les usages professionnels, l'artiste-interprète ou exécutant est la personne qui représente, chante, récite, déclame, joue ou exécute de toute autre manière une oeuvre littéraire ou artistique, un numéro de variétés, de cirque ou de marionnettes.

### Article L212-2

L'artiste-interprète a le droit au respect de son nom, de sa qualité et de son interprétation.

Ce droit inaliénable et imprescriptible est attaché à sa personne.

Il est transmissible à ses héritiers pour la protection de l'interprétation et de la mémoire du défunt.

### Article L212-3

Sont soumises à l'autorisation écrite de l'artiste-interprète la fixation de sa prestation, sa reproduction et sa communication au public, ainsi que toute utilisation séparée du son et de l'image de la prestation lorsque celle-ci a été fixée à la fois pour le son et l'image.

Cette autorisation et les rémunérations auxquelles elle donne lieu sont régies par les dispositions des articles L. 762-1 et L. 762-2 du code du travail, sous réserve des dispositions de l'article L. 212-6 du présent code.

### Article L212-3-1

I.-Au-delà des cinquante premières années du délai de soixante-dix ans prévu au 2° du I de l'article L. 211-4, l'artiste-interprète peut notifier son intention de résilier l'autorisation donnée en application de l'article L. 212-3 à un producteur de phonogrammes lorsque celui-ci n'offre pas à la vente des exemplaires du

phonogramme en quantité suffisante ou ne le met pas à la disposition du public de manière que chacun puisse y avoir accès de sa propre initiative.

II.-Si, au cours des douze mois suivant la notification prévue au I du présent article, le producteur de phonogrammes n'offre pas à la vente des exemplaires du phonogramme en quantité suffisante et ne le met pas à la disposition du public de manière que chacun puisse y avoir accès de sa propre initiative, l'artiste-interprète peut exercer son droit de résiliation de l'autorisation. L'artiste-interprète ne peut renoncer à ce droit.

III.-Les modalités d'exercice du droit de résiliation sont définies par décret en Conseil d'Etat.

## Article L212-3-2

Lorsqu'un phonogramme contient la fixation des prestations de plusieurs artistes-interprètes, ceux-ci exercent le droit de résiliation mentionné à l'article L. 212-3-1 d'un commun accord.

En cas de désaccord, il appartient à la juridiction civile de statuer.

## Article L212-3-3

I.-Si l'autorisation donnée en application de l'article L. 212-3 prévoit une rémunération forfaitaire, le producteur de phonogrammes verse à l'artiste-interprète, en contrepartie de l'exploitation du phonogramme contenant la fixation autorisée, une rémunération annuelle supplémentaire pour chaque année complète au-delà des cinquante premières années du délai de soixante-dix ans prévu au 2° du I de l'article L. 211-4. L'artiste-interprète ne peut renoncer à ce droit.

Toutefois, le producteur de phonogrammes qui occupe moins de dix personnes et dont le chiffre d'affaires annuel ou le total du bilan annuel n'excède pas deux millions d'euros n'est pas tenu, pour l'exercice en question, au versement de la rémunération mentionnée au premier alinéa du présent I dans l'hypothèse où les frais des opérations de calcul et de contrôle seraient hors de proportion avec le montant de la rémunération à verser.

II.-Le montant global de la rémunération annuelle supplémentaire mentionnée au I du présent article est fixé à 20 % de l'ensemble des recettes perçues par le producteur de phonogrammes au cours de l'année précédant celle du paiement de ladite rémunération annuelle pour la reproduction, la mise à la disposition du public par la vente ou l'échange, ou la mise à disposition du phonogramme de manière que chacun puisse y avoir accès de sa propre initiative, à l'exclusion des rémunérations prévues aux articles L. 214-1 et L. 311-1.

III.-Le producteur de phonogrammes fournit, à la demande de l'artiste-interprète ou d'un organisme de gestion collective mentionné au IV et chargé de percevoir la rémunération annuelle supplémentaire de l'artiste-interprète, un état des recettes provenant de l'exploitation du phonogramme selon chaque mode d'exploitation mentionné au II.

Il fournit, dans les mêmes conditions, toute justification propre à établir l'exactitude des comptes.

IV.-La rémunération annuelle supplémentaire prévue aux I et II est perçue par un ou plusieurs organismes de gestion collective régis par le titre II du livre III et agréés à cet effet par le ministre chargé de la culture.

L'agrément prévu au premier alinéa du présent IV est délivré en considération :

1° De la qualification professionnelle des dirigeants des organismes ;

2° Des moyens humains et matériels que ces organismes proposent de mettre en œuvre pour assurer la perception et la répartition de la rémunération prévue aux mêmes I et II, tant auprès de leurs membres qu'auprès des artistes-interprètes qui ne sont pas leurs membres ;

3° De l'importance de leur répertoire et de la représentation des artistes-interprètes bénéficiaires de la rémunération prévue auxdits I et II au sein des organes dirigeants ;

4° De leur respect des obligations prévues au titre II du livre III.

Un décret en Conseil d'Etat fixe les modalités de délivrance et de retrait de cet agrément.

## Article L212-3-4

Si l'autorisation donnée en application de l'article L. 212-3 prévoit une rémunération proportionnelle, le producteur de phonogrammes ne peut retrancher les avances ou les déductions définies contractuellement de la rémunération due à l'artiste-interprète en contrepartie de l'exploitation du phonogramme contenant la fixation autorisée après les cinquante premières années du délai de soixante-dix ans prévu au 2° du I de l'article L. 211-4.

## Article L212-3-5

Les artistes-interprètes ne peuvent interdire la reproduction et la communication publique de leur prestation si elle est accessoire à un événement constituant le sujet principal d'une séquence d'une oeuvre ou d'un document audiovisuel.

## Article L212-3-6

Les dispositions de l'article L. 131-9 sont applicables aux contrats valant autorisation d'exploitation en application des articles L. 212-3 et L. 212-4, entre les producteurs et les artistes-interprètes.

## section 2 : Contrats conclus entre un artiste-interprète et un producteur de vidéogrammes

## Article L212-4

La signature du contrat conclu entre un artiste-interprète et un producteur pour la réalisation d'une oeuvre audiovisuelle vaut autorisation de fixer, reproduire et communiquer au public la prestation de l'artiste-interprète.

Ce contrat fixe une rémunération distincte pour chaque mode d'exploitation de l'oeuvre.

## Article L212-5

Lorsque ni le contrat ni une convention collective ne mentionnent de rémunération pour un ou plusieurs modes d'exploitation, le niveau de celle-ci est fixé par référence à des barèmes établis par voie d'accords spécifiques conclus, dans chaque secteur d'activité, entre les organisations de salariés et d'employeurs représentatives de la profession.

## Article L212-6

Les dispositions de l'article L. 762-2 du code du travail ne s'appliquent qu'à la fraction de la rémunération versée en application du contrat excédant les bases fixées par la convention collective ou l'accord spécifique.

## Article L212-7

Les contrats passés antérieurement au 1er janvier 1986 entre un artiste-interprète et un producteur d'oeuvre audiovisuelle ou leurs cessionnaires sont soumis aux dispositions qui précèdent, en ce qui concerne les modes d'exploitation qu'ils excluaient. La rémunération correspondante n'a pas le caractère de salaire.

## Article L212-8

Les stipulations des conventions ou accords mentionnés aux articles précédents peuvent être rendues obligatoires à l'intérieur de chaque secteur d'activité pour l'ensemble des intéressés par arrêté du ministre compétent.

## Article L212-9

A défaut d'accord conclu dans les termes des articles L. 212-4 à L. 212-7 soit avant le 4 janvier 1986, soit à la date d'expiration du précédent accord, les modes et les bases de rémunération des artistes-interprètes sont

déterminés, pour chaque secteur d'activité, par une commission présidée par un magistrat de l'ordre judiciaire désigné par le premier président de la Cour de cassation et composée, en outre, d'un membre du Conseil d'Etat, désigné par le vice-président du Conseil d'Etat, d'une personnalité qualifiée désignée par le ministre chargé de la culture et, en nombre égal, de représentants des organisations de salariés et de représentants des organisations d'employeurs.

La commission se détermine à la majorité de membres présents. En cas de partage des voix, le président a voix prépondérante. La commission se prononce dans les trois mois suivant l'expiration du délai fixé au premier alinéa du présent article.

Sa décision a effet pour une durée de trois ans, sauf accord des intéressés intervenu avant ce terme.

## Section 3 : Contrats conclus entre un artiste-interprète et un producteur de phonogrammes

### Article L212-10

L'existence ou la conclusion d'un contrat de louage d'ouvrage ou de service avec un producteur de phonogrammes n'emporte pas dérogation à la jouissance des droits reconnus à l'artiste-interprète par les articles L. 212-2 et L. 212-3, sous réserve des exceptions prévues au présent code.

### Article L212-11

La cession des droits de l'artiste-interprète mentionnés au présent code est subordonnée à la condition que chacun des droits cédés fasse l'objet d'une mention distincte dans le contrat conclu avec le producteur de phonogrammes et que le domaine d'exploitation de ces droits soit délimité quant à son étendue et à sa destination, quant au lieu et quant à la durée.

Toute clause qui tend à conférer le droit d'exploiter la prestation de l'artiste-interprète sous une forme non prévisible ou non prévue à la date de signature est expresse et stipule, au bénéfice des artistes-interprètes dont les contrats prévoient le paiement direct par le producteur d'une rémunération proportionnelle aux recettes de l'exploitation, une participation corrélative auxdites recettes.

Lorsque l'artiste-interprète cède à un producteur de phonogrammes une créance sur les rémunérations provenant d'exploitations à venir de sa prestation en contrepartie d'une avance consentie par ce dernier, cette cession ne peut porter sur les rémunérations mentionnées aux articles L. 214-1 et L. 311-1. Toute clause contraire est nulle.

La cession au producteur de phonogrammes de droits de l'artiste-interprète autres que ceux mentionnés au présent code est subordonnée à la condition que chacun des droits cédés fasse l'objet d'une mention expresse distincte dans le contrat.

### Article L212-12

En cas d'abus notoire dans le non-usage par un producteur de phonogrammes des droits d'exploitation qui lui ont été cédés, la juridiction civile compétente peut ordonner toute mesure appropriée.

## Article L212-13

Le contrat conclu entre l'artiste-interprète et le producteur de phonogrammes fixe une rémunération minimale garantie en contrepartie de l'autorisation de fixation, rémunérée sous forme de salaire, de la prestation de l'artiste-interprète.

Chaque mode d'exploitation du phonogramme incorporant la prestation de l'artiste-interprète prévu au contrat fait l'objet d'une rémunération distincte.

Sont regardées comme des modes d'exploitation distincts la mise à disposition du phonogramme sous une forme physique et sa mise à disposition par voie électronique.

## Article L212-14

I.-La mise à disposition d'un phonogramme de manière que chacun puisse y avoir accès de sa propre initiative, dans le cadre des diffusions en flux, fait l'objet d'une garantie de rémunération minimale.

II.-Les modalités de la garantie de rémunération minimale prévue au I et son niveau sont établis par un accord collectif de travail conclu entre les organisations représentatives des artistes-interprètes et les organisations représentatives des producteurs de phonogrammes.

Cet accord peut être rendu obligatoire par arrêté du ministre chargé du travail.

III.-A défaut d'accord collectif dans un délai de douze mois à compter de la promulgation de la loi n° 2016-925 du 7 juillet 2016 relative à la liberté de la création, à l'architecture et au patrimoine, la garantie de rémunération minimale versée par le producteur aux artistes-interprètes prévue au I est fixée de manière à associer justement les artistes-interprètes à l'exploitation des phonogrammes, par une commission présidée par un représentant de l'Etat et composée, en outre, pour moitié, de personnes désignées par les organisations représentant les artistes-interprètes et, pour moitié, de personnes désignées par les organisations représentant les producteurs de phonogrammes.

## Article L212-15

Lorsque le contrat conclu entre un artiste-interprète et un producteur de phonogrammes prévoit le paiement direct par le producteur d'une rémunération qui est fonction des recettes de l'exploitation, le producteur de phonogrammes rend compte semestriellement à l'artiste-interprète du calcul de sa rémunération, de façon explicite et transparente.

A la demande de l'artiste-interprète, le producteur de phonogrammes fournit à un expert-comptable mandaté par l'artiste-interprète toutes justifications propres à établir l'exactitude de ses comptes.

# Chapitre III : Droits des producteurs de phonogrammes

## Article L213-1

Le producteur de phonogrammes est la personne, physique ou morale, qui a l'initiative et la responsabilité de la première fixation d'une séquence de son.

Copyright (C) 2007-2020 Legifrance

L'autorisation du producteur de phonogrammes est requise avant toute reproduction, mise à la disposition du public par la vente, l'échange ou le louage, ou communication au public de son phonogramme autres que celles mentionnées à l'article L. 214-1.

## Article L213-2

Le contrat conclu par le producteur d'un phonogramme avec un éditeur de services de communication au public par voie électronique mettant à disposition des œuvres musicales fixe les conditions de l'exploitation des phonogrammes de manière objective et équitable. Ces conditions ne peuvent comporter de clauses discriminatoires non justifiées par des contreparties réelles.

# Chapitre IV : Dispositions communes aux artistes-interprètes et aux producteurs de phonogrammes

## Article L214-1

Lorsqu'un phonogramme a été publié à des fins de commerce, l'artiste-interprète et le producteur ne peuvent s'opposer :

1° A sa communication directe dans un lieu public, dès lors qu'il n'est pas utilisé dans un spectacle ;

2° A sa radiodiffusion et à sa câblo-distribution simultanée et intégrale, ainsi qu'à sa reproduction strictement réservée à ces fins, effectuée par ou pour le compte d'entreprises de communication audiovisuelle en vue de sonoriser leurs programmes propres diffusés sur leur antenne ainsi que sur celles des entreprises de communication audiovisuelle qui acquittent la rémunération équitable.

Dans tous les autres cas, il incombe aux producteurs desdits programmes de se conformer au droit exclusif des titulaires de droits voisins prévu aux articles L. 212-3 et L. 213-1.

Ces utilisations des phonogrammes publiés à des fins de commerce, quel que soit le lieu de fixation de ces phonogrammes, ouvrent droit à rémunération au profit des artistes-interprètes et des producteurs.

Cette rémunération est versée par les personnes qui utilisent les phonogrammes publiés à des fins de commerce dans les conditions mentionnées aux 1°, 2° et 3° du présent article.

Elle est assise sur les recettes de l'exploitation ou, à défaut, évaluée forfaitairement dans les cas prévus à l'article L. 131-4.

Elle est répartie par moitié entre les artistes-interprètes et les producteurs de phonogrammes.

3° A sa communication au public par un service de radio, au sens de l'article 2 de la loi n° 86-1067 du 30 septembre 1986 relative à la liberté de communication, à l'exclusion des services de radio dont le programme principal est dédié majoritairement à un artiste-interprète, à un même auteur, à un même compositeur ou est issu d'un même phonogramme.

Dans tous les autres cas, il incombe aux services de communication au public en ligne de se conformer au droit exclusif des titulaires de droits voisins dans les conditions prévues aux articles L. 212-3, L. 213-1 et L. 213-2. Il en va ainsi des services ayant mis en place des fonctionnalités permettant à un utilisateur d'influencer le contenu du programme ou la séquence de sa communication.

## Article L214-2

Sous réserve des conventions internationales, les droits à rémunération reconnus par les dispositions de l'article L. 214-1 sont répartis entre les artistes-interprètes et les producteurs de phonogrammes pour les phonogrammes fixés pour la première fois dans un Etat membre de la Communauté européenne.

## Article L214-3

Le barème de rémunération et les modalités de versement de la rémunération sont établis par des accords spécifiques à chaque branche d'activité entre les organisations représentatives des artistes-interprètes, des producteurs de phonogrammes et des personnes utilisant les phonogrammes dans les conditions prévues aux 1°, 2° et 3° de l'article L. 214-1.

Ces accords doivent préciser les modalités selon lesquelles les personnes utilisant les phonogrammes dans ces mêmes conditions s'acquittent de leur obligation de fournir aux organismes de gestion collective le programme exact des utilisations auxquelles elles procèdent et tous les éléments documentaires indispensables à la répartition des droits.

Les stipulations de ces accords peuvent être rendues obligatoires pour l'ensemble des intéressés par arrêté du ministre chargé de la culture.

La durée de ces accords est comprise entre un et cinq ans.

## Article L214-4

A défaut d'accord intervenu avant le 30 juin 1986, ou si aucun accord n'est intervenu à l'expiration du précédent accord, le barème de rémunération et des modalités de versement de la rémunération sont arrêtés par une commission présidée par un représentant de l'Etat et composée, en nombre égal, d'une part, de membres désignés par les organisations représentant les bénéficiaires du droit à rémunération, d'autre part, de membres désignés par les organisations représentant les personnes qui, dans la branche d'activité concernée, utilisent les phonogrammes dans les conditions prévues aux 1°, 2° et 3° de l'article L. 214-1.

Les organisations appelées à désigner les membres de la commission ainsi que le nombre de personnes que chacune est appelée à désigner sont déterminés par arrêté du ministre chargé de la culture.

La commission se détermine à la majorité de ses membres présents. En cas de partage des voix, le président a voix prépondérante.

Les délibérations de la commission sont exécutoires si, dans un délai d'un mois, son président n'a pas demandé une seconde délibération.

Les décisions de la commission sont publiées au Journal officiel de la République française.

## Article L214-5

La rémunération prévue à l'article L. 214-1 est perçue pour le compte des ayants droit et répartie entre ceux-ci par un ou plusieurs organismes mentionnés au titre II du livre III.

## Article L214-6

I.-Sans préjudice du droit des parties de saisir le juge, le médiateur de la musique est chargé d'une mission de conciliation pour tout litige relatif à l'interprétation ou à l'exécution :

1° De tout accord entre les artistes-interprètes dont l'interprétation est fixée dans un phonogramme, les producteurs de phonogrammes et les éditeurs de services de communication au public en ligne mettant à disposition des œuvres musicales ;

2° D'un engagement contractuel entre un artiste-interprète et un producteur de phonogrammes ;

3° D'un engagement contractuel entre un producteur de phonogrammes et un éditeur de services de communication au public en ligne mettant à disposition des œuvres musicales ;

4° D'un engagement contractuel entre un producteur de phonogrammes et un producteur de spectacles.

Dans le cadre de sa mission, le médiateur peut être saisi par tout artiste-interprète, par tout producteur de phonogrammes, par tout producteur de spectacles ou par tout éditeur de services de communication au public en ligne mettant à disposition des œuvres musicales. Il peut également être saisi par leurs mandataires ou par toute organisation professionnelle ou syndicale intéressée, ainsi que par le ministre chargé de la culture.

Pour l'exercice de sa mission, il invite les parties à lui fournir toutes les informations qu'il estime nécessaires, sans que puisse lui être opposé le secret des affaires, et peut entendre toute personne dont l'audition lui paraît utile.

Le médiateur de la musique exerce sa mission dans le respect des compétences de l'Autorité de la concurrence. Lorsque les faits relevés par le médiateur apparaissent constitutifs de pratiques anticoncurrentielles mentionnées aux articles L. 420-1 à L. 420-7 du code de commerce, le médiateur saisit l'Autorité de la concurrence. Cette saisine peut être introduite dans le cadre d'une procédure d'urgence, conformément à l'article L. 464-1 du même code. Le médiateur peut également saisir pour avis l'Autorité de la concurrence de toute question de concurrence en application de l'article L. 462-1 dudit code. L'Autorité de la concurrence peut consulter le médiateur sur toute question relevant de sa compétence et lui communiquer, à cette fin, toute saisine entrant dans le champ de cette compétence.

Lorsque le litige dont il est saisi relève du champ de compétence d'une autre instance de conciliation créée par une convention ou un accord collectif de travail, le médiateur saisit cette instance pour avis. Il se déclare incompétent si cette instance lui en fait la demande.

Le médiateur de la musique favorise ou suscite toute solution de conciliation aux litiges qui lui sont soumis. Lorsqu'il constate un accord entre les parties, il rédige un procès-verbal de conciliation précisant les mesures à prendre pour le mettre en œuvre. A défaut d'accord entre les parties, le médiateur peut émettre une recommandation proposant des mesures tendant à mettre fin au litige. Il peut rendre publique la décision de conciliation ou la recommandation, sous réserve des informations couvertes par le secret des affaires.

II.-Le médiateur de la musique peut faire au ministre chargé de la culture toute proposition que lui paraît appeler l'accomplissement de ses missions. Il met en œuvre toute mesure de nature à favoriser l'adoption de codes des usages entre les organismes professionnels et les organismes de gestion collective représentant

les artistes-interprètes et les producteurs de phonogrammes, entre les producteurs de phonogrammes et les producteurs de spectacles ou entre les producteurs de phonogrammes et les éditeurs de services de communication au public en ligne mettant à disposition des œuvres musicales.

Le médiateur de la musique adresse chaque année un rapport sur son activité au ministre chargé de la culture. Ce rapport est public. Une copie en est adressée aux présidents des commissions permanentes de l'Assemblée nationale et du Sénat chargées de la culture.

III.-Un décret en Conseil d'Etat précise les conditions d'application du présent article.

# Chapitre V : Droits des producteurs de vidéogrammes

## Article L215-1

Le producteur de vidéogrammes est la personne, physique ou morale, qui a l'initiative et la responsabilité de la première fixation d'une séquence d'images sonorisée ou non.

L'autorisation du producteur de vidéogrammes est requise avant toute reproduction, mise à la disposition du public par la vente, l'échange ou le louage, ou communication au public de son vidéogramme.

Les droits reconnus au producteur d'un vidéogramme en vertu de l'alinéa précédent, les droits d'auteur et les droits des artistes-interprètes dont il disposerait sur l'oeuvre fixée sur ce vidéogramme ne peuvent faire l'objet de cessions séparées.

# Chapitre VI : Droits des entreprises de communication audiovisuelle

## Article L216-1

Sont soumises à l'autorisation de l'entreprise de communication audiovisuelle la reproduction de ses programmes, ainsi que leur mise à la disposition du public par vente, louage ou échange, leur télédiffusion et leur communication au public dans un lieu accessible à celui-ci moyennant paiement d'un droit d'entrée.

Sont dénommées entreprises de communication audiovisuelle les organismes qui exploitent un service de communication audiovisuelle au sens de la loi n° 86-1067 du 30 septembre 1986 relative à la liberté de communication, quel que soit le régime applicable à ce service.

## Article L216-2

L'autorisation de télédiffuser par voie hertzienne la prestation d'un artiste-interprète, un phonogramme, un vidéogramme ou les programmes d'une entreprise de communication audiovisuelle comprend la distribution à des fins non commerciales de cette télédiffusion sur les réseaux internes aux immeubles ou ensembles d'immeubles collectifs à usage d'habitation installés par leurs propriétaires ou copropriétaires, ou par les

mandataires de ces derniers, à seule fin de permettre le raccordement de chaque logement de ces mêmes immeubles ou ensembles d'immeubles collectifs à usage d'habitation à des dispositifs collectifs de réception des télédiffusions par voie hertzienne normalement reçues dans la zone.

# Chapitre VII : Dispositions applicables à la télédiffusion par satellite et à la retransmission par câble

## Article L217-1

Les droits voisins du droit d'auteur correspondant à la télédiffusion par satellite de la prestation d'un artiste-interprète, d'un phonogramme, d'un vidéogramme ou des programmes d'une entreprise de communication audiovisuelle sont régis par les dispositions du présent code dès lors que cette télédiffusion est réalisée dans les conditions définies aux articles L. 122-2-1 et L. 122-2-2.

Dans les cas prévus à l'article L. 122-2-2, ces droits peuvent être exercés à l'égard des personnes visées au 1° ou au 2° de cet article.

## Article L217-2

I.-Lorsqu'il est prévu par le présent code, le droit d'autoriser la retransmission par câble, simultanée, intégrale et sans changement, sur le territoire national, de la prestation d'un artiste-interprète, d'un phonogramme ou d'un vidéogramme télédiffusés à partir d'un Etat membre de la Communauté européenne ne peut être exercé, à compter de la date d'entrée en vigueur de la loi n° 97-283 du 27 mars 1997, que par un organisme de gestion collective. Si cet organisme est régi par le titre II du livre III, il doit être agréé à cet effet par le ministre chargé de la culture.

Si le titulaire du droit n'en a pas confié la gestion à l'un de ces organismes, il désigne celui qu'il charge de l'exercer. Il notifie par écrit cette désignation à l'organisme, qui ne peut refuser.

Le contrat autorisant la télédiffusion sur le territoire national de la prestation d'un artiste-interprète, d'un phonogramme ou d'un vidéogramme mentionne l'organisme chargé, le cas échéant, d'exercer le droit d'autoriser sa retransmission par câble, simultanée, intégrale et sans changement, dans les Etats membres de la Communauté européenne.

L'agrément prévu au premier alinéa est délivré en considération des critères énumérés à l'article L. 132-20-1.

Un décret en Conseil d'Etat fixe les conditions de délivrance et de retrait de l'agrément. Il fixe également, dans le cas prévu au deuxième alinéa, les modalités de désignation de l'organisme chargé de la gestion du droit de retransmission.

II.-Par dérogation au I, le titulaire du droit peut céder celui-ci à une entreprise de communication audiovisuelle.

Les dispositions du I ne sont pas applicables aux droits dont est cessionnaire une entreprise de communication audiovisuelle.

## Article L217-3

Des médiateurs sont institués afin de favoriser, sans préjudice du droit des parties de saisir le juge, la résolution des litiges relatifs à l'octroi de l'autorisation, lorsqu'elle est exigée, de retransmission par câble, simultanée, intégrale et sans changement, d'un élément protégé par un des droits définis au présent titre.

A défaut d'accord amiable, le Médiateur peut proposer aux parties la solution qui lui paraît appropriée, que celles-ci sont réputées avoir acceptée faute d'avoir exprimé leur opposition par écrit dans un délai de trois mois.

Un décret en Conseil d'Etat précise les conditions d'application du présent article et les modalités de désignation des médiateurs.

# Chapitre VIII : Droits des éditeurs de presse et des agences de presse

## Article L218-1

I.-On entend par publication de presse au sens du présent chapitre une collection composée principalement d'œuvres littéraires de nature journalistique, qui peut également comprendre d'autres œuvres ou objets protégés, notamment des photographies ou des vidéogrammes, et qui constitue une unité au sein d'une publication périodique ou régulièrement actualisée portant un titre unique, dans le but de fournir au public des informations sur l'actualité ou d'autres sujets publiées, sur tout support, à l'initiative, sous la responsabilité éditoriale et sous le contrôle des éditeurs de presse ou d'une agence de presse.

Les périodiques qui sont publiés à des fins scientifiques ou universitaires, tels que les revues scientifiques, ne sont pas couverts par la présente définition.

II.-On entend par agence de presse au sens du présent chapitre toute entreprise mentionnée à l'article 1er de l'ordonnance n° 45-2646 du 2 novembre 1945 portant réglementation des agences de presse ayant pour activité principale la collecte, le traitement et la mise en forme, sous sa propre responsabilité, de contenus journalistiques.

III.-On entend par éditeur de presse au sens du présent chapitre la personne physique ou morale qui édite une publication de presse ou un service de presse en ligne au sens de la loi n° 86-897 du 1er août 1986 portant réforme du régime juridique de la presse.

IV.-Le présent chapitre s'applique aux éditeurs de presse et agences de presse établis sur le territoire d'un Etat membre de l'Union européenne.

## Article L218-2

L'autorisation de l'éditeur de presse ou de l'agence de presse est requise avant toute reproduction ou communication au public totale ou partielle de ses publications de presse sous une forme numérique par un service de communication au public en ligne.

## Article L218-3

Les droits des éditeurs de presse et des agences de presse résultant de l'article L. 218-2 peuvent être cédés ou faire l'objet d'une licence.

Ces titulaires de droits peuvent confier la gestion de leurs droits à un ou plusieurs organismes de gestion collective régis par le titre II du livre III de la présente partie.

## Article L218-4

La rémunération due au titre des droits voisins pour la reproduction et la communication au public des publications de presse sous une forme numérique est assise sur les recettes de l'exploitation de toute nature, directes ou indirectes ou, à défaut, évaluée forfaitairement, notamment dans les cas prévus à l'article L. 131-4.

La fixation du montant de cette rémunération prend en compte des éléments tels que les investissements humains, matériels et financiers réalisés par les éditeurs et les agences de presse, la contribution des publications de presse à l'information politique et générale et l'importance de l'utilisation des publications de presse par les services de communication au public en ligne.

Les services de communication au public en ligne sont tenus de fournir aux éditeurs de presse et aux agences de presse tous les éléments d'information relatifs aux utilisations des publications de presse par leurs usagers ainsi que tous les autres éléments d'information nécessaires à une évaluation transparente de la rémunération mentionnée au premier alinéa du présent article et de sa répartition.

## Article L218-5

I.-Les journalistes professionnels ou assimilés, au sens des articles L. 7111-3 à L. 7111-5 du code du travail, et les autres auteurs des œuvres présentes dans les publications de presse mentionnées à l'article L. 218-1 du présent code ont droit à une part appropriée et équitable de la rémunération mentionnée à l'article L. 218-4. Cette part ainsi que les modalités de sa répartition entre les auteurs concernés sont fixées dans des conditions déterminées par un accord d'entreprise ou, à défaut, par tout autre accord collectif au sens de l'article L. 2222-1 du code du travail. S'agissant des autres auteurs, cette part est déterminée par un accord spécifique négocié entre, d'une part, les organisations professionnelles d'entreprises de presse et d'agences de presse représentatives et, d'autre part, les organisations professionnelles d'auteurs ou les organismes de gestion collective mentionnés au titre II du livre III de la présente partie. Dans tous les cas, cette rémunération complémentaire n'a pas le caractère de salaire.

II.-A défaut d'accord dans un délai de six mois à compter de la publication de la loi n° 2019-775 du 24 juillet 2019 tendant à créer un droit voisin au profit des agences de presse et des éditeurs de presse et en l'absence de tout autre accord applicable, l'une des parties à la négociation de l'accord d'entreprise ou de l'accord spécifique mentionnés au I du présent article peut saisir la commission prévue au III. La commission recherche avec les parties une solution de compromis afin de parvenir à un accord. En cas de désaccord persistant, elle fixe la part appropriée prévue au I ainsi que les modalités de sa répartition entre les auteurs concernés.

III.-Pour la mise en œuvre du II, il est créé une commission présidée par un représentant de l'Etat et composée, en outre, pour moitié de représentants des organisations professionnelles d'entreprises de presse et d'agences de presse représentatives et pour moitié de représentants des organisations représentatives des journalistes et autres auteurs mentionnées au I. Le représentant de l'Etat est nommé parmi les membres de la Cour de cassation, du Conseil d'Etat ou de la Cour des comptes, par arrêté du ministre chargé de la communication.

A défaut de solution de compromis trouvée entre les parties, la commission rend sa décision dans un délai de quatre mois à compter de sa saisine.

L'intervention de la décision de la commission ne fait pas obstacle à ce que s'engage dans les entreprises concernées une nouvelle négociation collective. L'accord collectif issu de cette négociation se substitue à la décision de la commission, après son dépôt par la partie la plus diligente auprès de l'autorité administrative, conformément à l'article L. 2231-6 du code du travail.

IV.-Les journalistes professionnels ou assimilés et les autres auteurs mentionnés au I du présent article reçoivent au moins une fois par an, le cas échéant par un procédé de communication électronique, des informations actualisées, pertinentes et complètes sur les modalités de calcul de la part appropriée et équitable de rémunération qui leur est due en application du même I.

V.-Un décret en Conseil d'Etat fixe les conditions d'application du présent article, notamment la composition et les modalités de saisine et de fonctionnement de la commission, les voies de recours juridictionnel contre ses décisions et leurs modalités de publicité.

# Livre III : Dispositions générales relatives au droit d'auteur, aux droits voisins et droits des producteurs de bases de données

## Titre Ier : Rémunération pour copie privée

## Chapitre unique

### Article L311-1

Les auteurs et les artistes-interprètes des oeuvres fixées sur phonogrammes ou vidéogrammes, ainsi que les producteurs de ces phonogrammes ou vidéogrammes, ont droit à une rémunération au titre de la reproduction desdites oeuvres, réalisée à partir d'une source licite dans les conditions mentionnées au 2° de l'article L. 122-5 et au 2° de l'article L. 211-3.

Cette rémunération est également due aux auteurs et aux éditeurs des oeuvres fixées sur tout autre support, au titre de leur reproduction réalisée à partir d'une source licite, dans les conditions prévues au 2° de l'article L. 122-5, sur un support d'enregistrement numérique.

### Article L311-2

Sous réserve des conventions internationales, le droit à rémunération mentionné à l'article L. 214-1 et au premier alinéa de l'article L. 311-1 est réparti entre les auteurs, les artistes-interprètes, producteurs de phonogrammes ou de vidéogrammes pour les phonogrammes et vidéogrammes fixés pour la première fois dans un Etat membre de la Communauté européenne.

# Article L311-3

La rémunération pour copie privée est, dans les conditions ci-après définies, évaluée selon le mode forfaitaire prévu au deuxième alinéa de l'article L. 131-4.

# Article L311-4

La rémunération prévue à l'article L. 311-3 est versée par le fabricant, l'importateur ou la personne qui réalise des acquisitions intracommunautaires, au sens du 3° du I de l'article 256 bis du code général des impôts, de supports d'enregistrement utilisables pour la reproduction à usage privé d'oeuvres, lors de la mise en circulation en France de ces supports.

Cette rémunération est également versée par l'éditeur d'un service de radio ou de télévision ou son distributeur, au sens de la loi n° 86-1067 du 30 septembre 1986 relative à la liberté de communication, qui fournit à une personne physique, par voie d'accès à distance, la reproduction à usage privé d'œuvres à partir d'un programme diffusé de manière linéaire par cet éditeur ou son distributeur, sous réserve que cette reproduction soit demandée par cette personne physique avant la diffusion du programme ou au cours de celle-ci pour la partie restante.

Le montant de la rémunération est fonction du type de support et de la durée ou de la capacité d'enregistrement qu'il permet ou, dans le cas mentionné au deuxième alinéa du présent article, du nombre d'utilisateurs du service de stockage proposé par l'éditeur ou le distributeur du service de radio ou de télévision et des capacités de stockage mises à disposition par cet éditeur ou ce distributeur.

Ce montant est également fonction de l'usage de chaque type de support et, dans le cas mentionné au même deuxième alinéa, des capacités de stockage mises à disposition par un éditeur ou un distributeur d'un service de radio ou de télévision. Cet usage est apprécié sur le fondement d'enquêtes. Toutefois, lorsque des éléments objectifs permettent d'établir qu'un support ou une capacité de stockage mise à disposition par un éditeur ou un distributeur de service de radio ou de télévision peut être utilisé pour la reproduction à usage privé d'œuvres et doit, en conséquence, donner lieu au versement de la rémunération, le montant de cette rémunération peut être déterminé par application des seuls critères mentionnés au troisième alinéa, pour une durée qui ne peut excéder un an à compter de cet assujettissement.

Le montant de la rémunération tient compte du degré d'utilisation des mesures techniques définies à l'article L. 331-5 et de leur incidence sur les usages relevant de l'exception pour copie privée. Il ne peut porter rémunération des actes de copie privée ayant déjà donné lieu à compensation financière.

# Article L311-4-1

Le montant de la rémunération prévue à l'article L. 311-3 propre à chaque support est porté à la connaissance de l'acquéreur lors de la mise en vente des supports d'enregistrement mentionnés à l'article L. 311-4. Une notice explicative relative à cette rémunération et à ses finalités, qui peut être intégrée au support de façon dématérialisée, est également portée à sa connaissance. Cette notice mentionne la possibilité de conclure des conventions d'exonération ou d'obtenir le remboursement de la rémunération pour copie privée dans les conditions prévues à l'article L. 311-8.

Les manquements au présent article sont recherchés et constatés par les agents mentionnés aux articles L. 511-3 et L. 511-21 du code de la consommation, dans les conditions prévues à l'article L. 511-5 du code de la consommation. Ces manquements sont sanctionnés par une amende administrative dont le montant ne peut être supérieur à 3 000 €.

Les conditions d'application du présent article sont définies par décret en Conseil d'Etat.

## Article L311-5

Les types de support, les taux de rémunération et les modalités de versement de celle-ci sont déterminés par une commission présidée par un représentant de l'Etat et composée, en outre, pour moitié, de personnes désignées par les organisations représentant les bénéficiaires du droit à rémunération, pour un quart, de personnes désignées par les organisations représentant les fabricants ou importateurs des supports mentionnés au premier alinéa de l'article L. 311-4 et, pour un quart, de personnes désignées par les organisations représentant les consommateurs. Trois représentants des ministres chargés de la culture, de l'industrie et de la consommation participent aux travaux de la commission, avec voix consultative. Le président et les membres de la commission transmettent au président de la Haute Autorité pour la transparence de la vie publique, dans un délai de deux mois suivant leur nomination, une déclaration d'intérêts telle que prévue au III de l'article 4 de la loi n° 2013-907 du 11 octobre 2013 relative à la transparence de la vie publique.

Le règlement intérieur de la commission et ses modifications font l'objet d'une publication au Journal officiel.

Les comptes rendus des réunions de la commission sont rendus publics, selon des modalités fixées par décret. La commission publie un rapport annuel, transmis au Parlement.

Les délibérations de la commission sont exécutoires si, dans un délai d'un mois, son président n'a pas demandé une seconde délibération.

Les décisions de la commission sont publiées au Journal officiel de la République française.

## Article L311-6

I.-La rémunération prévue à l'article L. 311-1 est perçue pour le compte des ayants droit par un ou plusieurs organismes de gestion collective mentionnés au titre II du présent livre, agréés à cet effet par le ministre chargé de la culture.

L'agrément est délivré pour cinq années en considération :

1° De la qualification professionnelle des dirigeants de l'organisme ;

2° Des moyens que l'organisme propose de mettre en œuvre pour assurer la perception des droits ;

3° De la diversité des associés de l'organisme.

II.-La rémunération prévue à l'article L. 311-1 est répartie entre les ayants droit par les organismes mentionnés au I du présent article, à raison des reproductions privées dont chaque œuvre fait l'objet.

III.-Une part ne pouvant excéder 1 % des sommes provenant de la rémunération pour copie privée est affectée par ces organismes au financement des enquêtes d'usage réalisées, en application du quatrième alinéa de l'article L. 311-4, par la commission mentionnée à l'article L. 311-5, qui en rédige les cahiers des charges préalables.

## Article L311-7

La rémunération pour copie privée des phonogrammes bénéficie, pour moitié, aux auteurs au sens du présent code, pour un quart, aux artistes-interprètes et, pour un quart, aux producteurs.

La rémunération pour copie privée des vidéogrammes bénéficie à parts égales aux auteurs au sens du présent code, aux artistes-interprètes et aux producteurs.

La rémunération pour copie privée des oeuvres visées au second alinéa de l'article L 311-1 bénéficie à parts égales aux auteurs et aux éditeurs.

## Article L311-8

I.-La rémunération pour copie privée n'est pas due lorsque le support d'enregistrement est acquis pour leur propre usage ou production par :

1° Les entreprises de communication audiovisuelle ;

2° Les producteurs de phonogrammes ou de vidéogrammes et les personnes qui assurent, pour le compte des producteurs de phonogrammes ou de vidéogrammes, la reproduction de ceux-ci ;

2° bis Les éditeurs d'oeuvres publiées sur des supports numériques ;

3° Les personnes morales ou organismes, dont la liste est arrêtée par le ministre chargé de la culture, qui utilisent les supports d'enregistrement à des fins d'aide aux handicapés visuels ou auditifs.

II.-La rémunération pour copie privée n'est pas due non plus pour les supports d'enregistrement acquis notamment à des fins professionnelles dont les conditions d'utilisation ne permettent pas de présumer un usage à des fins de copie privée.

II bis.-La rémunération pour copie privée n'est pas due non plus par les personnes qui procèdent à l'exportation ou à la livraison intracommunautaire de supports d'enregistrement mis en circulation en France.

III.-Une convention constatant l'exonération et en fixant les modalités peut être conclue entre les personnes bénéficiaires des I, II ou II bis et l'un des organismes mentionnés au I de l'article L. 311-6. En cas de refus de l'un des organismes de conclure une convention, ce dernier doit préciser les motifs de ce refus.

Copyright (C) 2007-2020 Legifrance

A défaut de conclusion d'une convention, ces personnes ont droit au remboursement de la rémunération sur production de justificatifs déterminés par les ministres chargés de la culture et de l'économie.

# Titre II : Gestion des droits d'auteur et des droits voisins par un organisme

## Chapitre Ier : Dispositions générales

## Section 1 : Organismes de gestion collective

### Article L321-1

I.-Les organismes de gestion collective sont des personnes morales constituées sous toute forme juridique dont l'objet principal consiste à gérer le droit d'auteur ou les droits voisins de celui-ci pour le compte de plusieurs titulaires de ces droits, tels que définis aux livres Ier et II du présent code, à leur profit collectif, soit en vertu de dispositions légales, soit en exécution d'un contrat.

Ces organismes doivent :

1° Soit être contrôlés par leurs membres titulaires de droits mentionnés au premier alinéa ;

2° Soit être à but non lucratif.

Ils agissent au mieux des intérêts des titulaires de droits qu'ils représentent et ne peuvent leur imposer des obligations qui ne sont pas objectivement nécessaires pour protéger leurs droits et leurs intérêts ou pour assurer une gestion efficace de leurs droits.

II.-Les organismes de gestion collective peuvent mener des actions de promotion de la culture et fournir des services sociaux, culturels et éducatifs dans l'intérêt des titulaires de droits qu'ils représentent et du public.

### Article L321-2

Les organismes de gestion collective régulièrement constitués ont qualité pour ester en justice pour la défense des droits dont ils ont statutairement la charge et pour défendre les intérêts matériels et moraux de leurs membres, notamment dans le cadre des accords professionnels les concernant.

Ils ont également qualité pour siéger au sein des organes compétents pour délibérer en matière de protection sociale, prévoyance et formation des titulaires de droits qu'ils représentent, sous réserve des règles applicables à la représentation des syndicats professionnels conformément aux dispositions du code du travail.

### Article L321-3

Les organismes de gestion collective permettent à leurs membres et aux autres titulaires de droits dont ils gèrent les droits patrimoniaux de communiquer avec eux par voie électronique, notamment pour l'exercice des droits qui leur sont reconnus au titre du présent code, notamment en matière d'information, de participation aux décisions collectives et pour le contrôle de l'organisme.

## Article L321-4

Les organismes de gestion collective établis en France sont soumis aux dispositions du présent titre.

Les organismes de gestion collective établis hors de l'Union européenne gérant les droits d'exploitation en France d'œuvres ou autres objets protégés, sont soumis aux dispositions des premier, deuxième et quatrième alinéas de l'article L. 324-6, des articles L. 324-7, L. 324-8, L. 324-12 à L. 324-14, du second alinéa de l'article L. 326-2, des articles L. 326-3 et L. 326-4.

Ils sont soumis au contrôle de la commission de contrôle des organismes de gestion des droits d'auteurs et des droits voisins au titre du 2° de l'article L. 327-1. La médiation prévue au a du 3° de l'article L. 327-1 leur est également applicable.

Les organismes de gestion collective établis hors de l'Union européenne gérant les droits d'exploitation en France d'œuvres musicales protégées sont en outre soumis aux dispositions des articles L. 325-1, L. 325-2, L. 325-5 à L. 325-7.

## Article L321-5

Les organismes de gestion collective sont régis par les dispositions propres à la forme juridique sous laquelle ils sont constitués, sous réserve des dispositions du présent titre.

# Section 2 : Organismes de gestion indépendants

## Article L321-6

Un organisme de gestion indépendant est une personne morale à but lucratif dont l'objet principal consiste à gérer le droit d'auteur ou les droits voisins de celui-ci pour le compte de plusieurs titulaires de droits, au profit collectif de ces derniers, qui n'est pas contrôlée, directement ou indirectement, par ces titulaires de droits.

Les organismes de gestion indépendants établis en France sont soumis aux dispositions du second alinéa de l'article L. 322-1, des premier, deuxième et quatrième alinéas de l'article L. 324-6, des articles L. 324-7, L. 324-8, L. 324-12 à L. 324-14, du second alinéa de l'article L. 326-2, des articles L. 326-3, L. 326-4 et L. 328-1. Ils sont soumis au contrôle de la commission de contrôle des organismes de gestion des droits d'auteur et des droits voisins au titre des 1° et 2° de l'article L. 327-1. La médiation prévue au a du 3° de l'article L. 327-1 leur est également applicable.

Les organismes de gestion indépendants établis en France gérant les droits d'exploitation d'œuvres musicales protégées sont en outre soumis aux dispositions des articles L. 325-1, L. 325-2, L. 325-5 à L. 325-7. La médiation prévue au b du 3° de l'article L. 327-1 leur est également applicable.

Les organismes de gestion indépendants établis hors de l'Union européenne gérant les droits d'exploitation en France d'œuvres ou autres objets protégés, sont soumis aux dispositions des premier, deuxième et quatrième alinéas de l'article L. 324-6, des articles L. 324-7, L. 324-8, L. 324-12 à L. 324-14, du second alinéa de l'article L. 326-2, de l'article L. 326-3 et de l'article L. 326-4. Ils sont soumis au contrôle de la commission de contrôle des organismes de gestion des droits d'auteur et des droits voisins au titre du 2° de l'article L. 327-1. La médiation prévue au a du 3° de l'article L. 327-1 leur est également applicable.

Les organismes de gestion indépendants établis hors de l'Union européenne gérant les droits d'exploitation en France d'œuvres musicales protégées sont en outre soumis aux dispositions des articles L. 325-1, L. 325-2, L. 325-5 à L. 325-7.

# Chapitre II : Autorisation de gestion des droits

## Article L322-1

Les organismes de gestion collective informent les titulaires de droits qui souhaitent leur confier la gestion de ceux-ci des droits dont ils bénéficient en application des articles L. 322-3 à L. 322-7 et L. 324-4 ainsi que des modalités d'exercice du droit prévu par ce dernier, avant d'obtenir leur consentement pour cette gestion.

Ils sont également tenus de leur fournir, préalablement à leur consentement, des informations concernant les frais de gestion et les autres déductions effectuées sur les revenus mentionnés au a de l'article L. 324-9.

## Article L322-2

L'obligation d'information prévue à l'article L. 322-1 ainsi que les droits qu'il mentionne sont portés à la connaissance de tout titulaire de droit dans un document de référence aisément accessible.

# Section 1 : Conditions et effets de l'autorisation de gestion des droits

## Article L322-3

L'autorisation de gestion des droits par l'organisme de gestion collective porte, au choix du titulaire, sur tout ou partie des droits, catégories de droits, types d'œuvres ou autres objets protégés et territoires définis par les statuts ou le règlement général de l'organisme. L'étendue de cette autorisation est précisée dans un document auquel le titulaire de droits a donné son consentement, y compris par voie électronique.

La liberté de définir l'étendue des droits que leur titulaire autorise un organisme à gérer ne fait pas obstacle à ce que l'organisme fixe, compte tenu de son objet social, de son activité et de ses moyens, les cas dans lesquels un apport de droits indissociables peut être imposé en vue d'en garantir une gestion efficiente.

## Article L322-4

Les organismes de gestion collective sont tenus d'accepter la gestion des droits dans les conditions prévues à l'article L. 322-3 dès lors que cette gestion relève de leur domaine d'activité.

Les conditions qu'ils fixent reposent sur des critères publics, objectifs, transparents et non discriminatoires.

Le refus d'un organisme d'accéder à une demande de gestion de droits patrimoniaux doit être écrit et énoncer les motifs de droit et de fait de la décision.

# Section 2 : Résiliation de l'autorisation de gestion des droits

## Article L322-5

Un titulaire de droits peut résilier à tout moment, en tout ou partie, dans les limites arrêtées par l'organisme et mentionnées au second alinéa de l'article L. 322-3, l'autorisation qu'il a donnée à l'organisme de gestion collective de gérer ses droits patrimoniaux.

## Article L322-6

L'organisme de gestion collective fixe et rend publiques les modalités de la résiliation, en particulier le délai de préavis, qui ne peut excéder six mois.

Il peut cependant prévoir que la résiliation ne prend effet qu'à la fin de l'exercice social.

La résiliation ne peut pas être subordonnée à la condition de confier la gestion des droits en cause à un autre organisme de gestion collective.

## Article L322-7

Si des sommes sont dues à un titulaire de droits pour des actes d'exploitation exécutés avant que sa demande de résiliation totale ou partielle n'ait pris effet, ou dans le cadre d'une autorisation d'exploitation octroyée avant cette date d'effet, il conserve les droits que lui confèrent les dispositions des troisième et quatrième alinéas de l'article L. 324-10, des I et II de l'article L. 324-12, des articles L. 324-14, L. 324-18, L. 325-7, des I et II de l'article L. 326-3 et des articles L. 326-4 et L. 328-1.

## Article L322-8

Les dispositions du présent chapitre ne sont pas applicables lorsque les droits en cause sont gérés par l'organisme en application des dispositions des articles L. 122-10, L. 132-20-1, L. 133-2, L. 134-3, L. 214-5, L. 217-2 et L. 311-6.

# Chapitre III : Organisation des organismes de gestion collective

## Article L323-1

Les statuts des organismes de gestion collective prévoient des règles permettant la participation effective de leurs membres à leur processus de décision et assurent, au sein de ce dernier, une représentation équilibrée des différentes catégories de membres.

Lorsque les droits et règles garantissant aux membres et aux tiers l'exercice de ces droits ou leur information ne figurent pas dans les statuts, ils sont régis par un règlement général de l'organisme adopté par l'assemblée générale des membres.

# Section 1 : Adhésion des membres

## Article L323-2

Ne peuvent être membres d'un organisme de gestion collective que les titulaires de droits mentionnés au premier alinéa de l'article L. 321-1 et, le cas échéant, des entités regroupant des titulaires de droits, notamment des organismes de gestion collective.

Les conditions d'adhésion à l'organisme de gestion collective et de refus éventuel de celui-ci sont soumises aux règles définies aux articles L. 322-3 et L. 322-4.

## Article L323-3

Les organismes de gestion collective tiennent à jour les registres de leurs membres.

# Section 2 : Décisions collectives des membres

## Article L323-4

Les décisions collectives des membres sont prises conformément aux dispositions particulières à la forme juridique adoptée par l'organisme de gestion collective, sous réserve des dispositions de la présente section.

## Article L323-5

L'assemblée générale des membres est réunie au moins une fois par an.

## Article L323-6

L'assemblée générale adopte les statuts et le règlement général, décide de toute modification à y apporter et fixe dans l'un de ces instruments les conditions d'adhésion à l'organisme de gestion collective.

Lorsque l'organisme est doté d'un conseil d'administration ou d'un conseil de surveillance, ou de tout autre organe collégial d'administration autre que celui composé des dirigeants de l'organisme, l'assemblée générale nomme et révoque ses membres dans les conditions fixées par la loi et par les statuts. Elle approuve leur rémunération et les autres avantages dont ils bénéficient.

L'assemblée générale nomme et révoque le commissaire aux comptes.

L'assemblée générale statue également sur :

1° La politique générale de répartition des sommes dues aux titulaires de droits ;

2° La politique générale d'utilisation des sommes qui ne peuvent être réparties ;

3° La politique générale d'investissement des revenus provenant de l'exploitation des droits et des recettes résultant de cet investissement ;

4° La politique générale des déductions effectuées sur ces revenus et recettes ;

5° L'utilisation, durant l'exercice précédent, des sommes qui n'ont pu être réparties ;

6° La politique de gestion des risques ;

7° L'approbation de toute acquisition, vente d'immeubles ou hypothèque sur ceux-ci ;

8° L'approbation des opérations de fusion ou d'alliance, de la création de filiales, et de l'acquisition d'autres entités ou de participations ou de droits dans d'autres entités ;

9° L'approbation des opérations d'emprunt, d'octroi de prêts ou de constitution de garanties d'emprunts.

Elle approuve le rapport annuel de transparence mentionné à l'article L. 326-1.

## Article L323-7

L'assemblée générale des membres peut déléguer tout ou partie des pouvoirs énumérés aux 6°, 7°, 8° et 9° de l'article L. 323-6 à l'organe de surveillance prévu à l'article L. 323-14 dans des conditions qu'elle détermine. L'organe de surveillance ne peut déléguer ces compétences.

## Article L323-8

Tous les membres d'un organisme de gestion collective ont le droit de participer et de voter à l'assemblée générale dans les conditions fixées par la loi et par les statuts et le règlement général.

Ils peuvent voter par voie électronique. Leur participation et l'exercice de leur droit de vote à l'assemblée générale ne peuvent être restreints par les statuts ou le règlement général qu'en fonction de la durée de leur adhésion ou du montant des revenus qu'ils ont reçu ou qui leur sont dus au titre de l'exploitation de leurs droits, sous réserve que ces critères, qui peuvent être cumulés, soient définis et appliqués de manière équitable et proportionnée.

## Article L323-9

Les membres de l'organisme de gestion collective peuvent donner mandat à un autre membre à l'effet de les représenter à l'assemblée générale et de voter en leur nom, à condition que cette désignation ne crée pas de conflit d'intérêts, en particulier lorsque le mandant et le mandataire relèvent de catégories différentes de titulaires de droits au sein de l'organisme.

Chaque mandat est valable pour une seule assemblée générale. Le mandataire jouit des mêmes droits que ceux dont le membre qui l'a désigné aurait bénéficié lors de l'assemblée générale. Le mandataire vote conformément aux instructions de vote données, le cas échéant, par le membre qui l'a désigné.

Les statuts et le règlement général peuvent prévoir des restrictions concernant la désignation des mandataires et l'exercice des droits de vote des membres qu'ils représentent, et notamment limiter le nombre de mandats dont dispose un mandataire, sous réserve que celles-ci ne compromettent pas la participation appropriée et effective des membres au processus de décision de l'organisme.

## Article L323-10

Lorsque l'organisme de gestion collective ne dispose pas, en raison de sa forme juridique, d'une assemblée générale de ses membres, les compétences de celle-ci, prévues à l'article L. 323-6, sont exercées par l'organe de surveillance prévu à l'article L. 323-14. Les règles prévues aux articles L. 323-5, L. 323-8 et L. 323-9 s'appliquent alors à cet organe.

Si l'ensemble des membres de l'organe sont des personnes morales représentant des titulaires de droit, les statuts peuvent en outre prévoir que tout ou partie des pouvoirs de l'assemblée générale sont exercés par un organe réunissant ces personnes morales.

# Section 3 : Organes de gestion, d'administration et de direction

## Article L323-11

Les statuts ou le règlement général des organismes de gestion collective prévoient les procédures administratives et comptables assurant un contrôle interne effectif des membres de l'organe d'administration et des représentants légaux.

## Article L323-12

Les statuts ou le règlement général des organismes prévoient des procédures assurant la prévention et le traitement des conflits d'intérêts qui pourraient survenir dans l'exercice des fonctions des membres des organes de gestion, d'administration et de direction, de manière à éviter qu'ils ne portent atteinte aux intérêts collectifs des titulaires de droits qu'ils représentent.

## Article L323-13

Les procédures mentionnées à l'article L. 323-12 prévoient notamment l'établissement d'une déclaration individuelle annuelle par chacun des membres, personnes physiques, du conseil d'administration, ou du conseil de surveillance et du directoire lorsque l'organisme en est doté, ainsi que par chacun des représentants légaux, précisant :

1° Tout intérêt qu'il détient dans l'organisme de gestion collective ;

2° Toute rémunération qu'il a perçue lors de l'exercice précédent de l'organisme, y compris sous la forme de prestations de retraite, d'avantages en nature ou de tout autre avantage ;

3° Tout revenu qu'il a perçu, lors de l'exercice précédent, de l'organisme en tant que titulaire de droits ;

4° Tout conflit réel ou potentiel entre ses intérêts personnels et ceux de l'organisme ou entre ses obligations envers celui-ci et celles qu'il a envers toute autre personne physique ou morale.

Cette déclaration est tenue à la disposition des membres de l'assemblée générale pendant un délai de deux mois avant la réunion annuelle de cette assemblée au siège de l'organisme de gestion collective. Les

conditions de sa consultation doivent assurer le respect de la vie privée, de la protection des données à caractère personnel et du secret des affaires.

Les statuts ou le règlement général déterminent les sanctions applicables à la personne qui omet de transmettre sa déclaration complète à l'organisme dans les délais qu'ils fixent ou qui mentionne des informations erronées dans ce document. Ces sanctions doivent être graduelles et proportionnées.

# Section 4 : Organe de surveillance

## Article L323-14

Les statuts des organismes de gestion collective instituent un organe collégial de surveillance des activités des organes de gestion, d'administration et de direction.

Cet organe est le conseil de surveillance lorsque l'organisme en est doté. Les dispositions du deuxième alinéa de l'article L. 225-68 du code de commerce ne s'appliquent que si l'assemblée générale a fait usage de la faculté de déléguer que lui reconnaît l'article L. 323-7.

Cet organe ne peut être un comité composé d'administrateurs du conseil d'administration ne prenant pas part à la gestion d'un organisme que lorsque celui-ci a adopté la forme d'une association dont les statuts n'attribuent pas au conseil d'administration des pouvoirs de gestion de l'association.

Il se réunit au moins une fois par semestre. Il a pour mission :

1° De contrôler l'activité des organes de gestion, d'administration et de direction, notamment la mise en œuvre des décisions de l'assemblée générale, en particulier s'agissant des politiques générales énumérées aux points a à d du quatrième alinéa de l'article L. 323-6 ;

2° D'exercer les compétences qui lui sont déléguées par l'assemblée générale, notamment dans les cas prévus par l'article L. 323-7 ;

3° D'émettre un avis sur les refus opposés par l'organisme de gestion collective aux demandes de communication de documents présentées par ses membres en application de l'article L. 326-5.

Il rend compte, au moins une fois par an, de l'exercice de ses missions à l'assemblée générale.

## Article L323-15

Les membres de l'organe de surveillance sont élus par l'assemblée générale.

Les règles statutaires régissant leur désignation assurent une représentation équilibrée des différentes catégories de membres de l'assemblée générale au sein de l'organe de surveillance. Elles peuvent autoriser l'élection de personnes physiques qui ne sont pas membres de l'organisme, sous réserve que ces derniers demeurent majoritaires au regard du nombre de droits de vote détenus ou du nombre de personnes siégeant au sein de l'organe de surveillance.

Aucun membre de cet organe ne peut être salarié ni appartenir aux organes de gestion, d'administration ou de direction de l'organisme de gestion collective.

# Chapitre IV : Gestion des droits

### Article L324-1

Les modalités de gestion par l'organisme des droits patrimoniaux qui lui sont confiés sont fixées soit par les statuts, soit par le règlement général, conformément aux dispositions du présent chapitre.

### Article L324-2

Les organismes de gestion collective respectent le principe d'égalité de traitement dans la gestion des droits patrimoniaux de l'ensemble des titulaires de droits qu'ils représentent, y compris dans le cas où cette gestion s'exerce au titre d'un accord de représentation.

## Section 1 : Octroi des autorisations d'exploitation et perception des revenus issus de l'exploitation des droits

### Article L324-3

Les contrats conclus par les organismes de gestion collective avec les utilisateurs de tout ou partie de leur répertoire sont des actes civils.

### Article L324-4

Les statuts ou le règlement général fixent les conditions dans lesquelles les titulaires de droits peuvent octroyer à des tiers des autorisations d'exploitation pour des utilisations non commerciales de droits ou catégories de droits dont ils ont confié la gestion à l'organisme, portant sur certains types d'œuvres ou d'autres objets protégés de leur choix.

### Article L324-5

Les organismes de gestion collective des droits des producteurs de phonogrammes et de vidéogrammes et des artistes-interprètes ont la faculté, dans la limite des mandats qui leur sont donnés soit par tout ou partie des membres, soit par des organismes étrangers ayant le même objet, d'exercer collectivement les droits prévus aux articles L. 213-1 et L. 215-1 en concluant des contrats généraux d'intérêt commun avec les utilisateurs de phonogrammes ou de vidéogrammes dans le but d'améliorer la diffusion de ceux-ci ou de promouvoir le progrès technique ou économique.

### Article L324-6

Les conditions d'octroi par les organismes de gestion collective des autorisations d'exploitation des droits sont fondées sur des critères objectifs, transparents et non discriminatoires.

Le montant des rémunérations demandées par les organismes pour l'exploitation des droits est raisonnable et garantit que les titulaires de droits qu'ils représentent perçoivent une rémunération appropriée pour ces exploitations. Il tient compte, notamment, de la valeur économique des droits exploités, qu'il s'agisse de droits exclusifs ou de droits à rémunération, de la nature et de l'étendue de l'utilisation des œuvres et autres

objets protégés sur lesquels portent ces droits, et de la valeur économique du service fourni par l'organisme de gestion collective.

Les statuts ou le règlement général des organismes doivent prévoir les conditions dans lesquelles les associations ayant un but d'intérêt général bénéficient, pour leurs manifestations ne donnant pas lieu à entrée payante, d'une réduction sur le montant des droits d'auteur et des droits voisins de ceux-ci qu'elles auraient à verser.

Lorsque des autorisations d'exploitation sont octroyées par les organismes de gestion collective à un utilisateur fournissant un nouveau type de service en ligne mis à la disposition du public de l'Union européenne depuis moins de trois ans, les conditions d'octroi de ces autorisations ne sauraient constituer des précédents pour déterminer les conditions d'octroi d'autres autorisations d'exploitation. Le délai de trois ans court à compter du premier contrat concernant le service considéré.

## Article L324-7

Les organismes de gestion collective permettent aux utilisateurs de communiquer avec eux par voie électronique.

Ils répondent dans un délai raisonnable aux demandes des utilisateurs et les informent des conditions d'octroi des autorisations d'exploitation, des critères qu'ils mettent en œuvre pour fixer le montant de la rémunération due et des informations qui leur sont nécessaires pour pouvoir proposer une autorisation d'exploitation.

Après réception de ces informations, l'organisme, dans un délai raisonnable, propose une autorisation d'exploitation ou adresse à l'utilisateur une réponse motivée expliquant les raisons pour lesquelles il n'entend pas octroyer l'autorisation sollicitée.

## Article L324-8

Lorsqu'une autorisation d'exploitation est octroyée, l'utilisateur est tenu de communiquer à l'organisme de gestion collective, dans un format et dans un délai convenu entre les parties ou préétablis, les informations pertinentes sur l'utilisation qu'il a faite des droits, de telle sorte que l'organisme soit en mesure d'assurer la perception et la répartition des revenus provenant de l'exploitation de ces droits.

Pour définir le format à respecter pour la communication de ces informations, les organismes et les utilisateurs prennent en considération, dans la mesure du possible, les normes sectorielles volontaires, en particulier les identifiants standard des œuvres et autres objets protégés. A défaut d'accord entre les parties dans un délai raisonnable, ces informations sont celles définies par un arrêté du ministre chargé de la culture pour le secteur d'activité concerné.

# Section 2 : Gestion des revenus issus de l'exploitation des droits

## Article L324-9

Les organismes de gestion collective établissent des comptes annuels comportant un bilan, un compte de résultat et une annexe, conformément à un règlement de l'autorité des normes comptables et de manière à séparer :

1° Les revenus provenant de l'exploitation des droits et toute recette ou actif résultant de l'investissement de ces revenus ;

2° Leurs actifs propres éventuels et les revenus tirés de ceux-ci ou d'autres activités, ainsi que les sommes qu'ils perçoivent au titre de leurs frais de gestion.

Les règles comptables communes aux organismes de gestion collective sont fixées par l'Autorité des normes comptables.

## Article L324-10

Les organismes de gestion collective ne sont pas autorisés à utiliser les revenus mentionnés au 1° de l'article L. 324-9 à des fins autres que leur répartition aux titulaires de droits.

Toutefois, ils peuvent déduire des revenus à répartir certaines sommes, correspondant notamment à leurs frais de gestion, dans les conditions fixées dans le cadre de la politique générale définie par l'assemblée générale des membres.

Ces déductions doivent être justifiées au regard des services rendus aux titulaires de droits.

Les sommes déduites au titre des frais de gestion ne peuvent excéder les coûts justifiés supportés par l'organisme pour la gestion des droits patrimoniaux qui lui est confiée.

Lorsque les revenus et les recettes mentionnés au 1° de l'article L. 324-9 sont perçus par l'organisme au titre d'un accord de représentation, seuls les montants correspondant aux frais de gestion peuvent être déduits de ces revenus, à moins que la personne morale partie à l'accord de représentation n'autorise expressément d'autres déductions.

## Article L324-11

Les organismes de gestion collective investissent les revenus provenant de l'exploitation des droits et les recettes résultant de l'investissement de ces revenus conformément à la politique générale d'investissement et de gestion des risques définie par l'assemblée générale, et aux règles suivantes :

1° S'il existe un quelconque risque de conflit d'intérêts, les organismes de gestion collective veillent à ce que l'investissement serve le seul intérêt des titulaires de droits ;

2° Les actifs sont investis de manière à garantir la sécurité, la qualité, la liquidité et la rentabilité de l'ensemble du portefeuille ;

3° Les actifs sont correctement diversifiés afin d'éviter une dépendance excessive à l'égard d'un actif particulier et l'accumulation de risques dans l'ensemble du portefeuille.

## Article L324-12

I.-Les organismes de gestion collective versent les sommes dues aux titulaires de droits au plus tard neuf mois à compter de la fin de l'exercice au cours duquel les revenus provenant de l'exploitation des droits ont été perçus.

Il ne peut être dérogé à ce délai que pour un motif légitime, notamment le manque d'information permettant l'identification ou la localisation des titulaires de droits bénéficiaires.

II.-Lorsque ces sommes sont versées à un organisme de gestion collective ou un organisme de gestion indépendant représentant le titulaire de droits, un contrat conclu entre ces différents organismes précise le

délai dont dispose chacun d'entre eux pour que le titulaire de droits perçoive les sommes qui lui sont dues dans le délai mentionné au I. A défaut de contrat, l'organisme collecteur dispose d'un délai d'un mois à compter de la fin de l'exercice pour verser les sommes dues à l'organisme qui est son membre. Celui-ci doit ensuite verser les sommes dues au titulaire de droits dans le délai fixé au I restant à courir.

Lorsque des organismes de gestion collective ou des organismes de gestion indépendants membres les uns des autres interviennent successivement dans la répartition de ces sommes, un contrat conclu entre eux fixe le délai s'appliquant à chacune des parties, sans que le délai total ne puisse excéder celui prévu au I. A défaut de contrat, l'organisme collecteur dispose d'un délai d'un mois à compter de la fin de l'exercice pour verser les sommes dues et le délai restant à courir est réparti à égalité entre les autres organismes.

III.-Les organismes de gestion collective versent les sommes dues en application d'un accord de représentation dans les conditions prévues au I. Ces sommes doivent ensuite être versées aux titulaires de droits dans un délai de six mois à compter de leur réception, sauf dans le cas prévu au deuxième alinéa du I.

## Article L324-13

Lorsque les sommes dues à des titulaires de droits ne peuvent pas être réparties ou versées dans les délais fixés à l'article L. 324-12 pour les motifs prévus au second alinéa du I de cet article, ces sommes font l'objet d'une gestion et d'une présentation séparées dans les comptes de l'organisme.

## Article L324-14

Les organismes de gestion collective prennent les mesures nécessaires pour identifier et localiser les titulaires de droits. En particulier, au plus tard trois mois après l'échéance du délai fixé au I de l'article L. 324-12, ils rendent facilement accessibles en ligne aux titulaires de droits qu'ils représentent, aux entités représentant ceux-ci lorsqu'elles sont membres de l'organisme de gestion collective, et aux organismes de gestion collective avec lesquels ils ont conclu des accords de représentation, la liste des œuvres et autres objets protégés pour lesquels un ou plusieurs titulaires de droits n'ont pas été identifiés ou localisés. Les éléments d'information relatifs aux œuvres ou autres objets protégés en cause devant être portés à la connaissance de ces personnes, sont déterminés par décret en Conseil d'Etat.

Les organismes vérifient également les registres mentionnés à l'article L. 323-3 ainsi que ceux qui sont pertinents et facilement accessibles.

Si les mesures prévues par les alinéas qui précèdent ne permettent pas d'identifier et de localiser les titulaires de droits, les organismes mettent ces informations à la disposition du public par un service en ligne, au plus tard un an après l'expiration du délai de trois mois prévu au premier alinéa.

## Article L324-15

Si les sommes dues à des titulaires de droits ne peuvent pas être réparties dans un délai de trois ans à compter de la fin de l'exercice au cours duquel ont été perçus les revenus provenant de l'exploitation des droits, et sous réserve que l'organisme de gestion collective ait pris toutes les mesures prévues à l'article L. 324-14 pour identifier et localiser les bénéficiaires, ces sommes sont réputées relever des sommes qui ne peuvent être réparties.

## Article L324-16

Les actions en paiement des droits perçus par les organismes de gestion collective se prescrivent par cinq ans à compter de la date de leur perception, ce délai étant suspendu pendant les délais de versement prévus à l'article L. 324-12 au plus ou, si elle intervient avant, jusqu'à la date de leur mise en paiement. La date de répartition ou de mise en paiement est portée à la connaissance de tout titulaire de droit dans un document de référence aisément accessible.

## Article L324-17

Les organismes de gestion collective utilisent à des actions d'aide à la création, à la diffusion du spectacle vivant, au développement de l'éducation artistique et culturelle et à des actions de formation des artistes :

1° 25 % des sommes provenant de la rémunération pour copie privée ;

2° La totalité des sommes perçues en application des articles L. 122-10, L. 132-20-1, L. 214-1, L. 217-2 et L. 311-1 et qui n'ont pu être réparties soit en application des conventions internationales auxquelles la France est partie, soit parce que leurs destinataires n'ont pas pu être identifiés ou retrouvés avant l'expiration du délai prévu à l'article L. 324-16.

Ils peuvent utiliser à ces actions tout ou partie des sommes visées au 2° à compter de la fin de la troisième année suivant la date de leur mise en répartition, sans préjudice des demandes de paiement des droits non prescrits.

La répartition des sommes correspondantes, qui ne peut bénéficier à une seule personne, est soumise à un vote de l'assemblée générale de l'organisme de gestion collective, qui se prononce à la majorité des deux tiers. A défaut d'une telle majorité, une nouvelle assemblée générale, convoquée spécialement à cet effet, statue à la majorité simple.

L'aide au développement de l'éducation artistique et culturelle s'entend des concours apportés par des auteurs ou des artistes-interprètes aux actions mentionnées au 9° de l'article 3 de la loi n° 2016-925 du 7 juillet 2016 relative à la liberté de la création, à l'architecture et au patrimoine.

## Article L324-18

Les conditions d'accès aux actions mentionnées à l'article L. 324-17 et aux prestations des organismes de gestion collective financées à l'aide des sommes mentionnées au deuxième alinéa de l'article L. 324-10 sont fondées sur des critères équitables.

# Chapitre V : Autorisations d'exploitation multiterritoriales de droits en ligne sur les œuvres musicales

## Article L325-1

Constitue une autorisation d'exploitation multiterritoriale de droits en ligne sur une œuvre musicale au sens du présent code une autorisation d'exploitation d'une œuvre musicale, octroyée au titre du droit d'auteur, à un prestataire de services en ligne sur le territoire de plus d'un Etat membre de l'Union européenne.

## Article L325-2

I.-Les organismes de gestion collective peuvent, dans des conditions fixées par décret en Conseil d'Etat, octroyer des autorisations d'exploitation multiterritoriales de droits en ligne sur des œuvres musicales sous réserve qu'ils disposent des moyens leur permettant de traiter par voie électronique les données nécessaires à la gestion de ces autorisations.

II.-Les prestataires de services en ligne sont tenus de rendre compte avec exactitude de l'utilisation effective des droits qui leur sont octroyés dans le cadre de ces autorisations.

## Article L325-3

Lorsqu'un organisme de gestion collective est en capacité d'octroyer des autorisations d'exploitation multiterritoriales de droits en ligne sur des œuvres musicales conformément aux dispositions du présent chapitre, il ne peut refuser le mandat de gestion de telles autorisations que décide de lui confier un autre organisme qui ne propose pas ce type d'autorisations sur les œuvres musicales de son propre répertoire.

Toutefois, l'organisme sollicité n'est tenu d'accepter ce mandat que s'il octroie déjà ou propose déjà l'octroi d'autorisations d'exploitation multiterritoriales pour la même catégorie de droits en ligne que ceux objets de la demande, sur des œuvres musicales figurant dans le répertoire d'un ou de plusieurs autres organismes.

## Article L325-4

Les titulaires de droits qui ont autorisé un organisme de gestion collective à octroyer des autorisations d'exploitation multiterritoriales de droits en ligne sur des œuvres musicales peuvent résilier cette autorisation dans le cas où cet organisme n'octroierait pas ou ne proposerait pas l'octroi de telles autorisations d'exploitation sur ces œuvres et n'aurait pas permis à un autre organisme de gestion collective d'en octroyer pour son compte. Une telle résiliation n'affecte pas les autres autorisations qu'ils ont données à l'organisme pour la gestion de leurs droits d'auteur.

Ils peuvent alors octroyer eux-mêmes des autorisations d'exploitation multiterritoriales pour leurs droits en ligne sur des œuvres musicales ou le faire par l'intermédiaire d'un tiers auquel ils accordent l'autorisation ou de tout autre organisme de gestion collective qui respecte les dispositions du présent chapitre.

## Article L325-5

Sans préjudice du droit des parties de saisir le juge, les litiges relatifs aux autorisations d'exploitation multiterritoriales de droits en ligne sur les œuvres musicales peuvent être soumis au médiateur mentionné à l'article L. 327-6 dans les conditions prévues au chapitre VII du présent titre.

## Article L325-6

Les dispositions du présent chapitre ne s'appliquent pas aux organismes de gestion collective lorsqu'ils octroient une autorisation d'exploitation multiterritoriale de droits en ligne sur des œuvres musicales aux entreprises de communication audiovisuelle pour la communication au public ou la mise à la disposition du public :

1° Simultanée ou postérieure des programmes de radio ou de télévision télédiffusés par l'entreprise de communication audiovisuelle ;

2° Des contenus, y compris les prévisualisations, produits par l'entreprise de communication audiovisuelle ou pour son compte, présentant un caractère accessoire à la première diffusion de ses programmes télédiffusés venant ainsi compléter ou prolonger son offre de programmes.

## Article L325-7

Les dispositions de l'article L. 324-12 ne sont pas applicables aux revenus issus de l'octroi d'autorisations d'exploitation multiterritoriales de droits en ligne sur les œuvres musicales.

# Chapitre VI : Transparence et procédures de contrôle

# Section 1 : Transparence et obligations d'information

## Article L326-1

Les organismes de gestion collective établissent un rapport de transparence annuel, comportant un rapport spécial portant sur l'utilisation des sommes déduites aux fins de fourniture de services sociaux, culturels ou éducatifs, notamment en application de l'article L. 324-17.

Ces rapports sont rendus publics et adressés au ministre chargé de la culture et à la commission de contrôle des organismes de gestion des droits d'auteur et des droits voisins, au plus tard dans les huit mois suivant la fin de chaque exercice sur lequel ils portent.

## Article L326-2

Les organismes de gestion collective établissent et gèrent une base de données électronique unique recensant, avec le nom de leurs bénéficiaires, le montant et l'utilisation des sommes mentionnées à l'article L. 324-17. Cette base est régulièrement mise à jour et mise à disposition gratuitement, sur un service de communication au public en ligne, dans un format ouvert et librement réutilisable.

Les organismes de gestion collective, sans préjudice de leurs autres obligations légales de publicité, publient également, sur leur site internet, des informations actualisées, précisées par décret en Conseil d'Etat, et notamment leurs statut, le règlement général, des contrats types et des tarifs standard, la liste des membres de leurs organes de gestion, d'administration et de direction, la politique de distribution des sommes dues aux titulaires de droit, la liste des accords de représentation et de leurs signataires, la politique de gestion des sommes non distribuables, les procédures de traitement des contestations et litiges.

## Article L326-3

I.-Les organismes mettent au moins une fois par an, selon des modalités définies par les statuts ou le règlement général, à la disposition de chacun des titulaires de droits auquel ils ont réparti ou versé des revenus provenant de l'exploitation de leurs droits au cours de l'exercice précédent, des informations relatives à la gestion de ceux-ci déterminées par décret en Conseil d'Etat.

II.-Lorsque les revenus provenant de l'exploitation des droits sont répartis ou versés aux titulaires de droits par une personne morale membre de l'organisme, à laquelle celui-ci a attribué les revenus, l'organisme

lui communique les informations mentionnées au I sauf si cette personne morale dispose déjà de ces informations.

Cette personne morale est tenue de mettre à la disposition des titulaires de droits qu'elle représente les informations mentionnées au I, dans les mêmes conditions.

III.-Lorsque l'organisme de gestion collective est lié à un autre par un accord de représentation, il met à sa disposition, au moins une fois par an et par voie électronique, au titre des revenus provenant de l'exploitation des droits qu'il lui a attribués ou versés au cours de l'exercice précédent, les informations relatives à la gestion des droits définies par décret en Conseil d'Etat.

## Article L326-4

En réponse à une demande dûment justifiée, les organismes de gestion collective communiquent, par voie électronique et dans un délai n'excédant pas un mois, aux titulaires de droits gérés par l'organisme à quelque titre que ce soit, aux organismes pour le compte desquels ils gèrent des droits au titre d'un accord de représentation et aux utilisateurs, les informations suivantes :

1° Les œuvres ou autres objets protégés qu'ils représentent, les droits qu'ils gèrent, directement ou dans le cadre d'accords de représentation, et les territoires couverts ;

2° Si, en raison du champ d'activité de l'organisme, ces œuvres ou autres objets protégés ne peuvent être déterminés, les types d'œuvres ou d'autres objets protégés qu'ils représentent, les droits qu'ils gèrent et les territoires couverts.

Ils peuvent demander le paiement de frais d'un montant strictement proportionné au coût de la fourniture de ces informations.

Ils sont dispensés de répondre aux demandes individuelles lorsqu'ils mettent ces informations à la disposition du public sur leur site internet.

## Article L326-5

Les conditions dans lesquelles les membres des organismes de gestion collective peuvent obtenir, dans le respect des secrets protégés par la loi, communication de documents ou informations, y compris à caractère nominatif relatifs à l'assemblée ou à l'exercice en cours, dans un délai fixé par les statuts ou le règlement général, qui ne peut être inférieur à deux mois avant l'assemblée générale mentionnée à l'article L. 323-5, sont fixées par décret en Conseil d'Etat.

## Article L326-6

Un dixième au moins des membres de l'organisme peut demander en justice la désignation d'un ou plusieurs experts chargés de présenter un rapport sur une ou plusieurs opérations de gestion.

Pour le calcul du nombre de membres mentionnés au premier alinéa, les membres d'une entité représentant des titulaires de droit elle-même membre de l'organisme sont regardés comme des membres de l'organisme.

Le ministère public et le comité d'entreprise sont habilités à agir aux mêmes fins.

Le rapport est adressé au demandeur, aux commissaires aux comptes, à l'organe de surveillance, au ministre chargé de la culture, à la commission de l'article L. 327-1, ainsi que, lorsque l'organisme en comporte un, au

conseil d'administration et au comité d'entreprise. Ce rapport est annexé à celui établi par les commissaires aux comptes en vue de la première assemblée générale ; il reçoit la même publicité.

# Section 2 : Contrôle par les commissaires aux comptes

## Article L326-7

Les organismes de gestion collective sont tenus de nommer un ou plusieurs commissaires aux comptes.

## Article L326-8

Le commissaire aux comptes vérifie la sincérité et la concordance avec les documents comptables de l'organisme des informations contenues dans le rapport de transparence annuel prévu à l'article L. 326-1 et dans la base de données prévue au premier alinéa de l'article L. 326-2. Il établit à cet effet un rapport spécial.

# Section 3 : Contrôle par le ministre chargé de la culture

## Article L326-9

Les projets de statuts et de règlements généraux des organismes de gestion collective sont adressés, préalablement à la constitution de ceux-ci, au ministre chargé de la culture selon les modalités définies par décret en Conseil d'Etat.

Dans les deux mois de leur réception, le ministre peut saisir le tribunal judiciaire au cas où des motifs réels et sérieux s'opposeraient à la constitution d'un de ces organismes.

Le tribunal apprécie la qualification professionnelle des fondateurs de ces organismes, les moyens humains et matériels qu'ils proposent de mettre en œuvre pour assurer le recouvrement des droits et l'exploitation de leur répertoire ainsi que la conformité de leurs statuts et de leur règlement général à la réglementation en vigueur.

## Article L326-10

L'organisme de gestion collective communique ses comptes annuels au ministre chargé de la culture et porte à sa connaissance, deux mois au moins avant son examen par l'assemblée générale, tout projet de modification de ses statuts, de son règlement général ou de sa politique générale de répartition des sommes dues aux titulaires de droits.

## Article L326-11

Le ministre chargé de la culture peut, à tout moment, saisir la commission de contrôle des organismes de gestion des droits d'auteur et des droits voisins lorsque ses observations tendant à la mise en conformité à la réglementation en vigueur des dispositions des statuts, du règlement général ou d'une décision des organes

sociaux n'ont pas été suivies d'effet dans un délai de deux mois à compter de leur transmission, ou de six mois si une décision de l'assemblée des membres est nécessaire.

## Article L326-12

L'organisme de gestion collective communique au ministre chargé de la culture, à la demande de celui-ci, tout document relatif à la perception et à la répartition des revenus provenant de l'exploitation des droits, dans le respect de la vie privée, du secret des affaires et de la protection des données à caractère personnel.

Le ministre chargé de la culture ou son représentant peut recueillir, sur pièces et sur place, les renseignements mentionnés au présent article.

## Article L326-13

Le ministre chargé de la culture peut saisir le tribunal compétent au cas où des motifs réels et sérieux justifieraient la dissolution d'un organisme de gestion collective.

# Chapitre VII : Commission de contrôle des organismes de gestion des droits d'auteur et des droits voisins

# Section 1 : Missions et composition

## Article L327-1

Il est institué une commission de contrôle des organismes de gestion des droits d'auteur et des droits voisins qui assure :

1° Une mission permanente de contrôle des comptes et de la gestion des organismes de gestion collective et des organismes de gestion indépendants mentionnés au premier alinéa de l'article L. 321-4 et au deuxième alinéa de l'article L. 321-6 ainsi que de leurs filiales et des organismes contrôlés par elles ;

2° Une mission de contrôle du respect des dispositions du présent titre par les organismes de gestion collective et leurs filiales, sans préjudice du contrôle exercé sur les organismes établis en France par le ministre en charge de la culture en application des articles L. 326-9 à L. 326-13, ainsi que du respect par les organismes de gestion indépendants et leurs filiales des dispositions qui leur sont applicables conformément aux deuxième, troisième, quatrième et cinquième alinéas de l'article L. 321-6 ;

3° Une mission de médiation entre les organismes de gestion collective ainsi que les organismes de gestion indépendants et :

a) Les prestataires de services en ligne, pour les litiges relatifs à l'octroi d'autorisations d'exploitation ;

b) Les titulaires de droits, les prestataires de services en ligne ou les autres organismes de gestion collective, pour les litiges relatifs aux autorisations d'exploitation multiterritoriales de droits en ligne sur les œuvres musicales.

## Article L327-2

La commission de contrôle est composée d'un collège de contrôle et d'un collège des sanctions.

Sauf disposition législative contraire, les missions confiées à la commission sont exercées par le collège de contrôle.

## Article L327-3

Le collège de contrôle est composé de cinq membres nommés par décret :

1° Un magistrat de la Cour des comptes, président, désigné par le premier président de la Cour des comptes ;

2° Un membre du Conseil d'Etat, président suppléant, désigné par le vice-président du Conseil d'Etat ;

3° Un membre de la Cour de cassation, désigné par le premier président de la Cour de cassation ;

4° Un membre de l'inspection générale des finances, désigné par le ministre chargé des finances ;

5° Un membre de l'inspection générale de l'administration des affaires culturelles, désigné par le ministre chargé de la culture.

Le président du collège de contrôle préside la commission.

Pour l'accomplissement des missions qui sont confiées au collège de contrôle, le président du collège a qualité pour agir en justice.

Il informe le procureur de la République de tout fait qu'il constate dans l'exercice de ses missions susceptible de constituer une infraction pénale.

## Article L327-4

Le collège des sanctions est composé de trois membres nommés par décret :

1° Un membre du Conseil d'Etat, président, désigné par le vice-président du Conseil d'Etat ;

2° Un magistrat de la Cour des comptes, président suppléant, désigné par le premier président de la Cour des comptes ;

3° Un membre de la Cour de cassation, désigné par le premier président de la Cour de cassation.

Des membres suppléants sont désignés dans les mêmes conditions. Le membre titulaire et son suppléant sont de sexe différent.

Les fonctions de membre du collège des sanctions sont incompatibles avec celles de membre du collège de contrôle.

## Article L327-5

La durée du mandat des membres des deux collèges est de cinq ans, renouvelable une fois.

Pour chacun des deux collèges, l'écart entre le nombre de femmes et d'hommes parmi les membres nommés ne peut être supérieur à un.

En cas de vacance d'un siège de membre dans l'un des collèges pour quelque cause que ce soit, constatée par son président, il est procédé à son remplacement par une personne de même sexe pour la durée du mandat restant à courir. Ce mandat n'est pas pris en compte pour l'application du premier alinéa.

## Article L327-6

Un médiateur chargé d'assurer la mission prévue au 3° de l'article L. 327-1 est nommé par le président de la commission au sein du collège de contrôle et après avis du collège de contrôle, pour une durée de trois ans renouvelable.

Il peut être saisi sur requête conjointe ou par l'une des parties au litige, par le ministre chargé de la culture ou par le président du collège de contrôle.

Les effets de la saisine du médiateur en matière de prescription de l'action civile et administrative obéissent aux dispositions de l'article 2238 du code civil.

Le médiateur coopère avec ses homologues étrangers en vue du règlement extrajudiciaire des litiges transfrontaliers.

## Section 2 : Règles de fonctionnement

### Article L327-7

La commission de contrôle siège dans les locaux de la Cour des comptes, qui assure son secrétariat.

### Article L327-8

Les décisions de chaque collège sont prises à la majorité des voix. En cas de partage égal de celles-ci, la voix du président du collège est prépondérante.

Chaque collège adopte un règlement intérieur.

## Article L327-9

Les membres de chacun des deux collèges et le médiateur remplissent une déclaration d'intérêt conforme au modèle de l'annexe 3 de l'article 2 du décret 23 décembre 2013 relatif aux déclarations de situation patrimoniale et déclarations d'intérêts adressées à la Haute Autorité pour la transparence de la vie publique et doivent notamment informer leur président des intérêts qu'ils ont détenus au cours des deux années précédant leur nomination, qu'ils détiennent ou viennent à détenir au sein d'un organisme de gestion collective ou d'un organisme de gestion indépendant, de leurs filiales ou des organismes contrôlés par elles.

Ces informations, ainsi que celles concernant les présidents des collèges, sont tenues à la disposition des membres de la commission de contrôle, dans un délai de deux mois suivant la nomination des membres des deux collèges.

Aucun membre de la commission de contrôle ne peut délibérer dans une affaire dans laquelle il a ou a eu un intérêt au cours des deux années précédant la délibération.

## Article L327-10

I.-Pour l'exercice de ses missions, la commission de contrôle peut se faire assister de rapporteurs désignés parmi les membres du Conseil d'Etat et du corps des conseillers de tribunaux administratifs et cours administratives d'appel, les magistrats de la Cour de cassation et des cours et tribunaux, les magistrats de la Cour des comptes et des chambres régionales des comptes, les membres de l'Inspection générale des finances et de l'Inspection générale des affaires culturelles et les membres du corps des administrateurs civils.

Elle peut en outre faire appel au concours d'experts et bénéficier de la mise à disposition d'agents publics désignés par son président.

II.-Les rapporteurs et agents de la commission sont habilités par son président dans des conditions fixées par décret en Conseil d'Etat pour exercer, après avoir prêté serment, les attributions mentionnées à l'article L. 327-11. Cette habilitation ne dispense pas de l'application des dispositions définissant les procédures autorisant l'accès aux secrets protégés par la loi.

# Section 3 : Procédure

# Sous-section 1 : Règles générales de procédure

## Article L327-11

I.-Pour l'exercice des missions prévues à l'article L. 327-1, les représentants légaux des organismes de gestion collective, des organismes de gestion indépendants, de leurs filiales et organismes contrôlés par elles, sont tenus de prêter leur concours au collège de contrôle, de lui communiquer tous documents et de répondre à toute demande d'information nécessaire à l'exercice de ses missions. Pour les opérations faisant appel à l'informatique, le droit de communication implique l'accès aux logiciels et aux données, ainsi que le droit d'en demander la transcription par tout traitement approprié dans des documents directement utilisables pour les besoins du contrôle.

II.-Le collège de contrôle peut demander aux commissaires aux comptes des organismes de gestion collective et des organismes de gestion indépendants tous renseignements sur les organismes qu'ils

contrôlent. Les commissaires aux comptes sont alors déliés du secret professionnel à l'égard des membres, rapporteurs et agents de la commission.

III.-Le collège de contrôle et le médiateur peuvent convoquer et entendre les représentants légaux et les membres de l'organisme de gestion objet du contrôle, de ses filiales et des organismes contrôlés par elles, les autres organismes de gestion collective et de gestion indépendants, notamment ceux liés par un accord de représentation avec l'organisme en cause, les représentants des utilisateurs du répertoire de celui-ci ainsi que toute personne dont l'avis est jugé utile.

Les représentants légaux des organismes de gestion collective et des organismes de gestion indépendants peuvent demander à être entendus par le collège de contrôle.

Toute personne entendue a le droit de se faire assister d'un conseil de son choix.

IV.-Le fait, pour tout dirigeant d'un organisme objet d'un contrôle, de faire obstacle de quelque manière que ce soit à l'exercice des missions des membres, rapporteurs ou agents du collège de contrôle mentionnés aux articles L. 327-3 et L. 327-10 est puni d'un an d'emprisonnement et de 15 000 € d'amende.

## Article L327-12

La commission de contrôle présente un rapport annuel au Parlement et au Gouvernement. Ce rapport est rendu public. Cette publication est portée par les organismes de gestion collective et les organismes de gestion indépendants à la connaissance des membres de leur assemblée générale.

# Sous-section 2 : Procédure de sanction

## Article L327-13

I.-Lorsqu'il est saisi par toute personne intéressée, par le ministre chargé de la culture ou par l'autorité compétente d'un autre Etat membre de l'Union européenne, de faits susceptibles de constituer un manquement aux dispositions du présent titre, ou lorsqu'il constate de tels faits dans l'exercice de sa mission de contrôle, le collège de contrôle procède à une enquête et établit un rapport sur la base duquel il peut mettre en demeure l'organisme de gestion de se conformer aux dispositions du présent titre, dans un délai qu'il détermine. Il peut décider de l'ouverture d'une procédure de sanction si l'organisme ne se conforme pas à la mise en demeure dans le délai fixé.

II.-Lorsqu'il est saisi par l'autorité compétente d'un autre Etat membre de l'Union européenne, le collège de contrôle lui adresse une réponse motivée dans un délai de trois mois.

Il peut demander à l'autorité compétente des informations sur un organisme de gestion collective ou un organisme de gestion indépendant établi dans un autre Etat membre exerçant son activité en France et, le cas échéant, la saisir de faits susceptibles de constituer un manquement par cet organisme aux règles de cet Etat relatives aux organismes de gestion collective ou organismes de gestion indépendants.

III.-Les saisines manifestement abusives, notamment par leur nombre, leur caractère répétitif ou systématique, peuvent être rejetées sans enquête ni rapport par le président du collège de contrôle.

IV.-En cas d'ouverture d'une procédure de sanction, le collège de contrôle notifie les griefs à l'organisme concerné et transmet cette notification et son rapport d'enquête au collège des sanctions. Toutefois, celui-ci ne peut être saisi de faits remontant à plus de trois ans s'il n'a été fait pendant ce délai aucun acte tendant à leur recherche, à leur constatation ou à leur sanction.

Il peut également saisir le tribunal compétent pour demander l'annulation des dispositions des statuts, du règlement général ou d'une décision des organes sociaux non conformes à la réglementation.

## Article L327-14

I.-Un membre du collège de contrôle est convoqué à l'audience. Il y assiste sans voix délibérative. Il peut présenter des observations au soutien des griefs notifiés et proposer une sanction.

Le collège des sanctions peut entendre tout rapporteur ou agent de la commission de contrôle.

Aucune sanction ne peut être prononcée sans que le représentant légal de l'organisme en cause ait été entendu ou, à défaut, dûment appelé.

II.-Le collège des sanctions statue par décision motivée.

Sur la base du rapport d'enquête transmis par le collège de contrôle et après une procédure contradictoire, il peut prononcer une ou plusieurs sanctions à l'encontre de l'organisme de gestion qui ne respecte pas les dispositions du présent titre.

III.-Les sanctions applicables à l'encontre de l'organisme en cause sont :

1° L'avertissement ;

2° L'injonction assortie éventuellement d'une astreinte d'adopter, dans un délai déterminé, une ou plusieurs décisions permettant à l'organisme de se conformer à des dispositions législatives ou réglementaires ;

3° Le retrait d'agrément, lorsque l'organisme est agréé par le ministre chargé de la culture en application des dispositions du présent code ;

4° Une sanction pécuniaire, dont le montant, qui ne peut être supérieur à 3 % du chiffre d'affaires ou des recettes hors taxes de l'organisme, dans la limite de 300 000 €, est fixé en fonction de la gravité des manquements commis et en relation avec les avantages ou les profits éventuellement tirés de ces manquements ; ce maximum est porté à 5 %, dans la limite de 500 000 €, en cas de nouvelle violation de la même obligation dans les cinq années suivant celle où la première violation de l'obligation a été sanctionnée ;

5° La publication de la sanction, précisant l'identité de l'organisme en cause et la nature du manquement, dans un journal de diffusion nationale.

La liquidation de l'astreinte est prononcée, d'office, à titre provisoire ou définitif, par le collège des sanctions. Son montant total ne peut excéder le plafond fixé au d pour les sanctions pécuniaires. Les sommes sont versées au budget de la commission

Les astreintes et sanctions pécuniaires sont recouvrées comme les créances de l'Etat étrangères à l'impôt et au domaine.

## Section 4 : Voies de recours

## Article L327-15

Les décisions prononcées par le collège des sanctions peuvent faire l'objet d'un recours devant la cour d'appel de Paris par l'organisme sanctionné ou par le président du collège de contrôle.

Ce recours n'a pas d'effet suspensif, sauf si la juridiction, saisie d'une demande de sursis à exécution, en décide autrement. Dans ce cas, la juridiction saisie peut ordonner qu'il soit sursis à l'exécution de la décision contestée si celle-ci est susceptible d'entraîner des conséquences manifestement excessives.

# Chapitre VIII : Dispositions diverses

## Article L328-1

Les organismes de gestion des droits d'auteurs et des droits voisins sont tenus de statuer par une décision écrite et motivée dans un délai n'excédant pas deux mois sur les contestations relatives aux conditions, aux effets et à la résiliation de l'autorisation de gestion des droits ainsi qu'à la gestion de ceux-ci, qui leur sont adressées par leurs membres, par les autres organismes pour lesquels ils gèrent des droits au titre d'un accord de représentation et par les titulaires de droits qui ne sont pas leurs membres mais qui ont une relation juridique directe avec eux par l'effet de la loi ou par voie de cession, de licence ou de tout autre accord contractuel.

Le délai prévu à l'alinéa précédent peut être prolongé pour un motif légitime, notamment lorsque l'organisme ne dispose pas des documents ou des informations nécessaires au traitement de la demande dont il est saisi.

La communication de ces contestations aux organismes est sans préjudice du droit des personnes mentionnées au premier alinéa de saisir le juge.

## Article L328-2

Un décret en Conseil d'Etat précise les modalités d'application du présent titre.

# Titre III : Prévention, procédures et sanctions

# Chapitre Ier : Dispositions générales

# Section 1 : Dispositions communes

## Article L331-1

Les actions civiles et les demandes relatives à la propriété littéraire et artistique, y compris lorsqu'elles portent également sur une question connexe de concurrence déloyale, sont exclusivement portées devant des tribunaux judiciaires, déterminés par voie réglementaire.

Les organismes de défense professionnelle régulièrement constitués ont qualité pour ester en justice pour la défense des intérêts dont ils ont statutairement la charge.

Le bénéficiaire valablement investi à titre exclusif, conformément aux dispositions du livre II, d'un droit exclusif d'exploitation appartenant à un producteur de phonogrammes ou de vidéogrammes peut, sauf stipulation contraire du contrat de licence, exercer l'action en justice au titre de ce droit. L'exercice de l'action est notifié au producteur.

Les dispositions qui précèdent ne font pas obstacle au recours à l'arbitrage, dans les conditions prévues aux articles 2059 et 2060 du code civil.

## Article L331-1-1

Si le demandeur justifie de circonstances de nature à compromettre le recouvrement des dommages et intérêts, la juridiction peut ordonner la saisie conservatoire des biens mobiliers et immobiliers du prétendu auteur de l'atteinte aux droits, notamment le blocage de ses comptes bancaires et autres avoirs, conformément au droit commun. Pour déterminer les biens susceptibles de faire l'objet de la saisie, elle peut ordonner la communication des documents bancaires, financiers, comptables ou commerciaux ou l'accès aux informations pertinentes.

## Article L331-1-2

Si la demande lui est faite, la juridiction saisie au fond ou en référé d'une procédure civile prévue aux livres Ier, II et III de la première partie peut ordonner, au besoin sous astreinte, afin de déterminer l'origine et les réseaux de distribution des marchandises et services qui portent prétendument atteinte aux droits du demandeur, la production de tous documents ou informations détenus par le défendeur ou par toute personne qui a été trouvée en possession de telles marchandises ou fournissant de tels services ou a été signalée comme intervenant dans la production, la fabrication ou la distribution de ces marchandises ou la fourniture de ces services.

La production de documents ou d'informations peut être ordonnée s'il n'existe pas d'empêchement légitime.

## Article L331-1-3

Pour fixer les dommages et intérêts, la juridiction prend en considération distinctement :

1° Les conséquences économiques négatives de l'atteinte aux droits, dont le manque à gagner et la perte subis par la partie lésée ;

2° Le préjudice moral causé à cette dernière ;

3° Et les bénéfices réalisés par l'auteur de l'atteinte aux droits, y compris les économies d'investissements intellectuels, matériels et promotionnels que celui-ci a retirées de l'atteinte aux droits.

Toutefois, la juridiction peut, à titre d'alternative et sur demande de la partie lésée, allouer à titre de dommages et intérêts une somme forfaitaire. Cette somme est supérieure au montant des redevances ou droits qui auraient été dus si l'auteur de l'atteinte avait demandé l'autorisation d'utiliser le droit auquel il a porté atteinte. Cette somme n'est pas exclusive de l'indemnisation du préjudice moral causé à la partie lésée.

## Article L331-1-4

En cas de condamnation civile pour contrefaçon, atteinte à un droit voisin du droit d'auteur ou aux droits du producteur de bases de données, la juridiction peut ordonner, à la demande de la partie lésée, que les objets réalisés ou fabriqués portant atteinte à ces droits, les supports utilisés pour recueillir les données extraites illégalement de la base de données et les matériaux ou instruments ayant principalement servi à leur réalisation ou fabrication soient rappelés des circuits commerciaux, écartés définitivement de ces circuits, détruits ou confisqués au profit de la partie lésée.

La juridiction peut aussi ordonner toute mesure appropriée de publicité du jugement, notamment son affichage ou sa publication intégrale ou par extraits dans les journaux ou sur les services de communication au public en ligne qu'elle désigne, selon les modalités qu'elle précise.

Les mesures mentionnées aux deux premiers alinéas sont ordonnées aux frais de l'auteur de l'atteinte aux droits.

La juridiction peut également ordonner la confiscation de tout ou partie des recettes procurées par la contrefaçon, l'atteinte à un droit voisin du droit d'auteur ou aux droits du producteur de bases de données, qui seront remises à la partie lésée ou à ses ayants droit.

## Article L331-2

Outre les procès-verbaux des officiers ou agents de police judiciaire, la preuve de la matérialité de toute infraction aux dispositions des livres Ier, II et III du présent code peut résulter des constatations d'agents assermentés désignés selon les cas par le Centre national du cinéma et de l'image animée, par les organismes de défense professionnelle visés à l'article L. 331-1 et par les organismes de gestion collective mentionnés au titre II du présent livre. Ces agents sont agréés par le ministre chargé de la culture dans les conditions prévues par un décret en Conseil d'Etat.

## Article L331-3

Le Centre national du cinéma et de l'image animée peut porter plainte et se constituer partie civile devant le juge d'instruction à raison des faits constitutifs du délit de contrefaçon, au sens de l'article L. 335-3 du présent code, d'œuvres audiovisuelles qui emportent pour lui un préjudice quant aux ressources qui lui sont affectées en application des articles L. 115-1 à L. 116-5 du code du cinéma et de l'image animée pour l'accomplissement de ses missions prévues à l'article L. 111-2 du même code.

Il peut également exercer les droits reconnus à la partie civile en ce qui concerne le délit de contrefaçon, au sens de l'article L. 335-3 du présent code, d'œuvres audiovisuelles et le délit prévu à l'article L. 335-4 s'agissant des droits des artistes-interprètes d'œuvres audiovisuelles et des producteurs de vidéogrammes, lorsque l'action publique a été mise en mouvement par le ministère public ou la partie lésée.

## Article L331-4

Les droits mentionnés dans la première partie du présent code ne peuvent faire échec aux actes nécessaires à l'accomplissement d'une procédure parlementaire de contrôle, juridictionnelle ou administrative prévue par la loi, ou entrepris à des fins de sécurité publique.

## Section 2 : Mesures techniques de protection et d'information

### Article L331-5

Les mesures techniques efficaces destinées à empêcher ou à limiter les utilisations non autorisées par les titulaires d'un droit d'auteur ou d'un droit voisin du droit d'auteur d'une oeuvre, autre qu'un logiciel, d'une interprétation, d'un phonogramme, d'un vidéogramme, d'un programme ou d'une publication de presse sont protégées dans les conditions prévues au présent titre.

On entend par mesure technique au sens du premier alinéa toute technologie, dispositif, composant qui, dans le cadre normal de son fonctionnement, accomplit la fonction prévue par cet alinéa. Ces mesures techniques sont réputées efficaces lorsqu'une utilisation visée au même alinéa est contrôlée par les titulaires de droits grâce à l'application d'un code d'accès, d'un procédé de protection tel que le cryptage, le brouillage ou toute autre transformation de l'objet de la protection ou d'un mécanisme de contrôle de la copie qui atteint cet objectif de protection.

Un protocole, un format, une méthode de cryptage, de brouillage ou de transformation ne constitue pas en tant que tel une mesure technique au sens du présent article.

Les mesures techniques ne doivent pas avoir pour effet d'empêcher la mise en oeuvre effective de l'interopérabilité, dans le respect du droit d'auteur. Les fournisseurs de mesures techniques donnent l'accès aux informations essentielles à l'interopérabilité dans les conditions définies au 1° de l'article L. 331-31 et à l'article L. 331-32.

Les dispositions du présent chapitre ne remettent pas en cause la protection juridique résultant des articles 79-1 à 79-6 et de l'article 95 de la loi n° 86-1067 du 30 septembre 1986 relative à la liberté de communication.

Les mesures techniques ne peuvent s'opposer au libre usage de l'oeuvre ou de l'objet protégé dans les limites des droits prévus par le présent code, ainsi que de ceux accordés par les détenteurs de droits.

Les dispositions du présent article s'appliquent sans préjudice des dispositions de l'article L. 122-6-1 du présent code.

### Article L331-6

Le bénéfice de l'exception pour copie privée et des exceptions mentionnées au 2° de l'article L. 331-31 est garanti par les dispositions des articles L. 331-7 à L. 331-10, L. 331-33 à L. 331-35 et L. 331-37.

### Article L331-7

Les titulaires de droits qui recourent aux mesures techniques de protection définies à l'article L. 331-5 peuvent leur assigner pour objectif de limiter le nombre de copies. Ils prennent cependant les dispositions utiles pour que leur mise en oeuvre ne prive pas les bénéficiaires des exceptions visées au 2° de l'article L. 331-31 de leur exercice effectif. Ils s'efforcent de définir ces mesures en concertation avec les associations agréées de consommateurs et les autres parties intéressées.

Les dispositions du présent article peuvent, dans la mesure où la technique le permet, subordonner le bénéfice effectif de ces exceptions à un accès licite à une oeuvre ou à un phonogramme, à un vidéogramme, à un programme ou à une publication de presse et veiller à ce qu'elles n'aient pas pour effet de porter atteinte à son exploitation normale ni de causer un préjudice injustifié aux intérêts légitimes du titulaire de droits sur l'oeuvre ou l'objet protégé.

## Article L331-8

Les titulaires de droits ne sont cependant pas tenus de prendre les dispositions de l'article L. 331-7 lorsque l'oeuvre ou un autre objet protégé par un droit voisin est mis à disposition du public selon des dispositions contractuelles convenues entre les parties, de manière que chacun puisse y avoir accès de l'endroit et au moment qu'il choisit.

## Article L331-9

Les éditeurs et les distributeurs de services de télévision ne peuvent recourir à des mesures techniques qui auraient pour effet de priver le public du bénéfice de l'exception pour copie privée, y compris sur un support et dans un format numérique, dans les conditions mentionnées au 2° de l'article L. 122-5 et au 2° de l'article L. 211-3.

Le Conseil supérieur de l'audiovisuel veille au respect des obligations du premier alinéa dans les conditions définies par les articles 42 et 48-1 de la loi n° 86-1067 du 30 septembre 1986 relative à la liberté de communication.

Lorsqu'un distributeur d'un service de radio ou de télévision met à disposition un service de stockage mentionné au deuxième alinéa de l'article L. 311-4, une convention conclue avec l'éditeur de ce service de radio ou de télévision définit préalablement les fonctionnalités de ce service de stockage.

Le Conseil supérieur de l'audiovisuel peut être saisi par un éditeur ou un distributeur des services de tout différend relatif à la conclusion ou à l'exécution de la convention mentionnée à l'avant-dernier alinéa du présent article et rendre une décision dans les conditions définies à l'article 17-1 de la loi n° 86-1067 du 30 septembre 1986 précitée.

## Article L331-10

Les conditions d'accès à la lecture d'une oeuvre, d'un vidéogramme, d'un programme, d'un phonogramme ou d'une publication de presse et les limitations susceptibles d'être apportées au bénéfice de l'exception pour copie privée mentionnée au 2° de l'article L. 122-5 et au 2° de l'article L. 211-3 par la mise en oeuvre d'une mesure technique de protection doivent être portées à la connaissance de l'utilisateur.

## Article L331-11

Les informations sous forme électronique concernant le régime des droits afférents à une oeuvre, autre qu'un logiciel, une interprétation, un phonogramme, un vidéogramme, un programme ou une publication de presse, sont protégées dans les conditions prévues au présent titre, lorsque l'un des éléments d'information, numéros ou codes est joint à la reproduction ou apparaît en relation avec la communication au public de l'oeuvre, de l'interprétation, du phonogramme, du vidéogramme, du programme ou de la publication de presse qu'il concerne.

On entend par information sous forme électronique toute information fournie par un titulaire de droits qui permet d'identifier une oeuvre, une interprétation, un phonogramme, un vidéogramme, un programme, une publication de presse ou un titulaire de droit, toute information sur les conditions et modalités d'utilisation d'une oeuvre, d'une interprétation, d'un phonogramme, d'un vidéogramme, d'un programme ou d'une publication de presse, ainsi que tout numéro ou code représentant tout ou partie de ces informations.

## Section 3 : Haute Autorité pour la diffusion des œuvres et la protection des droits sur internet

## Sous-section 1 : Compétences, composition et organisation

### Article L331-12

La Haute Autorité pour la diffusion des œuvres et la protection des droits sur internet est une autorité publique indépendante.

### Article L331-13

La Haute Autorité assure :

1° Une mission d'encouragement au développement de l'offre légale et d'observation de l'utilisation licite et illicite des œuvres et des objets auxquels est attaché un droit d'auteur ou un droit voisin sur les réseaux de communications électroniques utilisés pour la fourniture de services de communication au public en ligne ;

2° Une mission de protection de ces œuvres et objets à l'égard des atteintes à ces droits commises sur les réseaux de communications électroniques utilisés pour la fourniture de services de communication au public en ligne ;

3° Une mission de régulation et de veille dans le domaine des mesures techniques de protection et d'identification des œuvres et des objets protégés par un droit d'auteur ou par un droit voisin.

Au titre de ces missions, la Haute Autorité peut recommander toute modification législative ou réglementaire. Elle peut être consultée par le Gouvernement sur tout projet de loi ou de décret intéressant la protection des droits de propriété littéraire et artistique. Elle peut également être consultée par le Gouvernement ou par les commissions parlementaires sur toute question relative à ses domaines de compétence.

### Article L331-14

La Haute Autorité remet chaque année au Gouvernement et au Parlement un rapport rendant compte du respect de leurs obligations et engagements par les professionnels des différents secteurs concernés. Ce rapport est rendu public.

## Article L331-15

La Haute Autorité est composée d'un collège et d'une commission de protection des droits. Le président du collège est le président de la Haute Autorité.

Sauf disposition législative contraire, les missions confiées à la Haute Autorité sont exercées par le collège.

Dans l'exercice de leurs attributions, les membres du collège et de la commission de protection des droits ne reçoivent d'instruction d'aucune autorité.

## Article L331-16

Le collège de la Haute Autorité est composé de neuf membres, dont le président, nommés pour une durée de six ans par décret :

1° Un membre en activité du Conseil d'Etat désigné par le vice-président du Conseil d'Etat ;

2° Un membre en activité de la Cour de cassation désigné par le premier président de la Cour de cassation ;

3° Un membre en activité de la Cour des comptes désigné par le premier président de la Cour des comptes ;

4° Un membre du Conseil supérieur de la propriété littéraire et artistique désigné par le président du Conseil supérieur de la propriété littéraire et artistique ;

5° Trois personnalités qualifiées, désignées sur proposition conjointe des ministres chargés des communications électroniques, de la consommation et de la culture ;

6° Deux personnalités qualifiées, désignées respectivement par le président de l'Assemblée nationale et par le président du Sénat.

Le président du collège est élu par les membres parmi les personnes mentionnées aux 1°, 2° et 3°.

Pour les membres désignés en application des 1° à 4°, des membres suppléants sont désignés dans les mêmes conditions.

Selon des modalités fixées par décret en Conseil d'Etat, le collège est renouvelé partiellement tous les trois ans.

Le mandat des membres n'est pas renouvelable.

Le président exerce ses fonctions à temps plein.

## Article L331-17

La commission de protection des droits est chargée de prendre les mesures prévues à l'article L. 331-25 [Dispositions résultant de la décision du Conseil constitutionnel n° 2009-580 DC du 10 juin 2009].

Elle est composée de trois membres, dont le président, nommés pour une durée de six ans par décret :

1° Un membre en activité du Conseil d'Etat désigné par le vice-président du Conseil d'Etat ;

2° Un membre en activité de la Cour de cassation désigné par le premier président de la Cour de cassation ;

3° Un membre en activité de la Cour des comptes désigné par le premier président de la Cour des comptes.

Des membres suppléants sont nommés dans les mêmes conditions.

Lors de chaque renouvellement, le membre titulaire succédant à une femme est un homme et celui succédant à un homme, une femme.

Le membre titulaire et son suppléant sont de sexe différent.

En cas de vacance d'un siège de membre de la commission de protection des droits, pour quelque cause que ce soit, il est procédé à la nomination, dans les conditions prévues au présent article, d'un nouveau membre de même sexe pour la durée du mandat restant à courir.

Le mandat des membres n'est ni révocable, ni renouvelable.

Sauf démission, il ne peut être mis fin aux fonctions d'un membre qu'en cas d'empêchement constaté par la commission dans les conditions qu'elle définit.

Les fonctions de membre du collège et de membre de la commission de protection des droits sont incompatibles.

## Article L331-18

I. - Les fonctions de membre et de secrétaire général de la Haute Autorité sont incompatibles avec le fait d'exercer ou d'avoir exercé, au cours des trois dernières années :

1° Les fonctions de dirigeant, de salarié ou de conseiller d'un organisme de gestion collective régi par le titre II du présent livre ;

2° Les fonctions de dirigeant, de salarié ou de conseiller d'une entreprise exerçant une activité de production de phonogrammes ou de vidéogrammes ou d'édition d'œuvres protégées par un droit d'auteur ou des droits voisins ;

3° Les fonctions de dirigeant, de salarié ou de conseiller d'une entreprise de communication audiovisuelle ;

4° Les fonctions de dirigeant, de salarié ou de conseiller d'une entreprise offrant des services de mise à disposition d'œuvres ou d'objets protégés par un droit d'auteur ou des droits voisins ;

5° Les fonctions de dirigeant, de salarié ou de conseiller d'une entreprise dont l'activité est d'offrir un accès à des services de communication au public en ligne.

II. - Après la cessation de leurs fonctions, les membres de la Haute Autorité et son secrétaire général sont soumis aux dispositions de l'article 432-13 du code pénal.

Les membres de la Haute Autorité et son secrétaire général ne peuvent, directement ou indirectement, détenir d'intérêts dans un organisme ou entreprise mentionné au I du présent article.

# Article L331-19

Un secrétaire général est chargé du fonctionnement et de la coordination des services sous l'autorité du président.

Les rapporteurs chargés de l'instruction de dossiers auprès de la Haute Autorité sont nommés par le président.

La Haute Autorité peut faire appel à des experts. Elle peut également solliciter, en tant que de besoin, l'avis d'autorités administratives, d'organismes extérieurs ou d'associations représentatives des utilisateurs des réseaux de communications électroniques, et elle peut être consultée pour avis par ces mêmes autorités ou organismes.

# Article L331-20

Les décisions du collège et de la commission de protection des droits sont prises à la majorité des voix. Au sein du collège, la voix du président est prépondérante en cas de partage égal des voix.

# Article L331-21

Pour l'exercice, par la commission de protection des droits, de ses attributions, la Haute Autorité dispose d'agents publics assermentés habilités par le président de la Haute Autorité dans des conditions fixées par un décret en Conseil d'Etat. Cette habilitation ne dispense pas de l'application des dispositions définissant les procédures autorisant l'accès aux secrets protégés par la loi.

Les membres de la commission de protection des droits et les agents mentionnés au premier alinéa reçoivent les saisines adressées à ladite commission dans les conditions prévues à l'article L. 331-24. Ils procèdent à l'examen des faits.

Ils peuvent, pour les nécessités de la procédure, obtenir tous documents, quel qu'en soit le support, y compris les données conservées et traitées par les opérateurs de communications électroniques en application de l'article L. 34-1 du code des postes et des communications électroniques et les prestataires mentionnés aux 1 et 2 du I de l'article 6 de la loi n° 2004-575 du 21 juin 2004 pour la confiance dans l'économie numérique.

Ils peuvent également obtenir copie des documents mentionnés à l'alinéa précédent.

Ils peuvent, notamment, obtenir des opérateurs de communications électroniques l'identité, l'adresse postale, l'adresse électronique et les coordonnées téléphoniques de l'abonné dont l'accès à des services de communication au public en ligne a été utilisé à des fins de reproduction, de représentation, de mise à disposition ou de communication au public d'œuvres ou d'objets protégés sans l'autorisation des titulaires des droits prévus aux livres Ier et II lorsqu'elle est requise.

## Article L331-21-1

Les membres de la commission de protection des droits, ainsi que ses agents habilités et assermentés devant l'autorité judiciaire mentionnés à l'article L. 331-21, peuvent constater les faits susceptibles de constituer des infractions prévues au présent titre lorsqu'elles sont punies de la peine complémentaire de suspension de l'accès à un service de communication au public en ligne mentionnée aux articles L. 335-7 et L. 335-7-1.

Ils peuvent en outre recueillir les observations des personnes concernées. Il est fait mention de ce droit dans la lettre de convocation.

Lorsque les personnes concernées demandent à être entendues, ils les convoquent et les entendent. Toute personne entendue a le droit de se faire assister d'un conseil de son choix.

Conformément à l'article 28 du code de procédure pénale, l'article 61-1 du même code est applicable lorsqu'il est procédé à l'audition d'une personne à l'égard de laquelle il existe des raisons plausibles de soupçonner qu'elle a commis ou tenté de commettre une infraction.

Une copie du procès-verbal d'audition est remise à la personne concernée.

## Article L331-22

Les membres et les agents publics de la Haute Autorité sont astreints au secret professionnel pour les faits, actes ou renseignements dont ils ont pu avoir connaissance en raison de leurs fonctions, dans les conditions prévues à l'article 413-10 du code pénal et, sous réserve de ce qui est nécessaire à l'établissement des avis, des recommandations et des rapports, à l'article 226-13 du même code.

Dans les conditions prévues par l'article 17-1 de la loi n° 95-73 du 21 janvier 1995 d'orientation et de programmation relative à la sécurité, les décisions d'habilitation des agents mentionnés à l'article L. 331-21 du présent code sont précédées d'enquêtes administratives destinées à vérifier que leur comportement n'est pas incompatible avec l'exercice de leurs fonctions ou missions.

# Sous-section 2 : Mission d'encouragement au développement de l'offre légale et d'observation de l'utilisation licite et illicite d'œuvres et d'objets protégés par un droit d'auteur ou par un droit voisin sur les réseaux de communications électroniques

## Article L331-23

Au titre de sa mission d'encouragement au développement de l'offre légale, qu'elle soit ou non commerciale, et d'observation de l'utilisation, qu'elle soit licite ou illicite, des œuvres et des objets protégés par un droit d'auteur ou par un droit voisin sur les réseaux de communications électroniques, la Haute Autorité publie chaque année des indicateurs dont la liste est fixée par décret. Elle rend compte du développement de l'offre légale dans le rapport mentionné à l'article L. 331-14.

Dans des conditions fixées par décret en Conseil d'Etat, la Haute Autorité attribue aux offres proposées par des personnes dont l'activité est d'offrir un service de communication au public en ligne un label permettant aux usagers de ce service d'identifier clairement le caractère légal de ces offres. Cette labellisation est revue périodiquement.

La Haute Autorité veille à la mise en place, à la mise en valeur et à l'actualisation d'un portail de référencement de ces mêmes offres.

Elle évalue, en outre, les expérimentations conduites dans le domaine des technologies de reconnaissance des contenus et de filtrage par les concepteurs de ces technologies, les titulaires de droits sur les œuvres et objets protégés et les personnes dont l'activité est d'offrir un service de communication au public en ligne. Elle rend compte des principales évolutions constatées en la matière, notamment pour ce qui regarde l'efficacité de telles technologies, dans son rapport annuel prévu à l'article L. 331-14.

Elle identifie et étudie les modalités techniques permettant l'usage illicite des œuvres et des objets protégés par un droit d'auteur ou par un droit voisin sur les réseaux de communications électroniques. Dans le cadre du rapport prévu à l'article L. 331-14, elle propose, le cas échéant, des solutions visant à y remédier.

# Sous-section 3 : Mission de protection des œuvres et objets auxquels est attaché un droit d'auteur ou un droit voisin

## Article L331-24

La commission de protection des droits agit sur saisine d'agents assermentés et agréés dans les conditions définies à l'article L. 331-2 qui sont désignés par :

# les organismes de défense professionnelle régulièrement constitués ;

# les organismes de gestion collective ;

# le Centre national du cinéma et de l'image animée.

La commission de protection des droits peut également agir sur la base d'informations qui lui sont transmises par le procureur de la République.

Elle ne peut être saisie de faits remontant à plus de six mois.

## Article L331-25

Lorsqu'elle est saisie de faits susceptibles de constituer un manquement à l'obligation définie à l'article L. 336-3, la commission de protection des droits peut envoyer à l'abonné, sous son timbre et pour son compte, par la voie électronique et par l'intermédiaire de la personne dont l'activité est d'offrir un accès à des services de communication au public en ligne ayant conclu un contrat avec l'abonné, une recommandation lui rappelant les dispositions de l'article L. 336-3, lui enjoignant de respecter l'obligation qu'elles définissent et l'avertissant des sanctions encourues en application des articles L. 335-7 et L. 335-7-1. Cette recommandation contient également une information de l'abonné sur l'offre légale de contenus culturels en ligne, sur l'existence de moyens de sécurisation permettant de prévenir les manquements à l'obligation définie à l'article L. 336-3 ainsi que sur les dangers pour le renouvellement de la création artistique et pour l'économie du secteur culturel des pratiques ne respectant pas le droit d'auteur et les droits voisins.

En cas de renouvellement, dans un délai de six mois à compter de l'envoi de la recommandation visée au premier alinéa, de faits susceptibles de constituer un manquement à l'obligation définie à l'article L. 336-3, la commission peut adresser une nouvelle recommandation comportant les mêmes informations que la précédente par la voie électronique dans les conditions prévues au premier alinéa. Elle doit assortir cette recommandation d'une lettre remise contre signature ou de tout autre moyen propre à établir la preuve de la date de présentation de cette recommandation.

Les recommandations adressées sur le fondement du présent article mentionnent la date et l'heure auxquelles les faits susceptibles de constituer un manquement à l'obligation définie à l'article L. 336-3 ont été constatés. En revanche, elles ne divulguent pas le contenu des œuvres ou objets protégés concernés par ce manquement. Elles indiquent les coordonnées téléphoniques, postales et électroniques où leur destinataire peut adresser, s'il le souhaite, des observations à la commission de protection des droits et obtenir, s'il en formule la demande expresse, des précisions sur le contenu des œuvres ou objets protégés concernés par le manquement qui lui est reproché.

## Article L331-26

Après consultation des concepteurs de moyens de sécurisation destinés à prévenir l'utilisation illicite de l'accès à un service de communication au public en ligne, des personnes dont l'activité est d'offrir l'accès à un tel service ainsi que des organismes de gestion collective régis par le titre II du présent livre et des organismes de défense professionnelle régulièrement constitués, la Haute Autorité rend publiques les spécifications fonctionnelles pertinentes que ces moyens doivent présenter.

Au terme d'une procédure d'évaluation certifiée prenant en compte leur conformité aux spécifications visées au premier alinéa et leur efficacité, la Haute Autorité établit une liste labellisant les moyens de sécurisation. Cette labellisation est périodiquement revue.

Un décret en Conseil d'Etat précise la procédure d'évaluation et de labellisation de ces moyens de sécurisation.

## Article L331-27

Les personnes dont l'activité est d'offrir un accès à des services de communication au public en ligne font figurer, dans les contrats conclus avec leurs abonnés, la mention claire et lisible des dispositions de l'article L. 336-3 et des mesures qui peuvent être prises par la commission de protection des droits. Elles font également figurer, dans les contrats conclus avec leurs abonnés, les sanctions pénales et civiles encourues en cas de violation des droits d'auteur et des droits voisins et en application de l'article L. 335-7-1.

En outre, les personnes visées au premier alinéa du présent article informent leurs nouveaux abonnés et les personnes reconduisant leur contrat d'abonnement sur l'offre légale de contenus culturels en ligne, sur l'existence de moyens de sécurisation permettant de prévenir les manquements à l'obligation définie à l'article L. 336-3 ainsi que sur les dangers pour le renouvellement de la création artistique et pour l'économie du secteur culturel des pratiques ne respectant pas le droit d'auteur et les droits voisins.

# Article L331-28

La commission de protection des droits peut conserver les données techniques mises à sa disposition pendant la durée nécessaire à l'exercice des compétences qui lui sont confiées à la présente sous-section.

La personne dont l'activité est d'offrir un accès à des services de communication au public en ligne est tenue d'informer la commission de protection des droits de la date à laquelle elle a débuté la suspension ; la commission procède à l'effacement des données à caractère personnel relatives à l'abonné dès le terme de la période de suspension.

# Article L331-29

Est autorisée la création, par la Haute Autorité, d'un traitement automatisé de données à caractère personnel portant sur les personnes faisant l'objet d'une procédure dans le cadre de la présente sous-section.

Ce traitement a pour finalité la mise en œuvre, par la commission de protection des droits, des mesures prévues à la présente sous-section, de tous les actes de procédure afférents et des modalités de l'information des organismes de défense professionnelle et des organismes de gestion collective des éventuelles saisines de l'autorité judiciaire ainsi que des notifications prévues au cinquième alinéa de l'article L. 335-7.

Un décret en Conseil d'Etat, pris après avis de la Commission nationale de l'informatique et des libertés, fixe les modalités d'application du présent article. Il précise notamment :

# les catégories de données enregistrées et leur durée de conservation ;

# les destinataires habilités à recevoir communication de ces données, notamment les personnes dont l'activité est d'offrir un accès à des services de communication au public en ligne ;

# les conditions dans lesquelles les personnes intéressées peuvent exercer, auprès de la Haute Autorité, leur droit d'accès aux données les concernant conformément à la loi n° 78-17 du 6 janvier 1978 relative à l'informatique, aux fichiers et aux libertés.

# Article L331-30

Un décret en Conseil d'Etat fixe les règles applicables à la procédure et à l'instruction des dossiers devant le collège et la commission de protection des droits de la Haute Autorité.

## Sous-section 4 : Mission de régulation et de veille dans le domaine des mesures techniques de protection et d'identification des œuvres et des objets protégés par un droit d'auteur ou un droit voisin

### Article L331-31

Au titre de sa mission de régulation et de veille dans les domaines des mesures techniques de protection et d'identification des oeuvres et des objets protégés par le droit d'auteur ou par les droits voisins, la Haute Autorité exerce les fonctions suivantes :

1° Elle veille à ce que les mesures techniques visées à l'article L. 331-5 n'aient pas pour conséquence, du fait de leur incompatibilité mutuelle ou de leur incapacité d'interopérer, d'entraîner dans l'utilisation d'une oeuvre des limitations supplémentaires et indépendantes de celles expressément décidées par le titulaire d'un droit d'auteur sur une oeuvre autre qu'un logiciel ou par le titulaire d'un droit voisin sur une interprétation, un phonogramme, un vidéogramme, un programme ou une publication de presse ;

2° Elle veille à ce que la mise en oeuvre des mesures techniques de protection n'ait pas pour effet de priver les bénéficiaires des exceptions définies aux :

-2°, e du 3° à compter du 1er janvier 2009, 7° et 8° de l'article L. 122-5 ;

-2°, dernier alinéa du 3° à compter du 1er janvier 2009, 6° et 7° de l'article L. 211-3 ;

-3° et, à compter du 1er janvier 2009, 4° de l'article L. 342-3 ;

-et à l'article L. 331-4.

Elle veille également à ce que la mise en œuvre des mesures techniques de protection n'ait pas pour effet de priver les personnes bénéficiaires de l'exception de reproduction à des fins de collecte, de conservation et de consultation sur place mentionnée au 2° de l'article L. 132-4 et aux articles L. 132-5 et L. 132-6 du code du patrimoine.

Sous réserve des articles L. 331-7 à L. 331-10, L. 331-33 à L. 331-35 et L. 331-37 du présent code, la Haute Autorité détermine les modalités d'exercice des exceptions précitées et fixe notamment le nombre minimal de copies autorisées dans le cadre de l'exception pour copie privée, en fonction du type d'oeuvre ou d'objet protégé, des divers modes de communication au public et des possibilités offertes par les techniques de protection disponibles.

### Article L331-32

Tout éditeur de logiciel, tout fabricant de système technique et tout exploitant de service peut, en cas de refus d'accès aux informations essentielles à l'interopérabilité, demander à la Haute Autorité de garantir l'interopérabilité des systèmes et des services existants, dans le respect des droits des parties, et d'obtenir du titulaire des droits sur la mesure technique les informations essentielles à cette interopérabilité. A compter de sa saisine, la Haute Autorité dispose d'un délai de deux mois pour rendre sa décision.

On entend par informations essentielles à l'interopérabilité la documentation technique et les interfaces de programmation nécessaires pour permettre à un dispositif technique d'accéder, y compris dans un

standard ouvert au sens de l'article 4 de la loi n° 2004-575 du 21 juin 2004 pour la confiance dans l'économie numérique, à une oeuvre ou à un objet protégé par une mesure technique et aux informations sous forme électronique jointes, dans le respect des conditions d'utilisation de l'oeuvre ou de l'objet protégé qui ont été définies à l'origine.

Le titulaire des droits sur la mesure technique ne peut imposer au bénéficiaire de renoncer à la publication du code source et de la documentation technique de son logiciel indépendant et interopérant que s'il apporte la preuve que celle-ci aurait pour effet de porter gravement atteinte à la sécurité et à l'efficacité de ladite mesure technique.

La Haute Autorité peut accepter des engagements proposés par les parties et de nature à mettre un terme aux pratiques contraires à l'interopérabilité. A défaut d'un accord entre les parties et après avoir mis les intéressés à même de présenter leurs observations, elle rend une décision motivée de rejet de la demande ou émet une injonction prescrivant, au besoin sous astreinte, les conditions dans lesquelles le demandeur peut obtenir l'accès aux informations essentielles à l'interopérabilité et les engagements qu'il doit respecter pour garantir l'efficacité et l'intégrité de la mesure technique, ainsi que les conditions d'accès et d'usage du contenu protégé. L'astreinte prononcée par la Haute Autorité est liquidée par cette dernière.

La Haute Autorité a le pouvoir d'infliger une sanction pécuniaire applicable soit en cas d'inexécution de ses injonctions, soit en cas de non-respect des engagements qu'elle a acceptés. Chaque sanction pécuniaire est proportionnée à l'importance du dommage causé aux intéressés, à la situation de l'organisme ou de l'entreprise sanctionné et à l'éventuelle réitération des pratiques contraires à l'interopérabilité. Elle est déterminée individuellement et de façon motivée. Son montant maximum s'élève à 5 % du montant du chiffre d'affaires mondial hors taxes le plus élevé réalisé au cours d'un des exercices clos depuis l'exercice précédant celui au cours duquel les pratiques contraires à l'interopérabilité ont été mises en oeuvre dans le cas d'une entreprise et à 1,5 million d'euros dans les autres cas.

Les décisions de la Haute Autorité sont rendues publiques dans le respect des secrets protégés par la loi. Elles sont notifiées aux parties qui peuvent introduire un recours devant la cour d'appel de Paris. Le recours a un effet suspensif.

Le président de la Haute Autorité saisit l'Autorité de la concurrence des abus de position dominante et des pratiques entravant le libre exercice de la concurrence dont il pourrait avoir connaissance dans le secteur des mesures techniques. Cette saisine peut être introduite dans le cadre d'une procédure d'urgence, dans les conditions prévues à l'article L. 464-1 du code de commerce. Le président de la Haute Autorité peut également le saisir, pour avis, de toute autre question relevant de sa compétence. L'Autorité de la concurrence communique à la Haute Autorité toute saisine entrant dans le champ de compétence de celle-ci et recueille son avis sur les pratiques dont il est saisi dans le secteur des mesures techniques mentionnées à l'article L. 331-5 du présent code.

## Article L331-33

Toute personne bénéficiaire des exceptions mentionnées au 2° de l'article L. 331-31 ou toute personne morale agréée qui la représente peut saisir la Haute Autorité de tout différend portant sur les restrictions que les mesures techniques de protection définies à l'article L. 331-5 apportent au bénéfice desdites exceptions.

## Article L331-34

Les personnes morales et les établissements ouverts au public visés au 7° de l'article L. 122-5 qui réalisent des reproductions ou des représentations d'une oeuvre ou d'un objet protégé adaptées aux personnes

handicapées peuvent saisir la Haute Autorité de tout différend portant sur la transmission des textes imprimés sous la forme d'un fichier numérique.

## Article L331-35

Dans le respect des droits des parties, la Haute Autorité favorise ou suscite une solution de conciliation. Lorsqu'elle dresse un procès-verbal de conciliation, celui-ci a force exécutoire ; il fait l'objet d'un dépôt au greffe du tribunal judiciaire.

A défaut de conciliation dans un délai de deux mois à compter de sa saisine, la Haute Autorité, après avoir mis les intéressés à même de présenter leurs observations, rend une décision motivée de rejet de la demande ou émet une injonction prescrivant, au besoin sous astreinte, les mesures propres à assurer le bénéfice effectif de l'exception. L'astreinte prononcée par la Haute Autorité est liquidée par cette dernière.

Ces décisions ainsi que le procès-verbal de conciliation sont rendus publics dans le respect des secrets protégés par la loi. Elles sont notifiées aux parties qui peuvent introduire un recours devant la cour d'appel de Paris. Le recours a un effet suspensif.

## Article L331-36

La Haute Autorité peut être saisie pour avis par l'une des personnes visées à l'article L. 331-32 de toute question relative à l'interopérabilité des mesures techniques.

Elle peut également être saisie pour avis, par une personne bénéficiaire de l'une des exceptions mentionnées au 2° de l'article L. 331-31 ou par la personne morale agréée qui la représente, de toute question relative à la mise en œuvre effective de cette exception.

## Article L331-37

Un décret en Conseil d'Etat précise les conditions d'application de la présente sous-section. Il prévoit les modalités d'information des utilisateurs d'une oeuvre, d'un vidéogramme, d'un programme, d'un phonogramme ou d'une publication de presse mentionnées à l'article L. 331-10.

# Chapitre II : Saisie-contrefaçon

## Article L332-1

Tout auteur d'une œuvre protégée par le livre Ier de la présente partie, ses ayants droit ou ses ayants cause peuvent agir en contrefaçon. A cet effet, ces personnes sont en droit de faire procéder par tous huissiers, le cas échéant assistés par des experts désignés par le demandeur, sur ordonnance rendue sur requête par la juridiction civile compétente, soit à la description détaillée, avec ou sans prélèvement d'échantillons, soit à la saisie réelle des œuvres prétendument contrefaisantes ainsi que de tout document s'y rapportant. L'ordonnance peut autoriser la saisie réelle de tout document se rapportant aux œuvres prétendument contrefaisantes en l'absence de ces dernières.

La juridiction peut ordonner la description détaillée ou la saisie réelle des matériels et instruments utilisés pour produire ou distribuer illicitement les œuvres.

A cet effet, la juridiction peut ordonner :

1° La saisie des exemplaires constituant une reproduction illicite d'une œuvre de l'esprit protégée par le livre Ier de la présente partie ou de tout exemplaire, produit, appareil, dispositif, composant ou moyen portant atteinte aux mesures techniques et aux informations mentionnées, respectivement, aux articles L. 331-5 et L. 331-11 ;

2° La saisie, quels que soient le jour et l'heure, des exemplaires constituant une reproduction illicite de l'œuvre, déjà fabriqués ou en cours de fabrication, ou des exemplaires, produits, appareils, dispositifs, composants ou moyens, fabriqués ou en cours de fabrication, portant atteinte aux mesures techniques et aux informations mentionnées, respectivement, aux articles L. 331-5 et L. 331-11, des recettes réalisées, ainsi que des exemplaires illicitement utilisés ;

3° La saisie des recettes provenant de toute reproduction, représentation ou diffusion, par quelque moyen que ce soit, d'une œuvre de l'esprit, effectuée en violation des droits de l'auteur ou provenant d'une atteinte aux mesures techniques et aux informations mentionnées, respectivement, aux articles L. 331-5 et L. 331-11 ;

4° La saisie réelle des œuvres illicites ou produits soupçonnés de porter atteinte à un droit d'auteur ou leur remise entre les mains d'un tiers afin d'empêcher leur introduction ou leur circulation dans les circuits commerciaux.

La juridiction civile compétente peut également ordonner :

a) La suspension ou la prorogation des représentations ou des exécutions publiques en cours ou déjà annoncées ;

b) La suspension de toute fabrication en cours tendant à la reproduction illicite d'une œuvre ou à la réalisation d'une atteinte aux mesures techniques et aux informations mentionnées, respectivement, aux articles L. 331-5 et L. 331-11.

Elle peut subordonner l'exécution des mesures qu'elle ordonne à la constitution par le demandeur de garanties destinées à assurer l'indemnisation éventuelle du défendeur si l'action en contrefaçon est ultérieurement jugée non fondée ou la saisie annulée.

Elle peut, dans les mêmes formes, ordonner les mesures prévues au présent article à la demande des titulaires de droits voisins définis au livre II de la présente partie.

# Article L332-1-1

La juridiction peut ordonner, d'office ou à la demande de toute personne ayant qualité pour agir en contrefaçon, toutes les mesures d'instruction légalement admissibles, même si une saisie-contrefaçon n'a pas préalablement été ordonnée dans les conditions prévues à l'article L. 332-1.

# Article L332-2

Dans un délai fixé par voie réglementaire, le saisi ou le tiers saisi peuvent demander au président du tribunal judiciaire de prononcer la mainlevée de la saisie ou d'en cantonner les effets, ou encore d'autoriser la reprise

de la fabrication ou celle des représentations ou exécutions publiques, sous l'autorité d'un administrateur constitué séquestre, pour le compte de qui il appartiendra, des produits de cette fabrication ou de cette exploitation.

Le président du tribunal judiciaire statuant en référé peut, s'il fait droit à la demande du saisi ou du tiers saisi, ordonner à la charge du demandeur la consignation d'une somme affectée à la garantie des dommages et intérêts auxquels l'auteur pourrait prétendre.

## Article L332-3

A défaut pour le saisissant, dans un délai fixé par voie réglementaire, soit de s'être pourvu au fond, par la voie civile ou pénale, soit d'avoir déposé une plainte devant le procureur de la République, l'intégralité de la saisie, y compris la description, est annulée à la demande du saisi ou du tiers saisi, sans que celui-ci ait à motiver sa demande et sans préjudice des dommages et intérêts qui peuvent être réclamés.

## Article L332-4

La contrefaçon de logiciels et de bases de données peut être prouvée par tout moyen.

A cet effet, toute personne ayant qualité pour agir en contrefaçon est en droit de faire procéder en tout lieu et par tous huissiers, le cas échéant assistés d'experts désignés par le demandeur, en vertu d'une ordonnance rendue sur requête par la juridiction civile compétente, soit à la description détaillée, avec ou sans prélèvement d'échantillons, soit à la saisie réelle du logiciel ou de la base de données prétendument contrefaisants ainsi que de tout document s'y rapportant. La saisie-description peut se concrétiser par une copie des logiciels ou des bases de données prétendument contrefaisants.

La juridiction peut ordonner, aux mêmes fins probatoires, la description détaillée ou la saisie réelle des matériels et instruments utilisés pour produire ou distribuer un logiciel ou une base de données prétendument contrefaisants, ainsi que de tout document s'y rapportant.

L'ordonnance peut autoriser la saisie réelle de tout document se rapportant aux logiciels, bases de données, matériels et instruments mentionnés aux deuxième et troisième alinéas en l'absence de ces derniers.

La juridiction peut subordonner l'exécution des mesures qu'elle ordonne à la constitution par le demandeur de garanties destinées à assurer l'indemnisation éventuelle du défendeur si l'action en contrefaçon est ultérieurement jugée non fondée ou la saisie annulée.

A défaut pour le demandeur, dans un délai fixé par voie réglementaire, soit de s'être pourvu au fond, par la voie civile ou pénale, soit d'avoir déposé une plainte devant le procureur de la République, l'intégralité de la saisie, y compris la description, est annulée à la demande du saisi ou du tiers saisi, sans que celui-ci ait à motiver sa demande et sans préjudice des dommages et intérêts qui peuvent être réclamés.

## Chapitre III : Saisies des produits d'exploitation

## Article L333-1

Lorsque les produits d'exploitation revenant à l'auteur d'une oeuvre de l'esprit ont fait l'objet d'une saisie, le président du tribunal judiciaire peut ordonner le versement à l'auteur, à titre alimentaire, d'une certaine somme ou d'une quotité déterminée des sommes saisies.

## Article L333-2

Sont insaisissables, dans la mesure où elles ont un caractère alimentaire, les sommes dues, en raison de l'exploitation pécuniaire ou de la cession des droits de propriété littéraire ou artistique, à tous auteurs, compositeurs ou artistes ainsi qu'à leur conjoint survivant contre lequel n'existe pas un jugement de séparation de corps passé en force de chose jugée, ou à leurs enfants mineurs pris en leur qualité d'ayants cause.

## Article L333-3

La proportion insaisissable de ces sommes ne pourra, en aucun cas, être inférieure aux quatre cinquièmes, lorsqu'elles sont au plus égales annuellement au palier de ressources le plus élevé prévu en application du chapitre V du titre IV du livre Ier du code du travail.

## Article L333-4

Les dispositions du présent chapitre ne font pas obstacle aux saisies pratiquées en vue du recouvrement des créances d'aliments prévues par les dispositions du code civil.

# Chapitre IV : Droit de suite

## Article L334-1

En cas de violation des dispositions de l'article L. 122-8, l'acquéreur et les officiers ministériels peuvent être condamnés solidairement, au profit des bénéficiaires du droit de suite, à des dommages-intérêts.

# Chapitre V : Dispositions pénales

## Article L335-1

Les officiers de police judiciaire compétents peuvent procéder, dès la constatation des infractions prévues aux articles L. 335-4 à L. 335-4-2, à la saisie des phonogrammes et vidéogrammes reproduits illicitement, des exemplaires et objets fabriqués ou importés illicitement, de tout exemplaire, produit, appareil, dispositif, composant ou moyen portant atteinte aux mesures techniques et aux informations mentionnées respectivement aux articles L. 331-5 et L. 331-11 ainsi qu'à la saisie des matériels spécialement installés en vue de tels agissements.

## Article L335-2

Toute édition d'écrits, de composition musicale, de dessin, de peinture ou de toute autre production, imprimée ou gravée en entier ou en partie, au mépris des lois et règlements relatifs à la propriété des auteurs, est une contrefaçon et toute contrefaçon est un délit.

La contrefaçon en France d'ouvrages publiés en France ou à l'étranger est punie de trois ans d'emprisonnement et de 300 000 euros d'amende.

Seront punis des mêmes peines le débit, l'exportation, l'importation, le transbordement ou la détention aux fins précitées des ouvrages contrefaisants.

Lorsque les délits prévus par le présent article ont été commis en bande organisée, les peines sont portées à sept ans d'emprisonnement et à 750 000 euros d'amende.

## Article L335-2-1

Est puni de trois ans d'emprisonnement et de 300 000 euros d'amende le fait :

1° D'éditer, de mettre à la disposition du public ou de communiquer au public, sciemment et sous quelque forme que ce soit, un logiciel manifestement destiné à la mise à disposition du public non autorisée d'oeuvres ou d'objets protégés ;

2° D'inciter sciemment, y compris à travers une annonce publicitaire, à l'usage d'un logiciel mentionné au 1°.

## Article L335-3

Est également un délit de contrefaçon toute reproduction, représentation ou diffusion, par quelque moyen que ce soit, d'une oeuvre de l'esprit en violation des droits de l'auteur, tels qu'ils sont définis et réglementés par la loi.

Est également un délit de contrefaçon la violation de l'un des droits de l'auteur d'un logiciel définis à l'article L. 122-6.

Est également un délit de contrefaçon toute captation totale ou partielle d'une œuvre cinématographique ou audiovisuelle en salle de spectacle cinématographique.

# Article L335-3-1

I.-Est puni de 3 750 euros d'amende le fait de porter atteinte sciemment, à des fins autres que la recherche, à une mesure technique efficace telle que définie à l'article L. 331-5, afin d'altérer la protection d'une oeuvre par un décodage, un décryptage ou toute autre intervention personnelle destinée à contourner, neutraliser ou supprimer un mécanisme de protection ou de contrôle, lorsque cette atteinte est réalisée par d'autres moyens que l'utilisation d'une application technologique, d'un dispositif ou d'un composant existant mentionné au II.

II.-Est puni de six mois d'emprisonnement et de 30 000 euros d'amende le fait de procurer ou proposer sciemment à autrui, directement ou indirectement, des moyens conçus ou spécialement adaptés pour porter atteinte à une mesure technique efficace telle que définie à l'article L. 331-5, par l'un des procédés suivants :

1° En fabriquant ou en important une application technologique, un dispositif ou un composant, à des fins autres que la recherche ;

2° En détenant en vue de la vente, du prêt ou de la location, en offrant à ces mêmes fins ou en mettant à disposition du public sous quelque forme que ce soit une application technologique, un dispositif ou un composant ;

3° En fournissant un service à cette fin ;

4° En incitant à l'usage ou en commandant, concevant, organisant, reproduisant, distribuant ou diffusant une publicité en faveur de l'un des procédés visés aux 1° à 3°.

III.-Ces dispositions ne sont pas applicables aux actes réalisés à des fins de sécurité informatique, dans les limites des droits prévus par le présent code.

# Article L335-3-2

I.-Est puni de 3 750 euros d'amende le fait de supprimer ou de modifier, sciemment et à des fins autres que la recherche, tout élément d'information visé à l'article L. 331-11, par une intervention personnelle ne nécessitant pas l'usage d'une application technologique, d'un dispositif ou d'un composant existant, conçus ou spécialement adaptés à cette fin, dans le but de porter atteinte à un droit d'auteur, de dissimuler ou de faciliter une telle atteinte.

II.-Est puni de six mois d'emprisonnement et de 30 000 euros d'amende le fait de procurer ou proposer sciemment à autrui, directement ou indirectement, des moyens conçus ou spécialement adaptés pour supprimer ou modifier, même partiellement, un élément d'information visé à l'article L. 331-11, dans le but de porter atteinte à un droit d'auteur, de dissimuler ou de faciliter une telle atteinte, par l'un des procédés suivants :

1° En fabriquant ou en important une application technologique, un dispositif ou un composant, à des fins autres que la recherche ;

2° En détenant en vue de la vente, du prêt ou de la location, en offrant à ces mêmes fins ou en mettant à disposition du public sous quelque forme que ce soit une application technologique, un dispositif ou un composant ;

3° En fournissant un service à cette fin ;

4° En incitant à l'usage ou en commandant, concevant, organisant, reproduisant, distribuant ou diffusant une publicité en faveur de l'un des procédés visés aux 1° à 3°.

III.-Est puni de six mois d'emprisonnement et de 30 000 euros d'amende le fait, sciemment, d'importer, de distribuer, de mettre à disposition du public sous quelque forme que ce soit ou de communiquer au public, directement ou indirectement, une oeuvre dont un élément d'information mentionné à l'article L. 331-11 a été supprimé ou modifié dans le but de porter atteinte à un droit d'auteur, de dissimuler ou de faciliter une telle atteinte.

IV.-Ces dispositions ne sont pas applicables aux actes réalisés à des fins de recherche ou de sécurité informatique, dans les limites des droits prévus par le présent code.

## Article L335-4

Est punie de trois ans d'emprisonnement et de 300 000 euros d'amende toute fixation, reproduction, communication ou mise à disposition du public, à titre onéreux ou gratuit, ou toute télédiffusion d'une prestation, d'un phonogramme, d'un vidéogramme, d'un programme ou d'une publication de presse, réalisée sans l'autorisation, lorsqu'elle est exigée, de l'artiste-interprète, du producteur de phonogrammes ou de vidéogrammes, de l'entreprise de communication audiovisuelle, de l'éditeur de presse ou de l'agence de presse.

Sont punis des mêmes peines l'importation, l'exportation, le transbordement ou la détention aux fins précitées de phonogrammes ou de vidéogrammes réalisée sans l'autorisation du producteur ou de l'artiste-interprète, lorsqu'elle est exigée.

Est puni de la peine d'amende prévue au premier alinéa le défaut de versement de la rémunération due à l'auteur, à l'artiste-interprète ou au producteur de phonogrammes ou de vidéogrammes au titre de la copie privée ou de la communication publique ainsi que de la télédiffusion des phonogrammes.

Est puni de la peine d'amende prévue au premier alinéa le défaut de versement du prélèvement mentionné au troisième alinéa de l'article L. 133-3.

Lorsque les délits prévus au présent article ont été commis en bande organisée, les peines sont portées à sept ans d'emprisonnement et à 750 000 euros d'amende.

## Article L335-4-1

I.-Est puni de 3 750 euros d'amende le fait de porter atteinte sciemment, à des fins autres que la recherche, à une mesure technique efficace telle que définie à l'article L. 331-5, afin d'altérer la protection d'une interprétation, d'un phonogramme, d'un vidéogramme, d'un programme ou d'une publication de presse par un décodage, un décryptage ou toute autre intervention personnelle destinée à contourner, neutraliser ou supprimer un mécanisme de protection ou de contrôle, lorsque cette atteinte est réalisée par d'autres moyens que l'utilisation d'une application technologique, d'un dispositif ou d'un composant existant mentionné au II.

II.-Est puni de six mois d'emprisonnement et de 30 000 euros d'amende le fait de procurer ou proposer sciemment à autrui, directement ou indirectement, des moyens conçus ou spécialement adaptés pour porter atteinte à une mesure technique efficace telle que définie à l'article L. 331-5, par l'un des procédés suivants :

1° En fabriquant ou en important une application technologique, un dispositif ou un composant, à des fins autres que la recherche ;

2° En détenant en vue de la vente, du prêt ou de la location, en offrant à ces mêmes fins ou en mettant à disposition du public sous quelque forme que ce soit une application technologique, un dispositif ou un composant ;

3° En fournissant un service à cette fin ;

4° En incitant à l'usage ou en commandant, concevant, organisant, reproduisant, distribuant ou diffusant une publicité en faveur de l'un des procédés visés aux 1° à 3°.

III.-Ces dispositions ne sont pas applicables aux actes réalisés à des fins de sécurité informatique, dans les limites des droits prévus par le présent code.

## Article L335-4-2

I.-Est puni de 3 750 euros d'amende le fait de supprimer ou de modifier, sciemment et à des fins autres que la recherche, tout élément d'information visé à l'article L. 331-11, par une intervention personnelle ne nécessitant pas l'usage d'une application technologique, d'un dispositif ou d'un composant existant, conçus ou spécialement adaptés à cette fin, dans le but de porter atteinte à un droit voisin du droit d'auteur, de dissimuler ou de faciliter une telle atteinte.

II.-Est puni de six mois d'emprisonnement et de 30 000 euros d'amende le fait de procurer ou proposer sciemment à autrui, directement ou indirectement, des moyens conçus ou spécialement adaptés pour supprimer ou modifier, même partiellement, un élément d'information visé à l'article L. 331-11, dans le but de porter atteinte à un droit voisin du droit d'auteur, de dissimuler ou de faciliter une telle atteinte, par l'un des procédés suivants :

1° En fabriquant ou en important une application technologique, un dispositif ou un composant, à des fins autres que la recherche ;

2° En détenant en vue de la vente, du prêt ou de la location, en offrant à ces mêmes fins ou en mettant à disposition du public sous quelque forme que ce soit une application technologique, un dispositif ou un composant ;

3° En fournissant un service à cette fin ;

4° En incitant à l'usage ou en commandant, concevant, organisant, reproduisant, distribuant ou diffusant une publicité en faveur de l'un des procédés visés aux 1° à 3°.

III.-Est puni de six mois d'emprisonnement et de 30 000 euros d'amende le fait, sciemment, d'importer, de distribuer, de mettre à disposition du public sous quelque forme que ce soit ou de communiquer au public, directement ou indirectement, une interprétation, un phonogramme, un vidéogramme, un programme ou une publication de presse, dont un élément d'information mentionné à l'article L. 331-11 a été supprimé ou modifié dans le but de porter atteinte à un droit voisin du droit d'auteur, de dissimuler ou de faciliter une telle atteinte.

IV.-Ces dispositions ne sont pas applicables aux actes réalisés à des fins de sécurité informatique, dans les limites des droits prévus par le présent code.

## Article L335-5

Dans le cas de condamnation fondée sur l'une des infractions définies aux articles L. 335-2 à L. 335-4-2, le tribunal peut ordonner la fermeture totale ou partielle, définitive ou temporaire, pour une durée au plus de cinq ans, de l'établissement ayant servi à commettre l'infraction.

La fermeture temporaire ne peut entraîner ni rupture ni suspension du contrat de travail, ni aucun préjudice pécuniaire à l'encontre des salariés concernés. Lorsque la fermeture définitive entraîne le licenciement du personnel, elle donne lieu, en dehors de l'indemnité de préavis et de l'indemnité de licenciement, aux dommages et intérêts prévus aux articles L. 122-14-4 et L. 122-14-5 du code du travail en cas de rupture de contrat de travail. Le non-paiement de ces indemnités est puni de six mois d'emprisonnement et de 3 750 euros d'amende.

## Article L335-6

Les personnes physiques coupables de l'une des infractions prévues aux articles L. 335-2 à L. 335-4-2 peuvent en outre être condamnées, à leurs frais, à retirer des circuits commerciaux les objets jugés contrefaisants et toute chose qui a servi ou était destinée à commettre l'infraction.

La juridiction peut prononcer la confiscation de tout ou partie des recettes procurées par l'infraction ainsi que celle de tous les phonogrammes, vidéogrammes, objets et exemplaires contrefaisants ou reproduits illicitement ainsi que du matériel spécialement installé en vue de la réalisation du délit.

Elle peut ordonner la destruction, aux frais du condamné, ou la remise à la partie lésée des objets et choses retirés des circuits commerciaux ou confisqués, sans préjudice de tous dommages et intérêts.

Elle peut également ordonner, aux frais du condamné, l'affichage du jugement ou la diffusion du jugement prononçant la condamnation, dans les conditions prévues à l'article 131-35 du code pénal.

## Article L335-7

Lorsque l'infraction est commise au moyen d'un service de communication au public en ligne, les personnes coupables des infractions prévues aux articles L. 335-2, L. 335-3 et L. 335-4 peuvent en outre être condamnées à la peine complémentaire de suspension de l'accès à un service de communication au public en ligne pour une durée maximale d'un an, assortie de l'interdiction de souscrire pendant la même période un autre contrat portant sur un service de même nature auprès de tout opérateur.

Lorsque ce service est acheté selon des offres commerciales composites incluant d'autres types de services, tels que services de téléphonie ou de télévision, les décisions de suspension ne s'appliquent pas à ces services.

La suspension de l'accès n'affecte pas, par elle-même, le versement du prix de l'abonnement au fournisseur du service. L'article L. 121-84 du code de la consommation n'est pas applicable au cours de la période de suspension.

Les frais d'une éventuelle résiliation de l'abonnement au cours de la période de suspension sont supportés par l'abonné.

Lorsque la décision est exécutoire, la peine complémentaire prévue au présent article est portée à la connaissance de la Haute Autorité pour la diffusion des œuvres et la protection des droits sur internet, qui la notifie à la personne dont l'activité est d'offrir un accès à des services de communication au public en ligne afin qu'elle mette en œuvre, dans un délai de quinze jours au plus à compter de la notification, la suspension à l'égard de l'abonné concerné.

Le fait, pour la personne dont l'activité est d'offrir un accès à des services de communication au public en ligne, de ne pas mettre en œuvre la peine de suspension qui lui a été notifiée est puni d'une amende maximale de 5 000 €.

Le 3° de l'article 777 du code de procédure pénale n'est pas applicable à la peine complémentaire prévue par le présent article.

# Article L335-7-1

Pour les contraventions de la cinquième classe prévues par le présent code, lorsque le règlement le prévoit, la peine complémentaire définie à l'article L. 335-7 peut être prononcée selon les mêmes modalités, en cas de négligence caractérisée, à l'encontre du titulaire de l'accès à un service de communication au public en ligne auquel la commission de protection des droits, en application de l'article L. 331-25, a préalablement adressé, par voie d'une lettre remise contre signature ou de tout autre moyen propre à établir la preuve de la date de présentation, une recommandation l'invitant à mettre en œuvre un moyen de sécurisation de son accès à internet.

La négligence caractérisée s'apprécie sur la base des faits commis au plus tard un an après la présentation de la recommandation mentionnée à l'alinéa précédent.

Dans ce cas, la durée maximale de la suspension est d'un mois.

Le fait pour la personne condamnée à la peine complémentaire prévue par le présent article de ne pas respecter l'interdiction de souscrire un autre contrat d'abonnement à un service de communication au public en ligne pendant la durée de la suspension est puni d'une amende d'un montant maximal de 3 750 €.

# Article L335-7-2

Pour prononcer la peine de suspension prévue aux articles L. 335-7 et L. 335-7-1 et en déterminer la durée, la juridiction prend en compte les circonstances et la gravité de l'infraction ainsi que la personnalité de son auteur, et notamment l'activité professionnelle ou sociale de celui-ci, ainsi que sa situation socio-économique. La durée de la peine prononcée doit concilier la protection des droits de la propriété intellectuelle et le respect du droit de s'exprimer et de communiquer librement, notamment depuis son domicile.

# Article L335-8

Les personnes morales déclarées responsables pénalement, dans les conditions prévues par l'article 121-2 du code pénal, des infractions définies aux articles L. 335-2 à L. 335-4-2 encourent, outre l'amende suivant les modalités prévues par l'article 131-38 du code pénal, les peines prévues par l'article 131-39 du même code.

L'interdiction mentionnée au 2° de l'article 131-39 du même code porte sur l'activité dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise.

Les personnes morales déclarées pénalement responsables peuvent en outre être condamnées, à leurs frais, à retirer des circuits commerciaux les objets jugés contrefaisants et toute chose qui a servi ou était destinée à commettre l'infraction.

La juridiction peut ordonner la destruction aux frais du condamné ou la remise à la partie lésée des objets et choses retirés des circuits commerciaux ou confisqués, sans préjudice de tous dommages et intérêts.

## Article L335-9

Si l'auteur de l'un des délits prévus et réprimés par le présent chapitre est ou a été lié par convention avec la partie lésée, les peines encourues sont portées au double.

# Chapitre V bis : La retenue

## Article L335-10

En dehors des cas prévus par la réglementation de l'Union européenne, l'administration des douanes peut, sur demande écrite du titulaire d'un droit d'auteur ou d'un droit voisin, assortie des justifications de son droit, retenir dans le cadre de ses contrôles les marchandises que celui-ci prétend constituer une contrefaçon.

Cette retenue est immédiatement notifiée au demandeur et au détenteur. Le procureur de la République est également informé de ladite mesure par l'administration des douanes.

Lors de la notification mentionnée à la première phrase du deuxième alinéa du présent article, la nature et la quantité réelle ou estimée ainsi que des images des marchandises sont communiquées au titulaire du droit d'auteur ou du droit voisin, par dérogation à l'article 59 bis du code des douanes. Ces informations peuvent également être communiquées avant la mise en œuvre de la mesure prévue au présent article.

Sous réserve des procédures prévues aux articles L. 335-14 et L. 335-15 du présent code, la mesure de retenue est levée de plein droit à défaut pour le demandeur, dans le délai de dix jours ouvrables, ou de trois jours ouvrables pour les denrées périssables, à compter de la notification de la retenue des marchandises, de justifier auprès de l'administration des douanes soit de mesures conservatoires décidées par la juridiction civile compétente, soit de s'être pourvu par la voie civile ou la voie correctionnelle et d'avoir constitué les garanties destinées à l'indemnisation éventuelle du détenteur des marchandises au cas où la contrefaçon ne serait pas ultérieurement reconnue, soit d'avoir déposé une plainte auprès du procureur de la République. L'administration des douanes peut proroger le délai de dix jours ouvrables prévu au présent alinéa de dix jours ouvrables maximum sur requête dûment motivée du demandeur. En cas de prorogation du délai, le procureur de la République et le détenteur des marchandises en sont informés.

Les frais liés à la mesure de retenue ou aux mesures conservatoires prononcées par la juridiction civile compétente sont à la charge du demandeur.

Aux fins de l'engagement des actions en justice mentionnées au quatrième alinéa du présent article, le demandeur peut obtenir de l'administration des douanes communication des nom et adresse de l'expéditeur, de l'importateur, du destinataire et du déclarant des marchandises retenues ou de leur détenteur, ainsi que

des images de ces marchandises et des informations sur leur quantité, leur origine, leur provenance et leur destination, par dérogation à l'article 59 bis du code des douanes.

La retenue mentionnée au premier alinéa du présent article ne porte pas :

1° Sur les marchandises de statut communautaire, légalement fabriquées ou mises en libre pratique dans un Etat membre de l'Union européenne et destinées, après avoir emprunté le territoire douanier défini à l'article 1er du code des douanes, à être mises sur le marché d'un autre Etat membre de l'Union européenne pour y être légalement commercialisées ;

2° Sur les marchandises de statut communautaire, légalement fabriquées ou mises en libre pratique dans un autre Etat membre de l'Union européenne, dans lequel elles ont été placées sous le régime du transit, et qui sont destinées, après avoir transité sur le territoire douanier défini au même article 1er, à être exportées vers un Etat non membre de l'Union européenne.

# Article L335-11

En l'absence de demande écrite du titulaire d'un droit d'auteur ou d'un droit voisin et en dehors des cas prévus par la réglementation de l'Union européenne, l'administration des douanes peut, dans le cadre de ses contrôles, retenir des marchandises susceptibles de porter atteinte à un droit d'auteur ou à un droit voisin.

Cette retenue est immédiatement notifiée au titulaire du droit d'auteur ou du droit voisin. Le procureur de la République est également informé de ladite mesure par l'administration des douanes.

Lors de la notification mentionnée à la première phrase du deuxième alinéa du présent article, la nature et la quantité réelle ou estimée ainsi que des images des marchandises sont communiquées au titulaire du droit d'auteur ou du droit voisin, par dérogation à l'article 59 bis du code des douanes. Ces informations peuvent également être communiquées avant la mise en œuvre de la mesure prévue au présent article.

La mesure de retenue est levée de plein droit si l'administration des douanes n'a pas reçu du titulaire du droit d'auteur ou du droit voisin la demande prévue à l'article L. 335-10 du présent code, déposée dans un délai de quatre jours ouvrables à compter de la notification de la retenue mentionnée à la première phrase du deuxième alinéa du présent article.

Si la demande a été reçue conformément au quatrième alinéa du présent article, le délai de dix jours ouvrables mentionné au quatrième alinéa de l'article L. 335-10 commence à courir à compter de l'acceptation de cette demande par l'administration des douanes.

Le présent article n'est pas applicable aux marchandises périssables.

# Article L335-12

I. # Lorsque la retenue prévue par la réglementation de l'Union européenne et portant sur des marchandises soupçonnées de constituer une contrefaçon d'un droit d'auteur ou d'un droit voisin est mise en œuvre avant qu'une demande du titulaire du droit ait été déposée ou acceptée, les agents des douanes peuvent, par dérogation à l'article 59 bis du code des douanes, informer ce titulaire de la mise en œuvre de cette mesure. Ils peuvent également lui communiquer des informations portant sur la quantité des marchandises et leur nature.

Lorsque la retenue prévue par la réglementation de l'Union européenne et portant sur des marchandises soupçonnées de constituer une contrefaçon d'un droit d'auteur ou d'un droit voisin est mise en œuvre après qu'une demande du titulaire du droit a été acceptée, les agents des douanes peuvent également communiquer à ce titulaire les informations prévues par cette réglementation, nécessaires pour déterminer s'il y a eu violation de son droit.

II. # Les frais générés par la mise en œuvre de la retenue mentionnée au I sont à la charge du titulaire du droit d'auteur ou du droit voisin.

## Article L335-13

Pendant le délai de la retenue mentionnée à l'article L. 335-10 et au second alinéa du I de l'article L. 335-12, le titulaire du droit d'auteur ou du droit voisin peut, à sa demande ou à la demande de l'administration des douanes, inspecter les marchandises retenues.

Lors du contrôle des marchandises mises en retenue, l'administration des douanes peut prélever des échantillons. A la demande du titulaire du droit d'auteur ou du droit voisin, ces échantillons peuvent lui être remis aux seules fins d'analyse et en vue de faciliter les actions qu'il peut être amené à engager par la voie civile ou pénale.

## Article L335-14

I. # Lorsque la retenue portant sur des marchandises soupçonnées de constituer une contrefaçon de droit d'auteur ou de droit voisin est mise en œuvre après qu'une demande mentionnée à l'article L. 335-10 a été acceptée, les marchandises soupçonnées de porter atteinte à un droit d'auteur ou un droit voisin enregistré peuvent être détruites sous le contrôle des agents des douanes dès lors que les conditions suivantes sont remplies :

1° Le demandeur a confirmé par écrit et par une expertise détaillée aux autorités douanières, dans un délai de dix jours ouvrables, ou de trois jours ouvrables pour les denrées périssables, à partir de la notification de la retenue, le caractère contrefaisant des marchandises ;

2° Le demandeur a confirmé par écrit aux autorités douanières, dans un délai de dix jours ouvrables, ou de trois jours ouvrables pour les denrées périssables, à partir de la notification de la retenue, qu'il consent à la destruction, sous sa responsabilité, des marchandises ;

3° Le détenteur des marchandises a confirmé par écrit aux autorités douanières, dans un délai de dix jours ouvrables, ou de trois jours ouvrables pour les denrées périssables, à partir de la notification de la retenue, qu'il consent à la destruction des marchandises.

II. # Si le détenteur des marchandises n'a, dans le délai mentionné au 3° du I, ni confirmé qu'il consent à la destruction des marchandises, ni informé l'administration des douanes qu'il s'oppose à leur destruction, il est réputé avoir consenti à cette destruction.

III. # Lorsque le détenteur des marchandises n'a pas confirmé par écrit qu'il consent à leur destruction et qu'il n'est pas réputé avoir consenti à la destruction des marchandises dans les délais prévus, l'administration des douanes en informe immédiatement le demandeur, lequel, dans un délai de dix jours ouvrables, ou de trois jours ouvrables pour les denrées périssables, à partir de la notification de la retenue, prend les mesures mentionnées au quatrième alinéa de l'article L. 335-10. Le délai de dix jours peut être prorogé de dix jours ouvrables maximum sur requête dûment motivée du demandeur. En cas de prorogation du délai, le procureur de la République et le détenteur des marchandises en sont informés.

Si les conditions prévues au I du présent article ne sont pas réunies et si le demandeur n'a pas justifié auprès de l'administration des douanes qu'il a pris les mesures mentionnées au quatrième alinéa de l'article L. 335-10, la mesure de retenue est levée de plein droit.

IV. # Dans le cadre de la communication d'informations prévues au troisième alinéa des articles L. 335-10 et L. 335-11, les autorités douanières informent le demandeur de l'existence de la procédure prévue au présent article. Les informations prévues au sixième alinéa de l'article L. 335-10 peuvent également être communiquées au demandeur aux fins de mise en œuvre de la présente mesure.

## Article L335-15

I. # Lorsque la retenue portant sur des marchandises soupçonnées de constituer une contrefaçon de droit d'auteur ou de droit voisin est mise en œuvre après qu'une demande mentionnée à l'article L. 335-10 a été acceptée, les marchandises transportées en petits envois peuvent être détruites sous le contrôle des agents des douanes lorsque le demandeur a, dans sa demande, sollicité le recours à la procédure prévue au présent article.

II. # La notification mentionnée à la première phrase du deuxième alinéa de l'article L. 335-10 est faite dans un délai d'un jour ouvrable à compter de la date de la mise en retenue. Elle mentionne l'intention de l'administration des douanes de détruire ou non les marchandises et indique que :

1° Le détenteur des marchandises dispose d'un délai de dix jours ouvrables à compter de la notification de la retenue pour faire connaître à l'administration des douanes ses observations ;

2° Les marchandises concernées peuvent être détruites lorsque, dans un délai de dix jours ouvrables à partir de leur mise en retenue, le détenteur des marchandises a confirmé à l'administration des douanes qu'il consent à cette destruction. En cas de silence du détenteur des marchandises à l'issue de ce délai, le détenteur est réputé avoir consenti à leur destruction.

L'administration des douanes communique au demandeur, sur requête de celui-ci, les informations relatives à la quantité réelle ou estimée des marchandises détruites et à leur nature.

III. # Lorsque le détenteur des marchandises n'a pas confirmé par écrit qu'il consent à leur destruction ou lorsqu'il n'est pas réputé avoir consenti à leur destruction, l'administration des douanes en informe immédiatement le demandeur et lui communique la quantité, la nature ainsi que des images des marchandises.

IV. # La mesure de retenue est levée de plein droit à défaut pour le demandeur, dans le délai de dix jours ouvrables à compter de l'information prévue au III du présent article, de justifier auprès de l'administration des douanes qu'il a pris les mesures mentionnées au quatrième alinéa de l'article L. 335-10.

En vue de prendre ces mesures, le demandeur peut obtenir de l'administration des douanes communication des nom et adresse de l'expéditeur, de l'importateur, du destinataire et du détenteur des marchandises retenues ainsi que de leur quantité, leur origine, leur provenance et leur destination, par dérogation à l'article 59 bis du code des douanes.

V. # La définition des petits envois mentionnés au I du présent article est précisée par arrêté du ministre chargé des douanes.

VI. # Le présent article n'est pas applicable aux denrées périssables.

### Article L335-16

Lorsque le demandeur utilise les informations qui lui sont communiquées par l'administration des douanes, par dérogation à l'article 59 bis du code des douanes, à d'autres fins que celles prévues au présent chapitre, l'administration des douanes abroge, suspend ou refuse de renouveler ladite demande.

### Article L335-17

En vue de prononcer les mesures prévues aux articles L. 335-10 à L. 335-13, les agents des douanes appliquent les pouvoirs qui leur sont dévolus par le code des douanes.

### Article L335-18

Un décret en Conseil d'Etat fixe :

1° Les conditions d'application des mesures prévues aux articles L. 335-10 à L. 335-16 ;

2° Les conditions dans lesquelles a lieu la destruction des marchandises susceptibles de porter atteinte à un droit d'auteur ou à un droit voisin prévue par la réglementation européenne en vigueur ainsi que les conditions du prélèvement d'échantillons préalable à ladite destruction.

## Chapitre VI : Prévention du téléchargement et de la mise à disposition illicites d'œuvres et d'objets protégés par un droit d'auteur ou un droit voisin

### Article L336-1

Lorsqu'un logiciel est principalement utilisé pour la mise à disposition illicite d'oeuvres ou d'objets protégés par un droit de propriété littéraire et artistique, le président du tribunal judiciaire, statuant en référé, peut ordonner sous astreinte toutes mesures nécessaires à la protection de ce droit et conformes à l'état de l'art.

Les mesures ainsi ordonnées ne peuvent avoir pour effet de dénaturer les caractéristiques essentielles ou la destination initiale du logiciel.

L'article L. 332-4 est applicable aux logiciels mentionnés au présent article.

### Article L336-2

En présence d'une atteinte à un droit d'auteur ou à un droit voisin occasionnée par le contenu d'un service de communication au public en ligne, le président du tribunal judiciaire statuant selon la procédure accélérée au fond peut ordonner à la demande des titulaires de droits sur les œuvres et objets protégés, de leurs ayants droit, des organismes de gestion collective régis par le titre II du livre III ou des organismes de défense professionnelle visés à l'article L. 331-1, toutes mesures propres à prévenir ou à faire cesser une telle atteinte à un droit d'auteur ou un droit voisin, à l'encontre de toute personne susceptible de contribuer à y remédier. La demande peut également être effectuée par le Centre national du cinéma et de l'image animée.

## Article L336-3

La personne titulaire de l'accès à des services de communication au public en ligne a l'obligation de veiller à ce que cet accès ne fasse pas l'objet d'une utilisation à des fins de reproduction, de représentation, de mise à disposition ou de communication au public d'œuvres ou d'objets protégés par un droit d'auteur ou par un droit voisin sans l'autorisation des titulaires des droits prévus aux livres Ier et II lorsqu'elle est requise.

Le manquement de la personne titulaire de l'accès à l'obligation définie au premier alinéa n'a pas pour effet d'engager la responsabilité pénale de l'intéressé, sous réserve des articles L. 335-7 et L. 335-7-1.

## Article L336-4

Les caractéristiques essentielles de l'utilisation autorisée d'une œuvre ou d'un objet protégé, mis à disposition par un service de communication au public en ligne, sont portées à la connaissance de l'utilisateur d'une manière facilement accessible, conformément à l'article L. 331-10 du présent code et à l'article L. 111-1 du code de la consommation.

# Titre IV : Droits des producteurs de bases de données

# Chapitre Ier : Champ d'application

## Article L341-1

Le producteur d'une base de données, entendu comme la personne qui prend l'initiative et le risque des investissements correspondants, bénéficie d'une protection du contenu de la base lorsque la constitution, la vérification ou la présentation de celui-ci atteste d'un investissement financier, matériel ou humain substantiel.

Cette protection est indépendante et s'exerce sans préjudice de celles résultant du droit d'auteur ou d'un autre droit sur la base de données ou un de ses éléments constitutifs.

## Article L341-2

Sont admis au bénéfice du présent titre :

1° Les producteurs de bases de données, ressortissants d'un Etat membre de la Communauté européenne ou d'un Etat partie à l'accord sur l'Espace économique européen, ou qui ont dans un tel Etat leur résidence habituelle ;

2° Les sociétés ou entreprises constituées en conformité avec la législation d'un Etat membre et ayant leur siège statutaire, leur administration centrale ou leur établissement principal à l'intérieur de la Communauté ou d'un Etat partie à l'accord sur l'Espace économique européen ; néanmoins, si une telle société ou entreprise n'a que son siège statutaire sur le territoire d'un tel Etat, ses activités doivent avoir un lien réel et continu avec l'économie de l'un d'entre eux.

Les producteurs de bases de données qui ne satisfont pas aux conditions mentionnées ci-dessus sont admis à la protection prévue par le présent titre lorsqu'un accord particulier a été conclu avec l'Etat dont ils sont ressortissants par le Conseil de la Communauté européenne.

# Chapitre II : Etendue de la protection

## Article L342-1

Le producteur de bases de données a le droit d'interdire :

1° L'extraction, par transfert permanent ou temporaire de la totalité ou d'une partie qualitativement ou quantitativement substantielle du contenu d'une base de données sur un autre support, par tout moyen et sous toute forme que ce soit ;

2° La réutilisation, par la mise à la disposition du public de la totalité ou d'une partie qualitativement ou quantitativement substantielle du contenu de la base, quelle qu'en soit la forme.

Ces droits peuvent être transmis ou cédés ou faire l'objet d'une licence.

Le prêt public n'est pas un acte d'extraction ou de réutilisation.

## Article L342-2

Le producteur peut également interdire l'extraction ou la réutilisation répétée et systématique de parties qualitativement ou quantitativement non substantielles du contenu de la base lorsque ces opérations excèdent manifestement les conditions d'utilisation normale de la base de données.

## Article L342-3

Lorsqu'une base de données est mise à la disposition du public par le titulaire des droits, celui-ci ne peut interdire :

1° L'extraction ou la réutilisation d'une partie non substantielle, appréciée de façon qualitative ou quantitative, du contenu de la base, par la personne qui y a licitement accès ;

2° L'extraction à des fins privées d'une partie qualitativement ou quantitativement substantielle du contenu d'une base de données non électronique sous réserve du respect des droits d'auteur ou des droits voisins sur les oeuvres ou éléments incorporés dans la base ;

3° L'extraction et la réutilisation d'une base de données dans les conditions définies au 7° de l'article L. 122-5, au 1° de l'article L. 122-5-1 et à l'article L. 122-5-2 ;

4° L'extraction et la réutilisation d'une partie substantielle, appréciée de façon qualitative ou quantitative, du contenu de la base, sous réserve des bases de données conçues à des fins pédagogiques et des bases de données réalisées pour une édition numérique de l'écrit, à des fins exclusives d'illustration dans le cadre de l'enseignement et de la recherche, à l'exclusion de toute activité ludique ou récréative, dès lors que le public auquel cette extraction et cette réutilisation sont destinées est composé majoritairement d'élèves, d'étudiants, d'enseignants ou de chercheurs directement concernés, que la source est indiquée, que l'utilisation de cette extraction et cette réutilisation ne donne lieu à aucune exploitation commerciale et qu'elle est compensée par une rémunération négociée sur une base forfaitaire ;

5° Les copies ou reproductions numériques de la base réalisées par une personne qui y a licitement accès, en vue de fouilles de textes et de données incluses ou associées aux écrits scientifiques dans un cadre de recherche, à l'exclusion de toute finalité commerciale. La conservation et la communication des copies techniques issues des traitements, au terme des activités de recherche pour lesquelles elles ont été produites, sont assurées par des organismes désignés par décret. Les autres copies ou reproductions sont détruites.

Toute clause contraire au 1° ci-dessus est nulle.

Les exceptions énumérées par le présent article ne peuvent porter atteinte à l'exploitation normale de la base de données ni causer un préjudice injustifié aux intérêts légitimes du producteur de la base.

# Article L342-3-1

Les mesures techniques efficaces au sens de l'article L. 331-5 qui sont propres à empêcher ou à limiter les utilisations d'une base de données que le producteur n'a pas autorisées en application de l'article L. 342-1 bénéficient de la protection prévue à l'article L. 335-4-1.

Les producteurs de bases de données qui recourent aux mesures techniques de protection mentionnées au premier alinéa prennent cependant les dispositions utiles pour que leur mise en œuvre ne prive pas les bénéficiaires des exceptions définies à l'article L. 342-3 de leur bénéfice effectif, suivant les conditions prévues au 2° de l'article L. 331-31 et aux articles L. 331-7 à L. 331-10, L. 331-33 à L. 331-35 et L. 331-37.

Tout différend relatif à la faculté de bénéficier des exceptions définies à l'article L. 342-3 qui implique une mesure technique visée au premier alinéa du présent article est soumis à la Haute Autorité pour la diffusion des œuvres et la protection des droits sur internet prévue à l'article L. 331-12.

# Article L342-3-2

Les informations sous forme électronique relatives au régime des droits du producteur d'une base de données, au sens de l'article L. 331-11, bénéficient de la protection prévue à l'article L. 335-4-2.

## Article L342-4

La première vente d'une copie matérielle d'une base de données dans le territoire d'un Etat membre de la Communauté européenne ou d'un Etat partie à l'accord sur l'Espace économique européen, par le titulaire du droit ou avec son consentement, épuise le droit de contrôler la revente de cette copie matérielle dans tous les Etats membres.

Toutefois, la transmission en ligne d'une base de données n'épuise pas le droit du producteur de contrôler la revente dans tous les Etats membres d'une copie matérielle de cette base ou d'une partie de celle-ci.

## Article L342-5

Les droits prévus à l'article L. 342-1 prennent effet à compter de l'achèvement de la fabrication de la base de données. Ils expirent quinze ans après le 1er janvier de l'année civile qui suit celle de cet achèvement.

Lorsqu'une base de données a fait l'objet d'une mise à la disposition du public avant l'expiration de la période prévue à l'alinéa précédent, les droits expirent quinze ans après le 1er janvier de l'année civile suivant celle de cette première mise à disposition.

Toutefois, dans le cas où une base de données protégée fait l'objet d'un nouvel investissement substantiel, sa protection expire quinze ans après le 1er janvier de l'année civile suivant celle de ce nouvel investissement.

# Chapitre III : Procédures et sanctions

## Article L343-1

L'atteinte aux droits du producteur de bases de données peut être prouvée par tous moyens.

A cet effet, toute personne ayant qualité pour agir en vertu du présent titre est en droit de faire procéder par tous huissiers, assistés par des experts désignés par le demandeur, sur ordonnance rendue sur requête par la juridiction civile compétente, soit à la description détaillée, avec ou sans prélèvement d'échantillons, des supports ou produits portant prétendument atteinte aux droits du producteur de bases de données, soit à la saisie réelle de ces supports ou produits ainsi que de tout document s'y rapportant.

La juridiction peut ordonner, aux mêmes fins probatoires, la description détaillée ou la saisie réelle des matériels et instruments utilisés pour produire ou distribuer les supports ou produits portant prétendument atteinte aux droits du producteur de bases de données, ainsi que de tout document s'y rapportant.

L'ordonnance peut autoriser la saisie réelle de tout document se rapportant aux supports, produits, matériels et instruments mentionnés aux deuxième et troisième alinéas en l'absence de ces derniers.

La juridiction peut subordonner l'exécution des mesures qu'elle ordonne à la constitution par le demandeur de garanties destinées à assurer l'indemnisation éventuelle du défendeur si l'action engagée en vertu du présent titre est ultérieurement jugée non fondée ou si la mainlevée de la saisie est prononcée.

La mainlevée de la saisie peut être prononcée selon les modalités prévues par les articles L. 332-2 et L. 332-3.

## Article L343-1-1

La juridiction peut ordonner, d'office ou à la demande de toute personne ayant qualité pour agir en contrefaçon, toutes les mesures d'instruction légalement admissibles, même si une saisie-contrefaçon n'a pas préalablement été ordonnée dans les conditions prévues à l'article L. 343-1.

## Article L343-2

Toute personne ayant qualité pour agir dans le cas d'une atteinte aux droits du producteur de bases de données peut saisir en référé la juridiction civile compétente afin de voir ordonner, au besoin sous astreinte, à l'encontre du prétendu auteur de cette atteinte ou des intermédiaires dont il utilise les services, toute mesure urgente destinée à prévenir une atteinte aux droits du producteur de bases de données ou à empêcher la poursuite d'actes portant prétendument atteinte à ceux-ci. La juridiction civile compétente peut également ordonner toutes mesures urgentes sur requête lorsque les circonstances exigent que ces mesures ne soient pas prises contradictoirement, notamment lorsque tout retard serait de nature à causer un préjudice irréparable au demandeur. Saisie en référé ou sur requête, la juridiction ne peut ordonner les mesures demandées que si les éléments de preuve, raisonnablement accessibles au demandeur, rendent vraisemblable qu'il est porté atteinte à ses droits ou qu'une telle atteinte est imminente.

La juridiction peut interdire la poursuite des actes portant prétendument atteinte aux droits du producteur de bases de données, la subordonner à la constitution de garanties destinées à assurer l'indemnisation éventuelle du préjudice subi par le demandeur ou ordonner la saisie ou la remise entre les mains d'un tiers des produits soupçonnés de porter atteinte aux droits conférés par le titre, pour empêcher leur introduction ou leur circulation dans les circuits commerciaux.

Elle peut également accorder au demandeur une provision lorsque l'existence de son préjudice n'est pas sérieusement contestable.

Saisie en référé ou sur requête, la juridiction peut subordonner l'exécution des mesures qu'elle ordonne à la constitution par le demandeur de garanties destinées à assurer l'indemnisation éventuelle du défendeur si l'action engagée en vertu du présent titre est ultérieurement jugée non fondée ou les mesures annulées.

Lorsque les mesures prises pour faire cesser une atteinte aux droits du producteur de bases de données sont ordonnées avant l'engagement d'une action au fond, le demandeur doit, dans un délai fixé par voie réglementaire, soit se pourvoir par la voie civile ou pénale, soit déposer une plainte auprès du procureur de la

République. A défaut, sur demande du défendeur et sans que celui-ci ait à motiver sa demande, les mesures ordonnées sont annulées, sans préjudice des dommages et intérêts qui peuvent être réclamés.

## Article L343-3

Outre les procès-verbaux des officiers ou agents de police judiciaire, la preuve de la matérialité des infractions définies au présent chapitre peut résulter des constatations d'agents assermentés désignés par les organismes professionnels de producteurs. Ces agents sont agréés par le ministre chargé de la culture dans les mêmes conditions que celles prévues pour les agents visés à l'article L. 331-2.

## Article L343-4

Est puni de trois ans d'emprisonnement et de 300 000 euros d'amende le fait de porter atteinte aux droits du producteur d'une base de données tels que définis à l'article L. 342-1. Lorsque le délit a été commis en bande organisée, les peines sont portées à sept ans d'emprisonnement et à 750 000 euros d'amende.

## Article L343-5

Les personnes physiques coupables de l'un des délits prévus au présent chapitre peuvent en outre être condamnées, à leurs frais, à retirer des circuits commerciaux les objets jugés contrefaisants et toute chose qui a servi ou était destinée à commettre l'infraction.

La juridiction peut ordonner la destruction aux frais du condamné ou la remise à la partie lésée des objets et choses retirés des circuits commerciaux ou confisqués, sans préjudice de tous dommages et intérêts.

Elle peut également ordonner, aux frais du condamné, l'affichage ou la diffusion du jugement prononçant la condamnation, dans les conditions et sous les peines prévues à l'article 131-35 du code pénal.

## Article L343-6

Les personnes morales déclarées responsables pénalement, dans les conditions prévues par l'article 121-2 du code pénal, des infractions définies au présent chapitre encourent, outre l'amende suivant les modalités prévues par l'article 131-38 du code pénal, les peines prévues par l'article 131-39 du même code.

L'interdiction mentionnée au 2° de l'article 131-39 du même code porte sur l'activité dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise.

La juridiction peut ordonner la destruction aux frais du condamné ou la remise à la partie lésée des objets et choses retirés des circuits commerciaux ou confisqués, sans préjudice de tous dommages et intérêts.

## Article L343-7

En cas de récidive des infractions définies à l'article L. 343-4 ou si le délinquant est ou a été lié à la partie lésée par convention, les peines encourues sont portées au double.

Les coupables peuvent, en outre, être privés pour un temps qui n'excédera pas cinq ans du droit d'élection et d'éligibilité pour les tribunaux de commerce, les chambres de commerce et d'industrie territoriales et les chambres de métiers, ainsi que pour les conseils de prud'hommes.